**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AMERICAN BROADCASTING
COMPANIES, INC., DISNEY
ENTERPRISES, INC., TWENTIETH
CENTURY FOX FILM CORPORATION,
CBS BROADCASTING INC., CBS STUDIOS
INC., FOX TELEVISION STATIONS, LLC,
FOX BROADCASTING COMPANY, LLC,
NBCUNIVERSAL MEDIA, LLC,
UNIVERSAL TELEVISION LLC, and OPEN
4 BUSINESS PRODUCTIONS, LLC,

          Plaintiffs,

   v.

DAVID R. GOODFRIEND and SPORTS
FANS COALITION NY, INC.,

          Defendants.

No. 19-cv-7136

---

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs American Broadcasting Companies, Inc., Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, CBS Broadcasting Inc., CBS Studios Inc., Fox Television Stations, LLC, Fox Broadcasting Company, LLC, NBCUniversal Media, LLC, Universal Television LLC, and Open 4 Business Productions, LLC (collectively, "Plaintiffs") bring this Complaint against defendants David R. Goodfriend and Sports Fans Coalition NY, Inc. (collectively, "Defendants") for infringing Plaintiffs' exclusive rights under the Copyright Act (17 U.S.C. §§ 101 *et seq.*).  Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.     The Copyright Act gives copyright holders like Plaintiffs the exclusive right "to perform the[ir] copyrighted work publicly."  17 U.S.C. § 106(4).  In fulfilling the mandate of Article 1, Section 8 of the Constitution to protect and thereby incentivize the creation of

copyrighted works, Congress has explicitly recognized the copyright holder's exclusive right to transmit copyrighted works to the public. *Id.*

2.    Plaintiffs, including their affiliated companies, collectively invest billions of dollars to create, acquire, and provide valuable television programming.  That programming is broadcast to the public for free over-the-air viewing, but the overwhelming majority of households have elected the convenience and reliability of viewing Plaintiffs' copyrighted programming through services offered by cable, satellite, broadband, and mobile providers.  By virtue of several Acts of Congress, those providers must have a license to retransmit copyrighted television programming, notwithstanding that the programming is broadcast over the air by Plaintiffs and their local affiliates, and must also secure the consent of the broadcasters to retransmit the broadcast signals.  Indeed, Congress in 1976 amended the statutory text of the Copyright Act embodying the exclusive public-performance right specifically to include the retransmission of copyrighted content for the express purpose of protecting the rights of copyright holders in broadcast television programming.  And beginning in 1992, Congress also amended the Communications Act to give broadcasters the right to require pay-TV distributors, such as cable systems, to negotiate terms for the right to retransmit broadcast station signals to subscribers.  Congress' actions together form the legal framework through which producers of copyrighted broadcast television content and broadcast stations recoup their investments. Broadcast networks license the copyrighted content from producers, sell advertising, and distribute the programming through networks of affiliated broadcast stations, which in turn negotiate payment from pay-TV providers for retransmission consent.

3.    Defendants created and operate a service called Locast.  Locast captures over-the-air broadcast signals, strips critical data from those signals, and then retransmits those signals,

and the copyrighted content that they carry, to registered users over the internet.  The catch is, unlike licensed cable, satellite, and streaming services, Locast neither obtains Plaintiffs' permission nor pays for its exploitation of Plaintiffs' exclusive rights to publicly perform their copyrighted content.  Instead, Locast simply takes Plaintiffs' copyrighted content and retransmits it to its registered users at will over the internet.

4.      A white paper hosted on Locast's website claimed that when Locast launched in New York City it was acting to extend the "reach of [broadcast] signals throughout" the area, "including to places where tall buildings or other obstructions might interfere with over-the-air reception."  Locast contended that it could retransmit these signals and the copyrighted programming contained therein without authorization pursuant to an exemption in the 1976 Copyright Act adopted to support government or other non-profit services that (a) do nothing more than boost a local broadcast signal to those who cannot receive it, (b) "without any purpose of direct or indirect commercial advantage," and (c) without any charge other than cost-defraying "assessments."  Congress also required in the Communications Act that booster or translator stations first obtain the authorization of the local broadcast station whose signal they seek to boost.

5.      Locast is nothing like the local booster services contemplated by Congress in creating this narrow exemption.  Locast is not a public service devoted to viewers whose reception is affected by tall buildings.  Nor is Locast acting for the benefit of consumers who, according to Locast when promoting its purportedly free service, "pay too much."  Locast is not the Robin Hood of television; instead, Locast's founding, funding, and operations reveal its decidedly commercial purposes.

6.      There is nothing local about Locast.  Defendants have infringed Plaintiffs'

copyrighted programming and the programming of New York City stations WABC-TV, WCBS-

TV, WNYW, and WNBC, as well as stations in the following Nielsen television markets: Dallas;

Houston; Denver; Chicago; Boston; Philadelphia; Washington, D.C.; Baltimore; Sioux Falls,

South Dakota; Rapid City, South Dakota; Los Angeles; and San Francisco.  As of July 2019,

Defendants stream television stations serving thirteen markets, including the nine largest markets

in the United States.

7.      Nor is Locast in any respect limited to enhancing the local reception of over-the-

air broadcast signals.  Defendants' Locast service allows registered users to access Plaintiffs'

copyrighted programming via internet-connected devices, including television sets, laptops,

smartphones, and tablets.  Defendants stream Plaintiffs' programming over the internet twenty-

four hours a day, every day, without authorization, potentially to anyone in the world with an

internet connection.  And unlike legitimate booster and translator stations, Locast does not have

the permission of the broadcast stations it retransmits, in New York or anywhere else.

8.      Nor can Locast maintain the pretense that it is operating without any purpose of

direct or indirect commercial advantage.  It is operating for its own commercial benefit and for

the commercial benefit of companies that are among the largest commercial pay-TV distributors

in the country.  By retransmitting Plaintiffs' copyrighted programming without authorization,

Locast is not only infringing Plaintiffs' copyrights, it is devaluing the retransmission consent

rights that Congress created for the benefit of broadcasters.  That is why certain pay-TV

distributors have played an increasing role in creating, sustaining, and expanding Locast.

9.      Locast was founded by a former executive of DISH Network L.L.C. ("DISH"),

David R. Goodfriend, and initially was able to operate because of a sizable loan from a company

founded by another former DISH executive.  Immediately upon his exit from DISH, Mr.

Goodfriend became a paid lobbyist for DISH, where he advances DISH's case for retransmission

consent "reform" before Congress and the Federal Communications Commission ("FCC").

Locast serves as the direct action complement to DISH's and Mr. Goodfriend's lobbying efforts,

providing them with self-help if they cannot persuade Congress or the FCC to eliminate or

devalue broadcasters' right to compensation for retransmission consent.

10.     DISH is not the only pay-TV player assisting Locast.  When Locast needed more

capital, it found support from an even larger pay-TV distributor, AT&T, Inc. ("AT&T"), which

owns the U-Verse IPTV pay-TV service and whose subsidiary owns the satellite TV service

DIRECTV and the streaming TV service DIRECTV NOW.  AT&T recently disclosed a

"donation" of $500,000 to Locast.  In the words of one analyst, "we sense an important strategic

leverage rationale to supporting Locast" and "[w]e believe donating to Locast is the single

smartest move any [multichannel video program distributor] can make today" to impact the

market for retransmission consent.  Richard Greenfield, BTIG, *Locast Threatens Balance of

Power in Retrans Negotiations*, July 9, 2019.

11.     These two for-profit businesses provide Locast with valuable nationwide

distribution of the Locast app on the internet-connected set-top boxes of their subscribers.  At the

same time, Locast provides these two major distributors with commercial benefits that include

the ability (a) to avoid obtaining retransmission consent from local stations to include local

stations in their pay-TV offerings by integrating the Locast app into their customers' set-top

boxes; (b) to gain leverage in negotiations with broadcast stations over retransmission consent

rights to offer their subscribers access to broadcast channels; and (c) for DISH, to promote a

version of its Sling TV internet television service that does not carry local broadcast channels by

telling potential customers that they can "supplement" Sling TV by getting the broadcast channels via Locast.  Locast is not the noncommercial, community public service it purports to be.  It is a strategic play funded by and functioning for the benefit of decidedly commercial interests.

12.     Locast departs from the activities of a mere booster of broadcast signals in a variety of ways.  Among other things, Locast

i.     captures, transcodes, and retransmits broadcast signals over the internet, where they reach not only the local area served by the originating stations but are also accessible to anyone with internet access and an internet-enabled device;

ii.     retransmits the signals of broadcast stations that serve tens of millions of Americans, with a goal of disrupting the national broadcast television retransmission consent market;

iii.     strips from the over-the-air broadcast signals the Nielsen watermarks that measure viewing for local and national advertisers, thereby endangering broadcasters' advertising revenue;

iv.     partners with DISH and DIRECTV to integrate its internet-TV service into set-top boxes of the country's two leading pay-TV satellite providers, even though DISH and DIRECTV satellite subscribers already receive the major broadcast stations' signals as part of their subscriptions;

v.     competes unfairly in the market for live television delivered over the internet by refusing to seek the licenses paid for by every one of its streaming competitors;

vi.     supports and complements the commercial lobbying and consulting

business of its founder and president David R. Goodfriend, who lobbies

Congress on behalf of DISH for retransmission consent "reform";

vii.    maintains and grows a commercially valuable database of Locast user

email addresses by requiring users to register and log in with email

addresses or Facebook accounts even though there is no technological

reason to do so;

viii.   as enabled by its broad Terms of Service, collects commercially valuable

data about its users' television viewing habits while offering that data as

an enticement for other commercial players to support Locast with

infrastructure or other assistance;

ix.     helps DISH's internet-TV service Sling TV compete unfairly with

competitors like Hulu With Live TV, YouTube TV, and PlayStation Vue

by enabling it to tell potential subscribers that they can "supplement" their

lower-cost Sling TV service with the free Locast service; and

x.      claims to be a free service but interrupts its stream every fifteen minutes to

display commercials that seek "donations" while also terminating the

stream, requiring users to reload a channel to continue watching; Locast

then promises that the commercials will abate if viewers commit to the

recurring monthly "donation."

13.     As these and other facts set forth in more detail below demonstrate, Locast is

engaged in a massive infringement of Plaintiffs' exclusive rights under the Copyright Act.

Locast illegally and unfairly competes with live TV streaming services that *pay* for permission to

retransmit broadcast television, offering live internet TV while refusing to pay for the commercially bargained-for licenses that the law requires.

14.    Locast's operation is an acknowledged effort to devalue the entire market for the rights to retransmit Plaintiffs' copyrighted content.  Indeed, Defendants have candidly admitted that their unauthorized streaming service aids *authorized* services that *pay* for the rights to stream or otherwise retransmit over-the-air broadcasts in their efforts to negotiate lower fees for those rights.  That is why a former DISH executive who is a current paid lobbyist for DISH operates Locast, that is why another former DISH executive made substantial loans to enable Locast to operate initially, that is why AT&T has recently "donated" additional funding, and that is why DISH and AT&T have integrated Locast apps into their internet-connected set-top boxes.

15.    Unless Defendants are restrained by this Court, Plaintiffs will be irreparably harmed.  Harms caused by Defendants' unauthorized use of Plaintiffs' copyrighted works include, without limitation, Plaintiffs' loss of control over the distribution of their copyrighted programming and the interference with Plaintiffs' opportunities to license, among others.

16.    Accordingly, Plaintiffs ask this Court to enjoin Defendants' unlawful conduct and to award Plaintiffs damages arising out of this conduct.

## PARTIES

17.    Plaintiff American Broadcasting Companies, Inc. ("ABC") is a Delaware corporation with its principal place of business at 77 West 66th Street, New York, New York, and does business as the ABC Television Network and as WABC-TV.  ABC is actively engaged in the production and distribution of television programs and other copyrighted works, including programs ABC transmits to numerous broadcast television stations that it owns as well as other stations that are affiliated with its ABC Television Network and with other networks, in the United States.  ABC grants these stations the right to broadcast programming within their

8

communities of license and to negotiate for redistribution of network programming in certain circumstances.  The FCC has licensed ABC to operate the television station identified by the call letters WABC-TV ("WABC"), among other television stations.  WABC's signal is broadcast to viewers over-the-air in the New York City market.  Cable systems, satellite services, and other multichannel video programming distributors also make WABC retransmissions available to their subscribers upon negotiating for the right to do so under Section 325 of the Communications Act, 47 U.S.C. § 325.  ABC and/or its affiliated entities also own and operate the following broadcast television stations, among others, the retransmissions of which pay-TV providers also make available to their subscribers upon negotiating for the right to do so under Section 325: Chicago's WLS, Houston's KTRK, Philadelphia's WPVI, Los Angeles' KABC, and San Francisco's KGO.  ABC is a wholly owned indirect subsidiary of Plaintiff Disney Enterprises, Inc.

18.     Plaintiff Disney Enterprises, Inc. ("DEI") is a Delaware corporation with its principal place of business at 500 S. Buena Vista Street, Burbank, California.  DEI is actively engaged in the licensing of its copyrighted properties, and certain of its affiliates are engaged in the worldwide production and distribution of copyrighted entertainment products, including programs that television broadcast stations and other media outlets transmit or retransmit to the public.

19.     Plaintiff Twentieth Century Fox Film Corporation ("Twentieth Century Fox") is a Delaware corporation with its principal place of business at 10201 West Pico Blvd., Los Angeles, California.  Twentieth Century Fox, along with its subsidiaries and affiliates, is actively engaged in the worldwide production and distribution of copyrighted programming, including programs that television broadcast stations and other outlets transmit to the public.  Twentieth

Century Fox typically grants these stations and TV networks licenses to broadcast programming on these stations within their local markets only.  Twentieth Century Fox is a wholly owned indirect subsidiary of Plaintiff DEI.

20.     Plaintiff CBS Broadcasting Inc. ("CBS") is a New York corporation with its principal place of business at 51 West 52nd Street, New York, New York.  CBS is actively engaged in the production and distribution of television programs and other copyrighted works, including programs CBS transmits to numerous broadcast television stations in the United States that are affiliated with its CBS Television Network, including stations that it owns and operates. CBS grants these stations the right to broadcast programming within their communities of license.  The FCC has licensed CBS to operate the television station identified by the call letters WCBS-TV ("WCBS"), among other television stations.  WCBS' signal is broadcast to viewers over-the-air in the New York City market.  Cable systems, satellite services, and other multichannel video programming distributors also make WCBS retransmissions available to their subscribers upon negotiating for the right to do so under Section 325 of the Communications Act, 47 U.S.C. § 325.  CBS and/or its affiliated entities also own and operate the following broadcast television stations, among others, the retransmissions of which pay-TV providers also make available to their subscribers upon negotiating for the right to do so under Section 325: Boston's WBZ-TV, Chicago's WBBM-TV, Dallas' KTVT, Denver's KCNC-TV, Philadelphia's KYW-TV and WPSG, Baltimore's WJZ-TV, Los Angeles' KCBS-TV and KCAL-TV, and San Francisco's KPIX-TV.

21.     Plaintiff CBS Studios Inc. ("CBS Studios") is a Delaware corporation with its principal place of business at 51 West 52nd Street, New York, New York.  CBS Studios is actively engaged in the worldwide production and distribution of copyrighted entertainment

products, including programs that television broadcast stations and other media outlets transmit or retransmit to the public.

22.     Plaintiff Fox Television Stations, LLC ("Fox TV") is a Delaware corporation with its principal place of business at 1211 Avenue of the Americas, New York, New York.  Fox TV owns and operates many local broadcast television stations.  These stations are actively engaged in the production and distribution of television programs and other copyrighted works in the United States and elsewhere.  The FCC has licensed Fox TV to operate the television stations identified by the call letters WNYW and WWOR-TV ("WWOR"), among other television stations.  WYNW's and WWOR's signals are broadcast to viewers over-the-air in the New York City market.  Cable systems, satellite services, and other multichannel video programming distributors also make WNYW and WWOR retransmissions available to their subscribers upon negotiating for the right to do so under Section 325 of the Communications Act, 47 U.S.C. § 325.  Fox TV and/or its affiliated entities also own and operate the following broadcast television stations, among others, the retransmissions of which pay-TV providers also make available to their subscribers upon negotiating for the right to do so under Section 325: Chicago's WFLD and WPWR-TV, Dallas' KDFW and KDFI, Houston's KRIV and KTXH, Philadelphia's WTXF-TV, Washington, D.C.'s WTTG and WDCA, Los Angeles' KTTV and KCOP-TV, and San Francisco's KTVU and KICU-TV.

23.     Plaintiff Fox Broadcasting Company, LLC ("FBC") is a Delaware corporation with its principal place of business at 10201 West Pico Blvd., Los Angeles, California.  FBC operates the Fox Network, a national broadcast television network with affiliates reaching households across the United States.  FBC, directly or through its affiliated entities, is actively engaged in the production and distribution of copyrighted television programming.

11

24.     Plaintiff NBCUniversal Media, LLC ("NBCUniversal") is a Delaware limited liability company with its principal place of business at 30 Rockefeller Plaza, New York, New York.  NBCUniversal is actively engaged, among other things, in the production and distribution of television programs and other copyrighted works, including programs NBCUniversal transmits to broadcast television stations in the United States that it owns and operates, and numerous other stations that are affiliated with the NBC Television Network, which is also owned and operated by NBCUniversal.  NBCUniversal grants these stations the right to broadcast programming within their communities of license.  NBCUniversal operates the television station identified by the call letters WNBC, and owns the subsidiary entity that holds the FCC license for that station, among other television stations.  WNBC's signal is broadcast to viewers over-the-air in the New York City market.  Cable systems, satellite services, and other multichannel video programming distributors also make WNBC retransmissions available to their subscribers upon negotiating for the right to do so under Section 325 of the Communications Act, 47 U.S.C. § 325.  NBCUniversal licenses its copyrighted works to various media outlets in the United States and elsewhere through indirect wholly owned subsidiaries. NBCUniversal and/or its affiliated entities also own and operate the following broadcast television stations, among others, the retransmissions of which pay-TV providers also make available to their subscribers upon negotiating for the right to do so under Section 325: Boston's WBTS-LD, Chicago's WMAQ-TV, Dallas' KXAS-TV, Philadelphia's WCAU, Washington, D.C.'s WRC-TV, Los Angeles' KNBC, and San Francisco's KNTV.

25.     Plaintiff Universal Television LLC ("Universal Television") is a New York limited liability company, with its principal place of business at 30 Rockefeller Plaza, New York, New York, and is a wholly owned subsidiary of NBCUniversal.  Universal Television is actively

engaged in the production and licensed distribution of copyrighted entertainment products, including programs that television broadcast stations and other media outlets transmit or retransmit to the public.

26.     Plaintiff Open 4 Business Productions, LLC ("Open 4 Business") is a Delaware limited liability company, with its principal place of business at 100 Universal City Plaza, Universal City, California, and is a wholly owned subsidiary of NBCUniversal.  Open 4 Business is actively engaged in the production and licensed distribution of copyrighted entertainment products, including programs that television broadcast stations and other media outlets transmit or retransmit to the public.

27.     Defendant David R. Goodfriend is an individual who resides in Bethesda, Maryland.  Defendant Goodfriend is the President, Director, and Treasurer of Defendant Sports Fans Coalition NY, Inc.

28.     Defendant Sports Fans Coalition NY, Inc. ("SFCNY") is incorporated as and claims to be a charitable organization under the laws of the State of New York, with its principal place of business at 3075 Veterans Highway, Suite 131, Ronkonkoma, New York 11779. SFCNY operates Locast.

### JURISDICTION AND VENUE

29.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*  This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

30.     This Court has personal jurisdiction over Defendant Goodfriend pursuant to N.Y. Not-for-Profit Corp. Law § 309 because he is a director and officer of SFCNY, which is a New York corporation.  This Court has personal jurisdiction over Defendant SFCNY because it is incorporated in the State of New York.  The Court also has personal jurisdiction over Defendants

13

under New York C.P.L.R. § 302(a) because Defendants engage in copyright infringement in the State of New York by retransmitting without authorization Plaintiffs' copyrighted programming to users located in New York, causing injury to Plaintiffs in this State.

31.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant SFCNY captures the signals of, and programming transmitted by, broadcast television stations in this District—including stations owned and signals and programming transmitted by Plaintiffs— and most of the Plaintiffs are headquartered or have offices in this District and are injured in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1400(a) because both Defendant Goodfriend and Defendant SFCNY are subject to personal jurisdiction in this District.

## STATUTORY BASIS OF PLAINTIFFS' CLAIMS

32.    The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art. 1, § 8, cl. 8.  The basic "philosophy behind the . . . clause" is "the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors." *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) (quotation omitted).   Thus, while the ultimate goal of copyright protection is to "promot[e] broad public availability of literature, music, and the other arts," the law does so not by promoting public access at all costs, but rather by "rewarding the creators of copyrighted works," *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 710 (1984) (quotation omitted), thereby providing an "incentive" designed "to stimulate artistic creativity for the general public good," *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).

33.     To that end, the Copyright Act grants copyright owners "exclusive rights to do and to authorize" certain uses of their works.  17 U.S.C. § 106.  Among those is the exclusive right, "in the case of . . . audiovisual works, to perform the copyrighted work publicly."  *Id.* § 106(4).

34.     Broadcasters and producers of broadcast television content collectively invest billions of dollars in the creation, acquisition, and production of copyrighted content, which broadcast stations then transmit over the air to the public.  Broadcast television stations monetize the copyrighted content that they broadcast over the air for free through, among other things, advertising revenue and retransmission consent fees paid by cable and satellite providers, as well as fees paid by those who retransmit their copyrighted content over the internet.

35.     The Copyright Act makes clear that the exclusive right to "perform the copyrighted work publicly" under Section 106(4) includes the exclusive right to transmit a performance of the work to the public.

36.     To that end, the Copyright Act provides:

To perform or display a work "publicly" means—

    (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

    (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* § 101.  The Act thereby renders the unauthorized transmission of a broadcast containing copyrighted works an infringement of the exclusive right to perform a work publicly.

37.     While the 1976 Copyright Act brought broadcast retransmissions within the broad scope of the exclusive public performance right under Section 106, Congress has enacted compulsory licensing schemes to allow the retransmission of broadcasts containing copyrighted works by certain categories of pay-TV services meeting certain criteria: specifically, by "cable systems," § 111(c); by "satellite carriers" retransmitting "distant signals" to "unserved households," § 119; and by "satellite carriers" transmitting "into the station's local market," § 122.  Each of those compulsory licensing schemes is further conditioned on compliance by the licensee cable system or satellite carrier with the "rules, regulations, or authorizations of the Federal Communications Commission," which include, at the broadcast station's election, negotiation of "retransmission consent" terms pursuant to Section 325(b) of the Communications Act.  *See* 47 U.S.C. § 325(b).

38.     Plaintiffs rely on their exclusive rights under the Copyright Act, and their affiliated stations rely on the retransmission consent regime to earn fees and realize advertising revenue, to support broadcast programming.

39.     Plaintiffs market their programming through broadcast networks, which participate in the retransmission consent fees paid to affiliated stations by cable and satellite providers, as well as licensing the rights to stream live-television programming over the internet. Indeed, the rights to stream Plaintiffs' copyrighted programming over the internet to television sets and laptops, smartphones, and other mobile devices are tremendously valuable, and a vibrant and growing market has been developing for providing consumers live television signals of broadcast stations carrying local and major broadcast network programming over the internet.

## **FACTUAL BACKGROUND**

40.     In 2018, Defendants Goodfriend and SFCNY launched the Locast service.

16

41.     Locast functions by capturing the signals of broadcast television stations serving a local market, transcoding the signals into digital formats viewable on internet-connected devices, and then streaming the signals from it servers over the internet to registered users on internet-connected devices.

42.     To use Locast, a user need only visit Locast's website on a computer or other internet-connected device, register for a free account (or log in using Facebook) subject to Locast's Terms of Service, and select the programming to watch.

43.     Locast does not have authorization to publicly perform the copyrighted programming embodied in the over-the-air broadcast signals it retransmits.  Nor, unlike cable systems and satellite carriers, *see* 17 U.S.C. §§ 111 (c), 119(a), 122, does Locast qualify for or claim any right to a compulsory license to retransmit the copyrighted works within those over-the-air broadcasts.  Nor has Locast obtained the consent of Plaintiffs' owned-and-operated stations or that of their affiliates to retransmit the over-the-air broadcast signals it offers.

44.     Locast began streaming local television stations' programming in New York City under the guise of a public service purporting to have no direct or indirect commercial purpose; instead, Locast claimed that it was serving as a non-profit "booster" of signals to reach those whose ability to receive broadcast television was compromised by "tall buildings" in Manhattan.

45.     While Locast acknowledged that it was engaged in the unauthorized retransmission of copyrighted content, it claimed that it was immunized from liability for that copyright infringement by an exemption in the Copyright Act, 17 U.S.C. § 111(a)(5).  That narrow exemption permits local governments and other not-for-profit entities to operate booster and translator stations, which amplify broadcast signals so they can reach antennas in nearby areas otherwise unable to receive them.  In order to avoid copyright liability, the local

governments and other non-profit entities must retransmit the signals "without any purpose of direct or indirect commercial advantage."  *Id.*  This exemption was adopted against the backdrop of the provision of the Communications Act that requires booster and translator stations to have "express authority of the originating station" in order to retransmit the station's signal.  47 U.S.C. § 325(a).

46.     Locast no longer even purports simply to be enhancing signals for those plagued by tall buildings or otherwise unable to receive broadcast television.  Instead, Locast promotes itself to users who already have access to broadcast television as a way to enjoy the added convenience of live mobile viewing over the internet without having to pay for it.  Thus, in promotional materials featuring televisions, laptops, and smartphones, Locast promises users: "Watch your favorite broadcast stations **anytime, anywhere**."



47.     To that end, Locast makes its retransmissions available to users via all manner of devices and platforms, including applications for Android and Apple smartphones and devices, and applications for Roku, Chromecast, Amazon Fire TV, Apple TV, and Android TV television-viewing devices.  A growing number of users have installed and use these applications to watch Plaintiffs' copyrighted programming.

48.     Locast now retransmits without permission the signals of broadcast television stations embodying Plaintiffs' copyrighted content in a total of thirteen television markets, including the nine largest markets in the United States.  Locast offers to stream Plaintiffs' content to any of the tens of millions of people in those markets, without regard to whether "tall buildings" or anything else impedes their ability to access local signals.  And Locast has stated its intention to continue to expand to other markets throughout the United States.

49.     Moreover, while Locast purports to limit its streaming service to internet users within the applicable station's Nielsen Designated Market Area ("DMA"), its limits are easily circumvented by users.  In addition, Locast itself often retransmits broadcast signals to users located hundreds of miles outside originating stations' local DMAs.

50.     And unlike actual boosters and translators, Locast has never obtained consent from the local television stations that carry Plaintiffs' programming to retransmit their signals.

51.     Nor can Locast purport to be operating—as the exemption it has invoked requires—"without any purpose of direct or indirect commercial advantage."  17 U.S.C. § 111(a)(5).  Locast not only is securing important commercial advantages for itself, in forms including nationwide distribution of its application and valuable viewer data, but it is also operating in collaboration with, and for the commercial benefit of, two companies that are among the largest pay-TV distributors in the country.

52.     Locast was founded by Defendant Goodfriend, who moved immediately from his position as Vice President of Law and Public Policy at DISH to serving as a paid lobbyist for DISH.  Locast was initially able to operate because of a sizeable loan from a company called IOT Broadband, LLC, whose chairman and CEO, Michael Kelly, is another former DISH executive vice president.

53.     When Locast needed more capital, it was supplied by an even larger pay-TV

distributor, AT&T.  AT&T, which operates the U-Verse pay-TV service and whose subsidiary

DIRECTV, LLC operates the DIRECTV satellite service and the DIRECTV NOW streaming

service, recently disclosed that it made a "donation" of $500,000 to Locast.

54.     DISH has refused to say whether it also has funded Locast through more direct

means.  On a February 13, 2019 DISH earnings call, DISH Chairman Charlie Ergen was asked

the following question and gave the following answer: "[T]here's been some conversation

Charlie, that either you or DISH or both, are backing [Locast].  So do you have any comments on

that?"  "No."

55.     It is of little surprise that certain pay-TV companies are funding and otherwise

assisting Locast, for Locast serves to provide them with considerable commercial benefits.

56.     Locast has encouraged its potential users to "quit paying" for pay-TV services,

insisting that they "cost too much," and promotes itself as a way for people who already have TV

service to watch television over the internet without paying for it.  As Locast stated earlier this

year: "If you're sick of greedy companies over-charging you, fight back.  Support Locast!"

57.     While that may sound at first blush like a service that would disadvantage pay-TV

services that include retransmitted broadcast programming, in fact, Locast is serving its two pay-

TV patrons.  Because Locast is not *paying* for the rights to retransmit Plaintiffs' broadcasts,

Locast enables certain pay-TV companies to provide their paying subscribers a path to receive

Plaintiffs' copyrighted content without the pay-TV companies paying for retransmission consent.

As Locast extends its reach (including on apps now made accessible on DISH and DIRECTV

set-top boxes), certain pay-TV companies are using and will likely continue to use Locast's

presence in the market in an effort to gain leverage in retransmission consent negotiations for

broadcast programming, because of Locast's efforts to devalue retransmission rights.  Locast is thereby attempting to achieve through copyright infringement what its president has been unable to achieve in lobbying efforts on behalf of DISH, *i.e.*, to undermine the retransmission consent market that was established by Acts of Congress.

58.     Plaintiffs or their affiliate stations also license their streaming rights to authorized and paying licensees like Hulu With Live TV and YouTube TV.  Through its unauthorized streaming of Plaintiffs' copyrighted programming, Locast is diverting users from these legitimate streaming services offered by Plaintiffs or Plaintiffs' legitimate licensees.

59.     As is evident from DISH's own efforts to promote Locast, there is yet another respect in which Locast provides DISH with a commercial benefit.  In addition to integrating Locast apps into the internet-connected set-top boxes of DISH satellite subscribers, DISH has promoted its lower-cost OTT ("over the top") streaming service, Sling TV, which does not include broadcast stations in most markets, by telling prospective subscribers that "[j]ust like Sling TV, Locast is live TV streamed over the internet in high definition," and consumers can save money over Hulu and YouTube TV (which do include most broadcast stations) by subscribing to Sling TV and using the Locast app.  DISH has also provided a link for potential customers to download Locast to "supplement [their] Sling TV subscription":



60.     The scope of Defendants' infringement of Plaintiffs' copyrighted works is

massive.  Locast has been operating twenty-four hours a day, seven days a week in markets

around the country, infringing Plaintiffs' copyrighted works in vast numbers.  The Locast

program guide makes clear the breadth of its ongoing infringement.  Below, for example, is a

copy of the guide for the New York City market, showing a selection of nineteen over-the-air

broadcast stations:



61.     Defendants have vowed to continue their infringing service and expand it into

more markets.

62.     Moreover, while Locast claims to be a free service (in order to attempt to maintain the fiction that it satisfies the requirements of the Copyright Act's exemption), it displays to viewers intrusive donation-requesting commercials that interrupt and terminate the stream and require users to reload a channel every fifteen minutes to continue watching.  Locast then promises that the commercials will abate if viewers make a requested recurring monthly "donation" to SFCNY.

63.     And while Locast initially allowed its users to access its retransmissions of Plaintiffs' copyrighted programming merely by visiting the website, Locast now requires users to provide an email address and create an account, or log in using a Facebook account, to access its retransmissions.  That information is itself highly valuable to Locast, and is one of the many forms of commercial advantage that Locast is securing for itself while it serves the commercial purposes of the two pay-TV players that have sustained Locast and extended its reach.

## DEFENDANTS' UNLAWFUL CONDUCT

64.     Defendant Goodfriend has developed and operates and directs the Locast service.

65.     Defendant SFCNY has developed and operates and directs the Locast service.

66.     Defendant Goodfriend has been personally involved in (a) Defendants' decision to capture and retransmit Plaintiffs' copyrighted programming over the internet to registered users; (b) the development of the business model and technological systems employed by Defendants to infringe Plaintiffs' copyrights; (c) the decision to continue to expand Defendants' infringing activity; and (d) the supervision and active operation of this infringing activity. Defendant Goodfriend has been and is the primary actor in the activities that give rise to Plaintiffs' claims.

67.     Through Defendants' actions, Locast without authorization streams over the internet copyrighted programming that was broadcast by numerous television stations serving the

New York City area, including stations owned by Plaintiffs or their affiliated entities:  WABC-TV, WCBS-TV, WNYW, and WNBC.

68.     Locast without authorization also streams copyrighted content from stations in other markets that are owned and operated by Plaintiffs or their affiliated entities, including:

●       ABC's Chicago (WLS), Houston (KTRK), Philadelphia (WPVI), Los Angeles (KABC), and San Francisco (KGO) stations;

●       CBS' Boston (WBZ-TV), Chicago (WBBM-TV), Dallas (KTVT), Denver (KCNC-TV), Philadelphia (KYW-TV and WPSG), Baltimore (WJZ-TV), Los Angeles (KCBS-TV and KCAL-TV), and San Francisco (KPIX-TV) stations;

●       Fox's Chicago (WFLD and WPWR-TV), Dallas (KDFW and KDFI), Houston (KRIV and KTXH), Philadelphia (WTXF-TV), Washington, D.C. (WTTG and WDCA), Los Angeles (KTTV and KCOP-TV), and San Francisco (KTVU and KICU-TV) stations; and

●       NBC's Boston (WBTS-LD), Chicago (WMAQ-TV), Dallas (KXAS-TV), Philadelphia (WCAU), Washington, D.C. (WRC-TV), Los Angeles (KNBC), and San Francisco (KNTV) stations.

69.     Unless enjoined by this Court, Defendants intend to continue to infringe Plaintiffs' exclusive right to publicly perform their copyrighted works under the Copyright Act.

## Count I

## (COPYRIGHT INFRINGEMENT)

70.     Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

71.     Plaintiffs are the legal and beneficial owners of the copyrights of numerous programs that have been, or will be, exhibited over broadcast television stations and other media

outlets. A non-exhaustive list of representative examples of such television programs is set forth in Exhibit A ("Programs") and Exhibit B ("Section 411 Notices").

72. Each such Program is an original audiovisual work that has been or will be fixed in a tangible medium of expression and constitutes copyrightable subject matter within the meaning of 17 U.S.C. § 102. Each such Program has been or will be, consistent with the requirements of 17 U.S.C. § 411, registered with the United States Copyright Office. *See* Ex. A & Ex. B.

73. Under Section 106 of the Copyright Act, Plaintiffs have the exclusive rights, among other things, to "perform the copyrighted work publicly" and to authorize the same. 17 U.S.C. § 106(4).

74. Neither Plaintiffs nor any other person or entity authorized by Plaintiffs have granted permission, authorization, or a license to Defendants to exercise any of Plaintiffs' exclusive rights, including under 17 U.S.C. § 106(4) with respect to the Programs or any other works in which Plaintiffs own copyrights.

75. In offering the Locast service, Defendants have exercised and will exercise (or have authorized or will authorize others to exercise) Plaintiffs' exclusive rights under 17 U.S.C. § 106(4) with respect to the Programs or any other works in which Plaintiffs own copyrights.

76. Defendant Goodfriend is personally liable for the acts of infringement under the Copyright Act.

77. Defendant Goodfriend directed SFCNY to commence and continue infringement.

78. Defendants' acts of infringement are willful, in disregard of Plaintiffs' rights.

79. As a direct and proximate result of Defendants' infringement, Plaintiffs have been harmed and are entitled to damages.

80.     As a direct and proximate result of Defendants' acts, Plaintiffs have and will continue to sustain immediate and irreparable injury that cannot fully be compensated or measured in money.  Unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiffs' rights in their copyrighted works.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants for the following relief:

1.     For Plaintiffs' damages and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for maximum statutory damages; or for such other amounts as may be proper pursuant to 17 U.S.C. § 504(c).

2.     For a permanent injunction enjoining and restraining Defendants and all of their officers, agents, servants, and employees and all persons acting in concert or participation with them, from infringing Plaintiffs' exclusive rights under the Copyright Act by offering the Locast service and engaging in the conduct described above.

3.     For prejudgment interest according to law.

4.     For Plaintiffs' attorneys' fees and full costs incurred in this action pursuant to 17 U.S.C. § 505.

5.     For all such further and additional relief, in law or in equity, to which Plaintiffs may be entitled or which the Court deems just and proper.

Dated:  July 31, 2019                    Respectfully submitted,


                                        /s/ Gerson A. Zweifach_____
                                        Gerson A. Zweifach
                                        Thomas G. Hentoff (*pro hac vice to be filed*)
                                        Joseph M. Terry (*pro hac vice to be filed*)

                                        WILLIAMS & CONNOLLY LLP
                                        725 Twelfth Street, N.W.
                                        Washington, DC 20005

650 Fifth Avenue
Suite 1500
New York, NY 10019

Tel: (202) 434-5000
Fax: (202) 434-5029
gzweifach@wc.com
thentoff@wc.com
jterry@wc.com

*Attorneys for All Plaintiffs*

Paul D. Clement (*pro hac vice to be filed*)
Erin E. Murphy (*pro hac vice to be filed*)

KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004

Tel: (202) 389-5000
Fax: (202) 389-5200
paul.clement@kirkland.com
erin.murphy@kirkland.com

*Attorneys for Plaintiffs Fox Television Stations,*
*LLC and Fox Broadcasting Company, LLC*

27