K1V8AMEC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

AMERICAN BROADCASTING COMPANIES,
INC., et al.,

                    Plaintiffs,

          v.                              19 Cv. 7136 (LLS)

DAVID R. GOODFRIEND, et al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          January 31, 2020
                                          3:35 p.m.

Before:

                    HON. LOUIS L. STANTON,

                                          District Judge

                         APPEARANCES

WILLIAMS & CONNOLLY LLP
     Attorneys for Plaintiffs
BY:  GERSON A. ZWEIFACH
     THOMAS G. HENTOFF

ORRICK, HERRINGTON & SUTCLIFFE LLP
     Attorneys for Defendants
BY:  R. DAVID HOSP
     ELIZABETH E. BRENCKMAN

K1V8AMEC

1          (In jury room)

2          THE COURT:  Tell me where we stand.

3          MR. ZWEIFACH:  Since we saw you on November 1, we have

4     actually made progress.

5          THE COURT:  Good.

6          MR. ZWEIFACH:  We represent the four networks.  We

7     brought suit on grounds that the defendant was retransmitting

8     our programming over the internet without authorization.  We

9     were met with counterclaims and we had filed a motion to

10    dismiss, and that's how things stood when we first saw you.

11         I remember at the conference your Honor suggested that

12    we think about a way to advance the issue of whether the

13    exemption in the copyright statute that the defendant was

14    invoking indeed applied, and that if we tried that issue, the

15    others might drop out or sort out over time.

16         THE COURT:  That's where we left it.

17         MR. ZWEIFACH:  So we actually took the nudge and we

18    spent time working together productively, and we reached an

19    agreement that doesn't just advance that issue, the central

20    issue of the copyright exemption, but actually leaves it as the

21    principal issue left in the case.  So what happened was we --

22         THE COURT:  It's the one left.

23         MR. ZWEIFACH:  What happened is we abandoned any claim

24    to damages from Mr. Goodfriend personally.  That was another

25    nudge I felt.  The defendants dropped their counterclaims and

K1V8AMEC

1    affirmative defenses, except for, of course, the copyright

2    exemption and a state law and federal law personal immunity

3    that applies to Mr. Goodfriend.

4            MR. HOSP:  Just to be clear, nobody has amended any of

5    the pleadings or anything like that, and I don't think we

6    intend to at this point.  I think what we are intending to do

7    is move forward on the 111(a)(5) defense, and as a practical

8    matter, that's likely to resolve the case.

9            THE COURT:  Yes.

10           MR. ZWEIFACH:  In light of that, and we have an

11   agreement to this --

12           THE COURT:  It's just coming out sort of through the

13   backdoor instead of the front door.  That's fine.

14           MR. ZWEIFACH:  And we agreed as well that one of the

15   purposes of this was not just to give us a shorter and clearer

16   path to a trial or to a disposition, but also to narrow

17   discovery in a way.

18           THE COURT:  Yes.  And you can defer the other

19   discovery without it rotting away.

20           MR. ZWEIFACH:  I don't think it will happen.  I think

21   we have agreed to abandon those claims.  But what we are doing

22   is we agreed that certain things will be the subject of

23   discovery and certain things will be off limits, as much as we

24   can.

25           So we are in a good place where we are going to move

K1V8AMEC

1    ahead.  So I know I speak for Ms. Hosp when we thank you for

2    the nudge because it worked out.

3              THE COURT:  Good.

4              MR. ZWEIFACH:  I will say that Ms. Hosp and Ms.

5    Brenckman were good partners and incredibly professional and

6    creative in getting this done.  So we worked together and we

7    got something complicated accomplished.

8              THE COURT:  What kind of discovery will you need?

9    Regardless of what side you are on, what do you need to work

10   out the answer to that question?

11             MR. ZWEIFACH:  So from our end, some of the discovery

12   would be about whether and to what extent there is sort of any

13   purpose of commercial advantage that is accruing to either

14   defendant entity or Mr. Goodfriend personally, or in our view

15   of the law, affiliated distribution partners.

16             So we will look into that.  We will look into to what

17   extent, when this was pitched to people who have taken the app

18   and put it on their service, whether it was pitched as

19   something of a commercial advantage.

20             THE COURT:  This had to do with his past behavior; is

21   that where that answer is found?

22             MR. ZWEIFACH:  I think the answer will be found in

23   their documents and in the documents of those that he raised

24   money from or have become distribution partners.  So they have

25   taken this internet application and now it's going across the

K1V8AMEC

1    country on Pay TV, set-top boxes, and other places.

2              THE COURT:  Does what he did with the money matter?

3              MR. ZWEIFACH:  Not ultimately, not personally.  The

4    statute is phrased in terms of any purpose of commercial

5    advantage, direct or indirect.  So I don't think I have to show

6    that he ended up with a yacht.  I think what I need to show is

7    that he or his distribution partners were pursuing a commercial

8    advantage through this entity.  So we are going to look into

9    that.  Then there is going to be discovery from us that I know

10   is coming.

11             THE COURT:  It really goes to his goals.

12             MR. ZWEIFACH:  Any goal of it, yes.

13             So it's an intent issue in part.  So it's

14   fact-sensitive.  Which is how we end up with jury trials of

15   interesting cases.

16             So what we have crafted is a schedule that reflects,

17   and we are very far along --

18             MR. HOSP:  I think we have come to a resolution of

19   this that is --

20             THE COURT:  Manageable.

21             MR. HOSP:  It's manageable, and it was helpful, and I

22   thought we worked together very well.  We still are going to

23   have some disagreements, obviously.  I think in terms of one of

24   the central issues here is what is meant by direct or indirect

25   commercial advantage.  And ultimately when it comes to

K1V8AMEC

1    discovery, I will be clear that a lot of I think what is being

2    sought --

3          THE COURT:  "Direct or indirect commercial advantage,"

4    those are the words?

5          MR. HOSP:  Those are the words in the statute.  And

6    ultimately we will make clear that some of what is being sought

7    in discovery we think goes beyond what is relevant.  But that

8    said, Mr. Goodfriend came in to this case knowing that all of

9    the discovery was going to be taken.  We may have fights over

10   what is relevant, what is admissible ultimately, but I don't

11   think that we intend to have a lot of disputes about what it is

12   we are going to hand over, because ultimately Mr. Goodfriend's

13   goal here is to be absolutely transparent.  He is somebody who

14   has been involved in public service for his entire career,

15   going back to serving within the government, serving with the

16   FCC, within the White House, and starting other nonprofits, the

17   goal of which was to help the public.  And the same is true of

18   the others on the board.

19         So the goal here is to cut through all that.  We will

20   also, obviously, take discovery and we want to see what

21   documents they have related to Locast and things like that, and

22   the organizations that they belong to and things like that,

23   what they have had to say about various different aspects of

24   this.  But our goal is to, again, be very transparent and be

25   very quick with discovery.

K1V8AMEC

1          THE COURT:  When I was practicing, I would say quickly

2     that I devoted a decade of my life, and a little slower and

3     more careful it might be more than a decade, to the antitrust

4     decree entered against United Shoe Machinery Corporation in the

5     antitrust case.  The upshot of that long trial, long opinion,

6     was a selection of a day, ten years after the entry of the

7     judgment, in which the situation in the industry would be

8     reviewed with an eye to determining whether workable

9     competition had been brought into the situation.  And we went

10    through that process and had that review, and everybody thought

11    they knew what workable competition meant, but it turned out

12    that it is not a recognized economic term.  The economist said

13    we can't give it any content at all.  It was simply something

14    that was a kind of a useful framework of thinking more than

15    having any meaning of its own.

16          And that may be true with your words about the

17    commercial advantage.  It may not possess a definition, but

18    simply be sort of a mode of behavior.  And if that's the case,

19    I am just asking, as a matter of curiosity, it may be that the

20    better way of going at it is by a deposition, and depositions

21    of the people dealing with the business, and seeing what that

22    concept means as applied to what they do, much more than as

23    establishing an abstract goal or standard of its own.  It never

24    bothered us that nobody knew what workable competition meant

25    because we all knew well enough to get through the day and

K1V8AMEC

1    organize the evidence.  But the more I think as I look back on

2    it, it's really not found in the dictionary, it's found in the

3    facts, and then you emerge from your study of the facts and

4    say, well, it is there or it is not there.

5                MR. ZWEIFACH:  I think that is probably right.  This

6    is a case that will be very fact-sensitive.

7                So we have an order.  And we are in agreement on

8    almost everything, consistent with a few good months.

9                So we have fact discovery laid out and a schedule for

10   expert discovery and all of that.

11               THE COURT:  The experts being experts in what?

12               MR. ZWEIFACH:  One of the issues that has been raised

13   in part by Locast is they contend that is one of the reasons

14   that they are doing what they are doing.  So the relevant

15   phrase is "any purpose of direct or indirect commercial

16   advantage."  So "purpose" is part of it.  And one of their

17   purposes is they say that broadcast television doesn't --

18   insufficient resources have been devoted to making the signal

19   as strong and as penetrating as it could be.  So one of the

20   reasons he is retransmitting over the internet is to reach

21   people who can't be reached.

22               So one of the things that we may have some expert

23   testimony on is the ways in which the FCC really governs what

24   your broadcast signal is, how far it can reach, and subjects

25   like that, and whether and to what extent they are actually

K1V8AMEC

1    filling in those gaps, or whether, in fact, they are doing

2    something else which is more commercial in nature.  So that's

3    an area that a trier of a fact may benefit from hearing because

4    it's a little bit technical.  That's the nature of the beast.

5             So the only area where we have a difference here is

6    they propose building into the back of the schedule a briefing

7    schedule for summary judgment motions, and I am not suggesting

8    that either side -- obviously, no one is saying they can't file

9    one or that we can't file one, either side may file them.  Our

10   wish is that if one is filed, we will deal with it then and a

11   briefing schedule will be set.  But our hope is, instead of

12   extending a schedule to allow for summary judgment motions, as

13   plaintiffs, where from our perspective the infringement -- he

14   has been expanding even since we saw you November 1 into more

15   cities and more parts of the country, more subscribers, so we

16   are eager to get to trial and hopefully a final injunction,

17   which is what the parties have agreed, that if they don't have

18   the exemption, an injunction should be issued.  So we are eager

19   to get there sooner rather than later.  But the difference

20   between us is including a briefing period for summary judgment

21   or not, and it effectively extends the schedule four to six

22   weeks.  That's the entire difference in the order.

23             THE COURT:  The better policy, and it conforms to the

24   policy of the federal rules really with regard to litigation,

25   is normally coming without a summary judgment, although that's

K1V8AMEC

1   counterfactual these days, but to set up a schedule to get us

2   between here and trial, with the recognition that that schedule

3   may be derailed by a motion for summary judgment at whatever

4   time things seem to be ready for that, if there is to be one.

5   So it will grow naturally as life goes on.

6          MR. ZWEIFACH:  That was our position.

7          MR. HOSP:  Your Honor, I think what we are

8   anticipating in this case is that ultimately there really are

9   not going to be that many true factual disputes.  The financial

10  records are going to be what the financial records are.  The

11  FCC records on broadcast coverage and the usage --

12         THE COURT:  Well, we talk about stipulations of fact.

13         MR. HOSP:  Having sort of done cases like this a

14  number of different times, my guess is that even though the

15  facts are not going to be disputed, and we may be able to come

16  to some stipulations about financial records and things like

17  that, what we have experienced, literally with similar

18  plaintiffs and defendants, is when you try to distill

19  stipulations of facts into language, it becomes a battle of

20  characterizations --

21         THE COURT:  It certainly does.

22         MR. HOSP:  -- that nobody can ever agree on.

23         So it's our anticipation that we are going to come to

24  a point where you are going to be able to look and see what the

25  underlying facts are, even though we can't necessarily come to

K1V8AMEC

1    an agreement on how to characterize those facts.  And I could

2    be wrong, but my guess is we are going to come to the end of

3    the day and when it comes to any notion of commercial

4    advantage, the underlying facts are going to be pretty well

5    established and not particularly disputed.  It's just the other

6    side will call that a commercial advantage and we will

7    disagree, and that may end up being more of a question of law

8    than a question of fact.

9              MR. ZWEIFACH:  I just have to say I do think your

10   Honor is right when you suggested that the phrase that we are

11   wrestling with here, "any purpose of direct or indirect

12   commercial advantage," there is not a lot of teaching in the

13   cases about it.  It will be hard for somebody to give you a

14   rigid definition of it, and it may ultimately be a very

15   fact-sensitive exercise where the meaning of that phrase will

16   have to be effectively determined by a trier of fact seeped

17   into the details.  And I think that's how it plays out.  There

18   may be motions on pieces of this, but I think you're right when

19   you suggested and analogized it to working levels of

20   competition.  This is going to be a phrase that will take on

21   meaning and texture in the world of facts that we will bring to

22   you or to the trier of fact.

23             So in any event, that's the difference in the

24   schedule.

25             THE COURT:  I think that probably is correct.  You

K1V8AMEC

1    can't apply it prospectively as a standard.  It's really an

2    epithet applied to a bunch of facts and you look at it and say,

3    is that this or isn't it, and everybody knows what you're

4    talking about.

5              MR. ZWEIFACH:  So that's the only difference.

6    Otherwise all the other dates are set up and agreed to.  And in

7    our schedule we would be ready for a trial at the end of this

8    calendar year, and theirs the summary judgment motion would be

9    at the end of that calendar year and then we would be into the

10   following.  So we are eager to get there.

11             THE COURT:  By the time we get to trial, we will know

12   how to try it.  These things work themselves out.  Something

13   that you thought was important turns out to be immaterial.

14             MR. ZWEIFACH:  We eliminated about half the case in

15   two months.  We have made progress.  We are capable of it.  So

16   that's good.

17             THE COURT:  My form of 16(b) order was really not

18   designed for this case.

19             MR. ZWEIFACH:  Well, we followed it anyway.  When

20   judge set up forms, we use them.

21             THE COURT:  Let me take a look at it.

22             MR. ZWEIFACH:  Is that the same one?

23             This is the new one that we signed.  You won't see any

24   differences till you get pretty far along.  Page 5 and 6 there

25   is a little divergence.

K1V8AMEC

1        THE COURT:  I would be inclined to get in the

2    depositions early.  You are going to get much more out of them

3    than documents, and you use the documents with the witness and

4    you ask him what records he kept and what he expressed and what

5    he said and documents drop out of your lap.

6        When you say plaintiff's industry, you both know what

7    you mean?

8        MR. ZWEIFACH:  Right.  The broadcasting industry.

9        THE COURT:  I would take it as a question about his

10    personality.  Does he get up early in the morning?

11        Thinking back again to that United Shoe, where the

12    industry was about a dozen kinds of machines that performed

13    operations and the kind of operation you wanted to rent a

14    machine for depended on the type of shoe you were making and

15    things like that, it was very hard to isolate them so that you

16    could define the amount of competition for each item.  I must

17    say, looking back on it, I think the most useful thing was not

18    so much the testimony of the experts, they helped you organize

19    the facts and they worked on that hard and made a chart of how

20    the facts could describe the industry and allow you to deal

21    with separate segments.  And that isn't normally advertised as

22    the use of the experts, but, boy, they can be very useful.

23        I think I detect in this more than the normal desire

24    on the part of counsel to have the deadlines be deadlines and

25    not be just movable, adjustable estimates, and I must say I

K1V8AMEC

1    respect that.  I think the motive is excellent.  The moral is

2    that if they are to be regarded without much seriousness, you

3    can't make them too far into the future because you don't have

4    enough information.  Speaking for myself, I am somebody who

5    doesn't have to do the work and therefore is naturally ignorant

6    in what it really should take.  And I think the thing to do

7    here is to go up to page 5 as is and cut it off there, and we

8    will have a conference this summer.  We will know how it's

9    going then.  You will be much more in command of what has been

10   done and what still is to be done.  We will all be just as

11   smart then as we are now.  We will be much better informed.

12   And that's the time to talk about when we will do the other

13   things and heading towards trial.

14           Then I would pick it up at H, pick up those two

15   things.  Then all this about summary judgment is simply cut

16   out, and when you think it is time to make summary judgment,

17   write me and say so, laying out the ground, and we will talk

18   about it then.  We don't know enough to be able to say these

19   things as it is worded.

20           Then the discovery of experts, it is probably useful

21   to leave that in.

22           I kind of like the stuff on page 8.  It's more or less

23   precatory and gives you guidance anyhow.  So I would resume on

24   item 4 on page 7.

25           I would take off page 10 I think.  It scares me to say

K1V8AMEC

1    when I will intervene or when I won't.

2            MR. ZWEIFACH:  We actually picked that up from your

3    form.  We put the scary language in from you, that is where we

4    got it from.  That was from the form.

5            THE COURT:  These footnotes?

6            MS. BRENCKMAN:  No.  I drafted that.

7            THE COURT:  We will set a date now.

8            Let's go off the record because I don't want you to be

9    answering with a thought that you might be quoted or held to

10   your thought sometime.

11           (Discussion off the record)

12           MR. ZWEIFACH:  When do you want us back?

13           THE COURT:  I want you back after the completion of

14   fact discovery.  You will know by that time a lot more of the

15   case, a lot more of who is going to say what, a lot more of the

16   general shape of the facts and the lines of reality along which

17   you're going to be submitting it to the jury.  Therefore, a

18   discussion of how it stands and looks then may very much color

19   what you end up wanting from the experts.  So we will save

20   money by doing it at this point.

21           That would mean between June and September.  I am

22   pretty open.

23           MR. ZWEIFACH:  Fact discovery closes June 18 and the

24   expert reports are July 17.  So if we are going to save some

25   money --

K1V8AMEC

1          THE COURT:  We want to do it in June.  Any date we

2     pick now is to the best of your ability.  Try not to pick one

3     in which a member of the family is getting married or a reunion

4     that you want to get to.

5          MR. GOODFRIEND:  Your Honor, I promised not to speak

6     except for one thing.  My older son is graduating from

7     university.

8          THE COURT:  Let's steer around that.

9          MR. GOODFRIEND:  If it will be OK for the Court and

10    opposing counsel.

11         THE COURT:  But you know when that is.

12         MR. GOODFRIEND:  Yes, your Honor.  I think it's May

13    18.

14         THE COURT:  If we want to do it early, we can do it on

15    Friday, June 5.  Then the judicial conference takes me out

16    pretty much the following week.  Then there is Friday, June 19.

17         MR. ZWEIFACH:  The 19th would be good because we will

18    be done with fact discovery.

19         MR. HOSP:  I know that I have 30th college reunion.  I

20    believe it's either on the 19th or the 26th.

21         THE COURT:  The Fridays are not engraved in stone.  If

22    there is a reason for moving it to another, we will do it some

23    weekday afternoon because Fridays in the summer have other

24    needs.  This will give us a point around which we can satisfy

25    whatever.

K1V8AMEC

1              MR. HOSP:  So we are putting down the 19th or the

2    26th?

3              THE COURT:  The 19th.  How about 12 noon?  So anybody

4    who doesn't have their calendar can remember it easy.  We will

5    regard this as a kind of default day; in case nobody has

6    changed it for any reason, this is where we will end up.

7              MR. ZWEIFACH:  Good.  Thank you, your Honor.

8              MR. HOSP:  Thank you, your Honor.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25