# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., TWENTIETH CENTURY FOX FILM CORPORATION, CBS BROADCASTING INC., CBS STUDIOS INC., FOX TELEVISION STATIONS, LLC, FOX BROADCASTING COMPANY, LLC, NBCUNIVERSAL MEDIA, LLC, UNIVERSAL TELEVISION LLC, and OPEN 4 BUSINESS PRODUCTIONS, LLC,<br><br>        Plaintiffs,<br><br>        v.<br><br>DAVID R. GOODFRIEND and SPORTS FANS COALITION NY, INC.,<br><br>        Defendants. | Case No. 19-cv-7136-LLS<br><br>**JURY TRIAL DEMANDED** |

## ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS

Defendants David R. Goodfriend ("Mr. Goodfriend") and Sports Fans Coalition NY, Inc. ("SFCNY") (together, "Defendants") hereby answer the Amended Complaint for Damages and Injunctive Relief ("Complaint") by Plaintiffs American Broadcasting Companies, Inc., Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, CBS Broadcasting Inc., CBS Studios Inc., Fox Television Stations, LLC, Fox Broadcasting Company, LLC, NBCUniversal Media, LLC, Universal Television LLC, and Open 4 Business Productions, LLC (collectively, "Plaintiffs").

Every American has the right to access broadcast television for free, and SFCNY is a 501(c)(3) non-profit organization that operates Locast, a public service that provides local broadcast signals over the internet to American consumers in thirteen cities.

Plaintiffs' claims against SFCNY and Mr. Goodfriend are objectively baseless and constitute an unlawful sham. This case involves the application of unambiguous statutory language. Specifically, the Copyright Act, 17 U.S.C. § 111(a)(5), provides that "it is not an infringement of copyright" when a "non-profit organization" makes a secondary transmission of a performance of a copyrighted work, "without any purpose of direct or indirect commercial advantage, and without charge to the recipients of the secondary transmission other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service." Locast fits squarely within this Congressionally-designated exception to infringement.

Additionally, Plaintiffs' claims against Mr. Goodfriend in his personal capacity are impermissible as a matter of law because he serves SFCNY without compensation. This personal immunity is set out clearly in New York Not-For-Profit Corporation Law § 720-a, which provides that no person serving without compensation as a director or officer of a 501(c)(3) non-profit shall be liable based solely on his conduct in the execution of such office unless the conduct constituted gross negligence or was intended to cause the resulting harm to the person asserting such liability. Mr. Goodfriend is an unpaid officer and director of SFCNY—a fact that is publicly available and of which Plaintiffs are fully aware. His conduct has been wholly lawful and in pursuit of the public interest. No litigant could reasonably believe that it would succeed on the merits in a case asserting these claims, given the clarity of the law.

Plaintiffs' litigation is meant to intimidate Defendants into shuttering the Locast service—and should that strategy not work, to bury Defendants under costly and needless litigation. Although the service was launched in January 2018, Plaintiffs delayed filing suit, or raising any legal concerns whatsoever, until July 2019. Plaintiffs have colluded to limit the reasonable public access to the over-the-air signals that they are statutorily required to make available for free, and have opted instead to use their copyrights improperly to construct and protect a pay-TV model that forces consumers to forgo over-the-air programming or to pay cable, satellite, and online providers for access to programming that was intended to be free. A large portion of the fees paid by the public is then handed over to Plaintiffs in the form of retransmission consent fees.

This is classic copyright abuse. By limiting access to the over-the-air signals that Plaintiffs have committed to make freely available, and simultaneously using the copyrights in their programming to drive revenue for the local programming that consumers cannot now effectively receive over the air through their pay-TV model, Plaintiffs have colluded and misused copyrights to expand their market power beyond what those copyrights were intended to protect. The pay-TV providers get rich. Plaintiffs get rich. The public gets fleeced.

Locast is **_lawfully_** providing better and cheaper service to consumers who cannot receive quality broadcast signals and, in the process, threatening the dominance of ABC, CBS, FOX, and NBC in a market that generated nearly $11 billion in revenue last year (up sharply from roughly $215 million in 2006). Plaintiffs have admitted as much in their Complaint, where they argue that they have sued SFCNY because Locast's service is devaluing their consent rights. Compl. ¶ 8.

Plaintiffs' bad faith litigation is part of a broader coordinated campaign to undermine Defendants' business dealings and chill financial support among potential donors, including with direct threats of retaliation or baseless litigation against them. These threats have harmed

competition and will continue to do so until stopped by this Court.  They have also injured Defendants, as several current and prospective SFCNY donors and business partners have put their relationships on hold after commencement of this litigation.  This litigation also has injured and threatens to continue injury to Mr. Goodfriend, personally, in at least the loss of reputation.

Accordingly, Defendants deny that they infringe Plaintiffs' alleged rights.  Plaintiffs' claims are without merit, and Defendants are entitled to judgment in their favor on their counterclaims set forth below.  Except to the extent expressly admitted herein, Defendants deny each and every allegation of the Complaint.

1.      The allegations in Paragraph 1 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 1 of the Complaint, as the rights granted in 17 U.S.C. § 106(4) are subject to the qualifications of Section 111(a) of the Copyright Act.

2.      The allegations in Paragraph 2 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer to such conclusions of law is required, Defendants deny such allegations in Paragraph 2 of the Complaint, as an incomplete description of the legal framework enacted by Congress, which expressly exempts secondary transmissions by non-profit organizations.  Defendants otherwise lack knowledge or information sufficient to confirm the truth of the remainder of the allegations in Paragraph 2 of the Complaint, and therefore deny such allegations.

3.      Defendants admit that Mr. Goodfriend founded SFCNY, and that SFCNY operates a public service named Locast that retransmits local over-the-air broadcast signals over the internet in thirteen "designated market areas" ("DMA"), as such term is defined by A.C. Nielsen Co. ("Nielsen"), a firm that surveys television viewers.  Defendants deny that any permission or

payment is required for SFCNY to retransmit local over-the-air broadcasts to the public in their respective DMAs because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Defendants deny that SFCNY purposely strips critical data from the over-the-air broadcast signals.  Defendants otherwise deny the remaining allegations in Paragraph 3 of the Complaint.

4.      The allegations in Paragraph 4 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer to such conclusions of law is required, Defendants deny such allegations in Paragraph 4 of the Complaint.  Defendants admit that Locast serves to extend the reach of, and ease of access to, local over-the-air broadcast signals throughout New York City (and twelve other DMAs throughout the country), including to places where tall buildings or other obstructions might interfere with over-the-air reception.  Defendants deny that any authorization is required for SFCNY to retransmit local over-the-air broadcasts to the public in their respective DMAs because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Defendants further deny that Congress required booster or translator services that do not use the public airwaves for retransmission to obtain the authorization of the broadcast stations whose signals they seek to boost.  Defendants otherwise deny the remaining allegations in Paragraph 4 of the Complaint.

5.      Defendants deny the allegations in Paragraph 5 of the Complaint.

6.      Defendants admit that the Locast service is available only to consumers in the following thirteen DMAs (to receive over-the-air broadcasts only from their corresponding DMAs): New York, Philadelphia, Boston, Washington D.C., Baltimore, Chicago, Houston, Dallas, Sioux Falls, Denver, Rapid City, Los Angeles, and San Francisco.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 6 of the Complaint.

7.     Defendants admit that registered users access SFCNY's retransmissions of the over-the-air broadcasts in their DMAs through their internet-connected devices, including television sets, laptops, smartphones, and tablets.  Defendants deny that any authorization or permission is required for SFCNY to retransmit local over-the-air broadcasts to the public in their respective DMAs because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Defendants deny that the Locast service is available to anyone in the world, as SFCNY uses multiple technological methods (even though it is not required to) to restrict the viewing of local broadcast stations only to consumers physically located within a certain DMA (in the thirteen DMAs where Locast operates).  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 7 of the Complaint.

8.     Defendants deny the allegations in Paragraph 8 of the Complaint.

9.     Defendants admit that Mr. Goodfriend, who has a decades-long history of commitment to consumer advocacy and public service, founded SFCNY.  Defendants further admit that Mr. Goodfriend was an employee of DISH Network LLC ("DISH") more than a decade ago, and that although he still serves as a consultant for DISH today, his work for other clients and work on retransmission consent reform is consistent with his pro-consumer advocacy work generally (and is sometimes contrary to DISH's positions).  Defendants further admit that SFCNY received an arm's-length loan from IoT Broadband, LLC ("IoT"), and that the loan's terms are stringent, with above-market interest.  Defendants also admit that the CEO of IoT was once employed by DISH.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 9 of the Complaint.

10.    Defendants deny that DISH has assisted the Locast service.  Defendants admit that AT&T made a $500,000 donation to SFCNY in July 2019—more than a year and a half after

SFCNY first launched the Locast service.  Defendants further admit that Richard Greenfield is an industry analyst who has commented on Locast, and has noted, among other things, that the Locast service allows consumers to access over-the-air broadcast signals more easily, which will likely encourage cord-cutting and harm pay-TV distributors like DISH and AT&T.  Defendants state that the contents of Mr. Greenfield's publications speak for themselves.  Defendants lack knowledge or information sufficient to confirm the truth of the remaining allegations in Paragraph 10, and therefore deny such allegations.   Except as expressly admitted herein, Defendants deny the allegations in Paragraph 10 of the Complaint.

11.    Defendants admit that the Locast app is available (along with hundreds of other apps) through DISH's and AT&T's set-top boxes to consumers in the thirteen DMAs where the Locast service is available (to receive local over-the-air broadcasts from their corresponding DMAs).   Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 11 relating to any benefits to third parties, particularly given that industry analysis suggests that Locast could encourage cord-cutting, and therefore may harm pay-TV distributors like DISH and AT&T, and therefore deny such allegations.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 11 of the Complaint.

12.    Defendants deny that SFCNY departs from the activities of a booster of broadcast signals, except insofar as the signals are not relayed by over-the-air signals.

i.    Defendants admit that in any given local DMA that Locast serves, SFCNY functions by capturing the over-the-air signals, transcoding the signals into digital formats viewable on internet-connected devices, and then streaming the signals over the internet to registered users at the users' requests on internet-connected devices located within the local

market.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 12(i) of the Complaint.

ii. Defendants admit that Locast serves to extend the reach of, and ease of access to, local over-the-air broadcast signals in the thirteen DMAs in which it operates, including to places where tall buildings or other obstructions might interfere with over-the-air reception. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 12(ii) of the Complaint.

iii. Defendants deny that SFCNY purposely strips from the over-the-air broadcast signals the Nielsen watermarks that measure viewing for local and national advertisers. Defendants otherwise deny the remaining allegations in Paragraph 12(iii) of the Complaint.

iv. Defendants admit that the Locast app is available (along with hundreds of other apps) through DISH's and AT&T's set-top boxes to consumers in the thirteen DMAs where the Locast service is available (to receive local over-the-air broadcasts from their corresponding DMAs).  Defendants lack knowledge or information sufficient to confirm the truth of the remaining allegations in Paragraph 12(iv) of the Complaint, and therefore deny such allegations.

v. Defendants deny that any such licenses are required for SFCNY to retransmit over-the-air broadcasts to the public because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5). Defendants otherwise deny the remaining allegations in Paragraph 12(v) of the Complaint.

vi. Defendants admit that although Mr. Goodfriend serves as a consultant for DISH, his work for other clients and work on retransmission consent reform is consistent with his pro-consumer advocacy work generally (and is sometimes contrary to DISH's positions). Defendants otherwise deny the remaining allegations in Paragraph 12(vi) of the Complaint.

vii.     Defendants admit that SFCNY maintains the email addresses for Locast users to enable SFCNY to detect hacking, misuse, or misappropriation of programming streams; contact users about technical or other issues with the Locast service; or provide other information to users, and deny that there is no technological reason to maintain the email addresses.  Defendants otherwise deny the remaining allegations in Paragraph 12(vii) of the Complaint.

viii.    Defendants admit that SFCNY maintains anonymized, aggregated data about users' viewing habits, but deny that SFCNY offers that data to third parties to support the Locast service.  Defendants otherwise deny the remaining allegations in Paragraph 12(viii) of the Complaint.

ix.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 12(ix) of the Complaint, and therefore deny such allegations.

x.      Defendants admit that SFCNY solicits donations from Locast users solely to defray the costs of operating the Locast service.  Defendants admit that the retransmissions made by SFCNY can be viewed for successive fifteen-minute periods of time by members of the public who choose to use Locast without making donations, in their local DMAs.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 12(x) of the Complaint.

13.    Defendants deny the allegations in Paragraph 13 of the Complaint.

14.    Defendants deny the allegations in Paragraph 14 of the Complaint.

15.    Defendants deny the allegations in Paragraph 15 of the Complaint.

16.    Paragraph 16 of the Complaint makes a demand for relief to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 16 of the Complaint.

17.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 17 of the Complaint, and therefore deny such allegations.

18.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 18 of the Complaint, and therefore deny such allegations.

19.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 19 of the Complaint, and therefore deny such allegations.

20.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 20 of the Complaint, and therefore deny such allegations.

21.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 21 of the Complaint, and therefore deny such allegations.

22.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 22 of the Complaint, and therefore deny such allegations.

23.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 23 of the Complaint, and therefore deny such allegations.

24.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 24 of the Complaint, and therefore deny such allegations.

25.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 25 of the Complaint, and therefore deny such allegations.

26.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 26 of the Complaint, and therefore deny such allegations.

27.     Defendants admit that Mr. Goodfriend is an individual who resides in Bethesda, Maryland.  Defendants admit that Mr. Goodfriend is the unpaid President and Treasurer of SFCNY and is an unpaid member of the Board of Directors of SFCNY.

28.     Defendants admit that SFCNY is a tax-exempt non-profit charitable organization under Internal Revenue Code Section 501(c)(3), incorporated under the Not-For-Profit Corporation Law of the State of New York, with its principal place of business at 3075 Veterans Highway, Suite 131, Ronkonkoma, New York 11779.  Defendants admit that SFCNY operates Locast.

29.     The allegations in Paragraph 29 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants admit that this Court has subject matter jurisdiction.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 29 of the Complaint.

30.     The allegations in Paragraph 30 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants admit that the Court has personal jurisdiction over them.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 30 of the Complaint.

31.     The allegations in Paragraph 31 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants admit that venue is proper in this District.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 31 of the Complaint.

32.     The allegations in Paragraph 32 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 32 of the Complaint insofar as it is an incomplete statement of the balance that Congress struck with respect to the rights of the American public to access over-the-air broadcast signals, and the ability of non-profit organizations to retransmit those signals to facilitate such public access.

33.    The allegations in Paragraph 33 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 33 of the Complaint insofar as the "exclusive" rights granted by Congress in 17 U.S.C. § 106(4) are specifically subject to the limitations contained in 17 U.S.C. § 111(a)(5), which unambiguously states that retransmissions by non-profit entities do not constitute copyright infringement.

34.    Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 34 of the Complaint, and therefore deny such allegations.

35.    The allegations in Paragraph 35 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 35 of the Complaint insofar as the "exclusive" rights granted by Congress is 17 U.S.C. § 106(4) are specifically subject to the limitations contained in 17 U.S.C. § 111(a)(5), which unambiguously states that retransmissions by non-profit entities do not constitute copyright infringement.

36.    The allegations in Paragraph 36 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 36 of the Complaint insofar as the "exclusive" rights granted by Congress is 17 U.S.C. § 106(4) are specifically subject to the limitations contained in 17 U.S.C. § 111(a)(5), which unambiguously states that retransmissions by non-profit entities do not constitute copyright infringement.

37.    The allegations in Paragraph 37 of the Complaint state conclusions of law to which no answer is required.

38.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 38 of the Complaint, and therefore deny such allegations.

39.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 39 of the Complaint, and therefore deny such allegations.

40.     Defendants admit that the Locast service was launched in January 2018 by SFCNY and that SFCNY operates the Locast service.  Defendants further admit that Mr. Goodfriend founded SFCNY.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 40 of the Complaint.

41.     Defendants admit that in any given local DMA that Locast serves, SFCNY functions by capturing the over-the-air signals, transcoding the signals into digital formats viewable on internet-connected devices, and then streaming the signals over the internet to registered users at the users' requests on internet-connected devices located within the local market.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 41 of the Complaint.

42.     Defendants admit that to use Locast in any given local DMA that Locast serves, a user located within that DMA may access the Locast service by visiting Locast's website or downloading the Locast app, registering for a free account (or logging in using Facebook), and subject to Locast's Terms of Service, selecting the programming to watch.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 42 of the Complaint.

43.     The allegations in Paragraph 43 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer to such conclusions of law is required, Defendants deny that any authorization or consent is required for SFCNY to retransmit over-the-air broadcasts to the public because SFCNY is a 501(c)(3) non-profit organization that meets the

requirements of 17 U.S.C. § 111(a)(5).  Defendants otherwise deny the remaining allegations in Paragraph 43 of the Complaint.

44.     Defendants admit that SFCNY retransmits local over-the-air broadcast signals over the internet in New York City (and twelve other DMAs throughout the country).  Defendants further admit that there is no direct or indirect commercial purpose to SFCNY, and thus no direct or indirect commercial advantage to SFCNY for operating Locast.  Defendants further admit that Locast serves to extend the reach of, and ease of access to, local over-the-air broadcast signals throughout New York City (and twelve other DMAs), including to places where tall buildings or other obstructions might interfere with over-the-air reception.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 44 of the Complaint.

45.     The allegations in Paragraph 45 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer to such conclusions of law is required, Defendants deny that any authorization is required for SFCNY to retransmit over-the-air broadcasts to the public because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Defendants otherwise deny the remaining allegations in Paragraph 45 of the Complaint.

46.     Defendants admit that the Locast public service enables consumers to access local broadcast signals that they are permitted to access within their respective DMAs, and that the service can be used both by consumers who are not able to access such over-the-air signals (because of inadequate signal strength, physical obstruction, or any other reason) and by consumers who might be able to receive such over-the-air signals through a digital antenna. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 46 of the Complaint.

47.     Defendants admit that to use Locast in any given local DMA that Locast serves, a user within that DMA may access the Locast service through applications for Android and Apple smartphones and devices, and applications for Roku, Chromecast, Amazon Fire TV, Apple TV, TiVo over-the-air set-top boxes, and Android TV television-viewing devices.  Defendants further admit that a growing number of users have installed and used these applications to access free over-the-air broadcast content.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 47 of the Complaint.

48.     Defendants deny that any permission is required for SFCNY to retransmit over-the-air broadcasts to the public because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Defendants admit that the Locast service is available only to consumers in the following DMAs, to receive over-the-air broadcasts only from their corresponding local DMAs: New York, Philadelphia, Boston, Washington D.C., Baltimore, Chicago, Houston, Dallas, Sioux Falls, Denver, Rapid City, Los Angeles, and San Francisco. Defendants further admit that Locast serves to extend the reach of, and ease of access to, the local over-the-air broadcast signals in the thirteen markets in which it operates, including to places where tall buildings or other obstructions might interfere with over-the-air reception.  Defendants further admit that SFCNY intends to continue to expand the Locast service to additional DMAs in the United States.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 48 of the Complaint.

49.     Defendants deny the allegations in Paragraph 49 of the Complaint.

50.     Defendants deny that any consent is required for SFCNY to retransmit local over-the-air broadcasts to the public in their respective DMAs because SFCNY is a 501(c)(3) non-profit

organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Defendants otherwise deny the remaining allegations in Paragraph 50 of the Complaint.

51.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 51 of the Complaint relating to any benefits to third parties, and therefore deny such allegations.  Defendants deny that the Locast service provides them any direct or indirect commercial advantage.  Defendants otherwise deny the remaining allegations in Paragraph 51 of the Complaint.

52.     Defendants admit that Mr. Goodfriend, who has a decades-long history of commitment to consumer advocacy and public service, founded SFCNY.  Defendants further admit that Mr. Goodfriend was an employee of DISH more than a decade ago, and that although he still serves as a consultant for DISH today, his work for other clients and work on retransmission consent reform is consistent with his pro-consumer advocacy work generally (and is sometimes contrary to DISH's positions).  Defendants further admit that SFCNY received an arm's-length loan from IoT, and that the loan's terms are stringent, with above-market interest.  Defendants also admit that the CEO of IoT was once employed by DISH.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 52 of the Complaint.

53.     Defendants admit that AT&T made a $500,000 donation to SFCNY in July 2019—more than a year and a half after SFCNY first launched the Locast public service.  Defendants lack knowledge or information sufficient to confirm the truth of the remaining allegations in Paragraph 53, and therefore deny such allegations.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 53 of the Complaint.

54.     Defendants deny that DISH has provided funding to SFCNY or the Locast service. Defendants otherwise lack knowledge or information sufficient to confirm the truth of the remaining allegations in Paragraph 54 of the Complaint, and therefore deny such allegations.

55.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 55 of the Complaint relating to any benefits to third parties, and therefore deny such allegations.  Defendants otherwise deny the remaining allegations in Paragraph 55 of the Complaint.

56.     Defendants admit that SFCNY promotes itself as, and indeed is, a public service that retransmits local over-the-air broadcast signals over the internet within thirteen DMAs, as a way for American consumers in those markets to exercise their rights to access broadcast television for free.  Defendants state that SFCNY's public statements speak for themselves.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 56 of the Complaint.

57.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 57 of the Complaint relating to any benefits to third parties, and therefore deny such allegations.  Defendants otherwise deny the remaining allegations in Paragraph 57 of the Complaint.

58.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in the first sentence of Paragraph 58 of the Complaint, and therefore deny such allegations.  Defendants deny the allegations in the second sentence of Paragraph 58 of the Complaint.

59.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 59 of the Complaint relating to any benefits to, or actions taken by, third parties, and therefore deny such allegations.  Defendants state that DISH's public statements speak

for themselves.  Defendants otherwise deny the remaining allegations in Paragraph 59 of the Complaint.

60.     Defendants admit that Locast was launched in January 2018, and despite that fact, Plaintiffs delayed filing suit, or raising any legal concerns whatsoever, until July 2019.  Defendants state that the content of the Locast program guide speaks for itself but deny that the program guide identifies any infringement whatsoever.  Defendants otherwise deny the remaining allegations in Paragraph 60 of the Complaint.

61.     Defendants deny the allegations in Paragraph 61 of the Complaint.

62.     Defendants admit that SFCNY solicits donations from Locast users solely to defray the costs of operating the Locast service.  Defendants further admit that the retransmissions made by SFCNY can be viewed for successive fifteen-minute periods of time by members of the public who choose to use Locast without making donations, in their respective local DMAs.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 62 of the Complaint.

63.     Defendants admit that for identification, hacking-detection, and other purposes, SFCNY requires users to provide an email address and create an account, or log in using a Facebook account, to access the Locast service in their respective DMAs.  Defendants deny that the user information is used for any commercial advantage.  Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 63 of the Complaint relating to any alleged commercial purposes to third parties, and therefore deny such allegations. Defendants otherwise deny remaining the allegations in Paragraph 63 of the Complaint.

64.     Defendants admit that Mr. Goodfriend founded SFCNY and is an unpaid officer and director of SFCNY.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 64 of the Complaint.

65.     Defendants admit the allegations in Paragraph 65 of the Complaint.

66.     Defendants admit that Mr. Goodfriend is an unpaid officer and director of SFCNY, and solely in that capacity has been involved in decisions related to the operation and expansion of the Locast service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 66 of the Complaint.

67.     Defendants admit that SFCNY retransmits local over-the-air broadcast signals to members of the public who are entitled to receive such signals in their respective DMAs, and deny that any permission is required for SFCNY to retransmit over-the-air broadcasts to the public because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 67 of the Complaint.

68.     Defendants admit that SFCNY retransmits local over-the-air broadcast signals to members of the public who are entitled to receive such signals in their respective DMAs, and deny that any permission is required for SFCNY to retransmit over-the-air broadcasts to the public because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 68 of the Complaint.

69.     Defendants deny the allegations in Paragraph 69 of the Complaint.

70.     Defendants incorporate their responses to each of the preceding paragraphs as if fully set forth herein.

71.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 71 of the Complaint, and therefore deny such allegations.

72.     Defendants lack knowledge or information sufficient to confirm the truth of the allegations in Paragraph 72 of the Complaint, and therefore deny such allegations.

73.     The allegations in Paragraph 73 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 73 of the Complaint insofar as the "exclusive" rights granted by Congress in 17 U.S.C. § 106(4) are specifically subject to the limitations contained in 17 U.S.C. § 111(a)(5), which unambiguously states that retransmissions by non-profit entities do not constitute copyright infringement.

74.     Defendants deny that any permission, authorization, or license is required for SFCNY to retransmit local over-the-air broadcasts to the public in their respective DMAs because SFCNY is a 501(c)(3) non-profit organization that meets the requirements of 17 U.S.C. § 111(a)(5).  Defendants otherwise deny the remaining allegations in Paragraph 74 of the Complaint.

75.     The allegations in Paragraph 75 of the Complaint state conclusions of law to which no answer is required.  To the extent that an answer is required, Defendants deny such allegations in Paragraph 75 of the Complaint insofar as the "exclusive" rights granted by Congress in 17 U.S.C. § 106(4) are specifically subject to the limitations contained in 17 U.S.C. § 111(a)(5), which unambiguously states that retransmissions by non-profit entities do not constitute copyright infringement.  Defendants otherwise deny the remaining allegations in Paragraph 75 of the Complaint.

76.     Defendants deny the allegations in Paragraph 76 of the Complaint.

77.     Defendants deny the allegations in Paragraph 77 of the Complaint.

78.     Defendants deny the allegations in Paragraph 78 of the Complaint.

79.     Defendants deny the allegations in Paragraph 79 of the Complaint.

80.     Defendants deny the allegations in Paragraph 80 of the Complaint.

Defendants deny the allegations beginning with the word "WHEREFORE," and deny that Plaintiffs are entitled to any of the relief sought in the Complaint, or to any relief whatsoever.

## DEMAND FOR JURY TRIAL

Defendants hereby demand a jury trial on all issues so triable.

## AFFIRMATIVE DEFENSES

Defendants, for their affirmative defenses, and without conceding that they bear the burden of proof as to any such affirmative defense, state as follows:

1.     The Complaint fails to state a claim upon which relief may be granted because, among other reasons, Plaintiffs' claims are barred by 17 U.S.C. § 111(a)(5).

2.     Plaintiffs' claims against Mr. Goodfriend are barred by New York Not-For-Profit Corporation Law, Section 720-a.

3.     Plaintiffs' claims are barred by the doctrine of unclean hands.

4.     Plaintiffs' claims are barred by the doctrine of acquiescence.

5.     Plaintiffs' claims are barred by waiver.

6.     Plaintiffs' claims are barred by the doctrine of estoppel.

7.     Plaintiffs' claims are barred by the doctrine of laches.

8.     Plaintiffs' claims are barred by the doctrine of fair use.

9.     Plaintiffs' claims are barred due to an express or implied license or consent.

10.     Plaintiffs' claims are barred by the doctrine of copyright misuse.

11.     Plaintiffs' claims are barred inasmuch as this Court lacks subject matter jurisdiction over claims to enforce copyrights for which Plaintiffs have not previously obtained, or have not

pleaded ownership of, registrations.

12.     Plaintiffs' copyrights are invalid and/or unenforceable as to Defendants.

13.     Plaintiffs' claims are barred by their failure to mitigate damages.

14.     The statutory damages sought by Plaintiffs are unconstitutionally excessive and disproportionate to any actual damages that may have been sustained, in violation of the Due Process Clause of the United States Constitution.

Defendants reserve the right to assert additional affirmative defenses based upon further investigation and discovery.

## COUNTERCLAIMS

Counterclaim-Plaintiffs David R. Goodfriend ("Mr. Goodfriend") and Sports Fans Coalition NY, Inc. ("SFCNY") (together, "Counterclaim-Plaintiffs") hereby assert the following counterclaims against Counterclaim-Defendants American Broadcasting Companies, Inc., Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, CBS Broadcasting Inc., CBS Studios Inc., Fox Television Stations, LLC, Fox Broadcasting Company, LLC, NBCUniversal Media, LLC, Universal Television LLC, and Open 4 Business Productions, LLC (collectively, the "broadcasters" or "Counterclaim-Defendants") and allege on personal knowledge as to all matters relating to Mr. Goodfriend and SFCNY and on information and belief as to all other matters, except where noted otherwise, as follows:

## NATURE OF THE COUNTERCLAIMS

1.     These Counterclaims arise from the broadcasters' unlawful and collusive efforts to stifle competition in the retransmission of over-the-air broadcasts and to entrench the interests of the four largest television networks and their stations at the expense of consumers.  As explained below, the broadcasters' unlawful agreement has harmed competition and consumers in several

relevant markets and submarkets, and injured Counterclaim-Plaintiffs in their business and property.

2.      It is often forgotten that over-the-air broadcasting carries both benefits to and burdens on television broadcasters in the United States, as regulated by a series of laws enacted by Congress.  At a basic level, the "bargain" is that in exchange for free broadcast licenses, the broadcasters are required to make free, over-the-air local broadcasting available to the entire American public.

3.      Over time, the broadcasters have increasingly failed to fully satisfy their obligation to make local over-the-air broadcasting available to everyone for free.  In particular, the broadcasters are failing to transmit over-the-air signals strong enough to cover local television markets (as required to fulfill their obligation to operate in the public interest).  The broadcasters have also taken steps to ensure that local independent affiliates cannot retransmit the local over-the-air signals by other means to the public, ensuring that the signals are not fully accessible.

4.      This failure has led to poor quality over-the-air transmissions in many markets, forcing consumers to pay for video services that include local or national television programming, including: (i) through cable or satellite providers; (ii) online through the cable or satellite providers' authenticated video services; (iii) over-the-top streaming services offered by the broadcasters for a monthly fee (e.g., CBS All Access); or (iv) virtual pay-TV providers (e.g., YouTubeTV).  The broadcasters have then colluded to abuse their copyrights and extend their market power in a manner not contemplated under the copyright laws, to collect billions of dollars from consumers by charging "retransmission consent" fees to cable and satellite providers that carry their local television programs in each designated market area ("DMA"), as such term is defined by A.C. Nielsen Co. ("Nielsen"), a firm that surveys television viewers, and to launch or

announce the launch of their own competing paid streaming services that transmit over-the-air broadcasts or content contained therein live over the internet.

5.      Indeed, the copyright provisions that specifically cover broadcast programming were adopted by Congress with the expectation that the broadcasters would transmit signals in a manner that would make them reasonably and efficiently available to the entire local market, and not seek to discourage free access to those signals.  By failing to live up to their promises, and then simultaneously using their copyrights to, as a practical matter, force the public to pay for the programming that it is supposed to be able to receive for free (or to forgo access to that programming), Counterclaim-Defendants are committing classic copyright abuse.

6.      To address this issue, SFCNY launched a free service named "Locast" to consumers in New York City in January 2018.  Since the launch, SFCNY has expanded the Locast service to twelve other cities throughout the United States.

7.      In effect, SFCNY does through Locast what the broadcasters are supposed to do— make free, local, over-the-air broadcasting widely available to the American public, including in particular those individuals without reasonable access to over-the-air broadcasts.  And importantly, what SFCNY does falls squarely within 17 U.S.C. § 111(a)(5), an unambiguous statutory provision in the Copyright Act allowing non-profit organizations to retransmit local over-the-air broadcast signals to consumers, as long as the non-profits do not charge the consumers for the service (except assessments necessary to defray the operational costs of the service), and as long as the non-profits act without the purpose of direct or indirect commercial advantage.

8.      SFCNY is a traditional non-profit organization in every sense.  It has been approved by the Internal Revenue Service ("IRS") as tax exempt under Internal Revenue Code 501(c)(3).  It does not act with the purpose of any commercial advantage.  It, like any other non-profit, seeks

and receives consumer and corporate donations to run the organization.  Although it operates to be sustainable, as any non-profit must do, it carries debt and has yet to achieve operational cash flow break-even.

9.    SFCNY's founder is Mr. Goodfriend, a consumer advocate, former public servant, and co-owner with his wife of a small public policy advocacy firm, with decades of experience in the communications industry.  Mr. Goodfriend identified the failure of public access to over-the-air television broadcast signals and set out to create a non-profit with the immediate goal of using the internet to provide free over-the-air broadcasts to American consumers that lack quality access to the broadcasts that they are entitled to receive.

10.    Mr. Goodfriend also founded a non-profit organization named "Sports Fans Coalition," a grassroots coalition of sports activists, fighting to give sports fans a greater voice in public policy impacting professional and collegiate sports.  As one of its initiatives, Sports Fans Coalition took on the NFL, MLB, NHL, NBA, and the broadcast industry to petition the FCC to end the "Sports Blackout Rule" that had been in effect since 1975.  In 2014, on a unanimous, bipartisan, 5-0 vote, as a direct result of Mr. Goodfriend's and Sports Fans Coalition's advocacy, the FCC eliminated the Sports Blackout Rule.

11.    Mr. Goodfriend serves as SFCNY's President and Treasurer, and is also a member of the Board of Directors; however, he has received no compensation whatsoever from SFCNY (in the form of a salary or otherwise).  Accordingly, Mr. Goodfriend is exempt from any liability under New York Not-For-Profit Corporation Law Section 720-a, which protects uncompensated officers and directors of 501(c)(3) non-profit organizations from individual liability for actions taken in their corporate capacities on behalf of the non-profit.

12.     Despite SFCNY's non-profit purpose, the broadcasters perceive Locast as a threat to their business interests.  As a result, they have taken deliberate and coordinated unlawful steps to attack and eliminate the Locast service, including: (i) filing sham copyright infringement litigation to increase the cost of running Locast for SFCNY and intimidate Mr. Goodfriend by suing him personally; and (ii) threatening retaliation and baseless litigation against current and potential Locast donors, supporters, and third-party vendors to undermine Locast's ability to raise revenue and operate as a going concern.

13.     The broadcasters have substantial market power.  The broadcasters individually and together control the rights to programming, such as live sports, that is not substitutable with other programming.  These rights give them leverage to demand higher retransmission fees or to bundle over-the-air programming with non-broadcast programming channels for pay-TV services. Industry estimates put retransmission consent rights revenues at nearly $11 billion in the U.S. last year, an amount that is expected to increase another 11% this year.[1]  Industry analysis shows that Counterclaim-Defendants together are estimated to account for more than roughly 60% of the aggregate revenue in retransmission consent rights expected nationally in 2019 and possess market power in each of the relevant markets and submarkets alleged herein.[2]  In fact, the broadcasters are so dominant in these markets that they have been able to increase nationwide retransmission rights revenues roughly ***5000%*** since 2006, when they were only about $215 million.[3]  These price increases are not tied to any corresponding increase in broadcast programming output—for

---

[1] Adam Jacobson, *Retransmission Consent Revenue: An 11% Growth Engine*, Radio and Television Business Report, July 30, 2019 (referencing Kagan analysis) [hereinafter "RBR Article"].

[2] *See MEDIA: Back To The Basics With NET RETRANS*, Wells Fargo Securities Equity Research, Dec. 12, 2016 [hereinafter "Wells Fargo Research"].

[3] *See* RBR Article.

example, a December 2018 FX Networks Research Annual Report showed that the number of original scripted series airing on broadcast networks declined 1% from 2014 to 2018 and, over a longer time horizon, from 2002 to 2018, was up from only 135 to 146 shows.

14.     The broadcasters have no legitimate business justification for their conduct.  Each broadcaster should be acting unilaterally in its economic interest and in the public interest to expand output for its content, as SFCNY is doing by transmitting to consumers lacking quality signal access.  To the contrary, as set out in their Complaint, the broadcasters' intent is to restrain competition in providing over-the-air signals to the public to protect their broadcast franchise and the billions of dollars it allows them to reap from licensing retransmission rights—costs that are then passed on to the consumer.  Each broadcaster has a conscious commitment to this common scheme to achieve its unlawful objective, as evidenced by the Complaint and other joint conduct alleged herein.  If not stopped by this Court, the broadcasters' conduct threatens further harm to competition, programming output, and to the pocketbooks of all Americans who are entitled to receive the subject content over-the-air for free.

15.     The broadcasters' unlawful conduct has harmed and will continue to harm competition in each of the relevant markets alleged herein.  The broadcasters' conduct has limited innovation and output in over-the-air broadcasting, inflated the cost of retransmission consent rights in each relevant geographic market, and harmed consumers by increasing their costs and, if allowed to continue, by limiting consumers' choice of options, reducing output, and further increasing the cost of programming intended to be free.  Their conduct has caused direct and proximate injury to the business and property of Counterclaim-Plaintiffs, including a loss of goodwill to SFCNY and reputational harm to Mr. Goodfriend, and will continue to cause harm and injury until stopped by this Court.

16.     As shown below, the broadcasters' conduct, which constitutes both per se and unreasonable restraints of trade, violates Section 1 of the Sherman Act, 15 U.S.C. § 1, related New York State unfair competition and deceptive trade laws, related California unfair competition laws, and tortious interference laws.  Counterclaim-Plaintiffs seek to enjoin the anticompetitive conduct of the broadcasters to restrain trade in the relevant markets and submarkets defined herein and to remedy the broadcasters' harm to competition and to Counterclaim-Plaintiffs through their unlawful conduct.

## THE PARTIES

17.     Counterclaim-Plaintiff Mr. Goodfriend is an individual who resides in Bethesda, Maryland.  Mr. Goodfriend is the unpaid President and Treasurer of SFCNY and is an unpaid member of the Board of Directors of SFCNY.

18.     Counterclaim-Plaintiff SFCNY is a tax-exempt non-profit charitable organization under Internal Revenue Code Section 501(c)(3), incorporated under the Not-For-Profit Corporation Law of the State of New York, with its principal place of business at 3075 Veterans Highway, Suite 131, Ronkonkoma, New York 11779.  SFCNY offers the Locast service to customers in the New York City broadcast area (along with twelve other DMAs).

19.     Counterclaim-Defendant American Broadcasting Companies, Inc. ("ABC") is a Delaware corporation with its principal place of business at 77 West 66th Street, New York, New York, and does business as the ABC Television Network and as WABC-TV.  The FCC has licensed ABC to operate the television station identified by the call letters WABC-TV ("WABC"), among other television stations.  WABC's signal is broadcast to viewers over-the-air in the New York City market.  ABC is a wholly owned indirect subsidiary of Plaintiff Disney Enterprises, Inc.

20.     Counterclaim-Defendant Disney Enterprises, Inc. ("DEI") is a Delaware corporation with its principal place of business at 500 S. Buena Vista Street, Burbank, California.

21.     Counterclaim-Defendant Twentieth Century Fox Film Corporation ("Twentieth Century Fox") is a Delaware corporation with its principal place of business at 10201 West Pico Blvd., Los Angeles, California.  Twentieth Century Fox is a wholly owned indirect subsidiary of Plaintiff DEI.

22.     Counterclaim-Defendant CBS Broadcasting Inc. ("CBS") is a New York corporation with its principal place of business at 51 West 52nd Street, New York, New York. The FCC has licensed CBS to operate the television station identified by the call letters WCBS-TV ("WCBS"), among other television stations.  WCBS' signal is broadcast to viewers over-the-air in the New York City market.

23.     Counterclaim-Defendant CBS Studios Inc. ("CBS Studios") is a Delaware corporation with its principal place of business at 51 West 52nd Street, New York, New York.

24.     Counterclaim-Defendant Fox Television Stations, LLC ("Fox TV") is a Delaware corporation with its principal place of business at 1211 Avenue of the Americas, New York, New York.  The FCC has licensed Fox TV to operate the television stations identified by the call letters WNYW and WWOR-TV ("WWOR"), among other television stations.  WYNW's and WWOR's signals are broadcast to viewers over-the-air in the New York City market.

25.     Counterclaim-Defendant Fox Broadcasting Company, LLC ("FBC") is a Delaware corporation with its principal place of business at 10201 West Pico Blvd., Los Angeles, California. FBC operates the Fox Network, a national broadcast television network with affiliates reaching households across the United States.

26.     Counterclaim-Defendant NBCUniversal Media, LLC ("NBCUniversal") is a Delaware limited liability company with its principal place of business at 30 Rockefeller Plaza, New York, New York.  NBCUniversal operates the television station identified by the call letters WNBC and owns the subsidiary entity that holds the FCC license for that station, among other television stations.  WNBC's signal is broadcast to viewers over-the-air in the New York City market.

27.     Counterclaim-Defendant Universal Television LLC ("Universal Television") is a New York limited liability company, with its principal place of business at 30 Rockefeller Plaza, New York, New York, and is a wholly owned subsidiary of NBCUniversal.

28.     Counterclaim-Defendant Open 4 Business Productions, LLC ("Open 4 Business") is a Delaware limited liability company, with its principal place of business at 100 Universal City Plaza, Universal City, California, and is a wholly owned subsidiary of NBCUniversal.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation) as Count I of this Counterclaim arises under Section 1 of the Sherman Act (15 U.S.C. § 1), Section 4 of the Clayton Act (15 U.S.C. § 15), and Section 16 of the Clayton Act (15 U.S.C. § 26).

30.     This Court has supplemental subject matter jurisdiction for Counts II, III, IV, V, and VI under 28 U.S.C. § 1367 because these claims are so related to Counterclaim-Plaintiffs' overall claims and federal antitrust claims that they form part of the same case or controversy. Counts II, III, IV, V, and VI of the Counterclaim allege unfair competition under the Donnelly Act, N.Y. Gen. Bus. Law § 340, unfair and/or deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, unfair and unlawful competition in violation of the California Unfair

Competition Law, Cal. Bus. & Prof. Code § 17200, and tortious interference with prospective economic advantage.

31.     This Court has personal jurisdiction over Counterclaim-Defendants, all of which do and solicit business in the State of New York and in this District and have continuous and systematic contacts with New York.  In addition, Counterclaim-Defendants' conduct occurred in part in the State of New York and this District.  Each Counterclaim-Defendant engages in "commerce" as that term is defined in Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the conduct giving rise to this Counterclaim occurred in this judicial district; Counterclaim-Defendants are subject to the Court's personal jurisdiction; and Counterclaim-Defendants may be found or transact business in this judicial district, as provided in Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26).

## TRADE AND COMMERCE

33.     The activities of the broadcasters, as alleged herein, were and are within the flow of, and were and are intended to, did, and do have a direct, substantial, and reasonably foreseeable effect on, interstate and foreign commerce in the United States, the several States, the State of New York, and in this judicial District, including with respect to the markets and sub-markets alleged herein.

34.     The broadcasters produce, broadcast, transmit, license, and sell for retransmission television programming, including over public airwaves within states and across state borders. The broadcasters are horizontal competitors in each relevant market and submarket alleged herein (as well as suppliers of critical inputs into those markets).  The broadcasters, and in particular

station licensees, are trustees of the public's airwaves and must use the broadcast medium to serve the public interest.

35.    In addition, as detailed herein, the broadcasters' anticompetitive conduct has unlawfully, unreasonably, directly, substantially, and foreseeably restrained not only U.S. trade and commerce, but also trade and commerce within virtually every State and, in particular, those states in which Locast operates today.

## FACTUAL BACKGROUND

### *History of Broadcasting and Retransmission*

36.    Counterclaim-Defendants in this action are broadcasters and their affiliates.

37.    The American public, through Congress, has granted to the broadcasters free licenses to portions of the limited, publicly-owned broadcast spectrum to transmit television programming.

38.    These licenses are extremely valuable, and the broadcasters have built powerful, multi-billion-dollar businesses based on the oligopoly that they have been granted over the airwaves.

39.    In exchange for the licenses that have allowed these corporations to flourish, the broadcasters are obligated by law to operate in the public interest and to make the programming that they broadcast available to consumers for free.  Indeed, that is an express condition for the grant of the licenses that they have exploited for huge profits.

40.    The broadcasters are well aware of their obligations to make the programming that they broadcast over the air available to the public, and of their obligations to operate in the public interest.  These obligations are explicit in 47 U.S.C. § 309(a), which requires broadcast licensees to serve the "public interest, convenience, and necessity."

41.     Beginning as early as the 1950s, some members of the public, for various reasons, accessed the programming that broadcasters transmitted over the air through secondary transmissions made by third parties.  In some instances, this was because the broadcast signals were not strong enough to reach certain geographic areas.  In other instances, this was because physical impediments, such as buildings or mountains, blocked the over-the-air signal transmissions.  And in still other instances, this was because the secondary transmitters offered additional content beyond that carried on the over-the-air signals and bundled that additional programming with the content that was available over-the-air.

42.     Prior to 1976, the secondary transmissions could be made through various technologies.  The signals could be made through a simple relay station that boosted the signals and transmitted them to a broader area over the air.  They could be translated into microwaves and sent on in that manner.  And the signals were carried over wire cables.  Each technology accomplished the same end—to allow the public to access the over-the-air signals that licensed broadcasters had committed to make freely available to all members of the public.

43.     In 1976, Congress passed the Copyright Act, 17 U.S.C. §§ 101 *et seq*.  At the time, Congress recognized the existence of secondary transmitters.  Indeed, in the late 1960s and early 1970s, the Supreme Court had ruled on the copyright implications of retransmissions, finding that retransmissions did not violate the copyrights in the programming in question under the 1909 Copyright Act.

44.     In the 1976 Copyright Act, Congress legislatively overruled the Supreme Court and decreed that, under certain circumstances, the secondary retransmission of audio-visual signals could constitute copyright infringement.

45.     In enacting Section 111 of the Copyright Act (and in subsequently amending it), Congress struck a careful and deliberate balance—declaring that secondary transmissions of over-the-air broadcast signals made for the purpose of profit (i.e., pay-TV distribution) would infringe copyright if the re-transmitter did not seek and obtain permission and a license from the owners of the copyrights in programming that was carried on the original over-the-air broadcast.  Under Section 111(a)(5), however, secondary transmissions made by non-profit entities that do not seek any direct or indirect commercial advantage from the retransmission, do not constitute copyright infringement.

46.     This balance is logical and in the public interest.  The broadcasters have been given invaluable licenses that they are statutorily obligated to use for the benefit of the public.  Their charge is to make their signals fully accessible to the public for free within their broadcast area to serve the public good.  They have made billions of dollars in profit from the statutory licenses that they have been granted—and the broadcast executives have made a fortune as a result of the free licenses that they have been granted.

47.     But those licenses, and that financial gain, comes with responsibility.  Where third parties retransmit over-the-air broadcasts for a profit (pay-TV distributors), Congress deemed it appropriate to require those third parties to share that profit with the broadcasters.  However, where a third party (such as a government agency or "other non-profit") retransmits over-the-air signals without any profit motive, Congress deemed that to be in the public good—to increase public accessibility to the over-the-air signals so that the public could remain informed and have access to the programming broadcast in accordance with the free licenses that have been given to the broadcasters.

48.     The broadcasters are aware of Section 111(a)(5) and the balance that Congress struck, as well as their own obligations to make the programming broadcast over the air accessible to the public.

49.     The broadcasters have taken actions to limit the public's access to the free, over-the-air broadcast signals in an effort to force consumers to obtain broadcast programming from pay-TV services, including cable, satellite, over-the-top virtual pay-TV providers, and their own pay-to-stream services.  As noted in a recent L.A. Times Article, "[s]tation ownership groups and the media conglomerates get a cut of pay TV subscriber fees, giving them little incentive to promote over-the-air antenna use."[4] These actions include failing to cover local markets with adequate over-the-air signals, as well as prohibiting independent local broadcast affiliates from providing online streaming of over-the-air live television broadcasts.  In an industry study advocating against FCC rules limiting ownership of local TV stations, study authors note that stations were "hard pressed" to make "necessary investments" to upgrade equipment.[5]  Having deprived consumers of the reasonable opportunity and ability to access over-the-air signals in violation of their statutory obligations and against public policy, the broadcasters then use their market power to force consumers to pay for over-the-air programming that was intended to be free. They accomplish this by raising retransmission rates for third-party pay-TV providers, including cable, satellite, and online providers (the costs of which are then passed on to consumers), and by providing the programming in question on their own pay-streaming services, which charge for the same programming that the broadcasters are required to make accessible for free.

---

[4] *See* Stephen Battaglio, *TV antennas are making a comeback in the age of digital streaming*, L.A. Times, Dec. 28, 2018.
[5] Mark R. Fratrick, Ph.D, SVP/Chief Economist, The Economic Irrationality of the Top-4 Restriction (Mar. 15, 2019) (BIA Advisory Services).

50.     The broadcasters are also aware of New York Not-For-Profit Corporation Law Section 720-a, which specifically exempts unpaid officers and directors of not-for-profit corporations under Internal Revenue Code Section 501(c)(3) from individual liability for actions taken in their corporate capacities on behalf of the corporations.

*SFCNY and the Locast Service*

51.     In 2018, recognizing that the television broadcasters were not living up to their end of the broadcasting bargain with the American public—i.e., that they were failing to cover particular DMAs with sufficient over-the-air coverage—SFCNY set out to correct this issue.

52.     SFCNY provides a public service just like the traditional non-profit "translator" services that have existed since the dawn of television broadcasting to amplify over-the-air signals with transmitters, except that instead of using over-the-air signals to boost the broadcasters' reach, SFCNY streams the signals over the internet (i.e., SFCNY is a "digital translator").  In effect, the Locast service allows consumers who otherwise could not get the over-the-air signals to receive important programming, including local news, weather, and sports.

53.     The system architecture used by SFCNY for the Locast service is local by design. In every DMA, there is an over-the-air antenna that receives the signals.  Proprietary servers owned by SFCNY transcode those signals into internet-protocol bitstreams, and an upstream broadband connection brings those bitstreams from the servers to the Content Delivery Network ("CDN"), all within the local DMA of origin.

54.     The Locast service is available through applications for Android and Apple smartphones and devices, and applications for Roku, Chromecast, Amazon Fire TV, Apple TV, TiVo over-the-air set-top boxes, and Android TV television-viewing devices  The Locast service

is also available as an app (along with hundreds of other apps)  on AT&T's DirecTV and Uverse platforms, and DISH's Hopper and Wally receivers.

55.     To register to watch television through Locast in one of the thirteen cities where the service is available, a consumer signs up online and provides her name and email address (or logs in through Facebook), and certifies that she lives in and is logging in from her own DMA.

56.     Then upon visiting locast.org, a consumer is greeted with a message identifying the consumer's geographic location.   For example, Locast displays the following message to consumers in New York:



*See* Exhibit 1.

57.     SFCNY uses multiple technological methods to restrict the viewing of local broadcast stations to only consumers physically located within a certain DMA (in the thirteen DMAs where Locast operates).  Specifically, SFCNY uses ISP geo-location and GPS geo-location. If a consumer tries to watch broadcast stations while located outside her DMA, she sees the following message:



*See* Exhibit 2.

58.     When logged on in her own DMA, a consumer may review the program guide (depicted below) from her internet-enabled device, select a program, and begin watching.



*See* Exhibit 3.

### *The Expansion of the Locast Service*

59.    The consumer response to SFCNY's goal of improving access to over-the-air broadcast signals through the Locast service has been overwhelming.

60.    Many consumers around the country have publicly commented that, because of Locast, they are finally able to see their local broadcast television stations.  For example:

> Love locast. We cannot get local channels in our area with a ota antenna because of the mountains around Los Angeles. The news about locast is spreading fast in our area for people like myself.
>
> Like · Reply · 5w



*See* Exhibit 4.

61.     The broadcasters are aware that the signals that they broadcast over the air are too weak to be readily available for the public to access throughout the various local areas. The transition to digital television signals roughly ten years ago highlighted this problem. For example, one news article at the time covered how Bay Area residents would be impacted, noting that "some 337,000 Bay Area residents—many of them in the South Bay—who formerly were able to get an analog signal from KTVU will not be able to receive the digital one."[6] In fact, SFCNY itself has experienced difficulties in acquiring signals for retransmission by over-the-air antennas in certain circumstances while setting up its antennas, even though the antennas were within the local broadcast signals. Each of the broadcasters should have a unilateral interest to expand the reach

---

[6] Troy Wolverton, *Digital TV conversion troubles not over yet*, Mercury News, Mar. 12, 2009.

of its content to expand viewership, Nielsen ratings, and advertising revenue.  To the contrary, the broadcasters have worked to ensure that the signal strength is too low to access in certain areas so that the pay-TV model that they have created can be sustained and strengthened.

62.    Also as part of SFCNY's dedication to public service, SFCNY has undertaken initiatives to broaden access to local television to all income brackets, particularly to lower-income populations that are underserved, and often cannot afford the fees charged by pay-TV distributors like cable, broadband, and satellite providers.  For example, SFCNY has worked with the New York City Public Housing Authority to conduct an outreach program designed to educate local residents about the Locast service.  SFCNY included residents of the New York City Public Housing Authority system (e.g., at Edenwald Community Center and in Red Hook) within its sphere of outreach and engagement.

63.    By extending the reach of local broadcasting, Locast performs a critical public safety mission.  Local broadcasters often provide emergency weather and safety information, a core element of serving the "public interest, convenience, and necessity."  Anyone unable to receive an over-the-air signal or afford a pay-TV service might miss such life-saving information.  Locast serves that population by ensuring access to local broadcast weather and emergency information, and consumers have commented on this particular benefit.  For example:

> Guess what! When 3 EF2 tornadoes tore through our town a week ago, it was Locast that allowed me to continue watching local live storm coverage while in the basement. There's a need for this service it can aid in saving lives! The big 3 corporations can go straight to hell as far as I'm concerned!
>
> Like · Reply · 4d

*See* Exhibit 4.

64.     Locast is now available in a total of thirteen DMAs: New York, Philadelphia, Boston, Washington D.C., Baltimore, Chicago, Houston, Dallas, Sioux Falls, Denver, Rapid City, Los Angeles, and San Francisco.

65.     Recognizing the value of the Locast service, consumers throughout the country— particularly those without access to the traditional over-the-air signals—have clamored for SFCNY to bring the Locast service to their cities.  For example:



*See* Exhibit 5.

66.     Local broadcasters have also recognized that the Locast service enhances the public's access to local broadcast television.  In particular, two independent broadcast television owners approached Mr. Goodfriend, unsolicited, and asked to work with SFCNY because they

viewed the Locast service as an important way to reach their local audiences and adapt to the rapidly-evolving internet-video marketplace.

67.     Despite the public and high-profile launch and expansion of the Locast service, the broadcasters waited until July 31, 2019—i.e., after eighteen months had passed since the launch of the Locast service—to file suit against SFCNY and Mr. Goodfriend.  Up until the filing of the lawsuit, the broadcasters never sent a cease-and-desist letter, threatened any legal action, or otherwise contacted SFCNY or Mr. Goodfriend with any concerns.  The broadcasters are now leveraging their own delay to assert a right to claim excessive statutory damages for the past year and a half from both SFCNY and Mr. Goodfriend.

### *SFCNY's Status as a 501(c)(3) Non-Profit Corporation*

68.     SFCNY was incorporated in New York in 2017 as a "charitable corporation" under New York Not-for-Profit Corporation Law.  *See* Exhibit 6.

69.     On April 5, 2018, SFCNY, through its counsel, submitted application materials to the IRS to be recognized as a "501(c)(3)" corporation (i.e., exempt from federal income tax under Internal Revenue Code 501(c)(3)).  *See* Exhibit 7.

70.     As part of the application, among other things, SFCNY indicated that it would undertake fundraising activities through email, personal, and foundation grant solicitations, as well as that it would accept donations from its own and another organization's websites.  *Id.*

71.     On December 13, 2018, SFCNY, through its counsel, received official notice (shown below) that the IRS determined that SFCNY is: (i) exempt from federal income tax under Internal Revenue Code Section 501(c)(3); and (ii) classified as a "public charity."

```
INTERNAL REVENUE SERVICE                        DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201

Date:                                  Employer Identification Number:
          DEC 03 2018                    82-3111352
                                       DLN:
                                         17053101304008
SPORTS FANS COALITION NY INC           Contact Person:
3075 VETERANS HWY STE 131                FAITH E CUMMINS        ID# 31534
RONKONKOMA, NY  11779                  Contact Telephone Number:
                                         (877) 829-5500
                                       Accounting Period Ending:
                                         December 31
                                       Public Charity Status:
                                         170(b)(1)(A)(vi)
                                       Form 990/990-EZ/990-N Required:
                                         Yes
                                       Effective Date of Exemption:
                                         September 8, 2017
                                       Contribution Deductibility:
                                         Yes
                                       Addendum Applies:
                                         No


Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax
under Internal Revenue Code (IRC) Section 501(c)(3). Donors can deduct
contributions they make to you under IRC Section 170. You're also qualified
to receive tax deductible bequests, devises, transfers or gifts under
Section 2055, 2106, or 2522. This letter could help resolve questions on your
exempt status. Please keep it for your records.

Organizations exempt under IRC Section 501(c)(3) are further classified as
either public charities or private foundations. We determined you're a public
charity under the IRC Section listed at the top of this letter.
```

*See* Exhibit 8.

### *Donations to SFCNY*

72.     SFCNY does not currently require consumers to make donations in order to watch programming through the Locast service.

73.     SFCNY seeks donations from consumers solely to use for paying Locast's expenses for equipment, bandwidth, and operations to help run the service.  For example, the following messages are currently displayed on the locast.org website:





*See* Exhibit 9.

74.     To further aid in covering the operating expenses of the non-profit, Locast received a loan from IoT Broadband, LLC ("IoT") and a donation from AT&T.  The terms of the loan from IoT are stringent, with above-market interest.  The donation from AT&T was received in July 2019, after SFCNY had been operating the Locast service for more than a year and a half.

75.     SFCNY has received no financial support whatsoever from DISH.

76.     To date, SFCNY carries debt and has yet to achieve operational cash flow break-even.

***SFCNY is Engaged in Trade or Commerce***

77.     As noted above, SFCNY receives donations and loans from individuals and corporations to support its services.  It uses these donations and loans to fund the operations for the Locast service which include, for example:

i.      *Local Facilities in Each Market*: SFCNY makes monthly lease payments to building owners for the rights to place over-the-air antennas and rack space in server rooms to hold

SFCNY's proprietary servers, as well as payments for business-grade high-speed broadband internet connections;

ii.     *Technology Vendor & Consumer Donation Management Firm*: SFCNY makes monthly payments to Jaybird Marketing Group, which: (a) developed and continues to upgrade the Locast software; (b) handles the technical issues related to the operation of the Locast service, including managing local facilities and installations; (c) develops all technical integrations with third-party platforms (e.g., Apple, Android, Roku, Amazon); and (d) manages the consumer donations;

iii.    *Customer Service Firm*: SFCNY makes payments to eCreek, which is a vendor that handles customer service issues;

iv.     *Content Delivery Network*: SFCNY pays three vendors—AT&T, Verizon, and Amazon Web Services—for content delivery network capacity, based on a per-Gigabyte data usage rate; and

v.      *Equipment Acquisition*: SFCNY, through its vendor Jaybird, acquires all necessary hardware (including antennae, cables, and servers) from third-party vendors.

78.     Locast is a market participant in each alleged relevant market and is engaged in interstate commerce with the retransmission of over-the-air television broadcast signals and the payment of vendors in multiple states.

### *Mr. David Goodfriend*

79.     Mr. Goodfriend has a decades-long history of commitment to consumer advocacy and public service.

80.     Mr. Goodfriend began his career in public service.  He served as Deputy Staff Secretary to President William Jefferson Clinton; professional staff member to congressional

committees chaired by Senator Herb Kohl (D-WI) and Charles B. Rangel (D-NY); and Media
Legal Advisor to FCC Commissioner Susan Ness.

81.     Mr. Goodfriend has served as co-chairman of the Federal Communications Bar
Association Legislation Committee.

82.     In the private sector, Mr. Goodfriend served as co-founder, Executive Vice
President, and General Counsel of Air America Radio, the first-ever commercial progressive talk
radio program in the country.  Mr. Goodfriend also served as Vice President of Law and Public
Policy at DISH, a position he left over a decade ago.

83.     Mr. Goodfriend also founded "Sports Fans Coalition," a non-profit that, among
other initiatives, took on the NFL, MLB, NHL, NBA, and the broadcast industry to petition the
FCC to end the "Sports Blackout Rule" that had been in effect since 1975.  In 2014, on a
unanimous, bipartisan, 5-0 vote, as a direct result of Mr. Goodfriend's and Sports Fans Coalition's
advocacy, the FCC eliminated the Sports Blackout Rule.

84.     Today, Mr. Goodfriend is an Adjunct Professor at the Georgetown University Law
Center and a Professorial Lecturer at the George Washington University Law School.

85.     Mr. Goodfriend also has served, and currently serves, as a consultant, lobbyist,
regulatory advocate, and lawyer on behalf of dozens of clients.  Through a small firm founded by
his wife and business partner, and which he co-owns, Mr. Goodfriend routinely handles matters
before the United States Senate and House, FCC, Department of Justice Antitrust Division,
National Telecommunications and Information Administration, and the White House.  Mr.
Goodfriend's clients have included labor unions, independent television programmers, technology
startups, satellite television and broadband providers, and Fortune 50 technology companies.
Some of the pro-consumer advocacy that Mr. Goodfriend has conducted through his firm included

opposition to major telecommunications and media mergers, including the proposed Comcast/Time Warner Cable, AT&T/T-Mobile, and Sinclair/Tribune mergers, all of which were blocked. Some of Mr. Goodfriend's legislative victories include reauthorizations of the Satellite Home Viewer Act ("STELA" and "STELAR"); spectrum provisions of the Middle Class Tax Relief and Job Creation Act of 2012; and the introduction of the Energy Efficiency in Housing Act and the State Video Tax Fairness Act.

86. With respect to SFCNY, Mr. Goodfriend is the President and Treasurer, and is a member of the Board of Directors.

87. As reflected in SFCNY's Form 1023 (i.e., its 501(c)(3) application materials) and its publicly-available 2018 tax return form 990-EZ filed on April 25, 2019 (excerpted below), Mr. Goodfriend is unpaid, and takes no salary from SFCNY.

*Form 1023*



*Form 990-EZ*

| Part IV | List of Officers, Directors, Trustees, and Key Employees (list each one even if not compensated - see the instructions for Part IV) | | | |
| --- | --- | --- | --- | --- |
| Check if the organization used Schedule O to respond to any question in this Part IV | | | | ☐ |
| (a) Name and title | (b) Average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) (if not paid, enter -0-) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
| DAVID GOODFRIEND | | | | |
| CHAIRMAN, PRESIDENT AND TREASURER | 10.00 | 0. | 0. | 0. |
| PHILLIP BERENBROICK | | | | |
| SECRETARY | 0.03 | 0. | 0. | 0. |
| HABIBA ALCINDOR | | | | |
| DIRECTOR | 0.03 | 0. | 0. | 0. |

*See* Exhibits 7, 10.

88.    As made explicit in SFCNY's publicly-available Bylaws, Mr. Goodfriend's duty as a member of the SFCNY Board of Directors is to supervise and manage SFCNY's affairs.  As President, Mr. Goodfriend's obligation is to perform all duties customary to that office and serve as the CEO of SFCNY.  As Treasurer, Mr. Goodfriend is responsible for the funds and securities of SFCNY and for maintaining complete and accurate accounts of all receipts and disbursements of SFCNY.  *See* Exhibit 11.

89.    All of Mr. Goodfriend's actions with respect to SFCNY and the Locast service have been within the boundaries of his duties as President, Treasurer, and as a Director of SFCNY.

90.    Mr. Goodfriend has taken no compensation whatsoever from SFCNY, yet has spent hundreds of hours on the project—arguably a monetary loss to his business.

91.    Nor has Mr. Goodfriend been compensated in any way by any third party for his activities associated with SFCNY.  No third party has paid Mr. Goodfriend or his consulting firm any compensation for any activities related to SFCNY or Locast, and even when third parties have offered Mr. Goodfriend a speaking fee to talk about the public benefits of Locast, Mr. Goodfriend has declined any such compensation.

92.     No lobbying outcome sought by Mr. Goodfriend on behalf of any client has resulted from SFCNY or the Locast service.

## THE RELEVANT MARKETS

### *Relevant Product Markets*

93.     Television stations transmit programming content over the air to antenna receivers using video and sound signals.  The "Big 4" networks (which comprise Counterclaim-Defendants ABC, CBS, FOX, and NBC) supply and distribute network television programming through their owned and operated stations as well as affiliate stations in the relevant geographic markets alleged herein.  Each of the broadcasters is also a provider of retransmission services for its own content through over-the-top internet streaming services that distribute content to subscribers.

94.     Providers of cable, satellite, fiber optic television, and over-the-top video and sound distribution services (referred to collectively herein as multichannel video programming distributors or "MVPDs") obtain content from television broadcasters, including the Big 4, for retransmission to the MVPDs' respective subscribers.  MVPDs operating for profit must obtain a license or retransmission consent right to retransmit over-the-air broadcast content to subscribers.  Retransmission fees are negotiated between MVPDs and the broadcast content owners, including the broadcasters and their owned-and-operated and affiliate stations.  The costs of those fees are then passed on to consumers.

95.     By law, non-profit organizations meeting the criteria of the Copyright Act, 17 U.S.C. § 111(a)(5), may access over-the-air broadcasts and retransmit them to subscribers within the relevant DMA without further permission of the broadcasters.

i.      *Retransmission Services of Network Television Broadcasts*

96.      The retransmission of over-the-air broadcast content constitutes a relevant product market and line of commerce within the meaning of Section 1 of the Sherman Act, the Donnelly Act, and the California Unfair Competition Law.

97.      Over-the-air broadcast content includes unique offerings such as local news, sports, and national primetime programs that viewers do not consider to be substitutable with other media, or content found on cable, or niche programming.  As the US Department of Justice ("DOJ") recently concluded after its investigation of Nexstar Media Group, broadcast content is distinguishable from cable content.[7]  The DOJ noted, for instance, that cable channels do not offer local news "which provides a valuable connection to the local community."[8]

98.      MVPDs retransmit television broadcast content over their own infrastructure to their subscribers.  MVPDs and other for-profit retransmission service providers require television retransmission consent rights from the broadcasters for the broadcasters' programming content. The licensing of retransmission consent rights is a separate relevant market (described below) and critical input into the retransmission services market.  By law, non-profit organizations meeting the criteria of the Copyright Act, 17 U.S.C. § 111(a)(5), are market participants in the retransmission services market that may access over-the-air broadcasts and distribute them to subscribers.  Each of the broadcasters is also a provider of retransmission services for its own content through over-the-top internet streaming services that distribute content to subscribers.

99.      A small but significant and non-transitory increase in fees for retransmission of over-the-air broadcast content above the competitive level for those services would not cause

---

[7] Complaint, *United States v. Nexstar Media Grp.*, Case No. 1:19-cv-002295 (D.C. July 31, 2019).
[8] *Id.*

subscribers to shift enough business to other programming or services so as to make such a price increase unprofitable for a firm with monopoly power.

100.    A small but significant and non-transitory increase in fees for retransmission of over-the-air broadcast content above the competitive level for those services would not cause subscribers to shift enough business to other programming or services so as to make such a price increase unprofitable for a firm with monopoly power.

### ii.    Retransmission Services of Big 4 Network Television Broadcasts

101.    The retransmission of Big 4 television broadcast content constitutes a relevant product market (or submarket) and line of commerce within the meaning of Section 1 of the Sherman Act, the Donnelly Act, and the California Unfair Competition Law.

102.    MVPDs retransmit Big 4 television broadcast content over their own infrastructure to subscribers paying a fee to MVPDs for this retransmission service.  MVPDs and other for-profit retransmission service providers require consent rights from the Big 4 broadcasters for the broadcasters' content, which is a critical input into the Big 4 retransmission services market.  By law, non-profit distributors meeting the criteria of Copyright Act, 17 U.S.C. § 111(a)(5), are market participants in the Big 4 retransmission services market that may access over-the-air Big 4 broadcast content and distribute it to subscribers.  Each of the Big 4 broadcasters is also a provider of retransmission services for its own content through over-the-top internet streaming services that distribute content to subscribers.

103.    Big 4 broadcast content includes unique offerings such as local news, sports, and primetime programs that viewers do not consider to be substitutable with other media or content found on cable, other broadcast, or unaffiliated stations. Big 4 stations typically have the highest audience share and ratings in each DMA and each of the relevant geographic markets alleged

herein.  Viewers typically consider Big 4 stations to be substitutes for one another.  As the DOJ noted, "Big 4 broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable channels."[9]

104.    A small but significant and non-transitory increase in fees for retransmission of Big 4 content above the competitive level for those services would not cause subscribers to shift enough business to other programming or services so as to make such a price increase unprofitable for a firm with monopoly power.

### iii.    *Licensing of Television Retransmission Consent*

105.    The licensing of television retransmission consent constitutes a separate relevant product market and line of commerce within the meaning of Section 1 of the Sherman Act, the Donnelly Act, and the California Unfair Competition Law.

106.    Over-the-air broadcast content includes unique offerings such as local news, sports, and primetime programs that viewers do not consider to be substitutable with other media, or content found on cable or other programming.  As the DOJ recently concluded after its investigation of Nexstar Media Group, broadcast content is distinguishable from cable content.[10]

107.    MVPDs view over-the-air broadcast programming as desirable for inclusion in the packages they offer to subscribers.  MVPDs and other for-profit retransmission service providers require consent rights from the broadcasters to retransmit the broadcasters' content.

108.    By law, non-profit distributors meeting the criteria of Copyright Act, 17 U.S.C. § 111(a)(5), are zero-price market participants in the retransmission consent market.

---

[9] *Id.*
[10] *Id.*

109.    The broadcasters are able to exercise market power in the market for licensing of television retransmission consent in each of the relevant geographic markets alleged herein.  The broadcasters combined account for more than roughly 60% of the retransmission consent market.[11] These consent rights were estimated to generate nearly $11 billion in revenue in the U.S. last year.[12]

110.    The broadcasters' market power is further demonstrated by their ability to leverage the threat of foreclosure to raise the price of retransmission consent rights to MVPDs.  A Wells Fargo industry report estimated that average retransmission fees per subscriber per month would increase for: (i) CBS from $1.89 in 2017 to $2.59 in 2019; (ii) NBC from $1.81 in 2017 to $2.45 in 2019; (iii) ABC from $1.58 in 2017 to $2.07 in 2019; and (iv) FOX from $1.64 in 2017 to $2.13 in 2019.[13]  If MVPDs do not agree to pay higher amounts for retransmission consent rights, the broadcasters then allow the license agreements to expire, forcing a blackout of the broadcast programming for the MVPD's subscribers until a deal is reached and new, higher, fees are set.

111.    As broadcasters have consolidated through vertical integration with distributors, they have gained bargaining power and cable blackouts have become increasingly common.  There have been over 200 blackouts in 2019; in contrast, there were only 8 blackouts in 2010.[14]

112.    A small but significant and non-transitory increase in the fees for retransmission consent rights above the competitive level for those rights would not cause MVPDs or other licensees to shift enough business to other programming or services to make such a price increase unprofitable for a firm with monopoly power.

---

[11] *See* Wells Fargo Research.
[12] RBR Article (referencing Kagan analysis).
[13] Wells Fargo Research.
[14] *See* Brian Steinberg, *Cable Blackouts Growing More Common, Even If Subscribers Get Angry*, Variety, July 22, 2019 [hereinafter "Variety Article"].

### iv.    *Licensing of Big 4 Television Retransmission Consent*

113.    The licensing of Big 4 television retransmission consent constitutes a separate relevant market (or submarket) and line of commerce within the meaning of Section 1 of the Sherman Act, the Donnelly Act, and the California Unfair Competition Law.

114.    Big 4 broadcast content includes unique offerings such as local news, sports, and primetime programs that viewers do not consider to be substitutable for other media or content found on cable, other broadcast, or unaffiliated stations.  As the DOJ noted, "Big 4 broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable channels."[15] Big 4 stations typically have the highest audience share and ratings in each DMA and each of the relevant geographic markets alleged herein.  Nor are cable channels, which offer different content and that is generally not tailored to the local community, close substitutes for Big 4 broadcast content.  Viewers typically consider Big 4 stations to be substitutes for one another.

115.    MVPDs and other retransmission providers consider Big 4 programming to be highly desirable for inclusion in packages offered to subscribers because of the popular national content and valuable local news and sports coverage offered by these stations.  By law, non-profit distributors meeting the criteria of Copyright Act, 17 U.S.C. § 111(a)(5), are zero-price market participants in the Big 4 retransmission consent market.

116.    The broadcasters are able to exercise market power in the market for Big 4 licensing of television retransmission consent in each of the relevant geographic markets alleged herein. The broadcasters combined have or nearly have 100% of the Big 4 retransmission consent market.

---

[15] Complaint, *United States v. Nexstar Media Grp.*, Case No. 1:19-cv-002295 (D.C. July 31, 2019).

Retransmission consent rights were estimated to generate nearly $11 billion in revenue in the U.S. last year.[16]

117.   The Big 4 broadcasters' market power is further demonstrated by their aggressive retransmission consent negotiation tactics and their ability to extract increasing fees or limit output. For example, a Wells Fargo industry report estimated that average retransmission fees per subscriber per month would increase for: (i) CBS from $1.89 in 2017 to $2.59 in 2019; (ii) NBC from $1.81 in 2017 to $2.45 in 2019; (iii) ABC from $1.58 in 2017 to $2.07 in 2019; and (iv) FOX from $1.64 in 2017 to $2.13 in 2019.[17]   The broadcasters aggressively leverage retransmission consent negotiations to extract exorbitant fees from cable companies.

118.   If MVPDs do not agree to pay, the broadcasters drop their channels, thereby instituting a blackout of programming to gain leverage in negotiations.   Once an agreement is reached, these fees are passed to consumers.

119.   As broadcasters have consolidated through vertical integration with distributors, they have gained bargaining power and cable blackouts have become increasingly common.   There have been over 200 blackouts in 2019; in contrast, there were only 8 blackouts in 2010.[18]

120.   A small but significant and non-transitory increase in the fees for Big 4 retransmission consent rights above the competitive level for those rights would not cause MVPDs or other licensees to shift enough business to non-Big 4 programming or cable networks so as to make such a price increase unprofitable for a firm with monopoly power.

---

[16] RBR Article (referencing Kagan analysis).
[17] Wells Fargo Research.
[18] *See* Variety Article.

### *Relevant Geographic Markets*

121.    A DMA represents a geographic unit, as measured by Nielsen for its television survey business.  Nielsen refers to DMAs when providing data to industry participants for use in analyzing audience size and demographic composition in a particular area.  DMAs are widely accepted by industry participants as the standard geographic areas for assessing television audience size and demographic composition.  The Federal Communications Commission ("FCC") also uses DMAs as geographic units for its MVPD regulations.  For example, advertisers use DMAs when negotiating with local television stations for specific time periods and durations of broadcast.  DMAs are also used when retransmission consent rights are negotiated between MVPDs and programmers or content owners.

122.    Locast currently operates in thirteen DMAs, each of which is a relevant geographic market for each of the above relevant product markets (or submarkets): (i) New York, NY; (ii) Philadelphia, PA; (iii) Boston, MA (Manchester, NH); (iv) Washington, DC; (v) Baltimore, MD; (vi) Chicago, IL; (vii) Houston, TX; (viii) Dallas-Ft. Worth, TX; (ix) Sioux Falls, SD (Mitchell, SD); (x) Denver, CO; (xi) Rapid City, IA; (xii) Los Angeles, CA; and (xiii) San Francisco-Oakland-San Jose, CA.

123.    The signals of broadcast television stations located outside of a DMA generally do not reach a significant percentage of another DMA through either over-the-air or MVPD distribution.  Each DMA therefore represents a relevant geographic market for both retransmission services and for the licensing of broadcast retransmission consent rights within the meaning of Section 1 of the Sherman Act, the Donnelly Act, and the California Unfair Competition Law.

124.    In addition to the foregoing, in the event of a blackout of a Big 4 station's content, FCC rules generally prohibit an MVPD from importing the network's programming from another

DMA.  As a result, Big 4 viewers in one DMA cannot switch to Big 4 programming in another DMA in the face of a blackout.  Thus, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA.  Each DMA therefore represents a relevant geographic market for Big 4 retransmission and for the licensing of Big 4 television retransmission consent within the meaning of Section 1 of the Sherman Act, the Donnelly Act, and the California Unfair Competition Law.  For the same reasons, each DMA represents a relevant geographic market for the licensing of retransmission consents.

125.    The United States also constitutes a relevant geographic market for each of the above relevant product markets.  The broadcasters generate revenue from retransmission consent fees by negotiating for a certain dollar amount per subscriber per month for their owned and operated stations throughout the United States.

### Barriers to Entry and Expansion

126.    Barriers to entry and expansion in each of the relevant retransmission services markets are high.  Providers, including MVPDs, typically must invest heavily in, among other things, infrastructure such as physical distribution facilities, transmission technology, and unique programming before effective entry.  And even with access to physical infrastructure, an MVPD must obtain content and market recognition with consumers before offering a meaningful competitive alternative in a market.

127.    Barriers to entry and expansion in the retransmission consent markets are similarly high.  The FCC regulates the broadcast television industry and has strict broadcast ownership rules setting a limit on the number of broadcast stations—radio and TV—that a single entity can own.  It also imposes limits on the common ownership of broadcast stations and newspapers.  Broadcast television licenses therefore are difficult to obtain because of the lengthy FCC regulatory process,

as well as the limited availability of spectrum. Even if a new signal were to become available, commercial success typically takes a significant investment of capital and many years to attain, if at all.

## THE BROADCASTERS' UNLAWFUL ANTICOMPETITIVE CONDUCT

### *Conspiracy in Restraint of Trade*

128.    The broadcasters have conspired to restrain trade in the relevant markets alleged herein by bringing a sham copyright infringement claim against SFCNY (a recognized 501(c)(3) non-profit) and Mr. Goodfriend (in his personal capacity) and by threatening business retaliation and baseless legal claims against any current or prospective donors, supporters, or business partners of Counterclaim-Plaintiffs.

129.    The broadcasters' efforts are part of a larger conspiracy to limit consumers' practical access to over-the-air broadcasts so that consumers are forced to use pay-TV services that charge increasingly greater fees for access to the over-the-air television programming that the public should more readily be able to utilize.[19]  A significant portion of those fees are then paid to the broadcasters in the form of retransmission consent fees.  The broadcasters have also launched or announced the launch of their own competing paid streaming services that transmit over-the-air broadcasts, or content therein, live over the internet.

130.    The broadcasters have colluded to limit practical access to the over-the-air signals by broadcasting signals that they know are of insufficient strength to be accessed by all members of the public within the relevant local geographic areas.

---

[19] *See* Stephen Battaglio, *TV antennas are making a comeback in the age of digital streaming*, L.A. Times, Dec. 28, 2018.

131.   Mr. Goodfriend has spoken with a representative from a major market participant who indicated that he had been told by vendors of transmitter equipment that the broadcasters intentionally purchase low-end equipment even though other equipment is available for sale that could provide better over-the-air coverage.  The broadcasters are also capable of using additional translator stations of their own to better cover markets with adequate signals, but in many cases choose not to do so.

132.   The broadcasters have also colluded to ensure that local independent affiliates cannot retransmit the local over-the-air signals by other means to the public, ensuring that the signals are not fully accessible.

133.   It should be in the interests of each broadcaster, acting unilaterally in its own economic interest and independently in its role as a trustee of the licenses granted to it by Congress, to increase distribution and viewership for its programming to maximize advertising revenue. Each broadcaster, acting independently, should welcome retransmission of its programming through organizations such as SFCNY.

134.   Although, acting independently, the broadcasters would have an incentive to maximize distribution of their own programing to improve their respective ability to attract advertising revenue, the broadcasters as a group have an incentive to conspire to maximize their non-advertising revenue and: (i) degrade over-the-air signals; and (ii) limit retransmission services offered by non-profit distributors that access over-the-air broadcasts and distribute them for free.

### *Sham Litigation*

135.   The broadcasters' copyright infringement suit is objectively baseless and was brought with an intent to restrain trade and interfere with Counterclaim-Plaintiffs' business.

136.     Although the Locast service launched in New York City in January 2018, the broadcasters waited until July 2019 to file suit against Locast (or otherwise reach out to SFCNY with any concerns, legal or otherwise), apparently then recognizing Locast was gaining momentum as an increasing number of consumers registered for and used the service—and becoming increasingly upset by their belief that the billions of dollars of retransmission consent fees that they have collected by denying the public reasonable access to over-the-air signals could actually be in jeopardy if consumers could easily access the local over-the-air broadcast signals as the statutory broadcast regime originally intended.  The broadcasters' lawsuit also was filed in the midst of a highly publicized licensing negotiation and dispute with MVPDs, including AT&T.[20]

137.     As a threshold matter, the broadcasters do not challenge SFCNY's status as a non-profit under the plain language of the Copyright Act, 17 U.S.C. § 111(a)(5), which provides:

> The secondary transmission of a performance or display of a work embodied in a primary transmission is not an infringement of copyright if- … the secondary transmission … is made by a governmental body or other non-profit organization without any purpose of direct or indirect commercial advantage, and without charge to the recipients of the secondary transmission other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service.

The broadcasters do not challenge SFCNY's legal status as a non-profit in the Complaint; nor do they claim that SFCNY is a sham or otherwise run day-to-day in any way as to put its legal non-profit status at risk.  The broadcasters also do not allege that SFCNY is charging more than necessary to defray its costs (it currently charges nothing).  Rather, the broadcasters make the baseless claim that SFCNY is operating for "its own commercial benefit and for the commercial benefit of companies that are among the largest commercial pay-TV distributors in the country."

---

[20] *See* Mike Rosenstein, *CBS, AT&T, DirecTV strike a deal to end blackout just as NFL preseason schedule kicks off | What it means*, NJ.com, Aug. 08, 2019; Variety Article.

Compl. ¶ 8.  But the broadcasters offer no basis or even any allegations to support a claim that AT&T, DISH, or any other entity was or is directly involved in creating, operating, setting strategic direction, or improperly influencing Locast, SFCNY, or Mr. Goodfriend in his role as an officer and director with SFCNY.  DISH is not even a donor to SFCNY, and AT&T did not donate to SFCNY until SFCNY had been operating the Locast service for more than a year and a half.  The broadcasters were aware that SFCNY was a non-profit when they filed their Complaint.

138.    The broadcasters were also aware of and chose to ignore SFCNY's 501(c)(3) status, which required review by the IRS and approval that SFCNY has an exempt purpose (e.g., literary or educational), proper legal formation, no accumulation or distribution of profit to a private party, and no substantial political activity or campaigning.  *See* Exhibits 7, 8.  No litigant could reasonably expect to succeed on the merits of this claim.

139.    The broadcasters' claims against Mr. Goodfriend and SFCNY have been asserted in bad faith and in breach of the broadcasters' statutory obligations to operate in the public good. Incredibly, without any firm basis in law, fact or logic, the broadcasters argue that the identities of SFCNY's ***arms-length*** donors somehow could determine SFCNY's status as a non-profit.  This ignores and contradicts the criteria used by the IRS in determining SFCNY's 501(c)(3) status— proper legal formation, an exempt purpose (e.g., literary or educational), no unjust enrichment to private parties, including accumulation or distribution of net earnings or assets to private persons, no participation in or intervention in any political campaign, and no substantial lobbying activities.

140.    The broadcasters' meritless claims against Mr. Goodfriend in his ***personal*** capacity are even more egregious and inexcusable in light of the protections under New York Not-For-Profit Corporation Law Section 720-a.  Any pre-suit investigation would have revealed the gross deficiency of the infringement claim against Mr. Goodfriend.  No reasonable litigant in the

broadcasters' position could realistically expect to succeed on the merits of a copyright infringement claim against Mr. Goodfriend in his individual capacity.

141.    The broadcasters are aware that their claims are frivolous and wholly without merit but asserted them anyway to intimidate SFCNY (as well as any entity that might assist SFCNY) and Mr. Goodfriend personally, and to unfairly and illegally restrain SFCNY from engaging in legitimate commerce in the public's best interest.

142.    The broadcasters have undertaken their sham litigation with subjective intent to overwhelm Mr. Goodfriend and make it more expensive for SFCNY to provide free retransmission services to consumers, interfere with the current and prospective business relationships of SFCNY and Mr. Goodfriend, to intimidate and harass them, and to restrain trade in the relevant markets. The broadcasters' intent was and continues to be to use the litigation process to harm SFCNY and Mr. Goodfriend and competition.  The broadcasters' conspiracy has harmed and will continue to harm competition in these markets.

143.    The broadcasters reveal their anticompetitive intent in the Complaint: "As Locast extends its reach…certain pay-TV companies are using and will likely continue to use Locast's presence in the market in an effort to gain leverage in retransmission consent negotiations for broadcast programming, because of Locast's efforts to devalue transmission rights."  Compl. ¶ 58.

### *Exclusionary Threats*

144.    Despite the fact that Locast has been operating for at least the past eighteen months, none of the broadcasters had contacted SFCNY or Mr. Goodfriend concerning any alleged copyright infringement prior to sending an "Advance Notice of Potential Infringement" and filing a complaint on the same day.

145.    During a meeting between a senior executive at T-Mobile and Mr. Goodfriend on December 4, 2018, in Denver, Colorado, the executive recounted that he was at a group gathering where a broadcast industry representative said that they would crush Locast.  The executive also implied that the broadcast industry representative would "take on" any supporters of Locast.

146.    When Mr. Goodfriend met with a senior executive at cable company Mediacom on October 29, 2018, in New York, New York, the executive said that two entities—one broadcast owner and another broadcast network—said that they were waiting on Locast to get bigger and then would sue Locast and any supporters.

147.    In a meeting between Mr. Goodfriend and senior executives at a major pay-TV distributor, the executives said that when they met with negotiators for the broadcasters, the negotiators stated that, "We don't want any more Locast situations."

148.    In a meeting between representatives of SFCNY and senior executives at YouTubeTV in April 2019, the executives indicated that they had been told that if YouTubeTV provides access to Locast, then YouTubeTV will be punished by the Big 4 broadcasters in negotiating carriage agreements for other non-broadcast programming channels.

149.    Before the broadcasters filed their complaint against SFCNY and Mr. Goodfriend, SFCNY was in active discussions with a senior executive at Nielsen to ensure that Nielsen could measure Locast viewership (including discussions concerning a technical engineering issue regarding which audio channel contained the Nielsen watermark so that SFCNY could ensure that the watermark was there).  After the broadcasters filed the complaint around the same time that Nielsen was about to begin renewal negotiations with the broadcasters—the executive stopped returning Mr. Goodfriend's calls on behalf of SFCNY.  Nielsen changed its plans about working with SFCNY as a result of intimidation from the broadcasters.

150.    Also before the broadcasters filed their Complaint, Mr. Goodfriend met on behalf of SFCNY with the senior executive team of cable and internet provider RCN Corporation ("RCN") on January 15, 2019 at RCN's offices in New Jersey.  An executive explained to Mr. Goodfriend that RCN wanted to start focusing its strategy on providing broadband internet, so making Locast available as an app made a lot of sense for RCN users.  During that meeting, RCN committed to donating $750,000 to SFCNY, assuming SFCNY could find other donors to pledge first.  After SFCNY identified another donor and returned to RCN, the executive indicated that circumstances had changed, and RCN would no longer be willing to donate.  RCN changed its plans as a result of intimidation from the broadcasters.

## ANTITRUST INJURY AND DAMAGES

151.    Locast, as operated by SFCNY, is an actual or potential competitor in the relevant markets impacted by the broadcasters' unlawful anticompetitive conduct.

152.    SFCNY and Mr. Goodfriend each has suffered, or is likely to suffer, injury as a direct result of the broadcasters' unlawful conspiracies, including lost donations and goodwill for SFCNY, substantial and unnecessary litigation expenses, and reputational harm to Mr. Goodfriend.

153.    The injury to SFCNY and Mr. Goodfriend has directly and indirectly excluded, threatened, or harmed competition and, ultimately, consumers in each of the relevant markets.

154.    By reducing the incentive and ability of Locast (and SFCNY and Mr. Goodfriend) to invest and innovate in the secondary transmission markets, consumers are losing and will continue to lose the procompetitive benefits of having the ability to receive retransmission services through Locast's presence in these markets (and in those geographic markets into which SFCNY had planned to expand the Locast service).

155.    In addition, by their threats, baseless litigation, and other conduct, the broadcasters are entrenching their position in each relevant market herein and sending a message to any other non-profits or supporters of non-profits that they intend to impose a hefty (and unlawful) tax on innovation and expanded free access to over-the-air broadcasting—despite Congressional intent to the contrary.  Prices for retransmission consent rights—which are passed directly to pay TV consumers—will continue to skyrocket in secondary transmission markets.

156.    In addition, this conduct has and will continue to undermine the public interest— the broadcasters will be able to force consumers (including those without any option to receive over-the-air broadcasts) to pay exorbitant and supra-competitive fees for over-the air television programming services that were intended to be free—unless this Court stops this harmful and blatantly anticompetitive conduct.

157.    The broadcasters' unlawful conduct has injured and will continue to injure competition and consumers, unless and until it is enjoined by this Court.  The same conduct has proximately caused injury to Mr. Goodfriend, individually, and to SFCNY in its ability to raise funds, attract business partners, and to operate Locast.

## CLAIMS FOR RELIEF

### COUNT I: CONSPIRACY IN RESTRAINT OF TRADE
### IN VIOLATION OF § 1 OF THE SHERMAN ACT

158.    SFCNY and Mr. Goodfriend reallege and incorporate in this Count the allegations set forth in Paragraphs 1 to 157 herein.

159.    As alleged above, the broadcasters have market power in the relevant markets for retransmission consent (and the relevant markets or submarkets of Big 4 retransmission consent) within the thirteen DMAs where Locast operates and the United States.  The broadcasters together control the critical input of broadcast content for competition in each of the relevant markets

alleged herein for retransmission services (and the relevant markets or submarkets for Big 4 retransmission services).

160.     The broadcasters have contracted, combined, and conspired in an unreasonable and illegal restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in one or more relevant product and geographic markets or submarkets to: (i) file and maintain sham copyright infringement litigation for which no reasonable litigant could realistically expect success on the merits and that was motivated by their desire to use the judicial process to impose a collateral, anticompetitive injury rather than obtain a justifiable legal remedy; and (ii) threaten business retaliation and baseless litigation against current and potential Locast donors, supporters, and third-party vendors to undermine Locast's ability to raise revenue, to maintain access to broadcast content, and to operate.  The contract, combination, and conspiracy are continuing and will continue unless the relief prayed for herein is granted.

161.     The broadcasters' combination and conspiracy consists of a continuing agreement, understanding, and concert of action between and among Counterclaim-Defendants, the substantial terms of which include an agreement to: (i) prevent or limit retransmission services offered by non-profit distributors that access over-the-air broadcasts and distribute them for free; (ii) eliminate Locast as a competitor in the retransmission services market through objectively baseless, bad faith sham litigation, threats, and other conduct; and (iii) facilitate, effectuate, and implement the contract, combination, and conspiracy and restrain trade in the relevant markets alleged herein, including the retransmission consent markets.  At all times, the broadcasters had a conscious commitment to a common scheme to achieve these unlawful objectives.

162.     By restraining trade in the retransmission services market, the broadcasters have undermined Congressional intent as expressed in the copyright laws, limited innovation in over-

the-air broadcasting, inflated the cost of retransmission consent rights in each relevant geographic market, and harmed consumers by increasing their costs and, if allowed to continue, by limiting their choice of options and further increasing prices for programming intended to be free.  Their conduct has caused direct and proximate injury to the business and property of Counterclaim-Plaintiffs, including lost donations, loss of goodwill to SFCNY, and reputational harm to Mr. Goodfriend, and will continue to cause harm and injury until stopped by this Court.

163.    By reason of the foregoing, Counterclaim-Defendants have committed both per se and rule of reason violations of the antitrust laws.  As a direct and proximate result of the threats, baseless litigation, and other anticompetitive activities of the broadcasters, SFCNY and Mr. Goodfriend have been and will continue to be injured in their business and property, including in the ability to raise funds, attract business partners, and are entitled to compensatory and treble damages in an amount to be ascertained at trial.

### COUNT II: VIOLATION OF THE DONNELLY ACT (N.Y. GEN. BUS. LAW § 340)

164.    SFCNY and Mr. Goodfriend reallege and incorporate in this Count the allegations set forth in Paragraphs 1 to 163 herein.

165.    The agreements alleged above unreasonably restrain trade in violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340.

166.    SFCNY's and Mr. Goodfriend's damages are directly attributable to the broadcasters' threats, baseless litigation, and other anticompetitive activities.  SFCNY's and Mr. Goodfriend's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes the broadcasters' conduct unlawful.

## COUNT III: VIOLATION OF N.Y. GEN. BUS. LAW § 349

167.    SFCNY and Mr. Goodfriend reallege and incorporate in this Count the allegations set forth in Paragraphs 1 to 166 herein.

168.    Through their threats, baseless litigation, and other conduct, the broadcasters employed unlawful, unfair, and/or deceptive business practices, as described above, that are consumer-oriented and have broad impact on consumers at large in that they enable the broadcasters to force consumers to pay exorbitant and supra-competitive fees for over-the air television programming services that were intended to be free or forego those services.

169.    The broadcasters' unlawful, unfair, and/or deceptive business practices are not aimed at enforcing their rights under the copyright laws but instead to deter the consumer from engaging in legitimate business with SFCNY and Mr. Goodfriend.

170.    As a direct and proximate result of these deceptive trade practices, SFCNY and Mr. Goodfriend have been and will continue to be injured in business and property.

171.    As a direct and proximate result of these deceptive trade practices, consumers have been and will continue to be injured.

## COUNT IV: UNFAIR COMPETITION
## IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200, ET SEQ.

172.    SFCNY and Mr. Goodfriend reallege and incorporate in this Count the allegations set forth in Paragraphs 1 to 171 herein.

173.    Absent injunctive relief, SFCNY and Mr. Goodfriend will suffer loss of money or property and an economic injury in fact, specifically lost donations and goodwill for SFCNY, substantial and unnecessary litigation expenses, and reputational harm to Mr. Goodfriend, and thus have standing to seek relief under section 17200.

174.    The broadcasters committed business acts or practices as alleged above that violated the unfairness prong of section 17200 and in so doing directly and proximately caused SFCNY and Mr. Goodfriend to suffer injury in fact and loss of money or property.   The broadcasters' conduct violates the policy or spirit of antitrust law or threatens and incipient violation of the antitrust laws.   By their threats, baseless litigation, and other conduct, the broadcasters limit innovation and output in over-the-air broadcasting (including retransmission), inflate the cost of retransmission consent rights in each relevant geographic market, and harm consumers by increasing their costs and, if allowed to continue, by limiting their choice of options and reducing access to or further increasing the cost of programming intended to be free.   The broadcasters thus suppress competition and violate the core principles and spirit of the antitrust laws.

175.    Likewise, the filing of a sham, bad faith litigation for which no reasonable litigant could realistically expect success on the merits and that is motivated by their desire to use the judicial process to impose a collateral, anticompetitive injury rather than obtain a justifiable legal remedy is recognized as unlawful under antitrust law.   Such anticompetitive conduct enables conspirators to protect their market dominance through intimidation as well as costly and objectively meritless litigation.

176.    The copyright infringement claim against Locast results from the unlawful agreement among the broadcasters to protect their market dominance in the retransmission consent market and is meant to intimidate Locast and its supporters and to drive Locast out of business.

177.    The impact of the broadcasters' conduct has harmed SFCNY's and Mr. Goodfriend's donation and business prospects, has substantially injured and continues to substantially injure consumers by limiting their choice of programming options, slowing

innovation, reducing output in over-the-air broadcasting, and increasing consumers' costs. Consumers are not reasonably able to avoid these injuries.

178.    Thus, under any standard, the broadcasters' conduct constitutes actionable violations of the UCL's "unfair" business practices prong.

179.    As a direct and proximate result of the broadcasters' conduct, SFCNY and Mr. Goodfriend have suffered and will continue to suffer loss of money and property including but not limited to lost donations, loss of goodwill to SFCNY, and reputational harm to Mr. Goodfriend, Unless the broadcasters are restrained by a preliminary and permanent injunction, SFCNY and Mr. Goodfriend will suffer severe, irreparable harm in that it may be forced out of business entirely.

## COUNT V: UNLAWFUL COMPETITION
## IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200, ET SEQ.

180.    SFCNY and Mr. Goodfriend reallege and incorporate in this Count the allegations set forth in Paragraphs 1 to 179 herein.

181.    Absent injunctive relief, SFCNY and Mr. Goodfriend will suffer loss of money or property and an economic injury in fact, specifically lost donations and goodwill for SFCNY, substantial and unnecessary litigation expenses, and reputational harm to Mr. Goodfriend, and thus have standing to seek relief under section 17200.

182.    The broadcasters' tortious interference with prospective economic advantage and copyright misuse establish a claim of unlawful competition.

183.    As a direct and proximate result of the broadcasters' conduct, SFCNY and Mr. Goodfriend have suffered and will continue to suffer loss of money and property including but not limited to lost donations, loss of goodwill to SFCNY, and reputational harm to Mr. Goodfriend, Unless the broadcasters are restrained by a preliminary and permanent injunction, SFCNY and Mr. Goodfriend will suffer severe, irreparable harm in that it may be forced out of business entirely.

## COUNT VI: TORTIOUS INTERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE

184.    SFCNY and Mr. Goodfriend reallege and incorporate in this Count the allegations set forth in Paragraphs 1 to 183 herein.

185.    As described above, SFCNY has lost actual and/or potential partners, donors and supporters because of the broadcasters' improper actions, including threats to supporters.

186.    The broadcasters were aware of these relationships.  By participating in the conspiracy to drive SFCNY out of business through the filing of sham litigation and by threatening supporters in furtherance of that conspiracy, the broadcasters have harmed SFCNY's reputation and intentionally interfered with the foregoing potential business relationships.  There was a reasonable probability that the aforementioned donors and supporters would have contributed to SFCNY but for the broadcasters' tortious and unlawful activities and wrongful means.

187.    The broadcasters acted with the sole purpose of harming SFCNY, and have used dishonest, unfair, or wrongful means to do so.

188.    As a proximate result of the broadcasters' conduct, SFCNY has been damaged.

## DEMAND FOR JURY TRIAL

SFCNY and Mr. Goodfriend hereby demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, SFCNY and Mr. Goodfriend respectfully pray that this Court:

1.    Enter judgment in SFCNY's and Mr. Goodfriend's favor and against Counterclaim-Defendants on their Complaint and on this Counterclaim;

2.    Enjoin Counterclaim-Defendants and all in privity with them from:

(a)    Continuing with their copyright infringement litigation against Counterclaim-Plaintiffs;

(b)      Entering into or maintaining any agreement to prevent entry of competitors, including non-profit organizations, in retransmission services;

(c)      Entering into or maintaining any agreement requiring a non-profit organization to pay for retransmission consent; and

(d)      Entering into, maintaining, influencing, or directing others concerning any agreement regarding retransmission services by a non-profit organization;

3.      Order that Counterclaim-Defendants pay SFCNY and Mr. Goodfriend actual damages in the amount proved at trial;

4.      Treble the damages awarded, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

5.      Award SFCNY and Mr. Goodfriend reasonable attorneys' fees, costs, and expenses of suit of this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, and/or Section 16 of the Clayton Act, 15 U.S.C. § 26;

6.      Order restitution according to proof; and

7.      Order such other and further relief as the Court may deem just and proper.


Dated: November 13, 2020                    Respectfully submitted,

                                            ORRICK, HERRINGTON & SUTCLIFFE LLP

                                            　/s/ R. David Hosp　　　　　　　　　
                                            R. David Hosp
                                            Elizabeth E. Brenckman
                                            51 West 52nd Street
                                            New York, NY 10019-6142
                                            (617) 880-1886
                                            (212) 506-3535
                                            dhosp@orrick.com
                                            ebrenckman@orrick.com

Mark S. Puzella (admitted *pro hac vice*)
Sheryl Koval Garko (admitted *pro hac vice*)
222 Berkeley Street, Suite 2000
Boston, MA 02116
(617) 880-1896
(617) 880-1919
mpuzella@orrick.com
sgarko@orrick.com

*Counsel for Defendants and Counterclaim-Plaintiffs*
*David R. Goodfriend*
*and Sports Fans Coalition NY, Inc.*