**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN BROADCASTING
COMPANIES, INC., DISNEY
ENTERPRISES, INC., TWENTIETH
CENTURY FOX FILM CORPORATION,
CBS BROADCASTING INC., CBS STUDIOS
INC., FOX TELEVISION STATIONS, LLC,
FOX BROADCASTING COMPANY, LLC,
NBCUNIVERSAL MEDIA, LLC,
UNIVERSAL TELEVISION LLC, and OPEN
4 BUSINESS PRODUCTIONS, LLC,

        Plaintiffs,

    v.

DAVID R. GOODFRIEND and SPORTS
FANS COALITION NY, INC.,

        Defendants.

No. 19-cv-7136-LLS

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**REDACTED COPY**

## TABLE OF CONTENTS

INTRODUCTION......................................................................................................1

    A.    Statutory Background.................................................................4
          1.    The Copyright Act....................................................4
          2.    The 1992 Cable Act.................................................7

    B.    Factual Background ....................................................................8
          1.    Locast Captures Broadcasts Containing Copyrighted Television Programs And Retransmits Them Over The Internet. ...............................8
          2.    Locast Collects Revenue From Users And Pay-Television Providers. ................................................10
          3.    Locast's Revenues Greatly Exceed Its Costs. ...........................14
          4.    Locast Collects Commercially Valuable Information..............................15
          5.    Locast And Its Founder Seek Greater Name Recognition. .....................16

LEGAL STANDARD ...............................................................................................16

ARGUMENT ...........................................................................................................18

I.    SECTION 111(A)(5) DOES NOT APPLY TO LOCAST'S INTERNET RETRANSMISSION SERVICE. ...............................................................18
    A.    Section 111(a)(5) Is Limited To Local Transmissions........................18
    B.    Locast's Internet Service Is Inherently Global. ...................................26
    C.    Locast Significantly Alters Broadcast Signals. ...................................27

II.    LOCAST CANNOT PROVE IT MAKES SECONDARY TRANSMISSIONS WITHOUT ANY PURPOSE OF COMMERCIAL ADVANTAGE. .............................27
    A.    The Commercial-Advantage Clause Imposes An Independent Requirement, Above And Beyond Operating As A Nonprofit. ...........................28
    B.    A Nonprofit Must Prove It Makes Secondary Transmissions With No Purpose Of Commercial Advantage Whatsoever To Qualify For The Exemption. ................................................................30
    C.    Locast Cannot Prove It Makes Secondary Transmissions Without Any Purpose Of Commercial Advantage. ...................................................31

III.    LOCAST CANNOT PROVE IT IMPOSES NO CHARGES OTHER THAN ASSESSMENTS NECESSARY TO DEFRAY ITS OPERATING COSTS. ...............36
    A.    Locast Charges Users for Uninterrupted Services. ..............................37
    B.    Locast's Charges Are Not "Assessments."...........................................40
    C.    Locast's Charges Are Not Necessary to Defray Its Operating Costs. .................41

CONCLUSION.........................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*ABC, Inc. v. Aereo, Inc.*, 2014 WL 5393867 (S.D.N.Y. Oct. 23, 2014) .....................................28

*ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014) ...........................................................................25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................................18

*Assoc. Music Publishers v. Debs Mem'l Radio Fund*, 141 F.2d 852 (2d Cir. 1944).........31, 33, 34

*Ayestas v. Davis*, 138 S. Ct. 1080 (2018) ...................................................................................44

*Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016)...................................37

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................18

*City of De Pere v. Pub. Serv. Comm'n*, 63 N.W.2d 764 (Wis. 1954) ........................................43

*FAA v. Cooper*, 566 U.S. 284 (2012) ..........................................................................................43

*FDIC v. Giammettei*, 34 F.3d 51 (2d Cir. 1994) .........................................................................18

*Filmon X, LLC v. Window to the World Commc'ns, Inc.*, 2016 WL 1161276 (N.D. Ill. Mar. 23, 2016) ..........................................................................................................................28

*Fortnightly Corp. v. United Artists TV, Inc.*, 392 U.S. 390 (1968)..............................................5

*Fourth Floor Music v. Highfill*, 1986 WL 10883 (W.D. Mo. June 3, 1986)....................19, 20, 40

*Fox TV Stations v. Aereokiller, LLC*, 851 F.3d 1002 (9th Cir. 2017) ................................. passim

*Fox TV v. FilmOn X LLC*, 150 F. Supp. 3d 1 (D.D.C. 2015) ...............................................19, 27

*Golden v. Michael Grecco Prods., Inc.*, 2021 WL 878587 (E.D.N.Y. Mar. 9, 2021)............ 18, 19

*Herbert v. Shanley Co.*, 242 U.S. 591 (1917) ............................................................................38

*Hibbs v. Winn*, 542 U.S. 88 (2004) ......................................................................................30, 43

*Hinton v. Mainlands of Tamarac*, 611 F. Supp. 494 (S.D. Fla. 1985) ................................40, 41

*Ill. Cent. R. Co. v. City of Decatur*, 147 U.S. 190 (1893) ....................................................21, 43

*Internet Archive v. Shell*, 505 F. Supp. 2d 755 (D. Colo. 2007)................................................32

*Mills Music, Inc. v. Arizona*, 1975 WL 21095 (D. Ariz. July 23, 1975) ....................................34

*Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) ....................................27

*NARFE v. Horner*, 879 F.2d 873 (D.C. Cir. 1989)........................................................37

*Pappas v. Richfield City*, 962 P.2d 63 (Utah 1998).....................................................43

*Perrin v. United States*, 444 U.S. 37 (1979) ...............................................................40

*Soc'y of Holy Transfiguration Monastery. v. Gregory*, 689 F.3d 29 (1st Cir. 2012) ..................33

*Tasini v. N.Y. Times Co.*, 206 F.3d 161 (2d Cir. 2000)...............................................19

*Teleprompter Corp. v. CBS, Inc.*, 415 U.S. 394 (1974).................................................5

*UMG Recording, Inc. v. Escape Media Grp.*, 2014 WL 5089743  (S.D.N.Y. Sept. 29, 2014)..........................................................................................................18

*United States v. Buffalo*, 54 F.2d 471 (2d Cir. 1931) ...............................................43

*United States v. Gonzales*, 520 U.S. 1 (1997)...........................................................32

*Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100 (3d Cir. 2018) ...................................44, 45

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) .......................................33, 38

*Worldwide Church of God v. Phila. Church of God*, 227 F.3d 1110 (9th Cir. 2000) ...........33, 34

## STATUTES

17 U.S.C. § 101 .................................................................................................. passim

17 U.S.C. § 106 .................................................................................................. passim

17 U.S.C. § 107 ........................................................................................................33

17 U.S.C. § 108 ........................................................................................................30

17 U.S.C. § 111 .................................................................................................. passim

17 U.S.C. § 506 ........................................................................................................31

47 U.S.C. § 325 .................................................................................................. passim

Pub. L. 94-553 (1976)..........................................................................................22, 44

Pub. L. 100-667 (1988)...............................................................................................22

Pub. L. 102-385 (1992)................................................................................................8

## OTHER AUTHORITIES

Hearings before Sen. Subcomm. on Patents, Trademarks, and Copyrights  on S.1361, 93rd
 Cong., 1st Sess. (Aug. 1, 1973) .............................................................................. 7, 22, 26

Hearings before Subcomm.  No. 3 of the House Jud. Comm. on H.R. 4347,  89th
 Congress., 1st Sess, Ser. No. 8, Part 2 (June 24, 1965) ......................................................24

H.R. Rep. 90-83 (1967)......................................................................................... passim

H.R. Rep. 94-1476 (1976) .................................................................................... passim

S. Rep. 94-473 (1975)............................................................................................. 6, 23

S. Rep. 102-92 (1991).............................................................................................7, 8, 9

William F. Patry, *Patry on Copyright* §14:71 (West 2021) .................................... 6, 24

Plaintiffs American Broadcasting Companies, Inc., Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, CBS Broadcasting Inc., CBS Studios Inc., Fox Television Stations LLC, Fox Broadcasting Company LLC, NBCUniversal Media, LLC, Universal Television LLC, and Open 4 Business Productions, LLC (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for partial summary judgment. Specifically, Plaintiffs seek summary judgment rejecting Defendants' affirmative defense that their operation of the Locast internet service is exempt from copyright liability under 17 U.S.C. § 111(a)(5).

## INTRODUCTION

Defendants Sports Fans Coalition NY, Inc. ("SFCNY") and its founder, David Goodfriend (collectively, "Locast"), operate an internet television service called Locast. Without any license, Locast captures over-the-air broadcasts containing Plaintiffs' copyrighted television programs, modifies the signals, and "transmits" them over the internet 24 hours a day, 7 days a week to registered users—exercising a right belonging exclusively to copyright holders. *See* 17 U.S.C. §§ 101, 106(4). This is not in dispute.

Locast offers a "free" streaming service that is interrupted every 15 minutes by its own advertisements (during which users miss television programming), seeking what it calls "donations" for uninterrupted service. Locast collects additional funds, which it also calls "donations," from certain pay-television providers. ███████████████████████ ███████████████████████████████████████████████████████ ████████████████████████ By not paying for access to copyrighted programming, as other streaming services do, and collecting revenues far exceeding its costs, Locast has quickly moved into the black. ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████ None of this is in dispute either.

What is in dispute is the legal issue whether any of this can be squared with Locast's affirmative defense that it is exempt from copyright liability under 17 U.S.C. § 111(a)(5). That section provides a narrow exemption for a "secondary transmission of a performance . . . of a work embodied in a primary transmission" if "the secondary transmission is not made by a cable system but is made by a governmental body, or other nonprofit organization, without any purpose of direct or indirect commercial advantage, and without charge other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service."

As to this defense, Locast has identified an expert in nonprofit organizations who is prepared to tell a jury that, ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████ But before a jury is empaneled to hear that evidence, the Court should determine whether Locast possibly can qualify for the narrow exemption that Congress created, not as a matter of nonprofit "accounting principles," ████████████ but as a matter of copyright law.

Section 111(a)(5) does not apply to every entity that registers as a nonprofit and calls all of its revenue "donations." Instead, the text and legislative history make clear that Congress intended to exempt local "translators" and "boosters" that simply amplify broadcast signals and retransmit them to communities that otherwise have difficulty receiving such signals. To that end, Congress specified a series of mutually reinforcing limitations, each of which is crafted to confine the exemption to broadcast translators and boosters. Here, no reasonable jury could conclude that Locast can prove it meets three of those limitations, the failure of any one of which requires entering summary judgment for Plaintiffs on Locast's affirmative defense.

*First*, Section 111(a)(5) applies only to *local* transmission services. It does not extend to internet services, which are inherently *global* in reach. This conclusion flows from the statute's

text, legislative history, and purpose, all of which show that Congress crafted the exemption for local services. Moreover, Congress enacted Section 111(a)(5) against a statutory backdrop that regulated boosters and translators as local systems, further indicating that Congress fashioned an exemption with local scope. To extend that exemption to inherently global internet services would not only contravene Congress' intent, but also risk violating international agreements.

Here, there is no genuine dispute that Locast's internet service is inherently global in reach, which is only confirmed by Locast's use of "geo-fencing." For this threshold reason, Locast falls outside the scope of the exemption.

*Second*, no reasonable juror could conclude that Locast makes secondary transmissions "without *any* purpose of direct or indirect commercial advantage." 17 U.S.C. § 111(a)(5) (emphasis added). Contrary to Locast's theory, it cannot satisfy this element merely by claiming that it operates as a "nonprofit" in pursuit of a "charitable" mission. The exemption's commercial-advantage clause imposes an *independent* requirement, above and beyond the requirement that a nongovernmental organization be a nonprofit. And that independent requirement is strict: It forbids making secondary transmissions with "any purpose" of direct or indirect commercial advantage, no matter how tangential and no matter whether that purpose is realized.

As matter of law, Locast cannot meet that demanding standard. ███████████████

████████████████████████████████████████████████

███████████ Under the case law, that is a quintessential example of commercial advantage. The undisputed facts also show that Locast retransmits copyrighted content for numerous other commercial purposes—including ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████   Whether Locast or its sponsors actually obtain these advantages is irrelevant under Congress's test; the simple fact that Locast makes secondary transmissions for any commercial "purpose" disqualifies it from the exemption.

*Third*, Locast fails the requirement that a nonprofit may not impose any "charge" on recipients "other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service." 17 U.S.C. § 111(a)(5). Although Locast characterizes the payments it extracts from users as "donations," courts look beyond such labels and examine the substance of the transaction. Here, the substance is clear: Locast requires monthly payments in exchange for uninterrupted streaming of copyrighted works. By any reasonable definition, that is a "charge."

Further, as Locast concedes, ██████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████   And, it is no defense for Locast to claim it will one day use these profits to expand into other markets. In Section 111(a)(5), Congress protected local operators who extend broadcast signals without any purpose of commercial advantage and make community "assessments" only to cover their maintenance-and-operation costs. It did not protect organizations that ██████████████████████████████████████████████████

██████████████████████████████████████████████████   For all these reasons, the Court should grant summary judgment rejecting Locast's affirmative defense.

## STATUTORY AND FACTUAL BACKGROUND

### A.     Statutory Background

#### 1.     The Copyright Act

Under the Copyright Act, copyright owners have "exclusive rights to do and to authorize" certain acts with respect to their copyrighted works. 17 U.S.C. § 106. As relevant here, the Act

4

grants a copyright owner in the case of an "audiovisual work[]" the exclusive right to "perform the copyrighted work publicly." *Id.* § 106(4).

More than four decades ago, the Supreme Court, in a pair of decisions, held that community antenna television systems (the precursors to modern cable systems) did not infringe copyright owners' public-performance rights when they captured over-the-air broadcasts and retransmitted them to subscribers. *Fortnightly Corp. v. United Artists TV, Inc.*, 392 U.S. 390 (1968); *Teleprompter Corp. v. CBS, Inc.*, 415 U.S. 394 (1974).

In 1976, Congress amended the Copyright Act to overturn those decisions. *See* Pub. L. 94-553, 90 Stat. 2541, *codified as amended at* 17 U.S.C. § 101 *et seq.* Among other things, Congress amended the definition of public performance to include "transmit[ting] . . . a performance . . . to the public." 17 U.S.C. § 101. Congress thus made clear that, as a general rule, it is an act of infringement to transmit a performance of a copyrighted work to the public without authorization.

In Section 111 of the Act, Congress addressed the "complex and economically important problem" of applying that rule to certain entities that make "secondary transmissions" of primary transmissions containing copyrighted works. H.R. Rep. 94-1476, at 88 (1976). For example, in Section 111(c), Congress provided that "cable systems" may be liable for retransmitting primary transmissions in certain circumstances if they do not comply with a compulsory-licensing regime and regulations of the Federal Communication Commission ("FCC"). 17 U.S.C. § 111(c)(1)-(4).

In Section 111(a), Congress crafted a narrow set of exemptions from copyright liability for "[c]ertain secondary transmissions" not made by cable systems. *Id.* § 111(a). Of particular relevance here, Section 111(a)(5) exempts a secondary transmission that "is not made by a cable system but is made by a governmental body, or other nonprofit organization, without any purpose of direct or indirect commercial advantage, and without charge to the recipients of the secondary

transmission other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service."[1]

As the legislative history explains, Congress crafted this exemption to cover local broadcast "translators" and "boosters" that "do nothing more than amplify broadcast signals and retransmit them to everyone in an area for free reception." H.R. Rep. 94-1476, at 92 (1976); *accord* S. Rep. 94-473, at 78 (1975). These local services were run by "nonprofit organizations and government entities to supply television programming to rural areas" that otherwise had difficulty receiving over-the-air signals. 4 William F. Patry, *Patry on Copyright* §14:71 (West 2021).

Notably, an earlier version of the statute would have limited the exemption to cases where governmental bodies or nonprofits imposed "no charge" on recipients of a secondary transmission, "thus ruling out cases where *general community assessments or tax funds* are used to support a cooperative or other nonprofit service." H.R. Rep. 90-83, at 54 (1967) (emphasis added). However, the House Judiciary Committee "found persuasive the argument that services of these kinds should be exempted as long as they are *completely nonprofit and noncommercial*." *Id.* (emphasis added). The exemption thus was revised to provide that "a secondary transmission is generally exempt if it is made by a 'governmental body, or other nonprofit organization,' if there is no 'purpose of direct or indirect commercial advantage,' and if there is no charge to the recipients 'other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service.'" *Id.*

By enacting Section 111(a)(5), Congress did not give nonprofit translators and boosters *carte blanche* to retransmit signals without the originating broadcasters' consent. Instead, it legislated against the backdrop of Section 325 of the Communications Act. Under that provision,

---

[1] This exemption originally appeared in subsection (a)(4) but now is codified at (a)(5).

translator and booster broadcasting stations are required to obtain "express authority" from local originating stations before rebroadcasting their signals.  47 U.S.C. § 325(a).

Congress was well aware of Section 325 when it enacted Section 111(a)(5).  In testimony before Congress, the Motion Picture Association of America ("MPAA") highlighted Section 325 as one reason copyright holders were comfortable with the new exemption:  "These translators and boosters always have been subject to FCC regulation and require retransmission consent of the originating station under § 325(a) of the Federal Communications Act."  *See* Copyright Law Rev. Hearings before Sen. Subcomm. on Patents, Trademarks, and Copyrights on S.1361, 93rd Cong., 1st Sess., at 303 (Aug. 1, 1973).  Thus, Congress understood that translators and boosters that were exempt from liability to copyright owners under Section 111(a)(5) still would have to obtain consent from broadcast stations to rebroadcast their signals.

### 2.    The 1992 Cable Act

The retransmission-consent regime for cable and satellite providers is also relevant background to whether Locast can satisfy Section's 111(a)(5)'s requirements.

In 1992, Congress amended Section 325 of the Communications Act to make clear that the retransmission-consent requirement applies to cable providers and other multichannel video programming distributors ("MVPDs"), such as satellite providers.  *See* Cable Telev. Cons. Prot. and Comp. Act of 1992, Pub. L. 102-385, 106 Stat 1460, § 6 (1992).  Before that amendment, the FCC had "ruled that cable systems need not obtain consent from broadcast stations for retransmission of their signals."  S. Rep. 102-92, at 35 (1991).  Thus, while cable systems had to pay copyright holders compulsory licensing fees under the Copyright Act, they could retransmit broadcast signals "without having to seek the permission of the originating broadcaster or having to compensate the broadcaster for the value its product creates for the cable operator."  *Id*. at 35 & n.85.  This "resulted in an effective subsidy of the development of cable systems by local

broadcasters." Pub. L. 102-385,  § 2(a)(10).   At the same time, cable systems "increasingly compete[d]" with broadcasters "for television advertising revenue," jeopardizing "the economic viability of free local broadcast television."  *Id*. § 2(a)(14), (16).

To address these problems, Congress amended Section 325 to provide that a cable provider or other MVPD may not retransmit a broadcasting station's signal unless the station gives "express authority" or requests carriage under the statute. 47 U.S.C. § 325(b).  This amendment created a "marketplace for the disposition of the rights to retransmit broadcast signals." S. Rep. 102-92, at 36.  That is, unless a broadcaster asserts a right to carriage under the "must-carry" provisions, a cable or other MVPD must negotiate to obtain the broadcaster's consent to retransmit its signals.

### B.   Factual Background

#### 1.   Locast Captures Broadcasts Containing Copyrighted Television Programs And Retransmits Them Over The Internet.

The retransmission-consent regime drew the ire of various pay-television providers,

███████████████████████████████   Statement of Undisputed Material Facts ("SUMF") ¶ 2.

████████████████████████████████████████████████████████

████████████████████████████████████   SUMF ¶ 3.   ████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████   SUMF ¶ 4.

Goodfriend founded Sports Fans Coalition New York ("SFCNY"), which is organized as a New York nonprofit.  SUMF ¶ 5.  In January 2018, Goodfriend, through SFCNY, launched an internet television streaming service called Locast.  SUMF ¶ 6.   ██████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████   SUMF ¶¶ 10-12, 18-20, 25-28.  In other words, Locast captures and retransmits anything shown on a broadcast station, be it local

news, NFL games, or prime-time programming.   Users can view those broadcasts through the Locast application, which can be accessed on smart phones, tablets, and certain pay-television platforms, including DISH and AT&T's DirecTV.  SUMF ¶ 12.

Although Locast compares itself to a broadcast translator or booster, Locast bears none of the hallmarks of those services.  Unlike translators or boosters, Locast does not obtain consent from broadcast stations to retransmit their signals.  SUMF ¶ 14.  And while translators and boosters merely amplify and extend broadcast signals to everyone in an area for free reception, Locast limits its service to registered users and (as discussed below) interrupts its service depending on whether a user pays what Locast calls a "donation."   SUMF ¶¶ 15, 64-75.

While traditional translators and boosters operate to extend broadcasts to communities that have difficulty receiving signals, Locast operates in major media markets.  In January 2018, Locast started capturing signals in New York City.  SUMF ¶ 10.  At the time this suit was filed in July 2019, Locast captured signals in 13 of the largest "designated market areas" in the United States. SUMF ¶ 11.  Since that time, it has started capturing signals in 19 additional markets for a total of 32.  SUMF ¶ 12.  ██████████████████████████████████████████████
████████████████████████ SUMF ¶ 13. ██████████████████████████████████████
██████████████████████████████████████████ SUMF ¶ 13.

While translators and boosters merely retransmit broadcast signals to the local vicinity, Locast retransmits broadcasts over the internet.  SUMF ¶ 18.  The internet is an ████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ SUMF ¶ 19.
████████████████████████████████████████████████████████████████
██████████████████ SUMF ¶ 21. ████████████████████████████████████████████

████████████████████ SUMF ¶ 22. ███████████████████████████████

██████████████████████████████ SUMF ¶ 23. █████████████████████

████████████████████████████████████████████████████████████████

██████████████████ SUMF ¶ 24.

Further  distinguishing  it  from  translators  and  boosters,  ███████████████████

████████████████████████████████████████████████████████████████

███████   SUMF ¶ 54.  For  example,  ██████████████████████████████

████████████████████████  SUMF ¶ 55.  Unlike  those  services,  however,  Locast  does

not  pay  fees  for  the  right  to  retransmit  copyrighted  programming.   SUMF ¶¶ 17, 56.

**2.      Locast Collects Revenue From Users And Pay-Television Providers.**

██████████████████████████████████████████████████████████████

███████████████████████ SUMF ¶ 7. ██████████████████████████████

██████████████████████████████████████████ SUMF ¶¶ 8-9.

In  January  2019,  after  a  year  of  operating  Locast,  ██████████████████████

SUMF ¶¶ 32-33. ████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████ SUMF ¶ 32. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ SUMF ¶ 64. ████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ SUMF ¶ 32.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ SUMF

¶ 33. ███████████████████████████████████

████████████████████████████████████████████████████████████

████████  SUMF ¶ 33.  ████████████████████████████████

### a.    Locast Charges Users For Uninterrupted Service.

To raise funds, Locast implemented a business model used by many internet streaming companies: it offers a "free" service interrupted by advertisements and then charges users for access to uninterrupted services. *See* SUMF ¶ 65 (Locast expert discussing this model). In Locast's case, it interrupts a user's stream with *its own* advertisements, offering the user uninterrupted service in exchange for a monthly subscription fee of $5. While Locast publicly describes these payments as donations, ████ SUMF ¶ 64, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████  SUMF ¶ 64 (emphasis added). ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████  SUMF ¶ 73 (emphasis added). Also, Locast directs users to a payment webpage that describes the "donations" as "*subscriptions*." SUMF ¶ 68 (emphasis added).

Locast's subscriptions work as follows: After registering, a new user can watch broadcast television streams over the service without interruption for one hour (or, during some periods, 24 hours), ██████████████████████████████ SUMF ¶ 66. Thereafter, and on any subsequent login, Locast interrupts the user's stream every 15 minutes on a given channel with a Locast advertisement asking the user to pay $5 per month for uninterrupted service. SUMF ¶ 67. During these interruptions, Locast completely cuts off the stream, causing the user to miss television programing. SUMF ¶ 66. If the user does not pay, he or she is sent to Locast's program guide and must navigate back to the channel he or she was watching before the interruption—missing even more programming. SUMF ¶ 69.

If the user pays, he or she receives uninterrupted service for a length of time correlating to the amount of the payment.  SUMF ¶ 69.  For example, if the user pays the full $5 (or more) per month, he or she receives uninterrupted service for the entire month.  SUMF ¶ 70.  However, if the user pays less than $5, he or she receives uninterrupted service for only a portion of the month on a *pro rata* basis—*e.g.*, a $1 payment suppresses interruptions for 20% of the month.  SUMF ¶ 70.  ███████████████████████████████████████████

██████████████████████  SUMF ¶ 71.

Notably, Locast does not time its interruptions to coincide with commercial breaks.  Thus, as Locast's users have complained,  ██████████████████████████████████████

█████████████████████████████████████████████  SUMF ¶ 72.

████████████████████████████████████████████████

███████████  SUMF ¶ 74.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

### b.    Locast Obtains Revenue From Pay-Television Providers.

As discussed above, cable and satellite providers are required to negotiate to obtain consent from broadcasters to retransmit their signals.  *See* 47 U.S.C. § 325(b)(1)(A).  If these negotiations break down, a cable or satellite provider may lose the right to retransmit certain broadcast signals.  SUMF ¶ 30.  When this occurs, the provider's subscribers will be unable to watch certain broadcast

stations through their subscription services.  SUMF ¶ 30.  Such a "blackout" may lead to discontent among subscribers, who may cancel their pay-television services.  SUMF ¶ 30.

████████████████████████████████████████████████████████████████

██████████████████████████████  SUMF ¶ 31.  This is because, in the event of blackout, pay-television providers can direct their subscribers to Locast to watch broadcast stations that are otherwise unavailable on their platforms—allowing the providers to hold out longer in retransmission-consent negotiations.  SUMF ¶¶ 34-35.  Recognizing this advantage, certain pay-television providers have invested to integrate Locast's application into their set-top boxes and have invoked Locast during negotiations with broadcasters.  SUMF ¶¶ 36-42, 45-47.

████████████████████████████████████████████████████████████████

SUMF ¶ 36.  ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████  SUMF ¶ 38.  And when negotiations with Nexstar failed, DISH referred its subscribers to Locast as a way to watch Nexstar stations through DISH's set-top boxes.  SUMF ¶ 39.

████████████████████████████████████████████████████████████████

████████████████████████  SUMF ¶¶ 40-41.  ██████████████████████

███████████████████  SUMF ¶ 43.  ████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████  SUMF ¶ 45.  ████████████████████████████████████

████████████████████████████████████████████████████████████████

SUMF ¶ 46.  ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████   SUMF ¶ 47.  ████████████████████████████████████

████████████████████████████████████████████   SUMF ¶ 48.

Recognizing the benefits it provides these companies, Locast cashed in.  ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████   SUMF

¶ 33.█████████████████████████████████████   SUMF ¶ 49.

Locast has successfully executed on its plan—collecting hundreds of thousands of dollars, as well as other benefits, from pay-television companies:

- As noted, AT&T paid Locast a $500,000 "donation" in connection with integrating Locast's application into its platforms. SUMF ¶¶ 40-47. ████████████████ ████████████████████████████████████████████   SUMF ¶ 44.

- ████████████████████████████████████████████████ ████████████████████████   SUMF ¶ 50.

- ████████████████████████████████████████████████ ████████████████████████ SUMF ¶ 51.

- Although DISH has not paid a "donation," DISH integrated Locast's application into its platform—giving Locast access to DISH subscribers from whom it can solicit "donations." SUMF ¶¶ 36, 74. DISH also offers a low-cost streaming service called Sling TV ("Sling"), which does not carry local broadcast channels ████████████████████████████ ███████████   SUMF ¶ 52. To solve that problem, DISH (with Locast's permission) integrated Locast into Sling's channel guide, allowing subscribers to watch broadcast channels alongside Sling's slimmed-down offerings, *see* SUMF ¶ 53. As a result, Locast has access to Sling's subscribers, giving it more users from whom to solicit "donations."

### 3. Locast's Revenues Greatly Exceed Its Costs.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████ SUMF ¶ 76. ████████████████████████████████████████

████████████ SUMF ¶ 77.

████████████████████████████████████ For example, in 2020, Locast collected total revenue of ████████████████████████████████████████

████████ SUMF ¶ 79.  However, its total costs (including depreciation) were only ████████████ SUMF ¶ 78.  In other words, Locast's user revenue alone (setting aside other sources) exceeded its costs by ████████████

Locast forecasts that its profit margin will only grow.  For example, for 2021, it forecasts total revenue of ████████████████████████████████████████████████

████████████████ SUMF ¶ 80.  However, it predicts total costs of only ████████████ SUMF ¶ 80. In other words, Locast expects that user revenue alone (again, setting aside other sources) will exceed its total costs by over ████████████

Locast also forecasts that it will accumulate ████████ in cash over the coming years.  By 2024, Locast predicts that, depending on the number of new markets from which it captures broadcast signals, it will accumulate ████████████████████████ in cash.  SUMF ¶ 80.

### 4. Locast Collects Commercially Valuable Information.

In addition to collecting subscription fees from users and soliciting money from pay-television providers, Locast collects valuable data.  To register, users must provide Locast their email addresses. SUMF ¶ 57.  Locast also tracks viewership data, allowing it to see ████████████

████████████████████████████████████████████████████████████████

SUMF ¶ 58. ████████████████████████████    ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████ SUMF ¶ 58. ███████████████████████████████████████████

███████████████████████████████████████████████ SUMF ¶ 59.

### 5.   Locast And Its Founder Seek Greater Name Recognition.

At the helm of Locast, Goodfriend himself enjoys a number of commercial advantages. ██



███████████████████████████████ SUMF ¶ 61.

Goodfriend has also sought notoriety through his association with Locast. ███████████

SUMF ¶ 63.  Similarly, ██████████████████████████████████████████████

███████████████████████ SUMF ¶ 62.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a plaintiff may move for partial summary judgment to "challenge the legal sufficiency of an affirmative defense" on "which the defendant bears the burden of proof at trial." *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994). The Court must grant such a motion if the plaintiff "shows that there is no genuine dispute as to any material fact and the [plaintiff] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To make that showing, a plaintiff is not required to negate the affirmative defense. *Giammettei*, 34 F.3d at 54.  Instead, the plaintiff simply may point out the "absence of evidence" supporting an essential element of the defense. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317,

325 (1986).   The defendant then "bears the burden of producing sufficient evidence to support [its] affirmative defense[]." *Golden v. Michael Grecco Prods., Inc.*, 2021 WL 878587, at *6 (E.D.N.Y. Mar. 9, 2021).   To carry that burden, the defendant must adduce evidence from which a reasonable jury could rule in its favor on the defense.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   If the defendant fails to do so, "the court may properly grant summary judgment dismissing such a defense as a matter of law."   *UMG Recording, Inc. v. Escape Media Grp.*, 2014 WL 5089743, at *18 (S.D.N.Y. Sept. 29, 2014).

Here, Locast contends it is exempt from copyright liability under 17 U.S.C. § 111(a)(5). That is a classic affirmative defense on which Locast bears the burden.   Indeed, courts analyze similar copyright exemptions as affirmative defenses.   *See, e.g.*, *Fourth Floor Music v. Highfill*, 1986 WL 10883, at *3 (W.D. Mo. June 3, 1986), *aff'd*, 831 F.2d 300 (8th Cir. 1987) (reasoning that exemption in Section 110(4) is an "affirmative defense").   Thus, to survive summary judgment on this defense, Locast must adduce "sufficient evidence" from which a reasonable jury could rule in its favor.   *Golden*, 2021 WL 878587, at *6.

Further, because Section 111(a)(5) is an exemption from copyright liability, it should be narrowly construed to preserve the broad scope of Plaintiffs' copyrights.   In the Copyright Act, Congress's approach was to "set forth the copyright owner's exclusive rights in *broad terms* in section 106, and then to provide various limitations, qualifications, or exemptions."   H.R. Rep. 94-1476, at 61 (1976) (emphasis added).   Consistent with that approach, courts narrowly construe limitations, qualifications, and exemptions.   *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 691 F.3d 275, 281-82 (2d Cir. 2012) (narrowly construing Section 111's compulsory license); *Fox TV v. FilmOn X LLC*, 150 F. Supp. 3d 1, 22-23 (D.D.C. 2015) (same).   As the Second Circuit has put it, when the Copyright Act "sets forth exceptions to a general rule, we generally construe the

exceptions 'narrowly in order to preserve the primary operation of the provision." *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 168 (2d Cir. 2000) (quoting *Comm'r v. Clark*, 489 U.S. 726, 739 (1989)). Otherwise, an exception may "swallow the rule." *Id.*

Finally, as previously reported to the Court, the parties reached an agreement that narrows the scope of the case. Hr'g Tr. 2-4 (Jan. 31, 2019). By virtue of that agreement, if the Court grants partial summary judgment rejecting Locast's Section 111(a)(5) defense, that will "as a practical matter" resolve the case, *id.* at 3, ███████████████████████████

## ARGUMENT

## I.   SECTION 111(A)(5) DOES NOT APPLY TO LOCAST'S INTERNET RETRANSMISSION SERVICE.

Locast's affirmative defense fails for a threshold reason: Section 111(a)(5) applies only to *local* transmission services. It does not extend to internet services, which are inherently *global* in reach, for five reasons. *First*, Section 111(a)(5)'s language makes clear the exemption is limited to local services. *Second*, the legislative history confirms that Congress had no intention of exempting nationwide or global retransmission services. *Third*, extending the exemption to inherently global internet transmissions would contravene its narrow purpose. *Fourth*, Congress enacted the exemption against a statutory backdrop that regulated boosters and translators as local systems, indicating that Congress crafted an exemption with a local scope. *Fifth*, extending the exemption to internet services would risk violating the United States' international agreements.

### A.   Section 111(a)(5) Is Limited To Local Transmissions.

The Copyright Act makes clear that, as a general rule, it is an act of infringement to transmit a performance of a copyrighted work to the public without authorization. *See* 17 U.S.C. §§ 101, 106(4). Section 111(a)(5) sets forth a narrow exemption from infringement liability for "[c]ertain secondary transmissions" of performances of copyrighted works. *Id.* § 111(a). Numerous

considerations—specifically, the text, legislative history, statutory purpose, regulatory background, and international agreements—all compel the conclusion that internet transmissions are not the kind of secondary transmissions that fall within this narrow exemption.

Text:  Like Section 111's cable-system provisions (which courts have held are local in scope), Section 111(a)(5) employs "*location-sensitive* language." *Fox TV Stations v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (emphasis added); *accord ivi*, 691 F.3d at 284 & n.8. The exemption applies to certain secondary transmissions "not made by a cable system" but "made by a governmental body, or other nonprofit organization," without charge to "the recipients" other than "assessments" necessary to defray actual and reasonable costs. 17 U.S.C. § 111(a)(5).

As discussed in Section III.B below, an "assessment" (sometimes called a local or special assessment) is a charge imposed "upon property within a *limited area* for the payment for a *local improvement*, supposed to enhance the value of all property within *that area*." *Ill. Cent. R. Co. v. City of Decatur*, 147 U.S. 190, 197-98 (1893) (emphases added).  This understanding is confirmed by the legislative history, which explains that Congress added the assessment clause to cover cases where "*general community assessments or tax funds* are used to support a cooperative or other nonprofit service." H.R. Rep. 90-83, at 54 (1967) (emphasis added).  Congress' decision to confine Section 111(a)(5) to entities financed by "assessments" shows that the exemption applies only to services that are inherently local in scope and that benefit the entire local community.

This conclusion is reinforced by the fact that Congress paired the word "assessments" with "recipients."  Plainly, "recipients" refers to the class of persons who receive a secondary transmission.  The exemption then speaks of a governmental body or nonprofit imposing "assessments" (*i.e.*, community-specific charges) on that class of persons—much the same way that a governmental body or cooperative might impose assessments on community residents for

other local improvements.  Congress thus contemplated that the persons receiving a secondary transmission would be in the same geographic area.

The exemption's local scope is further confirmed by the fact that Congress excluded secondary transmissions by "cable system[s]"—which are *localized* systems.  *See Aereokiller*, 851 F.3d at 1013; *ivi*, 691 F.3d at 284.  Congress thus defined the type of transmissions that fall within Section 111(a)(5) by reference to a form of local media—underscoring it was legislating with local concerns in mind.  In fact, the legislative history makes clear Congress added the clause "not made by a cable system" at the suggestion of the MPAA, which explained the clause was meant "to *limit* the exemption to nonprofit translators and boosters and similar secondary transmitters"—that is, to local systems.  Copyright Law Rev. Hearings before Sen. Subcomm. on Patents, Trademarks, and Copyrights on S.1361, 93rd Cong., 1st Sess., at 303 (Aug. 1, 1973). (emphasis added).

This location-sensitive understanding of Section 111(a)(5) also comports with other Section 111(a) exemptions enacted in 1976.  For example, Section 111(a)(1) exempts retransmissions that "consist entirely of the relaying, by the management of a hotel, apartment house, or similar establishment, of signals transmitted by a broadcast station . . . *within the local service area* of such station to the private lodging of guests or residents of such establishment." 17 U.S.C. § 111(a)(1) (emphasis added).  And Section 111(a)(2) exempts transmissions under Section 110(2); as enacted in 1976, Section 110(2) referred to transmissions to, among other things, "*classrooms or similar places.*"  Pub. L. 94-553, § 110 (1976) (emphasis added).

Conversely, when Congress later confronted a type of retransmission that was *not* inherently localized (satellite television), it responded by amending Section 111 to add a separate exemption in (a)(4), along with its own compulsory licensing regime in Section 119 (and later Section 122 as well).  *See* Pub. L. 100-667, 102 Stat. 3935, § 202 (1988).  This example illustrates

that, if Congress had wanted to extend Section 111 to internet retransmissions, "it would have done so expressly." *ivi*, 691 F.3d at 282. Congress, however, has not amended Section 111 to create a compulsory licensing regime for internet retransmissions. *Id.* Nor has it amended Section 111(a) to create any exemption for internet transmissions, thus confirming that the exemptions in the 1976 Act do not reach such services at all.

Legislative History: The legislative history of the 1976 Copyright Act reinforces the conclusion that Congress had no intention of exempting nationwide, much less global, services when it enacted Section 111(a)(5). To the contrary, the history confirms what is evident from the text—namely, that Congress crafted the exemption for local services.

Specifically, the House and Senate reports make clear that Congress designed the exemption to cover nonprofit "translators" and "boosters" that "do nothing more than amplify broadcast signals and retransmit them to everyone *in an area* for free reception." H.R. Rep. 94-1476, at 92 (1976) (emphasis added); *accord* S. Rep. 94-473, at 78 (1975). And, as noted, Congress added the assessment clause because boosters and translators were supported by "general *community* assessments or tax funds." H.R. Rep. 90-83, at 54 (1967) (emphasis added).

Similarly, in reports to Congress, the Copyright Office used location-sensitive language. When discussing a preliminary draft of the statute, it explained that translators and boosters "merely magnif[y]" signals so that "anyone *in the vicinity* can pick the broadcast up." Copyright Law Rev. Part 3, Prelim. Draft, at 239 (1964) (emphasis added). And in a supplemental report, it wrote that the exemption covers "a nonprofit 'translator,' 'booster,' or similar equipment which merely amplifies broadcast signals and retransmits them to everyone *in an area* for free reception." Copyright Law Rev. Part 6, Supp. Rep., at 43 (1965) (emphasis added).

Likewise, in congressional hearings, witnesses from all interested parties described boosters and translators in location-sensitive terms. A cable-industry representative explained that, "in the case of boosters, translators, and repeaters, a television signal is received, and repeated and sent over the air omnidirectionally *to a small area*." Hearings Before Subcomm. No. 3 of the House Jud. Comm. on H.R. 4347, 89th Congress., 1st Sess., Ser. No. 8, Part 2 at 1256 (June 24, 1965) (emphasis added). A broadcast-industry representative noted that translators retransmit "a signal out into the air for anyone *within its range* to receive." *Id*. at 1233 (emphasis added). And a representative of producers of copyrighted programs explained the exemption "would permit bona fide contributions by *neighbors* to the actual costs of building and maintaining antennas." *Id.* at 1362 (emphasis added). The legislative history thus confirms Section 111(a)(5)'s local scope.

Legislative Purpose: It would undermine the purpose of Section 111(a)(5) to extend the exemption to internet services. In the Copyright Act of 1976, Congress broadly defined a copyright holder's right of public performance to include the right to "transmit" works to the public. 17 U.S.C. § 101. And in Section 111(a)(5), Congress carved out a narrow exemption for translators and boosters that do "nothing more than amplify broadcast signals and retransmit them to everyone in an area for free reception." H.R. Rep. 94-1476, at 92 (1976). The narrow purpose of the exemption was to permit nonprofits or governmental bodies to "supply television programing to rural areas" that have trouble receiving broadcasts. 4 *Patry on Copyright* § 14:71.

Internet transmission services do not serve that narrow purpose. Unlike a booster or translator, Locast's internet service is not aimed at extending broadcasts to communities that have difficulty receiving over-the-air signals; instead, Locast retransmits broadcasts over the internet to its registered users, ███████████████████████████████████████ SUMF ¶ 15. Moreover, as the Ninth Circuit has observed, "copyright owners are capable of transmitting their

works over the internet on their own." *Aereokiller*, 851 F.3d at 1011. For example, many broadcasters freely provide news and informational programming on their own websites or mobile applications. SUMF ¶ 16. Many broadcasters also license internet distribution through services like Hulu + Live TV and YouTube TV. SUMF ¶ 17. They do not need to rely on unauthorized third parties, like Locast, to achieve internet distribution.

Indeed, extending the exemption to internet transmissions would only undermine Congress's goals. In Section 111(a)(5), Congress struck a careful balance between broadly protecting copyright owners' rights and permitting the extension of broadcast signals to local areas dependent on translators or boosters. It would disrupt that balance to apply the exemption to internet services that not only compete in major markets for local broadcasters' audiences, but also have global reach. As the Ninth Circuit has observed, "an Internet-based service has no geographic boundary" and thus "poses a more serious threat to the value and integrity of copyrighted works." *Aereokiller*, 851 F.3d at 1011. For example, a copyright owner may wish to limit broadcasts of its works to a particular market, but an internet service could thwart that goal by retransmitting the same broadcasts "across the globe simultaneously." *Id.*

Moreover, courts must "consider the practical impact" of "construing Section 111 in a technological world unimaginable to Congress in 1976." *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 603-04 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012). Construing Section 111(a)(5) to cover internet services would raise a host of difficult policy issues never anticipated in 1976. These include that an unauthorized service like Locast can use the internet to unfairly compete with licensed streaming services like Hulu + Live TV or YouTube TV, *see infra* p.35, and that internet retransmissions are vulnerable to "unauthorized copying and other acts of piracy," *Aereokiller*, 851 F.3d at 1011. To be sure, if Locast believes that an exemption for internet services should

exist, it may "seek action from Congress." *ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431, 451 (2014). But it may not distort an exemption for local transmissions to cover internet transmissions.

Regulatory Background:  The regulatory background further reinforces the conclusion that Congress enacted Section 111(a)(5) to cover local transmissions.   Indeed, it "is impossible to evaluate the outer boundaries of Section 111 without considering this historical context." *See ivi*, 765 F. Supp. 2d at 603 (analyzing regulatory background of compulsory-license provisions). When Congress passed Section 111(a)(5), it "did not legislate on a blank slate." *Id*.  Instead, it acted against the backdrop of Section 325 of the Communications Act, which regulates translators and boosters as local systems.  Specifically, translators and boosters are required to obtain "express authority" from local originating stations before retransmitting their programs. 47 U.S.C. § 325(a).

Congress was well aware of this local consent requirement when it enacted Section 111(a)(5).  In fact, in congressional testimony, the MPAA highlighted Section 325 as one reason copyright owners did not oppose the new exemption:  "These translators and boosters always have been subject to FCC regulation and require retransmission consent of the originating station under § 325 of the Federal Communications Act." Copyright Law Rev. Hearings before Sen. Subcomm. on Patents, Trademarks, and Copyrights on S.1361, 93rd Cong., 1st Sess., at 303 (Aug. 1, 1973). This background of localized regulation indicates that Congress fashioned Section 111(a)(5)'s exemption with local, rather than national or international, scope.

To conclude otherwise would severely disrupt the overall regulatory scheme.  By enacting Section 111(a)(5), Congress did not green-light unauthorized secondary transmissions of broadcasts. Instead, it understood that translators and boosters that were exempt from liability to copyright owners under Section 111(a)(5) still were required to obtain retransmission consent from local originating stations under Section 325.  Here, however, Locast claims that internet services

may invoke Section 111(a)(5)'s exemption but are *not* subject to Section 325's consent requirement. It thus maintains that it has impunity to retransmit broadcasts without *any* consent.

There is no reason to believe that, by enacting Section 111(a)(5), Congress intended to open such a massive and unprecedented loophole in the regulatory scheme. "No technology . . . has been allowed to take advantage of Section 111 to retransmit copyrighted programming to a national audience while not complying with the rules and regulations of the FCC and without the consent of the copyright holder." *ivi*, 765 F. Supp. 2d at 602. And it would make no sense to require *local* boosters and translators that fall within Section 111(a)(5) to obtain broadcasters' consent, but to allow *inherently global* internet services to invoke the exemption while not obtaining such consent. To avoid such an anomalous result, the Court should interpret Section 111(a)(5) as a local exemption that comports with the local regulatory scheme.

<u>International Agreements</u>:   Finally, construing Section 111(a)(5) to cover internet transmissions would risk violating international agreements. It is a well-established canon of construction that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). "In other words, statutes should not be construed, if possible, to place the United States in violation of its international obligations." *FilmOn*, 150 F. Supp. 3d at 23.

The United States has "ratified several free trade agreements which contain the obligation that 'neither Party may permit the retransmission of television signals (whether terrestrial, cable, or satellite) on the Internet without authorisation of the right holder or right holders, if any, of the content of the signal and of the signal.'" U.S. Copyright Office, Sat. Home Viewer Ext. and Reauth. Act Sect. 109 Report, at 188 (2008) (quoting Australia FTA, U.S.-Austl., Article 17.4.10(b) and collecting examples). Courts have concluded that interpreting Section 111 to create

a compulsory license for internet retransmissions would risk violating those agreements. *Aereokiller*, 851 F.3d at 1011; *FilmOn*, 150 F. Supp. 3d at 23. It follows *a fortiori* that interpreting Section 111 to *exempt* certain unauthorized internet retransmissions from any copyright liability also would contravene those agreements. Because another possible construction remains, the Court should hold Section 111(a)(5) does not apply to internet transmissions.

**B.      Locast's Internet Service Is Inherently Global.**

Here, there is no genuine dispute that Locast's internet service is not localized. Although Locast characterizes itself as a "digital translator" (which is a tacit admission of the types of services that Section 111(a)(5) covers), Locast does not make local transmissions. Instead, it retransmits broadcasts over the internet, which is "an inherently global communications network that allows for data transmission from any Internet-connected computer to any other Internet-connected computer, regardless of those computers' locations." SUMF ¶ 19. As the Ninth Circuit has put it, internet services have "no geographic boundary" and "can retransmit works across the globe instantaneously." *Aereokiller*, 851 F.3d at 1011.

It is no answer for Locast to argue it employs "geo-fencing" technology to limit its transmissions to particular markets. It is undisputed that users can circumvent Locast's geo-fencing to watch broadcast stations from markets in which they are not located and that Locast frequently sends users broadcasts stations from the wrong markets. *See supra* pp. 9-10.

Even if, however, Locast's geo-fencing were immune to circumvention and error free, it would make no difference. The fact that Locast employs such technology only confirms the internet is *not* inherently localized. No actual translator or booster needs to "geo-fence."

Moreover, cases addressing this issue in the context of Section 111's compulsory-license provisions are instructive. *ABC, Inc. v. Aereo, Inc.*, 2014 WL 5393867, at *5 (S.D.N.Y. Oct. 23, 2014); *Filmon X, LLC v. Window to the World Commc'ns, Inc.*, 2016 WL 1161276, at *13 (N.D.

26

Ill. Mar. 23, 2016). There, courts hold that the fact that an internet service "may voluntarily limit its services to certain geographic areas does not change the fact that Internet retransmissions are still *capable* of reaching much farther afield than the localized cable systems that Congress intended § 111 to cover." *Aereo*, 2014 WL 5393867, at *5. Similarly here, Locast's geo-fencing does not change the fact that internet retransmissions are capable of reaching much farther than the localized services that Congress enacted Section 111(5)(a) to cover. For all these reasons, Locast's internet service falls outside the scope of the exemption.

> ### C.  Locast Significantly Alters Broadcast Signals.

Locast's service falls outside Section 111(a)(5) for a second, independent reason. The kinds of "secondary transmissions" that fall within Section 111(a)(5) are constrained by the fact that Congress enacted the exemption to cover translators and boosters that "do nothing more than amplify broadcast signals and retransmit them." H.R. Rep. 94-1476, at 92 (1976). Locast does far more than that: it significantly alters broadcast signals beyond anything that either traditional or modern translators do. Among other things, it degrades picture quality, reduces sound quality, and removes entire channels, all without the consent of the originating station. SUMF ¶¶ 25-28. For this additional reason, Locast does not qualify for the exemption.

## II.  LOCAST CANNOT PROVE IT MAKES SECONDARY TRANSMISSIONS WITHOUT ANY PURPOSE OF COMMERCIAL ADVANTAGE.

Even assuming internet services may fall within Section 111(a)(5) (they do not), Locast's defense fails because it cannot prove it makes secondary transmissions "without any purpose of direct or indirect commercial advantage." 17 U.S.C. § 111(a)(5). To satisfy that requirement, Locast cannot simply point to its purported status as a nonprofit or claim it ultimately serves some charitable purpose. Instead, it must prove what the statute requires: not only that it is a nonprofit, but that it makes secondary transmissions without *any* purpose of commercial advantage, whether

direct or indirect.  That strict standard reflects that Congress designed the exemption for translators and boosters that merely extend local broadcast signals, have no need to fund nationwide expansion, and lack any reason to pursue commercial advantage.

Locast is a far cry from those wholly noncommercial entities, and no reasonable juror could conclude it makes secondary transmissions without any purpose of commercial advantage.

### A.   The Commercial-Advantage Clause Imposes An Independent Requirement, Above And Beyond Operating As A Nonprofit.

Locast does not dispute it engages in "commercial activities." Ex. 59 (ECF No. 103, at 3) ("Defs.' Pre-Conf. Ltr."). Instead, it contends it lacks any commercial "purpose" because it operates as a "nonprofit" in pursuit of a "charitable mission." *Id.* Setting aside whether Locast actually serves any charitable purpose, its argument would render the commercial-advantage clause meaningless.  It is a basic canon of construction that a statute "'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, *Statutes and Stat. Constr.* § 46.06 (rev. 6th ed. 2000)).  Here, Section 111(a)(5) requires not only that a non-governmental organization be a "nonprofit," but also that it make transmissions "without any purpose of direct or indirect commercial advantage."  If it sufficed to operate as a nonprofit (which, by definition, must claim a charitable purpose), the additional commercial-advantage language would be superfluous.  The clause thus establishes an *independent* requirement, above and beyond being a nonprofit.

The text also makes clear that the commercial-advantage clause refers to a nonprofit's *purpose of making the relevant secondary transmission*, not to the ultimate purpose of the organization.  *See* § 111(a)(5) (referring to a "secondary transmission . . . made by a governmental body, or other nonprofit organization, without any purpose of direct or indirect commercial

28

advantage."). In this regard, the 1976 House Report's discussion of 17 U.S.C. § 108 is instructive. In language tracking that of Section 111(a)(5), Section 108 addresses a library's reproduction or distribution of copies "made without any purpose of direct or indirect commercial advantage." The report explains that "the 'advantage' referred to in this clause must attach to the immediate commercial motivation behind the reproduction or distribution itself, rather than to the ultimate profit-making motivation behind the enterprise in which the library is located." H.R. Rep. 94-1476, at 75 (1976). Similarly here, the "advantage" in Section 111(a)(5) refers to "any purpose" of the secondary transmission itself, not to the ultimate purpose of the nonprofit organization.

Also important are cases interpreting the "for profit" language in the Copyright Act of 1909. As the legislative history of the 1976 Act makes clear, Congress used the phrase "direct or indirect commercial advantage" to codify court decisions that broadly construed the prior statute's "for profit" language. *See* H.R. Rep. 94-1476, at 85 (1976) (discussing phrase in context of Section 110(4)). Those cases included the Second Circuit's decision in *Associated Music Publishers v. Debs Memorial Radio Fund*, 141 F.2d 852, 855 (2d Cir. 1944).

In *Debs*, a nonprofit radio station, supported by third-party advertisers, broadcast copyrighted songs during certain ad-free programs. 141 F.2d at 854-55. The Second Circuit reasoned that those ad-free programs were to "maintain and further build up the listening audience and thus furnish the field from which the paying advertisers may reap a profit." *Id*. at 855. By using copyrighted works in those programs, the nonprofit "was engaged in an enterprise which resulted in profit to the advertisers," as well as "an increment to its own treasury." *Id*. The Second Circuit held "[i]t can make no difference that the ultimate purposes of the corporate defendant were charitable or educational." *Id*. What mattered was that the nonprofit corporation sought "immediate profit" to itself and third-party advertisers by broadcasting copyrighted works. *Id*.

29

Similarly, under the commercial-advantage clause, it makes no difference that a nonprofit claims its ultimate purposes are "charitable." What matters is whether the nonprofit makes secondary transmissions without any purpose of commercial advantage.[2]

**B.      A Nonprofit Must Prove It Makes Secondary Transmissions With No Purpose Of Commercial Advantage Whatsoever To Qualify For The Exemption.**

In addition to being an independent requirement, the commercial-advantage clause is strict. It requires a nonprofit to make transmissions "without *any* purpose of direct or indirect commercial advantage." 17 U.S.C. § 111(a)(5) (emphasis added). Read naturally, the word "any" has "expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5 (1997). It means "one or some indiscriminately of whatever kind." *Id.* (quoting *Webster's Third New Int'l Dict.* (1976)). Thus, to fit within the exemption, a nonprofit must prove it makes secondary transmissions with no purpose of commercial advantage whatsoever, no matter how tangential.

████████████████████████████████████████████████████

███████████████████████████████  However, to qualify for Section 111(a)(5)'s copyright exemption, a nonprofit must prove it makes transmissions with *no commercial purpose at all*. As the text and legislative history make clear, the exemption applies only to "*[w]holly noncommercial* secondary transmissions." H.R. Rep. 90-83, at 6 (1967) (emphasis added). That strict standard reflects the nature of translators and boosters, which "do nothing more than amplify broadcast signals and retransmit them to everyone in an area for free reception." H.R. Rep. 94-1476, at 92 (1976).

---

[2] Courts likewise recognize that nonprofit status is not the determinative question under the criminal copyright statute, 17 U.S.C. § 506, which refers to "purposes of commercial advantage or private financial gain." *See Internet Archive v. Shell*, 505 F. Supp. 2d 755, 769 (D. Colo. 2007) (holding plaintiff stated a civil RICO claim based on criminal copyright statute against nonprofit corporation).

The phrase "*direct or indirect* commercial advantage" also is extraordinarily broad. It encompasses not only direct monetary gain, but also indirect advantages like expanding a customer base, achieving greater name recognition, acquiring commercially useful data, or conferring benefits on third parties with whom one has relationships.

In applying this language, the Court should draw guidance from cases construing the fair-use defense, which asks, among other things, whether a use was of "a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). In that context, courts recognize that "[m]onetary gain is not the sole criterion," particularly in settings where "profit is ill-measured in dollars." *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989). For example, a nonprofit (or an individual associated with one) acts commercially if it exploits copyrighted works to increase its name "recognition." *Id.* at 1324; *accord Soc'y of Holy Transfiguration Monastery. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012). A nonprofit also acts commercially if it exploits copyrighted works to attract "new members" and enable the organization's "growth." *Worldwide Church of God v. Phila. Church of God*, 227 F.3d 1110, 1118 (9th Cir. 2000). If a use counts as commercial under Section 107(1), then *a fortiori* it is disqualifying under Section 111(a)(5), which more strictly forbids "any purpose of direct or indirect commercial advantage."

## C.   Locast Cannot Prove It Makes Secondary Transmissions Without Any Purpose Of Commercial Advantage.

Here, no reasonable jury could conclude that Locast makes secondary transmissions without *any* purpose of commercial advantage. By Locast's own account, it retransmits broadcast signals to attract users, from whom it collects money to fund its "expansion" into new "markets." Defs. Pre-Conf. Ltr. 3. In other words, to quote *Debs*, Locast exploits copyrighted works to "build up" a user base and "furnish the field" from which it may solicit money for "its own treasury."

31

141 F.2d at 855.   And Locast does so not simply to defray its actual costs, but to enable its "growth."  *Worldwide Church*, 227 F.3d at 1118.

That is a quintessential purpose of commercial advantage, and no reasonable jury could conclude otherwise.  Indeed, Locast's expansionist mission confirms it has nothing in common with the translators and boosters that Section 111(a)(5) covers.  As noted, those local operators do nothing more than extend broadcast signals to a given area and impose community assessments to defray their costs.  H.R. Rep. 94-1476, at 92 (1976).  They do not make secondary transmissions to attract an ever-growing flock of subscribers—much less do they offer both interrupted and uninterrupted services so that they can solicit so-called "donations" to fuel their expansion.  For this reason alone, Locast is disqualified from the exemption.

The undisputed facts also show that Locast makes secondary transmissions for a host of other commercial purposes.  Each of these purposes independently disqualifies Locast.

<u>Commercial Benefits to, and Reciprocal Benefits from, Pay-Television Providers</u>:  To start, Locast acts for a commercial purpose by exploiting copyrighted works to benefit pay-television providers.   Here again, *Debs* is instructive.   As noted, the nonprofit in that case broadcast copyrighted works to "build up [its] listening audience and thus furnish the field from which [its] *paying advertisers* may reap a profit."   141 F.2d at 855 (emphasis added).  The Second Circuit held that the 1909 Act broadly protected against performances "for profit" and that it was "*unimportant* whether a profit went to [the nonprofit itself] or to its employe[e]s *or to the advertisers*."  *Id.* (emphasis added); *accord Mills Music, Inc. v. Arizona*, 1975 WL 21095, at *18-20 (D. Ariz. July 23, 1975), *aff'd.*, 591 F.2d 1278 (9th Cir. 1979) (following *Debs*).  Similarly, because Section 111(a)(5) broadly forbids any purpose of direct or indirect commercial advantage,

it is unimportant whether an advantage flows to Locast, its employees, or third parties (which, in this case, reciprocally benefit Locast with cash and nationwide distribution).

Here, the undisputed facts show that Locast makes secondary transmissions, at least in part, to benefit and obtain benefits from pay-television providers. ████████████

████████████████████████████████

████████████ SUMF ¶ 31. The reason is clear: to retransmit broadcast stations through their services, cable and satellite providers generally must negotiate for broadcasters' consent. 47 U.S.C. § 325(b)(1)(A). If these negotiations break down, a "blackout" may occur, ████████████

████████████████████████████ SUMF ¶ 30. Locast, however, presents cable and satellite providers with a workaround. During a blackout, they can steer subscribers to Locast to watch broadcast stations otherwise unavailable on their platforms—

████████████████████████████ SUMF ¶¶ 34-39, 46, 48.

████████████████████████████████

████████████████████████████████

████████████████████████ SUMF ¶ 37. ████████

████████████████████ SUMF ¶ 36. ████████████

████████████████████████ SUMF ¶ 38.

████████████████████████████████

████████████████ SUMF ¶¶ 40-42. ████████████

████████████████████████████████

SUMF ¶ 46. ████████████████████████

████████████████████████████████

████████████ SUMF ¶ 47.



Recognizing the benefits it provides these companies, Locast secured commercial benefits of its own. ████████████████████████████████████████ ████████████████████████████ SUMF ¶ 33. And Locast's plan worked, as pay-television companies and their supporters have paid it hundreds of thousands of dollars. *See supra* p. 14. For example, AT&T alone paid Locast $500,000. SUMF ¶ 43. In addition, Locast also has gained access to AT&T's and DISH's nationwide platforms—allowing it to solicit more users for "donations" to fuel its growth. Given these facts, no reasonable jury could conclude that Locast operates without *any* purpose of advantaging both itself and pay-television providers.

Locast also provides advantages to slimmed-down streaming services that do not carry broadcast content. SUMF ¶ 53. For example, DISH Network offers a service called Sling that does not have agreements to retransmit most broadcast stations. SUMF ¶ 52. ███████████ ████████████████████████████████████ SUMF ¶ 52. ████████████████ ████████████████ SUMF ¶ 52. ██████████████████ DISH markets the two services side-by-side and integrates Locast into Sling's channel guide, so that subscribers can watch broadcast channels alongside Sling's slimmed-down offerings. SUMF ¶ 52. This allows DISH to avoid paying licensing fees relating to Sling. SUMF ¶ 53. And by partnering with Sling, Locast gains access to more viewers, from whom it can solicit more cash.

████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ SUMF ¶ 53 (emphasis added). Given these facts, no reasonable jury could conclude that Locast makes transmissions without *any* purpose of advantaging slimmed-down streaming services, from whom it seeks and receives support.

34

<u>Competition with Other Streaming Companies</u>:  Locast also acts for a commercial purpose by exploiting copyrighted works to gain a competitive advantage over streaming services, like Hulu + Live TV or YouTube TV, that pay licensing fees to retransmit copyrighted programming. SUMF ¶¶ 54-56.  Unlike those companies (who play by the rules), Locast does not pay licensing fees, giving it a competitive edge.

███████████████████████████████████████████████

███████████████████████████████████████████████

SUMF ¶ 55.  ████████████████████████████████████████

██████████████████████████   SUMF ¶ 55.

Based on this competitive conduct, no reasonable juror could conclude that Locast acts without any purpose of commercial advantage.  Indeed, that Locast unfairly competes with licensed streaming companies in the internet market further underscores that it has nothing in common with the wholly noncommercial translators and boosters that Section 111(a)(5) covers.

<u>Data Collection</u>:   Locast also acts for a commercial purpose by exploiting copyrighted works to collect valuable data. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 445 (S.D.N.Y. 2016) (commercial-speech case noting that companies "profit from the collection and sale of data").  For example, Locast requires users to submit their email addresses.  SUMF ¶ 57. The resulting email list is itself a valuable commercial asset. *See NARFE v. Horner*, 879 F.2d 873, 877 (D.C. Cir. 1989) (FOIA case noting that nonprofit's "name and address list" has "apparent commercial value").

███████████████████████████████████████████████

██████████████████████████████████████   SUMF ¶ 58.  ████

███████████████████████████████████████████████



It makes no difference whether Locast has successfully monetized this data. Under Section 111(a)(5), the test is whether Locast acts for any "purpose" of commercial advantage, not whether it succeeds in securing an advantage. *See Herbert v. Shanley Co.*, 242 U.S. 591, 595 (1917) (holding that a "purpose" of using a copyrighted work for profit was "enough" under 1909 Copyright Act). Thus, the mere fact that Locast makes transmissions ██████████████████ ████████████████████████████ suffices to disqualify it from the exemption.

<u>Recognition</u>:    Finally, Locast acts for a commercial purpose by exploiting copyrighted works to increase its name "recognition" and that of its founder. *Weissmann*, 868 F.2d at 1324. ████████████████████████████████████████████████ ████████████████ SUMF ¶ 62. ███████████████████████████ ████████████████████████████████████████████████ ███████████████ SUMF ¶ 63. Given these admissions, there is no genuine dispute that Locast makes transmissions for at least some purpose of commercial advantage.

## III.    LOCAST CANNOT PROVE IT IMPOSES NO CHARGES OTHER THAN ASSESSEMENTS NECESSARY TO DEFRAY ITS OPERATING COSTS.

Locast's affirmative defense fails for a third, independent reason. It cannot prove it makes secondary transmissions "without charge to the recipients of the secondary transmission other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service." 17 U.S.C. § 111(a)(5). By its terms, that clause generally forbids a nonprofit from imposing any "charge." The only exception is for "assessments" that are

"necessary" to defray the costs of "maintaining and operating" the service. These strict requirements reflect that Congress enacted the exemption to cover translators and boosters that operate on a "completely nonprofit basis" and have no need to generate funds other than to sustain their local services. H.R. Rep. 94-1476, at 92 (1976).

Here, there is no genuine dispute that Locast fails these requirements. *First*, although Locast offers a "free" service frequently interrupted by its own advertisements, it charges subscription fees for uninterrupted services. Locast calls these payments "donations," but the Court should look beyond that label to the substance of the transaction. *Second*, Locast's charges are not assessments, which are community-based charges. *Third,* even assuming its charges are assessments, Locast cannot show they are "necessary" to defray its operating costs.

### A.    Locast Charges Users for Uninterrupted Services.

To start, there is no merit to Locast's claim that it merely solicits "donations" and does not "charge" users. Defs.' Pre-Conf. Ltr. 3. The text, case law, and evidence all refute that contention.

Starting with the text, it is a "fundamental canon of statutory construction" that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Here, Congress did not define the word "charge," so the Court should look to its ordinary meaning in 1976. Then, as now, dictionaries defined "charge" in an economic context as the price of goods or services.[3] In this

---

[3] *See, e.g., Webster's New World Dict. of the Am. Lang.*, Charge (2d ed. 1976) ("The cost or price of an article, service, etc."); 1 *Funk & Wagnalls Standard Desk Dict.*, Charge (1976) ("The expense or cost of something; price.").

regard, a charge differs from a donation; while a charge is a payment in exchange for goods or services, a donation is merely a gift.[4]

When distinguishing between charges and donations in copyright cases, courts "look beyond mere formal labels and consider the substance of the transaction." *Fourth Floor Music v. Highfill*, 1986 WL 10883, at *4 (W.D. Mo. June 3, 1986), *aff'd,* 831 F.2d 300 (8th Cir. 1987). This is because "donations" are "often merely euphemisms" for the purchase prices of goods or services. *Hinton v. Mainlands of Tamarac*, 611 F. Supp. 494, 496 (S.D. Fla. 1985).

For example, in *Hinton*, a condominium association imposed a $3 charge for admission to a dance where an orchestra performed copyrighted music. *Id.* at 495-96. The condominium association argued the charge was "only a suggested and voluntary donation" and did not render the event a public performance under Section 101. *Id.* at 496. On summary judgment, the court rejected that argument as "untenable." *Id.* Examining the substance of the transaction, the court concluded "the money exacted by the condominium" from attendees "was purely and simply the price of admission." *Id.* Accordingly, the court entered summary judgment for the plaintiff. *Id.*

Similarly here, Locast's "donations" are the price of its uninterrupted service. Like many internet companies, Locast attracts users with a free service interrupted by advertisements and charges subscription fees for uninterrupted service. *See* SUMF ¶ 65 (███████████████ ███████████████████████████████). Specifically, after a brief introductory period, Locast interrupts a user's stream every 15 minutes on a given channel with its own advertisements asking the user to pay $5 per month. *See supra* pp. 11-12. During those advertisements (which are not timed to coincide with commercial breaks), viewers miss the

---

[4] *See, e.g., Webster's New World Dict. of the Am. Lang.*, Donation (2d ed. 1976) ("The act of donating," "a gift or contribution as to a charitable organization"); 1 *Funk & Wagnalls Standard Desk Dict.*, Donation (1976) ("The act of giving," "a gift").

underlying television programming.  *Id*.  If a user does not pay, the user is returned to Locast's programming guide and must navigate back to the channel he or she was watching before the interruption.  *Id*.  If, however, the user pays, he or she receives uninterrupted service for a length of time correlating to the size of the payment.  *Id*.

The record also makes clear that Locast's uninterrupted service is superior to its interrupted service.  For example, ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████  SUMF ¶ 75.  ██████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████  SUMF ¶ 74.

In these circumstances, there is no genuine dispute that Locast charges fees for its uninterrupted service.  Although Locast labels these payments "donations," the substance of the transaction is clear: Locast requires users to pay a monthly amount in exchange for uninterrupted transmissions of copyrighted content.  Locast thus imposes "charges" under Section 111(a)(5).

In fact, Locast's internal communications confirm as much.  For example, ████████████ ████████████████████████████████████████████████████  SUMF ¶ 64 (emphasis added).  █████████████████████████████████ ████████████████████████████████████████████████████████ ███████████  SUMF ¶ 73 (emphasis added).  As these documents reflect, the term "donation" is merely a euphemism for the monthly subscription fee that Locast charges for uninterrupted service.

Contrary to Locast's argument, it makes no difference that some users employ its system without paying.  Defs.' Pre-Conf. Ltr. 3.  That some users opt to use Locast's free service despite the frequent interruptions does not alter the fact that Locast charges other users for interrupted

services.  To draw an analogy, many, if not most, users of streaming services like Spotify or YouTube use their free, ad-supported services.  But no reasonable person would dispute that those entities charge other users for ad-free services.  The same is true with respect to Locast.

Finally, this issue only further illustrates that Locast has nothing in common with translators and boosters.  As noted, those entities simply "amplify broadcast signals and retransmit them to everyone in an area for free reception."  H.R. Rep. 94-1476, at 92 (1976).  They do not offer different levels of service, nor do they impose subscription fees for uninterrupted services.

### B.    Locast's Charges Are Not "Assessments."

Because Locast imposes "charges," it is disqualified from the exemption unless it proves the charges are "assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service."  17 U.S.C. § 111(a)(5).  ███████████ ████████████████████████████████████████   SUMF ¶ 76 ███████████████████████ █████████████████████████████████   And for an obvious reason: Locast's charges are not "assessments" at all.  As discussed below, "assessments" are community-wide charges for community-wide benefits.  Locast, however, imposes fees on specific persons to use its uninterrupted service.  Locast's charges therefore fall outside the assessment clause.

Starting with the text, the word "assessment" is a "term of art."  *Pappas v. Richfield City*, 962 P.2d 63, 66 (Utah 1998).  It is a "cardinal rule" that "when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."  *FAA v. Cooper*, 566 U.S. 284, 291-92 (2012) (citations omitted).  Further, the word "assessments" cannot be read "in isolation," but must be interpreted in its statutory "context."  *Hibbs*, 542 U.S. at 101 (citations omitted).

Here, Congress used "assessments" to describe a subset of "charge[s]" imposed by governmental bodies or nonprofits.  Congress also used the term "assessments" in contradistinction

to "fees": while Section 111(f)(13) refers to cable systems charging "fee[s]" for "service[s]," Section 111(a)(5) refers to governmental bodies or nonprofits charging "assessments."

Thus, in context, the word "assessment" must be given a meaning narrower than "charge" but distinct from "fee." Established usage provides one: whereas a fee is a charge to specific persons for using a service, an assessment is a community-wide charge for a local improvement that benefits the community. *See Ill. Cent.*, 147 U.S. at 197 (assessments are "imposed upon property within a limited area for the payment for a local improvement supposed to enhance the value of all property within that area"); *United States v. Buffalo*, 54 F.2d 471, 475 (2d Cir. 1931) (Hand, J., concurring) (assessments are "charges for public improvements which are distributed among the property benefited"); *City of De Pere v. Pub. Serv. Comm'n*, 63 N.W.2d 764, 769-70 (Wis. 1954) (distinguishing fees from assessments). Congress thus clearly delineated between fees for service and community-wide assessments. And the legislative history confirms this understanding; it explains that the exemption permits "*general community assessments or tax funds.*" H.R. Rep. 90-83, at 54 (1967) (emphasis added).

Here, as Locast concedes, it "does not charge assessments." Defs.' Pre-Conf. Ltr. 3. Instead, as discussed, it charges monthly subscription fees to specific persons for use of its uninterrupted service. Locast's charges therefore disqualify it from the exemption.

## C.    Locast's Charges Are Not Necessary to Defray Its Operating Costs.

Even if Locast's subscription charges were "assessments," Locast cannot prove they are "necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service." 17 U.S.C. § 111(a)(5). Under that provision, Locast may not impose charges that exceed its maintenance-and-operation costs. Here, however, Locast's charges exceed its costs ██████████████, and it is no defense for Locast to say it plans to use the excess to fund its "expansion" into new markets. Indeed, Locast's interest in expanding to other markets

41

with its inherently non-local technology underscores how far removed it is from Congress' concerns in enacting Section 111(a)(5). For this additional reason, Locast's charges disqualify it from the exemption.

Beginning with the text, the assessment clause imposes strict requirements. *First*, it uses the term "necessary," which is a "word[] of limitation." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018) (citation omitted). As an adjective, it means indispensable, essential, or needed.[5] To be sure, "necessary" is "often used more loosely to refer to something that is merely important or strongly desired." *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018). But when Congress intends to use the term more loosely, it typically employs the phrase "reasonably necessary" or pairs "necessary" with a term like "appropriate." *Vorchheimer*, 903 F.3d at 107. Indeed, in another section of the Copyright Act of 1976, Congress did precisely that. Pub. L. 94-553, § 116(c)(5) (1976) ("reasonably necessary"). In Section 111(a)(5), however, Congress used "necessary" *by itself*, indicating it means indispensable, essential, or needed.

*Second*, the term necessary "tracks an underlying need" and "is often followed by 'to' or 'for,' specifying the need." *Vorchheimer*, 903 F.3d at 107. Here, Congress linked "necessary" to the purpose of "*defray[ing]* the actual and reasonable costs of maintaining and operating the secondary transmission service." 17 U.S.C. § 111(a)(5) (emphasis added). The term "defray" connotes providing money to pay certain costs or expenses—not raising funds for general use.[6]

---

[5] *See, e.g.*, *Am. Herit. Sch. Dict.*, Necessary (1977) ("Needed to achieve a certain result or effect; essential; requisite"); *Webster's New Colleg. Dict.*, Necessary (1976) ("absolutely needed; REQUIRED"); *Concise Oxford Dict. of Current Eng.*, Necessary (6th ed. 1976) ("Indispensable, requisite, (*to* or *for* person etc.; it is necessary that, to do); requiring to, that must, be done").

[6] *See, e.g.*, *Amer. Herit. Sch. Dict.*, Defray (1977) ("To pay or provide for payment of (costs or expenses)"); *Webster's New Colleg. Dict.*, Defray (1976) ("to provide for the payment of"); *Concise Oxford Dict. of Current Eng.*, Defray (6th ed. 1976) ("Provide money to pay (cost; expense)").

*Third*, Congress narrowly defined the costs to be defrayed as "the actual and reasonable costs of *maintaining* and *operating* the secondary transmission service." 17 U.S.C. § 111(a)(5) (emphasis added). Thus, a nonprofit may impose assessments only to defray the costs of sustaining the transmission service itself—not to generate ███████████ to fund nationwide expansion.

Reading the terms together, Section 111(a)(5) permits a nonprofit to charge assessments only if they are essential to pay for the costs of maintaining and operating the secondary transmission service itself. A nonprofit thus may not charge assessments *exceeding* such costs.

This understanding is confirmed by the legislative history. An earlier bill would have confined the exemption to cases where there was "*no charge*" at all, "thus ruling out cases where general community assessments or tax funds are used to support a cooperative or other nonprofit service." H.R. Rep. 90-83, at 54 (1967) (emphasis added). However, the House Judiciary Committee "found persuasive the argument that services of this kind should be exempted as long as they are *completely nonprofit and noncommercial*." *Id.* (emphasis added). It thus revised the exemption to apply "if there is no charge to the recipients 'other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service.'" *Id.* Congress thus made clear that a nonprofit may not impose assessments exceeding the costs of sustaining the local service itself.

Here, there is no genuine dispute that Locast imposes charges exceeding its maintenance-and-operation costs. ████████████████████████████████████ ██████████████████ Instead, it charges a set fee of $5 per month for uninterrupted service, regardless of the marginal costs of adding a user. ██████████████████████████ ██████████████████████████████████

It is thus unsurprising that Locast's user revenue does not track, and indeed greatly exceeds, its costs. In 2020, Locast collected total revenue of ████████████████████████ ████ SUMF ¶ 79. However, its total costs (including depreciation) were only ████████████ SUMF ¶ 78. In other words, Locast's user revenue alone (setting aside other revenue) exceeded its costs by ████████████

Moreover, Locast forecasts that its profit margins will only grow ████████████████ ████████████████ SUMF ¶ 81. For example, for 2021, it forecasts total revenue of ████████ ████████████████████████████ SUMF ¶ 80. However, it predicts total costs of only ████████ SUMF ¶ 80. In other words, Locast expects that user revenue alone (again, setting aside other revenue) will exceed its costs by over ████████ By any conceivable standard, Locast's user charges far exceed what is "necessary" to defray Locast's maintenance-and-operation costs.

It is no defense for Locast to claim it will use its excess funds to "expan[d]" into new markets from which it will capture additional broadcast signals. *See* Defs.' Pre-Conf. Ltr. 3. As noted, Section 111(a)(5) permits use of assessments only to defray the costs of "maintaining and operating the secondary transmission service" itself. It nowhere permits a nonprofit to collect massive revenues to "expand" its mission.

Further, Locast's argument again underscores it has nothing in common with translators and boosters. Those local operators imposed "general community assessments" simply to defray the costs of extending broadcast signals to "everyone in an area." H.R. Rep. 90-83, at 53-54 (1967) (emphasis added). Congress nowhere contemplated that such operators would collect massive charges to "expand" their operations on a nationwide scale using technology with inherently global

reach, as Locast does here.  For all these reasons, Locast's charges disqualify it from the Section 111(a)(5) exemption.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment rejecting Locast's affirmative defense under Section 111(a)(5) of the Copyright Act.

Dated: May 6, 2021

/s/ Gerson A. Zweifach
Gerson A. Zweifach
Thomas G. Hentoff (*pro hac vice*)
Joseph M. Terry (*pro hac vice*)
Tian Huang (*pro hac vice*)
Jean Ralph Fleurmont (*pro hac vice*)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street,
N.W. Washington, DC
20005

650 Fifth Avenue
Suite 1500
New York, NY 10019

Tel: (202) 434-5000
Fax: (202) 434-5029
gzweifach@wc.com
thentoff@wc.com
jterry@wc.com
thuang@wc.com
jfleurmont@wc.com

*Attorneys for All Plaintiffs*

Paul D. Clement (*pro hac vice*)
Erin E. Murphy (*pro hac vice*)

KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue,
N.W. Washington, DC 20004

Tel: (202) 389-5000

Fax: (202) 389-5200
paul.clement@kirkland.com
erin.murphy@kirkland.com

*Attorneys for Plaintiffs Fox Television
Stations, LLC and Fox Broadcasting
Company, LLC*

46