KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

June 11, 2021

*Via ECF*

The Honorable Louis L. Stanton
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

      Re:    *Am. Broad. Cos. v. Goodfriend*, No. 19-cv-7136

Dear Judge Stanton:

      Pursuant to the Court's June 3, 2021 order (Dkt. #138), I write on behalf of non-parties AT&T and DIRECTV, LLC (collectively, "AT&T") to request that the Court protect the contents of just six documents from public disclosure. AT&T made substantial document productions and sat for multiple depositions as part of a negotiated response to Plaintiffs' non-party subpoenas, and the parties cite that evidence repeatedly in their summary judgment filings. AT&T does not object to the public disclosure of the majority of that evidence. I understand from counsel that neither Plaintiffs nor Defendants oppose AT&T's requested relief.

<u>Five Documents Contain Information That Concerns AT&T's Ability to Compete</u>

      Of the more than sixty pages of AT&T deposition testimony the parties excerpted and filed with the Court, AT&T requests redaction of selected portions of just seven total pages from three excerpts of two depositions (**Thomas Tyrer** and **Stephen Ross**). In addition, AT&T requests that the Court fully seal two exhibits: **Exhibit 11 to the Ross deposition** and **Exhibit 15 to the Tyrer deposition**, and permit the parties to make all redactions necessary in other filings to protect the confidentiality of the above evidence.[1] These steps are necessary to protect sensitive information at the heart of AT&T's ability to compete in the market for content distribution. As the Court is aware, one way in which the Plaintiff broadcast networks distribute content to their viewers is by negotiating retransmission consent agreements with AT&T-owned

---

[1] The deposition excerpts and exhibits appear in, *e.g.*, the Zweifach Declaration (Dkt. #126), at Ex. 17 (Ross excerpts), Ex. 26 (Tyrer excerpts), Ex. 27 (Ross Exhibit 11), and Ex. 30 (Tyrer Exhibit 15), and in the Najemy Declaration (Dkt. #131), at Ex. 26 (defendants' Tyrer excerpts). They are also being filed with this letter, consistent with the Court's ECF rules.

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

The Honorable Louis L. Stanton
June 11, 2021
Page 2

services like DIRECTV and U-Verse, as well as with services like Dish, Charter, and others. Retransmission consent agreements are long-term, high-stakes, heavily negotiated contracts. *Cf. United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 170–72 (D.D.C. 2018) (detailing the "tough," "intense," "aggressive," "time consuming," "high stakes" nature of content negotiations, which produce agreements that "can dictate the transfer of upwards of a billion dollars between programmer and distributor"), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). For that reason, the internal analyses, deliberation, strategizing, and decision-making that go into preparing for and negotiating these agreements is commercially sensitive information of the highest order.

The excerpts and exhibits cited above implicate those concerns. Exhibit 11 is a presentation that provides specific detail, and visual illustrations, of AT&T's planning for a content dispute — including how it would deploy specific tools and features on specific AT&T products, specific messaging it would display to consumers, and the scheduling details for developing some of that functionality. Similarly, Mr. Ross (at pp. 46–47, 97–98) and Mr. Tyrer (at p. 78) divulge in their depositions precise measurements of the impact of a content blackout in terms of specific programming, geography, and subscriber counts. Exhibit 15 is — and Mr. Tyrer describes in his deposition (at pp. 186–87) — a "preliminary draft" of an AT&T press release related to retransmission consent and content "blackouts" that mentions some of the Plaintiff networks. The press release was later significantly revised; the draft in evidence contains language and promotional content related to content retransmission that, as part of a confidential internal deliberation, AT&T never made public in the final release.[2]

This evidence should be sealed for three reasons. *First*, exposing these documents would provide AT&T's counterparties and competitors with "an unearned advantage" in negotiations. *SEC v. Telegram Grp. Inc.*, 2020 WL 3264264, at *3 (S.D.N.Y. June 17, 2020). Courts regularly seal documents to prevent such a windfall to commercial competitors. *See*, *e.g.*, *id.* (sealing non-party "internal analyses" that "could reveal proprietary analysis and provide competitors with an unearned advantage"); *SEC v. Ahmed*, 2018 WL 4266079, at *3 (D. Conn. Sept. 6, 2018) (sealing non-party "records which would aid [c]ommercial competitors seeking an advantage over rivals"); *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 412–13 (S.D.N.Y. 2015) (sealing exhibit about "confidential sales information" and "confidential negotiations"). And with good reason: parties "engaged in a process of 'bargaining' or 'negotiation' . . . are not obliged to reveal their *strategies* . . . [f]or if the parties *do* have full strategic information, then the process of offer and counteroffer becomes superfluous, and the bargaining process is transformed into something else entirely." *NLRB v. Fed. Labor Relations Auth.*, 952 F.2d 523, 530 (D.C. Cir. 1992). For example, access to draft AT&T dispute messaging or detailed internal analyses would unfairly arm a counterparty with the ability to prepare for a negotiation or a potential dispute. AT&T's "narrowly tailored" request to seal a small subset of the documents it produced avoids that unfair result. *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019).

---

[2] The final version is available at https://about.att.com/story/2019/locast_app_and_directv_uverse.html.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Louis L. Stanton
June 11, 2021
Page 3

*Second*, the risk of competitive harm to AT&T if its proprietary information is disclosed is near-certain because the companies that would most benefit from that access are intimately involved with this case. AT&T's competitors in retransmission negotiations include non-parties Dish and Charter; its counterparties *are the broadcast-network Plaintiffs*. To date, only those parties' outside counsel have seen AT&T's sensitive evidence.[3] The parties themselves should not be permitted to see documents detailing preparations for disputes they may participate in.

*Third*, AT&T's status as a non-party that did not choose to become embroiled in litigation further justifies its narrow request. The Second Circuit has made clear that "[t]he privacy interests of innocent third parties should weigh heavily in a court's balancing equation." *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (ellipses omitted); *accord Telegram Grp.*, 2020 WL 3264264, at *3.

<u>One Document Is Largely Irrelevant and Risks Chilling Efforts to Compromise</u>

**Exhibit 17 to the Tyrer deposition**[4] is a letter from AT&T's counsel to Plaintiffs' counsel. Plaintiffs rely (*see* Dkt. #122 ¶ 44) on the letter for a statement in its first paragraph. The balance of the letter reflects AT&T's (successful) efforts to negotiate a voluntary non-party production, and it should be redacted. Arguably, such statements "lie entirely beyond" the presumption of access. *Brown*, 929 F.3d at 50. In any event, the uncited paragraphs are fully "ancillary to the [C]ourt's core role in adjudicating" the merits of the case. *Id.* Moreover, exposing the details of those negotiations could hamper future efforts to compromise in discovery and, in that way, impose on judicial resources. *Cf. Amodeo*, 71 F.3d at 1050.

AT&T's narrowly tailored requests for confidential treatment should be granted.

Respectfully submitted,

/s/ *Benjamin S. Softness*
Benjamin S. Softness

cc: Counsel of record

---

[3] Based precisely on the concerns outlined here, AT&T agreed to produce sensitive evidence only to Plaintiffs' outside counsel under the Court's protective order. Disclosure to the public — and, more importantly, Plaintiffs — would undermine that key premise of AT&T's production agreement and imperil the efficiency gains of voluntary non-party cooperation. *See Amodeo*, 71 F.3d at 1050 ("[C]ooperation is also often essential to judicial efficiency. If release is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access.").

[4] *See, e.g.*, Zweifach Decl. (Dkt. #126), Ex. 29.