# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AMERICAN BROADCASTING
COMPANIES, INC., DISNEY
ENTERPRISES, INC., TWENTIETH
CENTURY FOX FILM CORPORATION,
CBS BROADCASTING INC., CBS STUDIOS
INC., FOX TELEVISION STATIONS, LLC,
FOX BROADCASTING COMPANY, LLC,
NBCUNIVERSAL MEDIA, LLC,
UNIVERSAL TELEVISION LLC, and OPEN
4 BUSINESS PRODUCTIONS, LLC,

    *Plaintiffs and Counterclaim-Defendants*,

    v.

DAVID R. GOODFRIEND and SPORTS
FANS COALITION NY, INC.,

    *Defendants and Counterclaim-Plaintiffs*.

Case No.:  19-cv-7136-LLS

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ..................................................................................................3

    A.   The 1976 Copyright Act .............................................................................3

    B.   The Federal Policy of Promoting Access to Over-The-Air Television ............................5

    C.   Accessing Broadcast Television Can Be Difficult for Numerous Reasons in All Parts of the United States...............................................................................6

    D.   Network Broadcasters' Abuse of Pay-TV Regulations Gives Them an Incentive to Favor Pay-TV Viewers Above Over-The-Air Viewers. ...............7

    E.   SFCNY Was Founded to Serve the Public Interest by Increasing Access to Local Broadcasts.....................................................................................10

        1.       SFCNY is a Nonprofit Organization in Good Standing. .......................13

        2.       No MVPD Was Involved in Founding SFCNY or Launching Locast .................14

        3.       No Individual Has Personally Benefited From SFCNY .......................15

        4.       MVPD Contributions to SFCNY Have Been Limited and Sporadic...................17

        5.       Locast is Now Fully Funded Through User Donations .......................18

LEGAL STANDARDS .......................................................................................19

ARGUMENT .....................................................................................................19

    A.   There is No Genuine Dispute That Locast Makes Secondary Transmissions.................20

        1.       "Transmit" is Technology Agnostic. ...............................................20

        2.       "Secondary Transmission" is Technology Agnostic. .........................20

    B.   There Is No Dispute That Locast is Not a Cable System ................................21

    C.   There Is No Genuine Dispute That SFCNY is a Nonprofit Organization ........................21

    D.   There is No Genuine Dispute That SFCNY Lacks Any Purpose of Commercial Advantage, Direct or Indirect..............................................................23

        1.       Nonprofit Law Establishes That SFCNY Has No Purpose of Commercial Advantage ...............................................................23

        2.       Section 111(a)(5) Incorporates the Nonprofit Law Definition of "Purpose of Commercial Advantage"......................................................27

        3.       SFCNY has No Purpose of Causing Commercial Advantage for Third Parties..............................................................................28

       a.    *Incidental or Collateral Benefits to Third Parties Do Not Show Purpose.* ..................................................................................28

       b.    *SFCNY and Mr. Goodfriend Have No Purpose of Benefitting Pay-TV Providers.* ....................................................................29

       c.    *There is No Evidence that SFCNY has Resulted in Any Benefit to MVPDs.* ...............................................................................30

    4.    Locast's Hypothetical "Market Value" is Irrelevant. ...........................31

    5.    "Competitive Advantage" from "Avoiding License Fees" is the Purpose of Section 111(a)(5) ....................................................................33

    6.    Notoriety is Not a Commercial Benefit for a Nonprofit. .......................33

E.    There Is No Genuine Dispute That SFCNY Does Not Charge Recipients of Locast's Secondary Transmissions, Nor That Viewer Donations Offset Costs ...............34

    1.    Viewer Donations to Locast are Not Charges. ......................................34

    2.    Viewer Donations Offset Locast's Operational Costs. ..........................36

CONCLUSION ..............................................................................................................37

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Broad. Companies, Inc. v. Aereo, Inc.*,
573 U.S. 431 (2014)................................................................................................ 20

*Bohemian Gymnastic Ass'n Sokol of City of New York v. Higgins*,
147 F.2d 774 (2d Cir. 1945) .............................................................................. 25, 27

*Buell v. Mitchell*,
274 F.3d 337 (6th Cir. 2001) .................................................................................. 28

*Consumer Elecs. Ass'n v. FCC*,
347 F.3d 291 (D.C. Cir. 2003) ................................................................................ 20

*Debs Mem'l Radio Fund v. C.I.R.*,
148 F.2d 948 (1945)...................................................................................... 24, 26, 27

*Fortnightly Corp. v. United Artists Television, Inc.*,
392 U.S. 390 (1968).................................................................................................. 3

*Fourth Floor Music v. Highfill*,
No. 85-0729-CV-S-4, 1986 WL 108834 (W.D. Mo. June 3, 1986) ........................ 35

*Fox Television Stations, Inc v. Aereokiller, LLC*,
851 F.3d 1002 (9th Cir. 2017) ................................................................................ 21

*Fox Television Stations, Inc. v. FilmOn X LLC*,
150 F. Supp. 3d 1 (D.D.C. 2015) ...................................................................... 20, 21

*Herbert v. Shanley Co.*,
242 U.S. 591 (1917)................................................................................................ 28

*Highfill v. LaSalle Music Pub.*,
831 F.2d 300 (8th Cir. 1987) .................................................................................. 35

*Howard v. Criminal Information Svcs., Inc.*,
654 F.3d 887 (9th Cir. 2011) .................................................................................. 28

*Kidd v. Thomson Reuters Corp.*,
925 F.3d 99 (2d Cir. 2019) ................................................................................ 27, 28

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)................................................................................................ 29

*Otto v. Hearst Communications, Inc.*,
345 F. Supp. 3d 412 (S.D.N.Y. Dec. 10, 2018) ...................................................... 33

*Presbyterian & Reformed Pub. Co. v. C.I.R.*,
    743 F.2d 148 (3d Cir. 1984) ............................................................... 22, 27

*Spiritual Outreach Soc. v. C.I.R.*,
    58 T.C.M. (CCH) 1284 (T.C. 1990) ........................................................... 35

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
    415 U.S. 394 (1974) .............................................................................. 4

*Television Corp. of Mich. v. F.C.C.*,
    294 F.2d 730 (D.C. Cir. 1961) .................................................................. 5

*Turner Broadcasting System, Inc. v. Federal Communications Commission*,
    512 U.S. 622 (1994) ............................................................................. 25

*United States v. Rothberg*,
    222 F. Supp. 2d 1009 (N.D. Ill. 2002) ...................................................... 28

*W. Michigan Telecasters, Inc. v. F.C.C.*,
    460 F.2d 883 (D.C. Cir. 1972) .................................................................. 5

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012) ............................................................... 20, 21

**Statutes**

17 U.S.C. § 101 ................................................................................... 4, 20

17 U.S.C. § 102 ...................................................................................... 5

17 U.S.C. § 107 ..................................................................................... 33

17 U.S.C. § 108 ...................................................................................... 5

17 U.S.C. § 111 ................................................................................. passim

17 U.S.C. § 121 ...................................................................................... 5

26 C.F.R. § 1.170A-13 ............................................................................. 35

26 C.F.R. § 1.501 ..................................................................... 24, 26, 32

26 U.S.C. § 4958 .................................................................... 13, 14, 32

26 U.S.C. § 501 ................................................................................ passim

47 C.F.R. § 73.3555 ................................................................................. 9

47 U.S.C. § 151 ...................................................................................... 5

47 U.S.C. § 325 ...................................................................................... 8

Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385 ........ 7

Deficit Reduction Act of 2005, Pub. L. No. 109-171 ................................................. 6

DTV Delay Act of 2009, Pub. L. No.111-4 .............................................................. 6

Satellite Home Viewer Extension and Reauthorization Act of 2004, Pub. L. No. 108-447 .......... 7

Satellite Home Viewers Improvement Act of 1999, Pub. L. No. 106-113, 113 Stat. 1501 ........... 7

**Legislative Materials**

138 Cong. Rec. S562-63 (Jan. 29, 1992) .................................................................. 8

*Completing the Digital Television Transition: Hearing Before the Committee on Commerce, Science, and Transportation*, 108th Cong. 1 (2004) .................................................. 5

H.R. Rep. No. 94-1476 (1976) .............................................................................. 4

**Other Authorities**

Aaron Heresco & Stephanie Figueroa, *Over the Top: Retransmission Fees and New Commodities in the U.S. Television Industry*, Democratic Communique Vol. 29, No. 1 (2020) ................................................................................................... 9

Black's Law Dictionary, 10th ed. 2014 .................................................................. 28

*FCC Broadcast Ownership Rules* ......................................................................... 9

Keach Hagey, *CBS Plays Hardball as Affiliate Fees Pile Up*, (Aug. 20, 2014) .................... 9

N.Y. Not-for-Profit Corp. Law § 204 (McKinney 2014) .............................................. 26

*Tax-Exempt Status for Your Organization*, IRS Pub. L. No. 557 (Jan. 2020) .................... 32

## INTRODUCTION

Sports Fans Coalition NY, Inc. ("SFCNY") is the nonprofit operator of Locast, a service that helps television viewers receive and watch their local broadcast television stations. Locast retransmits broadcast television channels pursuant to Section 111(a)(5) of the Copyright Act, which allows for retransmissions without permission from rightsholders when:

> (1) they are "secondary transmission[s]";
> (2) "not made by a cable system";
> (3) "made by a . . . nonprofit organization";
> (4) "without any purpose of direct or indirect commercial advantage"; and
> (5) "without charge to the recipients other than assessments necessary to defray the actual and reasonable costs of operating the service."

17 U.S.C. § 111(a)(5). There is no genuine dispute that Locast's transmissions meet each of these conditions. Locast's transmissions are secondary transmissions according to settled law, which also establishes that Locast is not a cable system. 17 U.S.C. § 111(a)(5). SFCNY is a 501(c)(3) charitable non-profit organization in good standing under Federal and New York law. No one owns SFCNY. It pays no dividends, no distributions, and no salaries. It pays typical market prices for the services and equipment it needs to operate, such as physical space, equipment, technical upkeep, and internet bandwidth. And it defrays those costs by seeking and accepting donations and contributions, including voluntary donations from viewers.

David Goodfriend ("Mr. Goodfriend") founded SFCNY and Locast to address a problem that he identified during his years working at the Federal Communications Commission ("FCC") and in the field of communications policy: too many Americans lack access to their local television programs, even though those programs are transmitted for free over the public airwaves. He convinced friends and former colleagues to donate their time, expertise, and money to help him solve this problem. And he overcame significant start-up issues, including raising the funds needed to begin operations in diverse local television markets.

1

SFCNY and Mr. Goodfriend neither seek, nor have they received, any private profit or benefit, whether for themselves, their officers, or anyone else.  SFCNY exists, rather, to fulfill a public policy goal codified in federal law: to enhance Americans' access to their local television broadcasts.  SFCNY, dedicated to serving that goal, is precisely the type of nonprofit service for which Congress created Section 111(a)(5).

Plaintiffs operate television stations and networks.  Their business incentives favor viewers who use commercial Pay-TV services such as cable or satellite, rather than those who receive free over-the-air broadcasts, notwithstanding their legal obligation as FCC-licensed broadcasters to make their programming available to as many Americans as possible for free.  Because Pay-TV services generate greater revenues for Plaintiffs, Plaintiffs would prefer that SFCNY not be permitted to make it easier for consumers to access the over-the-air signals.  Because they cannot rewrite the Copyright Act to remove Section 111(a)(5), Plaintiffs are doing their best to render it a nullity.

Their efforts must fail.  Plaintiffs' theory of the case is entirely made up—it has no basis in fact.  Knowing that Locast was expressly designed to comply with Section 111(a)(5), Plaintiffs resort to claiming that Mr. Goodfriend established SFCNY and launched Locast at the behest and direction of DISH Network ("DISH") and other Pay-TV platforms.  If Plaintiffs' theory were correct—if, for example, the cable companies had secretly funded and were the driving force behind SFCNY, and it were organized for the purpose of benefitting cable companies[1]—then SFCNY would not be entitled to Section 111(a)(5)'s protection.  But Plaintiffs can present no

---

[1] If SFCNY had been organized for such any such purpose, it would not qualify as a 501(c)(3) organization, which by definition cannot have any purpose (even a secondary purpose) of direct or indirect commercial benefit.  26 U.S.C. § 501(c)(3).  It could still be a nonprofit organization, but it would have to be a 501(c)(6) organization, which is not prohibited from having commercial purposes.

evidence of such secret involvement of DISH or cable interests, no evidence of such secret profit, and no evidence of any purpose to achieve that end. That is because Plaintiffs' allegations are nothing more than unfounded conspiracy theories. Mr. Goodfriend and SFCNY have turned over all of their correspondence, emails, and financial documents. They show that no cable or satellite companies had any involvement in the founding of SFCNY or the launch of Locast; that Locast actually encourages consumers to give up their cable subscription and "cut the cord" (a practice that is directly at odds with the interests of Pay-TV platforms); and that SFCNY operates in the manner of any well-run nonprofit organization in pursuit of a public mission that seeks to be sustainable for the long term.

Section 111(a)(5) has never been construed by a court, but its language is unambiguous, drawing on concepts of nonprofit status and private profit that are used across multiple areas of the law. Just like all of the other limits that Congress has chosen to place on copyrights, Section 111(a)(5) must be read fairly, not tortured to conform to the interests of incumbent businesses.

SFCNY's retransmissions comply with Section 111(a)(5) and fulfill the purpose for which that section was created. Accordingly, Defendants SFCNY and Mr. Goodfriend ask the Court to grant summary judgment in their favor and dismiss Plaintiffs' claims.

## **BACKGROUND**

### A.     The 1976 Copyright Act

Before the Copyright Act of 1976, capturing over-the-air television broadcasts and retransmitting them to viewers was not considered a "public performance" of the motion pictures carried on those broadcast signals, and retransmission did not require any license from copyright holders. *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968). Retransmission was not an infringing act regardless of whether the viewers of the retransmission could also receive the original transmission over the air. *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S.

394 (1974).   Affirming this legal standard, the Supreme Court held that "[t]he privilege of receiving the broadcast electronic signals and of converting them into the sights and sounds of the program inheres in all members of the public who have the means of doing so," and that third parties were entitled to supply those means to communities without broadcasters' consent.  *Id.* at 408.

In 1976, Congress modified the public performance right to bring some but not all retransmissions within the scope of copyright.   Congress "believe[d] that cable systems are ***commercial enterprises*** whose basic retransmission operations are based on the carriage of copyrighted program material and that copyright royalties should be paid by cable operators to the creators of such programs."  H.R. Rep. No. 94-1476, at 89 (1976) (emphasis added).   Accordingly, Congress redefined the public performance right in the commercial context to include transmissions to the public "by means of any device or process."  17 U.S.C. § 101.[2]

For retransmissions by nonprofits, however, Congress preserved the pre-1976 status quo as established in *Fortnightly* and *Teleprompter*.   Unlike the statutory license for cable systems, Section 111(a) sets out limitations on the exclusive rights of copyright holders—activities that "are not an infringement of copyright" in the first instance.  17 U.S.C. § 111(a).  One of the categories that remains outside of copyright is retransmissions by nonprofit services which are not cable systems, with no commercial purpose and no charge to viewers beyond an assessment of costs to support the service.  17 U.S.C. § 111(a)(5).

---

[2] Simultaneously, Congress took steps to ensure that commercial retransmissions of broadcast TV stations could continue at reasonable costs to consumers.  The Copyright Act of 1976 included a statutory license for cable systems, Section 111(c)-(d), which permits those systems to retransmit broadcast signals by complying with a set of conditions, including compliance with applicable FCC rules and payment of fees.

### B.    The Federal Policy of Promoting Access to Over-The-Air Television

Section 111(a)(5) reflects a U.S. government policy of promoting access to local over-the-air broadcasts.  Like other limits on copyright such as the exclusion of ideas and processes (§ 102), the library exceptions (§ 108), and the exceptions for accessibility (§ 121), it represents Congress's considered decision to limit the exclusive rights of a copyright holder to promote other policy priorities.

This policy is also reflected in provisions of communications law that arose separately from copyright.  The Communications Act of 1934 established a policy priority: providing access to radio communications "to all the people of the United States."  47 U.S.C. § 151.  Courts have since interpreted this mandate to include broadcast television signals, with the D.C. Circuit holding "that deprivation of [television] service to any group was undesirable, and to be justified only by offsetting factors." *Television Corp. of Mich., Inc. v. F.C.C.*, 294 F.2d 730, 732 (D.C. Cir. 1961) (internal citations omitted).  Accordingly, the Federal Communications Commission ("FCC") considers any action by a broadcaster that would result in a loss of television service to customers to be "*prima facie* inconsistent with the public interest." *W. Michigan Telecasters, Inc. v. F.C.C.*, 460 F.2d 883, 889 (D.C. Cir. 1972).

Congress reiterated this policy in the run-up to the nation's transition to digital broadcasting in 2009.  In debate on a bill to effect that transition, Senator John McCain remarked that "any proposal to accelerate the digital television transition is incomplete unless it ensures that consumers may continue to use their existing television sets to view over-the-air broadcast signals," warning that "[w]e must not leave these consumers out in the digital cold." *Completing the Digital Television Transition: Hearing Before the Committee on Commerce, Science, and Transportation*, 108th Cong. 1 (2004).  Congress delayed the transition multiple times, and allocated $1.5 billion in subsidies for digital-to-analog converter boxes, to avoid viewers losing

access to signals.  Deficit Reduction Act of 2005, Pub. L. No. 109-171 § 3005; DTV Delay Act of 2009, Pub. L. No.111-4 (2009); SOMF ¶ 36.

### C.   Accessing Broadcast Television Can Be Difficult for Numerous Reasons in All Parts of the United States.

Despite Congress's attempts to preserve access, the transition to digital broadcasting did cause many people to lose access to over-the-air television channels.  SOMF ¶ 35.  While analog signals can be received at a great distance from the transmitter with a gradual decline in fidelity, digital signals become completely unviewable at such distances, a phenomenon known as the "digital cliff."  SOMF ¶ 37.

Today, despite advances in technology, many viewers have difficulty receiving over-the-air TV signals.  SOMF ¶ 34.  They may be too far from the transmitter, or the signal may be blocked or scattered by a variety of obstacles, including mountainous terrain.  SOMF ¶ 38.  The presence of tall buildings or other large structures between the transmitter and the viewer can also cause access difficulties, by causing multiple reflections of the transmitted signal to reach the receiving antenna at slightly different times (called the "multipath" problem).  SOMF ¶ 39. Viewers may also have the wrong type of antenna, poor antenna placement, or nearby sources of radio interference.  SOMF ¶ 40.  Weather conditions may interfere with TV signals.  SOMF ¶ 41. Viewers may also simply be inside buildings whose walls block the signal.  SOMF ¶ 42.  In particular, many people who live in multi-unit buildings are limited to using indoor antennas. SOMF ¶¶ 40, 42.  As TV market areas often cover broad and diverse geographic areas, these problems occur in every market, whether they are predominantly considered urban or rural.  SOMF ¶ 43.

When viewers cannot access over-the-air signals, Pay-TV services that carry those signals are a costly alternative.  SOMF ¶ 44.  And even an expensive Pay-TV subscription doesn't

guarantee access to local broadcasts.  SOMF ¶¶ 45-46.  Programming blackouts resulting from the expiration of retransmission consent agreements have grown more frequent in recent years.  SOMF ¶ 49.  During a blackout, both local and network programming can become unavailable to Pay-TV subscribers.  SOMF ¶ 46.  Even if a consumer lives in an area served by a Pay-TV provider or has broadband access sufficient to receive Pay-TV packages over the internet, millions of Americans no longer can afford such services.  SOMF ¶ 48.

### D.  Network Broadcasters' Abuse of Pay-TV Regulations Gives Them an Incentive to Favor Pay-TV Viewers Above Over-The-Air Viewers.

Cable TV services began in the late 1940s and 1950s as "community antenna" systems, in which a community would erect an antenna on a mountaintop or other high point to capture nearby broadcasts, then retransmit those broadcasts to individual households by wire.  SOMF ¶ 21.  While their original purpose was to provide access to TV signals for those who couldn't otherwise receive them, cable systems also began offering non-broadcast programming such as HBO and ESPN. SOMF ¶ 22.

Cable services were eventually joined by other types of Pay-TV services, such as satellite services.  SOMF ¶ 23.  These services are collectively known as "multichannel video programming distributors" ("MVPDs").  SOMF ¶ 24.  Over time, Congress and the FCC have established regulations governing MVPDs, including their relationships with TV broadcasters.  SOMF ¶ 25; *see also, e.g.*, Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385; Satellite Home Viewers Improvement Act, Pub. L. No. 106-113, 113 Stat. 1501 (1999); Satellite Home Viewer Extension and Reauthorization Act of 2004, Pub. L. No. 108-447 (2004). One important factor in those relationships is the FCC's retransmission consent rules, which allow broadcasters to demand payment from MVPDs when those MVPDs retransmit the broadcast

signal.[3]   47 U.S.C. § 325(b); SOMF ¶ 26.   Among other things, Congress intended the retransmission consent regime to support localism—a mainstay of federal broadcast policy—by affording local broadcasters an additional revenue stream with which to support local news, weather, sports, and public interest programming.  *See The Cable Act at 20: Hearing Before the S. Comm. on Commerce, Sci., and Transp.*, 112th Cong. 17, n.18 (2012) (statement of Sen. Inouye, Member, S. Comm. on Commerce, Sci., and Transp.) (stating that the intent of retransmission consent was to "permit local stations, not national networks . . . to control the use of their signals.") (citing 138 Cong. Rec. S562-63 (Jan. 29, 1992)); SOMF ¶ 27.  While broadcasters have historically received most of their revenue from sales of advertising time, retransmission consent payments from MVPDs make up a large and growing share of their revenue, in some instances reaching close to 50% today.  SOMF ¶¶ 28-29.

This environment creates incentives for broadcasters to encourage consumers to access their signal through Pay-TV services rather than free over-the-air broadcasts.  SOMF ¶ 33.  When viewers receive broadcasts through MVPD subscriptions, the broadcaster has two income streams: advertising sales and retransmission consent payments, which are calculated based on the number of MVPD subscribers.  SOMF ¶¶ 30-31.  When viewers watch over the air, in contrast, broadcasters receive revenue only from advertising sales.  SOMF ¶ 32.  Thus, broadcasters' economic interests are often at cross-purposes with the federal policy of promoting access to free over-the-air television.  SOMF ¶ 33.

---

[3] Retransmission consent is a separate legal regime from copyright.  Retransmission consent, governed by FCC regulation, concerns the right to carry television broadcast **signals**, rather than programming.  Broadcasters may own the copyrights in some of the programming carried on their signals, but the copyright in many of the programs they broadcast are owned by third parties.  The public performance of the **programs** that results from the retransmission of those signals is governed by copyright law and Section 111(a)(5), not by the FCC or the 1992 Cable Act.

Moreover, as the "Big Four" networks (ABC, NBC, CBS, and Fox) owned by the Plaintiffs have increased their bargaining power over independently owned network affiliates by successfully lobbying for the relaxation of broadcast station ownership limits,[4] the Big Four have demanded an ever-increasing share of the affiliates' retransmission consent revenues[5] and ever higher network affiliation fees (known as "reverse compensation" payments),[6] further undermining Congress's intent that the retransmission consent regime support local stations' financing of local news, weather, sports, and public interest programming. *See* SOMF ¶ 30. This siphoning of local retransmission consent funds to the Big Four networks further drives local affiliates to seek higher retransmission consent fees, driving up the proportion of broadcast

---

[4] *See* 47 C.F.R. § 73.3555(e)(1) ("No license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent."); *FCC Broadcast Ownership Rules*, (last accessed May 4, 2021), https://www.fcc.gov/consumers/guides/fccs-review-broadcast-ownership-rules#:~:text=There%20is%20no%20limit%20on,of%20all%20U.S.%20TV%20households ("There is no limit on the number of television stations a single entity may own nationwide as long as the station group collectively reaches no more than 39 percent of all U.S. TV households."); *Id.* ("In 2017, the Commission eliminated its rule that had previously prohibited common ownership of a full-power broadcast station and a daily newspaper if the station's contour (defined separately by type of station) completely encompassed the newspaper's city of publication and the station and newspaper were in the same relevant Nielsen market. At the same time, the Commission also eliminated the radio-television cross-ownership rule, which had restricted the common ownership of broadcast radio and television stations located in the same market.").

[5] Keach Hagey, *CBS Plays Hardball as Affiliate Fees Pile Up*, The Wall Street Journal (Aug. 20, 2014),     https://www.wsj.com/articles/cbs-plays-hardball-as-affiliate-fees-pile-up-1408578087 ("[A] network will receive Pay-TV 'retransmission' fees directly only from those stations it owns outright. But the networks have successfully demanded that affiliate stations share the fees they negotiate with Pay-TV operators. In the past few years, networks have been pushing for a bigger cut of that revenue.").

[6] *See* SOMF at ¶ 30; *see also* Aaron Heresco & Stephanie Figueroa, *Over the Top: Retransmission Fees and New Commodities in the U.S. Television Industry*, Democratic Communique Vol. 29, No. 1, at 26 (2020), https://journals.flvc.org/demcom/article/view/121286/120253.

revenues derived from Pay-TV services and diminishing broadcasters' incentive to increase over-the-air viewership.

The effects of these perverse incentives can be observed most clearly during programming blackouts.  Negotiations between broadcasters and MVPDs often continue beyond the expiration of a retransmission consent agreement, causing "blackouts" or "takedowns" of one or more channels on the MVPD's service.  SOMF ¶ 45.  These blackouts have grown more frequent over time, depriving viewers who depend on Pay-TV of access to local programming.  SOMF ¶¶ 48-49.

### E.    SFCNY Was Founded to Serve the Public Interest by Increasing Access to Local Broadcasts.

SFCNY's purpose, as reported to the IRS on its 2019 Form 990, is to "provide[] a public service by offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market."  SOMF ¶ 66.  Section 111(a)(5) itself, which was adopted to allow nonprofits to expand public access to the free over-the-air programming, is evidence of Congress's belief that services like Locast serve the public good.  *See* SOMF ¶ 69.  Locast enables viewers to watch live TV that is broadcast in their geographic area, by capturing the over-the-air signals and transmitting ("streaming") them over the internet to a viewing device of the user's choice.  SOMF ¶ 51.  As with other streaming video applications, users can view Locast on a "Smart TV," a conventional TV attached to a streaming device such as a Roku or Apple TV, or on a variety of other internet-connected devices such as smartphones and tablets.  SOMF ¶ 52.

Although Section 111(a)(5) is not limited to local retransmissions, Locast employs geofencing—limiting its availability based on the geographic location of the user—to ensure that viewers are within the geographic boundaries of the television market (known as a DMA) where the signals are broadcast.  SOMF ¶ 53.  This geofencing mimics the geographic limitations of a

traditional broadcast translator.  SOMF ¶ 54.  Locast's App also provides a program guide and allows for selecting and switching between channels.  SOMF ¶ 55.  As a result, in addition to receiving the national news and entertainment programming that broadcasters are under an obligation to provide for free to the public, viewers can use Locast to receive local information, including news, sports, and locally produced programming.  SOMF ¶¶ 56-57.  In particular, viewers have used Locast to receive severe weather warnings and information about the spread and prevention of COVID-19, as evidenced by the following testimonials:

- "Without Locast, my family would not have known about the tornado and flood warning in my area on 02/06/2020.  Locast has allowed me and my family to stay current with local and national news, to include the corona virus and how to take precautions."

- "Locast has been our 'filling the gap,' especially during bad weather or when there is a local news event that we need to keep up with.  Locast is not just a 'nicety' it is essential for us to maintain local information updates."

- "When the massive fires destroyed many homes in LA and Ventura County we depended on LoCast to bring us local Los Angeles tv channels to keep us informed.  We need our local channels to keep us informed for fire and Earthquake warnings.  Don't take that away from us! Please!!!"

- "I cannot install a tv antenna on my roof and I have tried 3 long range indoor antennas and they do not work.  We just had tornado warnings and the only way I knew what was going on was Locast! I have satellite TV but it had lost signal earlier due to heavy rain.  It is a life and safety issue!"

- "Without Locast, we would not have been aware of the severity of the approaching weather front that we experienced a few weeks ago that included a tornado passing by Suches, GA, about eight miles from our home."

SOMF ¶ 58.

SFCNY and the Locast service were the brainchild of David Goodfriend, the founder and Chairman of SFCNY.  SOMF ¶ 1.  Mr. Goodfriend spent much of his early career working in government.  SOMF ¶ 4.  He served as Deputy Staff Secretary for President Bill Clinton.  SOMF ¶ 6.  He worked as a professional staff member to Congressional committees chaired by Senator

Herb Kohl (D-WI) and Charles B. Rangel (D-NY) from 1990 to 1993. SOMF ¶ 5. From around 1999 to 2001, he worked in various roles at the FCC, including as Media Legal Advisor to Commissioner Susan Ness. SOMF ¶ 7. At the FCC, Mr. Goodfriend was directly involved in the transition to digital TV broadcasting. SOMF ¶ 8. One proposal that Mr. Goodfriend worked on during this time was a proposed policy that would require the geographic reach of a TV broadcaster's signal not decrease because of the digital transition, a so-called "signal replication" requirement that a broadcaster's digital broadcast cover exactly the same geographic area as the analog "Grade B" contour area. SOMF ¶ 9. This requirement was abandoned in the face of opposition from broadcasters. SOMF ¶ 10. Through this work and later work, Mr. Goodfriend learned about the problems caused by a reduction in access to over-the-air television. SOMF ¶ 11.

After leaving government service, Mr. Goodfriend spent a total of seven years at DISH Network ("DISH"), first as Director of Regulatory Affairs, and then as Vice President of Law and Public Policy. SOMF ¶¶ 12-13, 15. During this time, he also took a year off to co-found Air America Radio, the Progressive-talk radio network. SOMF ¶ 14. In 2009, following his work at DISH, Mr. Goodfriend joined his wife's consulting business, Emmer Consulting, in which he represents various companies, labor unions, nonprofits, and other organizations involved in telecommunications. SOMF ¶ 16. Over the past 12 years, Mr. Goodfriend has represented the Communications Workers of America, independent television producers and distributors, technology startups, and satellite television and broadband providers, among others. SOMF ¶ 17. Mr. Goodfriend also represents DISH, although the fees DISH pays to Mr. Goodfriend have declined by 25% since Mr. Goodfriend started SFCNY. SOMF ¶ 18.

Mr. Goodfriend founded SFCNY in order to solve a problem experienced by many Americans with respect to accessing the over-the-air television broadcasts every American is

entitled to receive for free.  SOMF ¶¶ 59, 66.  As described in more detail below, Locast was not launched for the commercial benefit of any entity, and because Locast encourages cord cutting, it does not benefit any interest other than that of the television viewer.  SOMF ¶ 107.

### 1.    SFCNY is a Nonprofit Organization in Good Standing.

Sports Fans Coalition New York is a nonprofit organization.  SOMF ¶¶ 60-61, 65.  It was incorporated on September 8, 2017 in the State of New York as a charitable organization under Section 201 of the Not-For-Profit Corporation law.  SOMF ¶ 60.  The Internal Revenue Service issued a tax determination on December 3, 2018, with a retroactive date of September 8, 2017, confirming SFCNY's status as a tax-exempt public charity under § 501(c)(3) of the Internal Revenue Code.  SOMF ¶¶ 62-63.

As required by Federal and New York law, SFCNY's bylaws forbid the organization from acting for the private financial benefit or gain of any individual, beyond the payment of reasonable rates for salaries, goods, and services in pursuit of its public mission. 26 U.S.C. § 501(c)(3) ("no part of the net earnings of which inures to the benefit of any private shareholder or individual"); Internal Revenue Code ("IRC"), 26 U.S.C. § 4958 (2018); SOMF ¶¶ 86, 88.  Therefore, any income received in excess of expenses (in other words, "profits") must be used to further the organization's mission and cannot be distributed to any individual without a corresponding benefit to the organization's mission.  26 U.S.C. § 4958; SOMF ¶¶ 86-87.  Every dollar of income realized by SFCNY has been used in pursuit of its mission to improve access to broadcast TV programming, including expanding its service to more TV viewers in more local coverage areas. SOMF ¶¶ 102, 105.  SFCNY has never distributed excess income to any individual or company, beyond payments for goods and services that are used to operate Locast.  SOMF ¶ 92.  In particular, neither Mr. Goodfriend nor either of SFCNY's other board members has received payments of any

kind from SFCNY.  SOMF ¶ 93.  Nor has SFCNY made any payments to third-party companies or organizations, except in return for services rendered.  SOMF ¶ 100.

SFCNY is subject to monitoring, audit, and enforcement by the IRS and the State of New York regarding its nonprofit status.  SOMF ¶ 89.  Any acts taken for the private benefit of any individual, or otherwise in violation of the law governing nonprofits, would subject SFCNY to fines, tax assessments, and potential dissolution.  26 U.S.C. § 4958; SOMF ¶ 90.

No such enforcement has occurred.  SOMF ¶ 91.  SFCNY has filed annual statements with the IRS and the State of New York for each year of its existence, attesting to its compliance.  SOMF ¶ 64.

### 2.    No MVPD Was Involved in Founding SFCNY or Launching Locast

Neither DISH, nor AT&T, nor any other MVPD was involved in the conception, planning, or creation of SFCNY or the Locast service.  SOMF ¶ 106, 110.  Mr. Goodfriend did seek funding from various MVPDs (as well as broadcasters, foundations, and other potential sources of funding) *after* SFCNY launched the Locast service, but he was rebuffed for a year and a half by every MVPD that he approached.  SOMF ¶ 121.

Locast's original funding came from a commercial loan granted by IoT Broadband, a company owned by Michael Kelly.  SOMF ¶ 124.  Mr. Kelly was at one point an executive at DISH Network and a colleague of Mr. Goodfriend there.  SOMF ¶ 125.  Mr. Kelly retired from DISH and started IoT Broadband, however, in 2015.  SOMF ¶¶ 126-127.  Since starting IoT Broadband, Mr. Kelly has had no connection to DISH.  SOMF ¶ 127.  IoT Broadband was never paid by DISH, and has never been a co-investor with DISH's founder and chairman Charlie Ergen, or any of Mr. Ergen's investment vehicles.  SOMF ¶ 128.  And Mr. Kelly has never discussed Locast, or the retransmission consent regime, with Mr. Ergen.  SOMF ¶ 129.

Two years after Mr. Kelly left DISH, in the summer of 2017, Mr. Goodfriend told Mr. Kelly about Locast, and asked him for a $2 million loan to help launch the service. SOMF ¶ 130. Before that time, Mr. Kelly and Mr. Goodfriend had not spoken about creating a new television distribution service. SOMF ¶ 131. Mr. Kelly viewed himself as a lender to Locast, not an investor. SOMF ¶ 132. And Mr. Kelly never discussed taking any kind of equity stake in Locast, or in any hypothetical for-profit business associated with Locast. *Id.*

Mr. Kelly agreed to have IoT Broadband provide a $2 million revolving loan to SFCNY at a 10 percent annual interest rate. SOMF ¶ 133. For its first full year of operation, in spite of Mr. Goodfriend's repeated attempts to raise donations from many third parties, including MVPDs, broadcasters, foundations, and others, the loan from IoT Broadband was the only source of SFCNY's funding. SOMF ¶¶ 121, 134. SFCNY ultimately borrowed only $1,313,141.10 (including interest) from IoT Broadband, and repaid that amount in full in the fall of 2020. SOMF ¶ 135. Apart from the interest that SFCNY paid on the loan, which was a commercially reasonable amount, Mr. Kelly has received no money or other compensation from SFCNY. SOMF ¶ 136.

### 3.     No Individual Has Personally Benefited From SFCNY

No individual has benefitted monetarily from the creation or operation of SFCNY or the Locast service. SOMF ¶¶ 85-105. Mr. Goodfriend, who has served as the Chairman, President, and Treasurer of SFCNY since 2017 and is currently the Chairman and a member of the Board of Directors, has never been paid anything by the organization—not even a market-rate salary. SOMF ¶¶ 71, 93-94. Nor has Mr. Goodfriend been paid anything by any third party—including DISH, AT&T, or any other MVPD—in exchange for founding SFCNY or launching and operating the Locast service. SOMF ¶ 95. No such payments have ever been contemplated. SOMF ¶ 96. Indeed, since Mr. Goodfriend founded SFCNY and launched Locast, Mr. Goodfriend's compensation for his lobbying work for DISH has gone down by 25%. SOMF ¶ 18.

Nor has any other SFCNY principal benefitted monetarily from SFCNY or the Locast service.  SOMF ¶¶ 85, 92-93.  The two other current SFCNY board members—Gigi Sohn and Habiba Alcindor—are longtime advocates for the public interest with a history of nonprofit work. SOMF ¶¶ 73-84.

Gigi Sohn has dedicated her career to the public interest in media and technology policy. SOMF ¶ 75.  She currently works at the Georgetown University Law Center.  *Id.*  She founded and led the nonprofit advocacy organization Public Knowledge, which "promotes freedom of expression, an open internet, and access to affordable communications tools and creative works." SOMF ¶ 76.  She has also served as the Executive Director of the nonprofit law firm Media Access Project, which represented the public interest in media and telecommunications regulation.  SOMF ¶ 77.  Ms. Sohn has also been a Project Specialist at the Ford Foundation.  SOMF ¶ 78.  From 2013 to 2016, she was Special Counsel to FCC Chairman Tom Wheeler.[7]  SOMF ¶ 79.  Ms. Sohn currently produces a podcast about technology and communications policy, called "Tech on the Rocks."  SOMF ¶ 80.

Habiba Alcindor is a writer, producer, dramatist, director, and social justice activist. SOMF ¶ 81.  She has been an opinion writer at publications including The Nation and The Root, writing on topics such as equality, education, sports, and the media.  SOMF ¶ 82.  She also advocates for expanding access to media, particularly sports programming.  SOMF ¶ 83.

Like Mr. Goodfriend, both Ms. Sohn and Ms. Alcindor donate their time to SFCNY and take no salary or other remuneration in return for their work on behalf of SFCNY in helping to

---

[7] Ms. Sohn currently serves on the board of the Electronic Frontier Foundation, which is counsel to SFCNY in this action.

broaden access to the free over-the-air television broadcasting content to the public, and in particular to underserved communities.  SOMF ¶ 84.

### 4. MVPD Contributions to SFCNY Have Been Limited and Sporadic

Because the Locast service does not, in fact, create any commercial advantage for MVPDs, it should not be surprising that contributions from MVPDs to SFCNY have been limited, sporadic, or both.  SOMF ¶ 123.  No MVPD donated to SFCNY or gave any kind of support for the first year and a half of SFCNY's operations.  SOMF ¶ 108.  Throughout that entire time, the only financial means that SFCNY had was the loan from IoT Broadband, notwithstanding Mr. Goodfriend's efforts to have various MVPDs (as well as broadcasters and other entities) donate to the organization.  SOMF ¶¶ 121, 124.

AT&T donated $500,000 at the end of June of 2019—a year and a half after the Locast service was launched.  SOMF ¶ 137.  As the Plaintiffs point out, this donation was given shortly before AT&T entered into retransmission consent negotiations with CBS that resulted in a temporary blackout of CBS stations on the AT&T DirecTV platform, and AT&T alerted its subscribers that they could access CBS content through the Locast App (as well as through the over-the-air signals and through the CBS App).  SOMF ¶ 138; *see also id.* at ¶ 139.  The donation was unrestricted and was used to cover costs for the Locast service to provide greater access for more members of the American public to the over-the-air television programming they are entitled to access for free.  SOMF ¶¶ 140-141.  AT&T never gave another donation, suggesting that, to the extent that AT&T anticipated that it would reap some commercial advantage from its donation, that calculation proved faulty.

Similarly, a nonprofit organization led by two small cable companies in South Dakota gave a much smaller unrestricted donation that was used to offset the costs of launching the Locast service in two small markets in that state.  SOMF ¶ 142.  Viewers in the service areas of those

cable companies have significant difficulties receiving over-the-air broadcast signals.   SOMF ¶ 144.   Neither of those cable companies was involved in retransmission consent negotiations at the time, nor were there imminent blackouts on their systems caused by an impasse in retransmission consent negotiations.   SOMF ¶ 143.

SFCNY received a similar donation from Liberty Cablevision of Puerto Rico.   SOMF ¶ 145.   That cable company was not nearing retransmission consent negotiations, nor was it in danger of reaching an impasse in any negotiations that would result in a broadcast blackout, at the time of its donation to SFCNY.   SOMF ¶ 146.   Rather, the modest donation was used by SFCNY to offset the costs of launching the Locast service in Puerto Rico where, because of mountainous terrain and damage caused by catastrophic storms, many residents are unable to access the free over-the-air broadcast programming they are entitled to receive.   SOMF ¶¶ 147-148.

### 5.   Locast is Now Fully Funded Through User Donations

As of today, all or nearly all of SFCNY's income comes from donations made by Locast users.   SOMF ¶ 149.   Locast requests these monthly donations from its users, but does not require them in order to view television channels.   SOMF ¶ 152.   Ordinarily, after a trial period of twenty-four hours, Locast requests donations by temporarily halting the transmission, playing a fifteen-second video requesting donations, and returning the user to the Locast program guide, from which they can restart the broadcast stream or choose another channel.   SOMF ¶ 153.   This occurs after 15 minutes of watching a single channel.   SOMF ¶ 154.   The 15-minute timer resets to zero when a user changes the channel.   SOMF ¶ 155.   Locast ceases to run the 15-second donation requests when a user donates or reports that they are experiencing a financial hardship, the impacts of the COVID-19 pandemic, or the impacts of natural disasters like wildfires.   SOMF ¶ 156.   Approximately 90% of all Locast users watch TV through Locast without donating, and more than

18

half of all regular users who access the service multiple times a month use the service without making donations.  SOMF ¶¶ 157-158.

## LEGAL STANDARDS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also LuxSoma LLC v. Leg Resource, Inc.*, 289 F. Supp. 3d 514, 521 (S.D.N.Y. 2018).[8] A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if it would "affect the outcome of the suit."  *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *LuxSoma LLC*, 289 F. Supp. 3d at 521.  "Metaphysical doubt," conjecture, or surmise concerning the facts are not sufficient to avoid summary judgment.  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co*., 804 F.2d 9 (2d Cir. 1986).

## ARGUMENT

As explained below, there is no genuine dispute that Locast's retransmissions of the over-the-air broadcasts are (1) "secondary transmission[s]," (2) "not made by a cable system," (3) "made by a . . . nonprofit organization," (4) "without any purpose of direct or indirect commercial advantage" and (5) "without charge to the recipients other than assessments necessary to defray the actual and reasonable costs of operating the . . . service."  17 U.S.C. § 111(a)(5).  Because the facts are consistent with a plain reading of Section 111(a)(5), the Court should grant summary judgment for SFCNY and Mr. Goodfriend.

---

[8] Unless otherwise indicated, all internal citations and quotations have been omitted and all emphasis has been added.

**A.      There is No Genuine Dispute That Locast Makes Secondary Transmissions**

Section 111(a)(5) applies to "the secondary transmission of the performance or display of a work embodied in a primary transmission."  Locast's transmissions fall within this category, which is agnostic as to the technology employed to make the secondary transmission.

**1.      "Transmit" is Technology Agnostic.**

The Copyright Act's definition of "secondary transmission" is built on the Copyright Act's definition of transmission: "To 'transmit' . . . a performance or display is to communicate it *by any device or process* whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101 (emphasis added).  This definition is purposely broad and technology-neutral.  "[T]he Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application."  *Consumer Elecs. Ass'n v. F.C.C.*, 347 F.3d 291, 298 (D.C. Cir. 2003).  And addressing a for-profit streaming service that used Internet transmissions similar to Locast, the Court held that "stream[ing] . . . program[s] over the Internet" is a form of "transmit[ting] a performance of . . . an audiovisual work."  *Am. Broad. Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 445 (2014); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012) (noting absence of dispute that an Internet streaming service "publicly performed" TV programming); *Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 6 (D.D.C. 2015) ("[R]etransmitting copyrighted programming over the Internet constitutes a public performance within the meaning of the Transmit Clause.") (citing *Aereo*).

**2.      "Secondary Transmission" is Technology Agnostic.**

Building on the definition of "transmit," Section 111 defines a "secondary transmission" as "the further transmitting of a primary transmission simultaneously with the primary transmission."  This definition, like the underlying definition of "transmit," is technology-neutral, containing no language limiting its application to cable systems or any other transmission

technology.  In fact, the statute expressly contemplates that entities *other than* cable systems make secondary transmissions.   Sections 111(a)(1) and 111(a)(5) both contemplate a "secondary transmission . . . not made by a cable system," placing no further limitation on the types of service or technology that engage in secondary transmissions.  And courts have explicitly treated Internet streaming as "secondary transmission." *See FilmOn*, 150 F. Supp. 3d at 31 ("[a]n unauthorized secondary transmission constitutes a performance.").

Locast receives primary over-the-air transmissions made free to the public by the broadcasters, and further transmits them to viewers simultaneously with the primary transmissions. As this is all the statute requires, Locast makes covered secondary transmissions.

### B.     There Is No Dispute That Locast is Not a Cable System

The law is now well-established that systems like Locast, which use the internet to make secondary transmissions to viewers, are not cable systems according to the Copyright Act's definition. *See* 17 U.S.C. § 111(f)(3); *see also Fox Television Stations, Inc v. Aereokiller, LLC*, 851 F.3d 1002, 1015 (9th Cir. 2017); *Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 19 (D.D.C. 2015); *WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 284–85 (2d Cir. 2012).  Plaintiffs do not dispute that Locast fulfills this element of Section 111(a)(5).  SOMF ¶ 50.

### C.     There Is No Genuine Dispute That SFCNY is a Nonprofit Organization

SFCNY is incorporated as a New York not-for-profit charitable corporation.  SOMF ¶¶ 60-65.  The IRS has granted SFCNY a tax exemption under Section 501(c)(3).  SOMF ¶¶ 62-63.  And SFCNY has maintained its corporate and tax status since its inception by filing statements with the New York Department of State and the IRS, and by complying with the applicable laws. SOMF ¶ 64.  SFCNY's statements, filed under penalty of perjury, as well as its audited financial statements, demonstrate that SFCNY has not engaged in any private inurement, nor acted for

21

anyone's private benefit.  SOMF ¶¶ 86-87.  For example, Article 10 of the SFCNY Articles of

Incorporation states:

> No part of net earnings of the Corporation shall inure to the benefit of or be
> distributed to any director, employee or other individual, partnership, estate, trust
> or corporation having a personal or private interest in the Corporation.
> Compensation for services actually rendered and reimbursement for expenses
> actually incurred in attending to the affairs of the Corporation shall be limited to
> reasonable amounts.

SOMF ¶ 86.

Plaintiffs admit that SFCNY is a nonprofit organization.  SOMF ¶ 65.  And there exist no

facts that would support a challenge to SFCNY's status.  In particular, it is undisputed that SFCNY

has made no distributions of excess income, whether to Mr. Goodfriend, other board members, or

any other individual or entity.  SOMF ¶¶ 85, 92, 97.

SFCNY has only recently begun to take in more income than it pays to cover costs.  SOMF

¶ 103.  It is using this money to expand and improve service, as well as to cover operating costs,

and has no plans to use it for any other purpose.  SOMF ¶ 104.  Plaintiffs have admitted that all of

SFCNY's income to date has been used to provide and expand the Locast service.  SOMF ¶ 105.

Expanding the services provided in pursuit of its mission does not turn a nonprofit into a for-profit

business.  *Presbyterian & Reformed Pub. Co. v. C.I.R.*, 743 F.2d 148, 157 (3d Cir. 1984); SOMF

¶ 99.  If that were so, "organizations seeking § 501(c)(3) status may be forced to choose between

expanding their audience and influence on the one hand, and maintaining their tax-exempt status

on the other."  *Id.* at 158-59.  A small nonprofit "could then have within its penumbra only a small-

scale operation run off a kitchen table."  *Id.*  This result "does not reflect the dynamic quality of

our society or the goals that generated the grant of tax-exempt status" to qualifying nonprofits.  *Id.*

As SFCNY remains in good standing as a nonprofit organization under federal and New York law, and the record contains no facts that would support a challenge to that legal status, SFCNY is a nonprofit organization for purposes of Section 111(a)(5) as well.

### D.       There is No Genuine Dispute That SFCNY Lacks Any Purpose of Commercial Advantage, Direct or Indirect

SFCNY and Mr. Goodfriend have no "purpose of direct or indirect commercial advantage" under any valid interpretation of that statutory phrase, because undisputed facts show that they do not profit from the operation of Locast, nor do they act with a purpose of generating profit for any other person or entity.   Moreover, they could not seek private profit for anyone without endangering SFCNY's ability to perform its stated mission.

Unable to credibly dispute the facts, Plaintiffs propose to rewrite the law, insisting that the financially responsible operation and expansion of Locast—which necessarily involves engaging in commercial transactions, running short-term cash surpluses, being subject to "control" by its management, establishing a solid reputation, and amassing hypothetical "value"—would disqualify Locast from 111(a)(5) protection.   Plaintiffs also claim that the alleged effects of Locast's existence on retransmission consent negotiations mean that Locast's purpose is to benefit MVPDs.   As either of these theories would deny 111(a)(5) protection to *any* nonprofit organization that effectively expands the reach of over-the-air broadcast signals, Plaintiffs' interpretation would undermine the very purpose of the statute, and cannot be correct.

### 1.       Nonprofit Law Establishes That SFCNY Has No Purpose of Commercial Advantage

Federal tax law and state corporate law give meaning to the term "nonprofit organization." Section 501(c)(3) of the federal tax code imposes two key requirements on nonprofit organizations. The first is that it must not be organized or operated for the benefit of private interests, so that no net earnings of the organization can "inure[] to the benefit of any private shareholder or

individual." 26 U.S.C. § 501(c)(3); 26 C.F.R. § 1.501(c)(3)-1(d)(1)(ii).  The second is that it must be operated *exclusively* for specified purposes that have been deemed to be in the public interest—none of which includes any purpose of direct or indirect commercial advantage.  26 U.S.C. § 501(c)(3); 26 C.F.R. § 1.501(c)(3)-1(d)(1)(i)-(ii).  If an organization is deemed to have *any* commercial purpose, it loses its 501(c)(3) tax exempt status.[9]  As a result, there is a well-defined body of case law that identifies when a 501(c)(3) organization that has a legitimate public interest purpose can be deemed to *also* have a commercial purpose that negates its tax-exempt status.

Importantly, 501(c)(3) corporations *are* permitted to engage in ***commercial transactions***, including profitable transactions, without being deemed to have a commercial purpose, provided that the profits gained from such transactions are used to advance the nonprofit's mission.  The Second Circuit has held that a nonprofit-owned radio station could earn "substantially all" of its income from the sale of commercial advertising without losing its tax-exempt nonprofit status "since its ultimate purpose is the maintaining of a free public forum for educational, cultural and civic purposes without financial gain to any individual." *Debs Mem'l Radio Fund v. C.I.R.*, 148 F.2d 948, 951 (1945).  A nonprofit can also pay for goods and services to further its mission, provided that it pays reasonable rates for those goods and services.  SOMF ¶ 92.  Excessive payments can be subject to taxes and penalties.  SOMF ¶ 90.  And, of course, if any of the funds generated by the nonprofit are used for improper purposes—such as to enrich individuals connected with the organization—that would be deemed a commercial purpose that would negate the 501(c)(3) status.  *Id.*

---

[9] Other types of nonprofits, such as social welfare organizations and business leagues, must also avoid "private inurement" but can pursue other purposes, including purposes of direct or indirect commercial advantage such as advancing the indirect commercial interests or benefits of an industry or trade.  *See, e.g.*, § 501(c)(6).  Thus, while some types of nonprofits can have a purpose of commercial advantage, a 501(c)(3) nonprofit cannot.

SFCNY has a legitimate public interest purpose: to "provide[] a public service by offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market."   SOMF ¶ 66; *see also* SOMF ¶ 67.   This purpose is consistent with the longstanding government policy of promoting access to local broadcasts for everyone in the U.S. *See Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 646 (1994) ("There is a substantial government interest in promoting the continued availability of such free television programming, especially for viewers who are unable to afford other means of receiving programming."); SOMF ¶ 68.   SFCNY thus furthers the goal set by Congress before and during the digital TV transition.   And as obstacles to reception of over-the-air signals occur in every local television market, SFCNY's expansion of Locast into both large urban markets and smaller rural ones is consistent with that goal.   SOMF ¶ 43.

Feedback from Locast users confirms that the service is fulfilling its purpose.   Viewers use Locast to receive emergency information, local news, local sports, and other information and entertainment they value and are entitled to receive.   SOMF ¶¶ 57-58.   While some broadcast channels may be streamed over the internet through broadcasters' websites or other sources, Locast is the only service that seeks to provide viewers with the complete set of broadcast channels for their local area via the Internet, without a Pay-TV subscription.   SOMF ¶ 47.

Plaintiffs' contention that SFCNY has a secondary commercial purpose because it engages in commercial activity is at odds with the law.   A 501(c)(3) corporation may engage in commercial activity and maintain exempt status so long as the commercial activity serves its nonprofit mission. *See, e.g.*, *Bohemian Gymnastic Ass'n Sokol of City of New York v. Higgins*, 147 F.2d 774 (2d Cir. 1945) (interpreting parallel language to exempt from commercial purpose a nonprofit that operated a bar and restaurant for the public and charged membership dues because its commercial income

25

was used to advance the association's charitable activities and accumulating surpluses was not its ultimate goal); *Debs Mem'l Radio Fund*, 148 F.2d at 949 (finding a public service broadcast radio station using a portion of broadcasting time for commercial programming to finance its operations maintained its 501(c)(3) status because no sizeable surpluses were accumulated and any improvements made to the station's facilities directly served public service purposes in allowing the station to continue to operate).

Every donation that SFCNY has received from any source has been used solely to operate the Locast service.  SOMF ¶¶ 102, 105.  This is not in dispute.  Any purpose of commercial advantage would violate tax law and New York corporate law and risk enforcement against SFCNY, including substantial penalties.  26 U.S.C. § 501(c)(3); 26 C.F.R. § 1.501(c)(3)-1(d)(1)(ii) ("An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest."); N.Y. Not-for-Profit Corp. Law § 204 (McKinney 2014) ("Notwithstanding any other provision of this chapter or any other general law, a corporation of any kind to which this chapter applies shall conduct no activities for pecuniary profit or financial gain, whether or not in furtherance of its corporate purposes, except to the extent that such activity supports its other lawful activities then being conducted."); SOMF ¶ 90.  It is undisputed that SFCNY has not made any payments to Mr. Goodfriend, the other board members, or any other individual affiliated with SFCNY.  SOMF ¶¶ 92-93, 97.  In addition, SFCNY does not pay salaries, although a nonprofit is of course permitted to do so.  SOMF ¶ 85.  SFCNY has not given any money to other corporations or organizations, except as payment for goods and services that advance SFCNY's mission—specifically, inputs needed to operate the Locast service.  SOMF ¶ 97.  SFCNY is already subject to monitoring and audit.  SOMF ¶ 89.  SFCNY's continued good standing with

these authorities shows that the organization does not act for the purpose of commercial advantage and has no intention of doing so.  SOMF ¶¶ 64, 91.

Plaintiffs' argument that engaging in commercial activity and seeking to have a strong financial balance sheet for the purpose of furthering the legitimate public purpose of the organization is at odds with well-established nonprofit law.  *See Bohemian Gymnastic*, 147 F.2d 774; *Debs Mem'l Radio Fund*, 148 F.2d at 949; *Presbyterian & Reformed Pub. Co.*, 743 F.2d 148. Plaintiffs' interpretation of "commercial advantage" would mean that most 501(c)(3) corporations, including many hospitals, museums, schools and other charities, would lose their tax-exempt status merely because of responsible financial stewardship.

### 2.  Section 111(a)(5) Incorporates the Nonprofit Law Definition of "Purpose of Commercial Advantage"

The Copyright Act does not provide a different definition of commercial purpose from that used in tax law, and nothing in the Act's structure or legislative history suggests that a different definition should apply.  On the contrary, the Copyright Act's use of "commercial advantage" mirrors the tax code.  Just as nonprofits that have a charitable purpose and avoid private inurement are exempt from paying certain taxes that commercial entities must pay, the same organizations are given the freedom to use copyrighted works in specified ways that commercial actors generally must pay for.

This also comports with canons of construction regarding the interpretation of laws by their plain meaning.  The term "purpose" corresponds with the concept of specific intent.  *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 104 (2d Cir. 2019) (explaining that "a person who causes a particular result is said to act purpose[ly] if he consciously desires that result, whatever the likelihood of that result happening from his conduct.  This understanding comports with the common dictionary definition of purpose as something set up as an object or end to be attained.")

(internal citations and quotations omitted).  One has a purpose to accomplish a result when they act "with the intent to accomplish the precise . . . act."  *Id.*  (citing Black's Law Dictionary, 10th ed. 2014); *see also Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001) ("a person acts purposely when it is his specific intention to cause a certain result.").

In the Copyright Act as elsewhere, a "purpose of commercial advantage" has been interpreted to mean "a desire to profit."  *United States v. Rothberg*, 222 F. Supp. 2d 1009, 1017 (N.D. Ill. 2002).  This corresponds with the former language of the 1909 Copyright Act, which covered public performances made "for profit," *i.e.*, "not eleemosynary."  *See Herbert v. Shanley Co.*, 242 U.S. 591, 595 (1917).  Even in circumstances where copyrighted works are exchanged for valuable consideration, a participant does not have any "purpose of commercial advantage" if he seeks no "monetary gain" from his participation.  *Rothberg*, 222 F. Supp. 2d at 1017-18.

**3.  SFCNY has No Purpose of Causing Commercial Advantage for Third Parties.**

Plaintiffs have attempted to insinuate that SFCNY is run with an intent to benefit various Pay-TV providers, but these insinuations fall short of showing any purpose of commercial advantage, direct or indirect.

**a.  *Incidental or Collateral Benefits to Third Parties Do Not Show Purpose.***

When a person's purpose is inferred from their actions, collateral or incidental consequences of those actions do not establish the actor's purpose.  *Howard v. Criminal Information Svcs., Inc.*, 654 F.3d 887, 891-92 (9th Cir. 2011) (evidence that a business stockpiled drivers license data did not establish that the business had a purpose of using the data improperly).  And while providing any service to the public can have collateral effects on other service providers and markets, neither mere knowledge of possible effects, nor "ordinary acts incident to product distribution," establish that the service provider had a purpose to cause those collateral effects.  *See*

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005).  For example, the construction of a nonprofit hospital may increase the business, and thus the profits, of nearby restaurants and motels.  But the fact of such increases doesn't establish that the hospital had a purpose of causing them, even if the hospital's managers were aware of the possibility.

Accordingly, even if Locast's existence benefitted Pay-TV services by strengthening their bargaining position in retransmission consent negotiations, that collateral effect would not establish that Locast has any commercial purpose.

### b.   *SFCNY and Mr. Goodfriend Have No Purpose of Benefitting Pay-TV Providers.*

Even if commercial benefit to third parties were relevant to the Section 111(a)(5) exception, SFCNY and Mr. Goodfriend have no purpose of benefitting Pay-TV providers (MVPDs) or any other third party.  Locast is as likely to harm the commercial interests of cable and satellite TV providers as it is to benefit them.  TV viewers in the U.S. increasingly seek to "cut the cord" by canceling expensive MVPD subscriptions, relying instead on over-the-air viewing and lower-cost Internet streaming services to access the programming they want.  SOMF ¶ 115.  Locast helps viewers "cut the cord" by providing a key piece of the TV programming that viewers want: local broadcasts.  SOMF ¶¶ 115, 117-119.

Conversely, the alleged effect of Locast on retransmission consent payments by MVPDs is highly speculative and uncertain.  *See* SOMF ¶¶ 111-120.  This explains why, for example, DISH Network expressed deep ambivalence about the creation of Locast and did not support it.[10] SOMF ¶ 122.  In fact, no MVPD provided support to SFCNY in its first eighteen months of

---

[10] Comcast, the nation's largest MVPD, would have the most to gain if Plaintiffs' theory about Locast's effect on retransmission consent markets were true.  But far from supporting Locast, several of Comcast's NBC subsidiaries are plaintiffs in this lawsuit.  *See* Compl. ¶¶ 24-26.

operation.   SOMF ¶ 108.   Once Locast was operating, Mr. Goodfriend did approach various

MVPDs to ask for donations, but very few donated, and none more than once.   SOMF ¶¶ 121, 123.

Moreover, Mr. Goodfriend and SFCNY did not coordinate with any MVPDs in forming

Locast, nor did Mr. Goodfriend or his associates even speak to MVPDs about Locast before its

formation.   SOMF ¶ 106.

### c.   There is No Evidence that SFCNY has Resulted in Any Benefit to MVPDs.

The record does not show that Locast's existence has actually benefitted MVPDs.   For the

first eighteen months of its existence, no MVPD provided any funding or other support for Locast,

despite Mr. Goodfriend's requests for donations.   SOMF ¶ 108.   Importantly, Plaintiffs' theory

that the purpose behind Mr. Goodfriend's founding of SFCNY and launching of Locast was to

benefit MVPDs fails because there is no evidence that Locast has given MVPDs any quantifiable

commercial advantage.

Plaintiffs have presented no evidence of any actual quantifiable benefit that has resulted

for MVPDs in relation to retransmission consent negotiations.   SOMF ¶ 112.   Indeed, the existence

of the Locast service has been raised only three times in connection with dozens of broadcast

stations' retransmission consent negotiations affecting hundreds of markets that Plaintiffs and

others have participated in since Locast was launched.   SOMF ¶ 111.   Even in those instances,

Plaintiffs have been unable to identify any quantifiable impact caused by the availability of Locast.

SOMF ¶ 112.   This shouldn't be surprising, as MVPDs also often remind their subscribers that

many of them can access broadcast stations using an over-the-air antenna, and that much of the

content is available online and through the broadcasters' apps.   SOMF ¶ 114.

In contrast, there is no dispute that Locast has been touted as a boon to those cable and

MVPD subscribers looking to "cut the cord" and abandon their MVPD subscriptions.   SOMF

¶ 115.  Plaintiffs have conceded that cord-cutting is harmful to the commercial interests of MVPDs like DISH and AT&T.  SOMF ¶ 116.  When Locast was launched, SFCNY and Mr. Goodfriend specifically publicized the service to cord-cutters and potential cord-cutters.  SOMF ¶ 117.  Cord-cutting websites and advocates have noted the benefits of Locast to help people avoid expensive cable bills, and even Plaintiffs' affiliates have noted on their websites the fact that Locast is a good tool to help "cut the cord."  SOMF ¶ 119.

Finally, and most importantly, Mr. Goodfriend has used blackouts that have resulted from retransmission consent negotiations not to help MVPDs, but rather to help customers free themselves from high Pay-TV platform fees, specifically encouraging DISH and AT&T subscribers to view such blackouts as a good occasion to "cut the cord."  SOMF ¶ 120.  Plaintiffs cannot explain why Mr. Goodfriend would encourage DISH and AT&T subscribers to cancel their subscriptions if, as Plaintiffs claim, his very purpose in founding SFCNY and launching Locast was to create a commercial advantage for those entities.

#### 4.   Locast's Hypothetical "Market Value" is Irrelevant.

Plaintiffs' assertion that SFCNY's has a "market value" that establishes a commercial purpose makes no sense and does not support their claims.  It is possible to apply techniques used for valuing for-profit companies to estimate the "market value" of any nonprofit.  *See* Ex. 6 (Rebuttal Expert Report of Thomas J. Raffa) at ¶¶ 21-23.  Such techniques would reveal very large valuations, some in the billions, for nonprofits such as Harvard and Georgetown Universities, research and medical support groups such as the American Heart Association and American Cancer Society, nonprofit hospitals such as St. Jude's and Shriners, as well as groups like the United Way, the American Red Cross, Goodwill, and CARE.  *See id.* at ¶ 22.  Many of these organizations also have for-profit "competitors" that provide the same services.  *Id.* ¶ 21.

Plaintiffs' proposed definition of "commercial purpose" would strip thousands of charitable institutions of their non-profit status.

Their value, whether $1000 or $100 million, doesn't matter.  As nonprofits, these organizations are forbidden by law from bestowing any of their purported value on private parties. 26 U.S.C. § 501(c)(3) ("no part of the net earnings of which inures to the benefit of any private shareholder or individual"); 26 U.S.C. § 4958.  If the assets and ongoing operations of any of these organizations were to be sold to a private party, the proceeds of such sale could only be used to continue the organization's tax-exempt purposes and could not enrich any individual.  26 C.F.R. § 1.501(c)(3)-1(b)(4).  And if one of these organizations were dissolved, its tangible and intangible assets could only be given to another nonprofit, or to the government.  26 C.F.R. § 1.501(c)(3)-1(b)(4); *see also Tax-Exempt Status for Your Organization*, IRS Pub. L. No. 557 (Jan. 2020), https://www.irs.gov/pub/irs-pdf/p557.pdf.  Thus, any "market value" in a charitable nonprofit is entirely hypothetical and unrealizable, and the mere ability to estimate such value says nothing about the purpose of the organization.

SFCNY is no different.  As required by the tax code, SFCNY's founding documents contain this commitment:

> Upon dissolution of the Corporation, its assets shall be disposed of exclusively for one or more exempt purposes within the meaning of §501(c)(3), or distributed to such organization organized and operated exclusively for charitable purposes which shall, at that time, qualify as exempt organizations under 501(c)(3), or to the Federal government or to a state or local government, for public purpose.

SOMF ¶ 87.  Thus, the only way for any hypothetical "market value" of SFCNY to become a reality would be for SFCNY to dispose of assets or funds in violation of federal law and its own bylaws, actions which could be enjoined and overridden by a court.  It defies logic to suggest that SFCNY intends to try this, and nothing in the record suggests such an intent.

### 5.   "Competitive Advantage" from "Avoiding License Fees" is the Purpose of Section 111(a)(5)

Plaintiffs also claim that the ability to avoid paying rightsholders for licenses to transmit their programming is itself a "competitive advantage" that falls outside the scope of Section 111(a)(5).  This, too, is illogical.  When Congress declares that retransmissions of TV broadcasts by nonprofits are "not an infringement of copyright," then no license or payment to rightsholders is required.  17 U.S.C. § 111(a)(5).  Because rendering license fees unnecessary for nonprofit streaming of TV broadcasts is the very purpose of Section 111(a)(5), any "competitive advantage" is conferred by the statute.  Conversely, the video-streaming services that Plaintiffs call "competitors" of Locast must pay license fees precisely because they are businesses operated for profit.  By definition, *any* use of an exception to copyright means that license fees are not paid; to cite the absence of such payments as grounds for denying the exception is circular reasoning. *See Otto v. Hearst Communications, Inc.*, 345 F. Supp. 3d 412, 432 (S.D.N.Y. Dec. 10, 2018) ("The Second Circuit has recognized the danger of circularity in considering whether the loss of potential licensing revenue should weight the fourth factor [of 17 U.S.C. § 107] in favor of a plaintiff.  Since the issue is whether the copying should be compensable, the failure to receive licensing revenue cannot be determinative in the plaintiff's favor.").

### 6.   Notoriety is Not a Commercial Benefit for a Nonprofit.

Any nonprofit organization that serves a broad population has to make its existence known among the population it seeks to serve.  A new chain of thrift stores, for example, could not hope to succeed at raising funds to provide services for the poor if potential customers don't know it exists.  Conversely, building a reputation for providing a valuable public service, and for filling a public need, helps that chain grow, increase its income, and put more resources towards filling that

need.  For any nonprofit organization that serves a broad population, building a good reputation is integral to fulfilling its mission.

SFCNY is no different.  It cannot fulfill its goal of making broadcast TV more available unless people who seek better access to their local channels know that they can turn to Locast.  For SFCNY, gaining "notoriety" is part of its fulfilling its mission.

The same is true of any nonprofit organization running a traditional translator station and relying on Section 111(a)(5): those organizations cannot succeed in extending the reach of broadcast stations if viewers don't know they can tune in.  And building a reputation for providing a valuable service helps those stations increase viewership, further advancing the purpose for which Congress created the nonprofit exception.  If building "notoriety" were deemed to establish a "purpose of direct or indirect commercial advantage," then once again, the exception would be illusory.  The law does not require that a nonprofit provider of secondary transmissions be invisible in the communities it serves.  Merely having and building "notoriety" for the service it performs does not show that Locast has a commercial purpose.

### E.    There Is No Genuine Dispute That SFCNY Does Not Charge Recipients of Locast's Secondary Transmissions, Nor That Viewer Donations Offset Costs

With respect to the last element of Section 111(a)(5), there is no genuine dispute that SFCNY does not charge users a fee for service.  Nor is there any genuine dispute that the donations received from users of the Locast service are used to offset the costs of operation and expansion of the service.

#### 1.    Viewer Donations to Locast are Not Charges.

Undisputed facts establish that donations by Locast viewers are not charges.  Plaintiffs assert that Locast demands users pay a monthly fee in exchange for uninterrupted service, which means that any payments made by users cannot be considered voluntary donations.  This argument

34

contravenes both the undisputed facts and the established law.

First, there is no dispute that the majority of regular Locast users access the service without donating to SFCNY, making clear that donations are, in fact, voluntary.  SOMF ¶¶ 157-158.  To the extent that Plaintiffs assert that there is some marginal "value" to users who donate to SFCNY, IRS regulations make clear that limited membership rights or privileges (such as "preferred access to goods or services") that accrue to a donor in exchange for donations totaling less than $75 annually are disregarded as "benefits" such that the full donation is still fully tax-deductible.  *See* 26 C.F.R. § 1.170A-13(f)(8)(i)(B).  In this case, because the requested $5 per month payments are for "preferred" uninterrupted access to the Locast service, and amount to less than $75 dollars per year, they are donations (not fees for services, as Plaintiffs assert) as a matter of law.  *See id.*; *see also* SOMF ¶ 160.

Moreover, the difference between a suggested donation and an admission charge is that the latter is understood by the public to be mandatory.  *See Fourth Floor Music v. Highfill*, No. 85-0729-CV-S-4, 1986 WL 10883, at *4 (W.D. Mo. June 3, 1986), *aff'd sub nom. Highfill v. LaSalle Music Pub.,* 831 F.2d 300 (8th Cir. 1987) ("The Court infers that the average customer . . . would feel compelled to pay the admission charge."); *see also Spiritual Outreach Soc. v. C.I.R.*, 58 T.C.M. (CCH) 1284 (T.C. 1990), *aff'd*, 927 F.2d 335 (8th Cir. 1991) ("[T]here is nothing in the record to show that a person could attend the event without making the appropriate 'donation.'").  A viewer community in which a majority do not donate at all is one that doesn't feel compelled to donate.  SOMF ¶¶ 157, 158.

Locast's practice of interrupting viewing to request donations is comparable to PBS radio and television stations, which also interrupt their programming for "pledge breaks," except that unlike those broadcasters, Locast ceases donation requests to viewers who have already donated

the recommended amount. *See* Ex. 6 (Rebuttal Expert Report of Thomas J. Raffa) at ¶ 109. Locast is also comparable to a nonprofit museum or concert hall that provides experiences to the public for free (or at low cost) while also giving special benefits, such as expanded hours or exclusive events, to members or recurring donors. The high volume of users who watch Locast without donating are not deterred by the donation requests, which take up far less time in each hour (four 5-second videos, at most) than the commercial breaks in the broadcasts themselves, which generally total over 15 minutes per hour. *See* SOMF ¶ 159.

Locast's donation requests are also easy to avoid without donating. Users can avoid them by simply changing the channel, which restarts the 15-minute timer. SOMF ¶¶ 154-155. Locast also suspends donation request messages when users request it, whether because of financial hardship, the impact of the COVID-19 pandemic, or the impact of natural disasters such as wildfires. SOMF ¶ 156.

### 2. Viewer Donations Offset Locast's Operational Costs.

Even if the donations that viewers make to SFCNY could be considered fees, they would still be consistent with Section 111(a)(5), which allows for "assessments necessary to defray the actual and reasonable costs of operating the secondary transmission service." 17 U.S.C. § 111(a)(5). Contributions from users are essential to the continued operation and expansion of the Locast service. SOMF ¶ 150. But those contributions, particularly in the early phases of the operation, have also not been sufficient to operate the service without additional donations. In fact, the record shows "no point of break even in which the accumulation of each $5 donation would eventually get operations [past] a break even to profitability." SOMF ¶ 151. Every dollar taken in by SFCNY has been used to operate and expand the Locast service. SOMF ¶¶ 102, 105. In short, the monthly $5 donations that Locast requests from viewers (and that only a minority of them pay) are entirely necessary to defray the costs of operation. SOMF ¶ 150.

36

## CONCLUSION

Undisputed facts establish that SFCNY serves an important public purpose—to expand access to local TV broadcasts—and that all of its activities are done in service of that goal. SFCNY, in short, is exactly the type of organization that Congress meant to encourage when it enacted Section 111(a)(5).  Plaintiffs' arguments amount to no more than insinuations that an improper purpose *could* exist, or *might* come to exist in the future—but not that any such purpose is actually present.  Accordingly, the Court should grant summary judgment in favor of SFCNY and Mr. Goodfriend.

Dated: May 6, 2021

Respectfully submitted,

/s/ R. David Hosp
R. David Hosp
Mark S. Puzella (admitted pro hac vice)
Sheryl Koval Garko (admitted pro hac vice)
Caroline K. Simons
Laura B. Najemy (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, MA 02116
Tel: (617) 880-1800
dhosp@orrick.com
mpuzella@orrick.com
sgarko@orrick.com
csimons@orrick.com
lnajemy@orrick.com

Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Tel: (415) 436-9333
mitch@eff.org

Elizabeth E. Brenckman
Lindsay Rindskopf
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street

New York, NY 10019-6142
Tel: (212) 506-5000
ebrenckman@orrick.com
lrindskopf@orrick.com

Shane D. Anderson (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
sanderson@orrick.com

Erin M.B. Leach (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main St. Suite 1100
Irvine, CA 92614
Tel: (949) 567-6700
eleach@orrick.com

*Counsel for Defendants and Counterclaim-Plaintiffs David R. Goodfriend and Sports Fans Coalition NY, Inc.*