## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., TWENTIETH CENTURY FOX FILM CORPORATION, CBS BROADCASTING INC., CBS STUDIOS INC., FOX TELEVISION STATIONS, LLC, FOX BROADCASTING COMPANY, LLC, NBCUNIVERSAL MEDIA, LLC, UNIVERSAL TELEVISION LLC, and OPEN 4 BUSINESS PRODUCTIONS, LLC,<br><br>          Plaintiffs,<br><br>     v.<br><br>DAVID R. GOODFRIEND and SPORTS FANS COALITION NY, INC.,<br><br>          Defendants. | No. 19-cv-7136-LLS<br><br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

    A.    Statutory Background ...............................................................5

           1.    In The 1976 Copyright Act, Congress Did Not Broadly Exempt
               Nonprofits From Liability For Retransmitting Copyrighted Works.............5

           2.    In The 1992 Cable Act, Congress Extended The Retransmission-
               Consent Regime To Pay-Television Providers. ......................................8

           3.    Broadcasters Maximize Over-The-Air Coverage In Accordance
               With FCC Regulations. ..................................................................9

    B.    Factual Background .................................................................11

           1.    Goodfriend Founds Locast To Benefit Pay-Television Companies
               In Retransmission-Consent Negotiations..........................................11

           2.    Locast Collects Revenue From Users And Pay-Television
                Providers. ...................................................................................14

           3.    Locast's Revenues Greatly Exceed Its Costs...........................................19

LEGAL STANDARD.................................................................................................20

ARGUMENT ...........................................................................................................21

I.     SECTION 111(A)(5) DOES NOT APPLY TO LOCAST'S INTERNET
      RETRANMSISSION SERVICE. ...............................................................22

II.    LOCAST CANNOT PROVE AS A MATTER OF LAW THAT IT MAKES
      SECONDARY TRANSMISSIONS WITHOUT ANY PURPOSE OF
      COMMERCIAL ADVANTAGE. ...............................................................25

    A.    The Commercial Advantage Clause Imposes An Additional Requirement,
         Above And Beyond Operating As A Nonprofit. ......................................26

    B.    To Qualify For The Exemption, A Nonprofit Must Prove It Makes
         Secondary Transmissions With No Purpose of Commercial Advantage
         Whatsoever. ................................................................................30

    C.    Locast Cannot Prove As A Matter Of Law That It Makes Secondary
         Transmissions Without Any Purpose of Commercial Advantage. ..............31

III.   LOCAST CANNOT PROVE AS A MATTER OF LAW THAT IT IMPOSES
      NO CHARGES OTHER THAN ASSESSEEMENTS NECESSARY TO
      DEFRAY ITS ACTUAL AND REASONABLE OPERATING COSTS. .......40

    A.    Locast Charges Users For Uninterrupted Service.................................40

    B.    Locast's Charges Are Not "Assessments."...........................................46

    C.    Locast's Charges Are Not Necessary to Defray Its Operating Costs. ..............47

IV.   LOCAST CANNOT PROVE AS A MATTER OF LAW THAT IT OPERATES
      AS A NONPROFIT ORGANIZATION.....................................................48

CONCLUSION.................................................................................................................................52

# TABLE OF AUTHORITIES

## CASES

*Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612 (2d Cir. 1998)...................20, 21

*Am. Campaign Acad. v. Commissioner*, 92 T.C. 1053 (1989)......................................................49

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)..........................................21

*Assoc. Music Publishers v. Debs Mem'l Radio Fund*, 141 F.2d 852 (2d Cir. 1944).........29, 32, 33

*Cap. Cities Cable v. Crisp*, 467 U.S. 691 (1984)........................................................................5

*Capitol Recs., LLC v. Vimeo, LLC,* 826 F.3d 78 (2d Cir. 2016)....................................................24

*Debs Mem'l Radio Fund v. Commissioner*, 148 F.2d 948 (2d Cir. 1945).........................29, 32, 33

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)......................................................................................5

*FilmOn X, LLC v. Window to the World Commc'ns, Inc.*, 2016 WL 1161276 (N.D. Ill. Mar. 23, 2016)...........................................................................................................................23

*Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986)..............................................................20

*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968).....................................6

*Fourth Floor Music v. Highfill*, 1986 WL 10883 (W.D. Mo. June 3, 1986), *aff'd*, 831 F.2d 300 (8th Cir. 1987) ..................................................................................4, 21, 41, 46

*Fox TV Stations v. Aereokiller, LLC*, 851 F.3d 1002 (9th Cir. 2017).......................................23, 25

*Freedom Church of Revelation v. United States*, 588 F. Supp. 693 (D.D.C. 1984) .....................49

*Herbert v. Shanley Co.*, 242 U.S. 591 (1917) ............................................................................36

*Hibbs v. Winn*, 542 U.S. 88 (2004) ............................................................................................27

*Hinton v. Mainlands of Tamarac*, 611 F. Supp. 494 (S.D. Fla. 1985)..........................................41

*Kidd v. Thomson Reuters Corp.*, 925 F.3d 99 (2d Cir. 2019).......................................................30

*Mills Music, Inc. v. Arizona*, 1975 WL 21095 (D. Ariz. July 23, 1975), *aff'd*, 591 F.2d 1278 (9th Cir. 1979).............................................................................................................28

*Orange Cnty. Agr. Soc'y v. Commissioner*, 893 F.2d 529 (2d Cir. 1990)....................................49

*Perrin v. United States*, 444 U.S. 37 (1979) ...............................................................................41

*Presbyterian & Reformed Pub. Co. v. Commissioner*, 743 F.2d 148 (3d Cir. 1984) ...................50

*Soc'y of Holy Transfiguration Monastery. v. Gregory*, 689 F.3d 29 (1st Cir. 2012) ...................31

*Tasini v. N.Y. Times Co.*, 206 F.3d 161 (2d Cir. 2000)...................................................................24

*Teleprompter Corp. v. Columbia Broad. Sys.*, 415 U.S. 394 (1974)..............................................6

*United States v. Gonzales*, 520 U.S. 1 (1997)..............................................................................30

*United States v. Rothberg*, 222 F. Supp. 2d 1009 (N.D. Ill. 2002)................................................31

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) ...........................................................31, 39

*Worldwide Church of God v. Phila. Church of God*, 227 F.3d 1110 (9th Cir. 2000) .............31, 32

## CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS

U.S. Const. art. I, § 8, cl. 8................................................................................................................5

17 U.S.C. § 101 ...............................................................................................................2, 6, 22, 24

17 U.S.C. § 106.........................................................................................................................5, 6, 24

17 U.S.C. § 107.........................................................................................................................31, 39

17 U.S.C. § 108...............................................................................................................................27

17 U.S.C. § 111 ...................................................................................................................... *passim*

17 U.S.C. § 504...............................................................................................................................35

17 U.S.C. § 506...............................................................................................................................31

26 U.S.C. § 501...............................................................................................................................49

47 U.S.C. § 325............................................................................................................................8, 9

Pub. L. 102-385 (1992)....................................................................................................................8

26 C.F.R. § 1.170A-13....................................................................................................................43

## OTHER AUTHORITIES

Hearings before Sen. Subcomm. on Patents, Trademarks, and Copyrights on S.1361, 93rd
     Cong., 1st Sess. (Aug. 1, 1973)................................................................................................24

H.R. Rep. No. 90-83 (1967)...................................................................................... *passim*

H.R. Rep. No. 94-1476 (1976)................................................................................ *passim*

S. Rep. No. 94-473 (1975) ...........................................................................................7

S. Rep. No. 102-92 (1991) .......................................................................................8, 9

4 William F. Patry, *Patry on Copyright* §14:71 (West 2021).......................................7

Plaintiffs American Broadcasting Companies, Inc., Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, CBS Broadcasting Inc., CBS Studios Inc., Fox Television Stations LLC, Fox Broadcasting Company LLC, NBCUniversal Media, LLC, Universal Television LLC, and Open 4 Business Productions, LLC (collectively, "Plaintiffs") respectfully submit this opposition to Defendants' motion for summary judgment that their operation of the Locast internet service is exempt from copyright liability under 17 U.S.C. § 111(a)(5).

## INTRODUCTION

Defendants Sports Fan Coalition NY, Inc. ("SFCNY") and its founder, David Goodfriend (collectively, "Locast") operate an internet television streaming service called Locast.  Without any license, Locast captures over-the-air broadcasts containing Plaintiffs' copyrighted television programs, modifies the signals, and retransmits them over the internet.  Although registered as a "nonprofit," Locast operates for a host of commercial purposes.  For example, it partners with and receives payments from certain pay-television companies who use the service as a source of leverage in their retransmission-consent negotiations with broadcasters.  It frequently interrupts users' streams of broadcast programming with its own advertisements, asking users to pay monthly subscriptions fees (which it labels "donations") for uninterrupted service.  It competes with licensed streaming services for paying subscribers.  And it collects cash far in excess of its costs.

Despite these facts, Locast asks the Court to hold as a matter of law that its unlicensed service is exempt from copyright liability under the affirmative defense in 17 U.S.C. § 111(a)(5).  Specifically, Locast posits that Section 111(a)(5) merely "incorporates" nonprofit tax and corporate law.  Thus, in its view, as long as a nonprofit organization complies with those bodies of law and pursues a purportedly charitable "mission," Section 111(a)(5) grants it immunity to retransmit copyrighted works while engaging in any number of "commercial activities."

As Plaintiffs explained in the memorandum supporting their own motion for summary judgment, Locast's theory is contradicted by settled principles of statutory construction, legislative history, and common sense. By enacting Section 111(a)(5), Congress did not simply "incorporate" nonprofit tax or corporate law into the Copyright Act, nor did it give organizations claiming nonprofit status free reign to exploit copyrighted works. Instead, Congress crafted a narrow exemption from copyright liability for nonprofit "translator" and "booster" stations that merely extend the reach of broadcast signals within local areas, pursue no commercial advantage, and collect assessments only to defray their actual costs. To ensure the narrow scope of the exemption, Congress specified a series of mutually reinforcing limitations, each of which reflects the nature of translators and boosters. Here, no reasonable jury could conclude that Locast satisfies three of these limitations, the failure of any one of which requires granting Plaintiffs' motion. As to the fourth limitation, Locast has not come close to proving that element as a matter of law.

*First*, Section 111(a)(5) applies only to *local* transmission services. It does not extend to Locast's internet service, which is inherently *global* in reach. Locast cannot avoid this conclusion by arguing that the definitions of "transmit" in Section 101 and "secondary transmission" in Section 111(f) are "technology agnostic." While internet services may fall within those general definitions, they do not fit within Section 111(a)(5)'s narrower exemption, which is local in scope.

*Second*, Locast cannot prove that it makes secondary transmissions "without *any* purpose of direct or indirect commercial advantage." 17 U.S.C. § 111(a)(5) (emphasis added). By its terms, this clause does not "incorporate" nonprofit tax or corporate law. Instead, its text, structure, and legislative history all show that it imposes an *independent* requirement, above and beyond the exemption's separate requirement that a non-governmental organization operate as a nonprofit. And that independent requirement is strict: to qualify for the exemption, a nonprofit organization

2

must prove it makes secondary transmissions without "any" purpose of commercial advantage, no matter how tangential and whether "direct or indirect."

Here, the record shows that Locast makes secondary transmissions for a number of direct and indirect commercial advantages, including funding its nationwide "expansion" and providing its pay-television patrons greater leverage in their retransmission-consent negotiations.  The Court thus should grant Plaintiffs' motion.  At a minimum, Locast certainly has not proven as a matter of law that it operates *without any* of these purposes, which requires denying its motion.

*Third*, Locast fails the requirement that a nonprofit may not impose any "charge" on recipients "other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service."  17 U.S.C. § 111(a)(5).  Although Locast labels the payments it extracts from users as "donations," courts look beyond such labels to the substance of the transactions.  Here, the substance is clear:  Locast charges users a monthly subscription fee in exchange for access to uninterrupted streaming of copyrighted programs.  It makes no difference that some portion of users opt to use Locast's free, interrupted service; that is true of many commercial streaming services, such as YouTube or Spotify, that offer different tiers of service.  And it is no defense that Locast "suspends" the payment requirement for certain users claiming "hardship."  There would be no need to "suspend" that requirement if it were truly a "voluntary donation," and the fact that Locast grants special dispensations to some users only underscores that its fees are mandatory for the vast bulk of users wanting uninterrupted service.

Furthermore, as Goodfriend has conceded, Locast's charges are not "assessments," nor are they "necessary" to defray Locast's actual operating costs.  Instead, they exceed Locast's costs by millions of dollars.  That Locast uses these excess charges to "expand" into new markets and to accumulate vast stockpiles of cash only confirms that it falls well outside Section 111(a)(5).

3

*Fourth*, Locast falls far short of proving as a matter of law that it operates as a "nonprofit organization" under Section 111(a)(5).  Locast touts that it incorporated as a nonprofit and has been granted tax-exempt status.  But the mere fact that an entity registers as a nonprofit for corporate or tax purposes does not end the inquiry.  Instead, the Court must examine the manner in which Locast *actually* operates.  Such an examination reveals that Locast is not faithful to its stated purposes of benefiting consumers unable to afford pay-television, helping rural households unable to receive over-the-air signals, and ensuring availability of public-interest information.  In reality, Locast partners with and is compensated by pay-television companies, operates primarily in urban areas that already are well served by over-the-air signals, and interrupts public-interest information that broadcasters provide to the public over the internet for free, all to generate revenue beyond its costs.  These facts—none of which Locast has reported to the IRS or state authorities— would preclude entry of summary judgment in its favor, even if summary judgment against it on the other factors were not compelled.

Finally, there is no merit to Locast's suggestion that Plaintiffs' plain reading of Section 111(a)(5) would deny the exemption to "*any* nonprofit organization" that effectively expands access to broadcast signals.  Dfs.' Mem. 23.  To the contrary, such a reading would cover the very services for which Congress crafted the exemption—namely, the numerous translators and boosters across the United States that operate non-commercially with the authorization of local broadcasters.  The Court should not accept the invitation to distort Section 111(a)(5) to cover an internet service like Locast that works hand in glove with pay-television providers, generates excessive amounts of cash, and competes with licensed services for paying subscribers.  The Court should deny Locast's motion and grant Plaintiffs' motion.

# BACKGROUND

### A.     Statutory Background

### 1.     In The 1976 Copyright Act, Congress Did Not Broadly Exempt Nonprofits From Liability For Retransmitting Copyrighted Works.

The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.  The "philosophy behind the clause" is that "encouragement of individual effort by personal gain is the best way to advance public welfare." *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) (citation omitted).  While the ultimate goal of copyright protection is to "promot[e] broad public availability of literature, music, and the other arts," the law does so not by promoting access at all costs, but by "rewarding the creators of copyrighted works."  *Cap. Cities Cable v. Crisp*, 467 U.S. 691, 710 (1984).  "[C]opyright law *celebrates* the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit." *Eldred*, 537 U.S. at 212 n.18 (citation omitted).

To that end, the Copyright Act grants copyright owners "exclusive rights to do and to authorize" certain uses of their copyrighted works.  17 U.S.C. § 106.  These rights include, in the case of an "audiovisual work[]," the right to "perform the copyrighted work publicly." *Id.* § 106(4).

Over the years, Congress has expanded the definition of a public performance to ensure protection of copyright holders' rights and to spur incentives to create and disseminate copyrighted works.  This is particularly true with respect to copyrighted television programs that are broadcast over the air.  In 1968 and 1974, the Supreme Court took a narrow view of copyright holders' public-performance rights, holding that community antenna television systems (the precursors to modern cable systems) did not infringe those rights by capturing over-the-air broadcasts and

retransmitting them to their subscribers. *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968); *Teleprompter Corp. v. Columbia Broad. Sys.*, 415 U.S. 394 (1974).

In 1976, however, Congress amended the Copyright Act to overturn those decisions. Among other things, Congress amended the definition of public performance specifically to include "transmit[ting] ... a performance ... to the public." 17 U.S.C. § 101.  It also defined "transmit" to include communicating a performance "by any device or process whereby images or sounds are received beyond the place from which they are sent."  *Id.*  Congress adopted this "broad" definition, so that "if the transmission reaches the public in [an]y form, the case comes within the scope of clauses (4) and (5) of section 106"—*i.e.* within the copyright holder's public-performance rights.  H.R. Rep. No. 94-1476, at 64 (1976).  Thus, as a general rule, it is an act of infringement to transmit a performance of a copyrighted work to the public without authorization.

In the 1976 Act, Congress addressed the application of this rule to various entities that make "secondary transmissions" of primary transmissions containing copyrighted works.  17 U.S.C. § 111.  For example, Congress provided that cable systems may be liable for infringement in certain circumstances, unless they comply with a compulsory-licensing regime and the regulations of the Federal Communication Commission ("FCC").  17 U.S.C. §§ 111(c)(1)-(4).

Congress also addressed certain secondary transmissions by nonprofit organizations.  *See* 17 U.S.C. § 111(a)(5).  Congress did not simply "preserve the pre-1976 status quo" for "retransmissions by nonprofits," as Locast asserts. Dfs.' Mem. 4.  Instead, Congress amended the definition of public performance to remove the general "for profit" requirement as insufficiently protective of copyright owners.  *See* H.R. Rep. No. 94-1476, at 62 (1976).  Congress acted because "[t]he line between commercial and 'nonprofit' organizations is increasingly difficult to draw"; "[m]any 'non-profit' organizations are highly subsidized and capable of paying royalties"; and

"the widespread public exploitation of copyrighted works by public broadcasters and other noncommercial organizations is likely to grow." *Id.* at 62-63. Congress concluded that "a broad 'not for profit' exemption" would not only "hurt" copyright owners, but also "dry up" incentives to create copyrighted works. *Id.* at 63. Congress thus eschewed any "outright exemption" for nonprofits in favor of "specific exemptions" for certain "nonprofit uses." *Id.* at 62.

One of those specific provisions appears in Section 111(a), which exempts "[c]ertain secondary transmissions." Specifically, Section 111(a)(5) exempts a secondary transmission that "is not made by a cable system but is made by a governmental body, or other nonprofit organization, without any purpose of direct or indirect commercial advantage, and without charge to the recipients of the secondary transmission other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service."[1]

There is no suggestion in the legislative history that, having gone out of its way to overrule Supreme Court precedents that narrowed copyright protection for broadcast programming, Congress enacted Section 111(a)(5) as a vehicle for any organization claiming nonprofit status to retransmit copyrighted works across the country without authorization. Instead, the history makes clear that Congress narrowly crafted the exemption to cover local "translators" and "boosters" that "do nothing more than amplify broadcast signals and retransmit them to everyone in an area for free reception." H.R. Rep. No. 94-1476, at 92 (1976); *accord* S. Rep. No. 94-473, at 78 (1975). These local services were run "to supply television programming to rural areas" that had difficulty receiving over-the-air signals. 4 William F. Patry, *Patry on Copyright* §14:71 (West 2021).

The legislative history further shows that Congress intended to exempt these local services only if they were "*completely nonprofit and noncommercial*." H.R. Rep. No. 90-83, at 54 (1967)

---

[1] This exemption originally appeared in subsection (a)(4) but now is codified at (a)(5).

(emphasis added).  Congress thus designed a series of limitations to confine the exemption to such services.  Not only must a secondary transmission be made by a "'governmental body, or other nonprofit organization,'" but there must be "no 'purpose of direct or indirect commercial advantage'" and "no charge to the recipients 'other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service.'"  *Id.*

Congress also acted against the backdrop of Section 325 of the Communications Act, which requires translator and booster stations to obtain "express authority" from originating stations before rebroadcasting their signals.  47 U.S.C. § 325(a).  Thus, Congress understood that translators and boosters that were exempt from copyright liability under Section 111(a)(5) would not be free to compete with licensed broadcasters; instead, they would need to obtain the consent of those broadcasters to retransmit their signals.  This background underscores that Congress enacted Section 111(a)(5) to cover noncommercial services that complement local broadcasters, not to grant nonprofits broad immunity to compete with those broadcasters.

## 2.    In The 1992 Cable Act, Congress Extended The Retransmission-Consent Regime To Pay-Television Providers.

In 1992, Congress took further steps to protect the value of broadcast programming by extending Section 325's retransmission-consent regime to cable providers and other multichannel video programming distributors ("MVPDs").  *See* Cable Telev. Cons. Prot. and Comp. Act of 1992, Pub. L. 102-385, 106 Stat 1460, § 6 (1992) ("1992 Cable Act.").  Prior to 1992, the FCC had "ruled that cable systems need not obtain consent from broadcast stations for retransmission of their signals." S. Rep. No. 102-92, at 35 (1991).  Thus, while cable systems had to pay copyright holders compulsory licensing fees under the Copyright Act, they could retransmit broadcasts "without having to seek the permission of the originating broadcaster or having to compensate the broadcaster for the value its product creates for the cable operator."  *Id*. at 35 & n.85.  This "resulted

in an effective subsidy of the development of cable systems by local broadcasters." Pub. L. 102-385, § 2(a)(10).  Cable systems, however, "increasingly compete[d]" with broadcasters "for television advertising revenue," threatening their "economic viability."  *Id.* § 2(a)(14), (16).

To protect local broadcasting, Congress amended Section 325 to provide that a cable provider or other MVPD may not retransmit a broadcasting station's signal unless the station gives "express authority" or requests carriage under the statute.  47 U.S.C. § 325(b).  This amendment created a "marketplace for the disposition of the rights to retransmit broadcast signals."  S. Rep. No. 102-92, at 36 (1991).  That is, unless a broadcaster asserts a right to carriage under statute, an MVPD must negotiate to obtain the broadcaster's consent to retransmit its signals.

### 3. Broadcasters Maximize Over-The-Air Coverage In Accordance With FCC Regulations.

In the background to its memorandum, Locast devotes considerable space to arguing that broadcasters have "[a]bused" the retransmission-consent regime and have "incentives to encourage consumers to access their signal through Pay-TV services rather than free over-the-air broadcasts."  Dfs.' Mem. 7-10.  Those policy arguments, however, are explicitly barred by the parties' case-narrowing agreement, under which Plaintiffs withdrew certain claims against Goodfriend and Locast expressly agreed not to argue that broadcasters "are withholding broadcast coverage to extract retransmission consent fees."  Pls.' Ex. 60 § C(4)(b). (Agreement).  In that agreement, the parties recognized that those arguments—which certain pay-television providers and their lobbyists like Mr. Goodfriend have been making to Congress for years—have no place in a case now focused on whether Locast is entitled to the protection of Section 111(a)(5).  The parties therefore agreed that, while Plaintiffs "may argue that the purpose of [Locast] is to devalue retransmission consent rights for the direct and indirect commercial advantage of [Locast] and [its] distribution partners and funders," Locast is *not* entitled to argue that broadcasters "have created

9

the need for retransmission consent fees or sought to maintain or enhance them by withholding broadcast coverage or discouraging viewers from enjoying free-to-air television." *Id.* § C (4)(d).

In all events, those arguments are baseless. Broadcasters consistently have acted to maximize over-the-air coverage in accordance with FCC regulations. Pls.' Ex. 61 (Corn-Revere Decl., Ex. A, ¶ 4). Their efforts have included providing both analog and digital signals during the transition to digital television and obtaining FCC approval to expand their maximum service areas. *Id.* (Corn-Revere Decl., Ex. A, ¶¶ 10-12). Also, broadcasters authorize thousands of FCC-licensed translator and booster stations to extend signals to areas where coverage is adversely affected by distance, terrain, or other impediments (rather than encouraging satellite services that pay retransmission-consent fees). *Id.* (Corn-Revere Decl., Ex. A, ¶ 8). In many instances, broadcasters operate their own translators or boosters; in other cases, they authorize nonprofits to do so. *Id.* (Corn-Revere Decl., Ex. B, ¶¶ 6-12). In total, there are about 3,725 licensed translators or boosters operating throughout the country, *id.*, which undercuts any notion that broadcasters are withholding signals to force consumers to pay for cable or satellite television.

Although retransmission-consent fees have grown as a source of broadcast revenue since passage of the 1992 Cable Act, broadcasters still collect most of their revenue from advertising. *Id.* (Corn-Revere Decl., Ex. A ¶ 13). Broadcasters thus continue to have strong incentives to reach larger audiences by maximizing over-the-air coverage. *Id.* Further, any notion that broadcasters have not adequately provided over-the-air coverage is at odds with recent viewership trends. Since the transition to digital signals in 2009, the number of households watching over-the-air signals has *increased* by fifty percent. *Id.* (Corn-Revere Decl., Ex. A ¶ 15).

### B.   Factual Background

#### 1.   Goodfriend Founds Locast To Benefit Pay-Television Companies In Retransmission-Consent Negotiations.

The retransmission-consent regime is relevant not because broadcasters have a purported "incentive" to discourage over-the-air viewership, but because David Goodfriend founded Locast to help pay-television providers undermine that regime.  Far from being "made up" as Locast asserts, Dfs.' Mem. 2, this basic fact is clearly reflected in both documents and testimony.  This evidence is set forth below and in Plaintiffs' summary-judgment memorandum.  Pls.' Mem. 8-16.

Goodfriend is a former vice president of DISH Network, which has been a major opponent of the retransmission-consent regime.  Pls.' SUMF ¶¶ 2-3.[2]  While at DISH, Goodfriend oversaw lobbying efforts to change the retransmission-consent rules.  Pls.' SUMF ¶ 3.  ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████.  Pls.' Ex. 4.  Goodfriend continues to serve as a DISH lobbyist and consultant to this day.  Pls.' SUMF ¶ 4.

In 2017, Goodfriend pitched to the board of his advocacy group, Sports Fan Coalition, the idea of establishing a tax-exempt nonprofit to retransmit broadcast signals over the internet.  Pls.' Ex. 62 (Goodfriend Ex. 20, at SCFNY-000044166-44167).  He admitted this would "test the boundaries" of copyright law and "[l]itigation would be a given."  *Id.*  But he predicted he could "raise funds" because "so many entities [*i.e.* pay-television providers] are frustrated with the

---

[2] "Pls.' SUMF" refers to the Statement of Undisputed Material Facts filed in support of Plaintiffs' motion for summary judgment.  "Pls.' Ex. __" refers to the consecutively numbered exhibits attached to the declarations of Gerson A. Zweifach filed in support of Plaintiff's motion for summary judgment and in support of this opposition.

restrictions of the current video market." *Id.* Thereafter, he founded SFCNY, which is organized as a nonprofit. Pls.' SUMF ¶ 5.

In January 2018, Goodfriend, through SFCNY, launched his internet streaming service, Locast. Pls.' SUMF ¶ 6. Without any authorization from copyright holders or broadcasters, Locast captures broadcast signals containing copyrighted television programs, modifies the signals, and retransmits them over the internet to registered users. Pls.' SUMF ¶¶ 10-12, 14, 18-20, 25. Users can view those broadcasts through the Locast application, which can be viewed on mobile devices and certain pay-television platforms, including DISH and AT&T's DirectTV. Pls.' SUMF ¶ 12.

From the outset, Goodfriend knew his service could become a boon to pay-television companies. For example, before even launching Locast, Goodfriend asked DISH for funding. Pls.' Ex. 63 (Blum Dep. 26:4-11). Also, around launch, he predicted that pay-television providers would "*flock*" to Locast "*if a blackout threatens*." Pls.' SUMF ¶ 31 (emphasis added). The reason was clear. If retransmission-consent negotiations break down, satellite or cable providers temporarily may lose the right to retransmit broadcast stations on their platforms, potentially causing their subscribers to cancel their subscriptions. SUMF ¶ 30. Locast, however, offers those providers a workaround. During so-called "blackouts," they can direct their subscribers to the Locast application to watch broadcast stations otherwise unavailable on their platforms, allowing them to hold out longer in retransmission negotiations. Pls.' SUMF ¶¶ 34-39, 46, 48.

Notably, however, Goodfriend and SFCNY did not disclose any purpose of benefiting pay-television providers when seeking tax-exempt status. Instead, they represented to the IRS that Locast provides a "public service" by "offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market." Dfs.' Ex. 39. In particular, they claimed Locast's public purpose is to serve "*consumers who do not receive local broadcast station*

12

*programming through a pay-tv service,* such as cost-sensitive consumers unable to pay a monthly pay-tv fee or rural households unable to receive an over-the-air signal." *Id.* (emphasis added). They further represented that Locast "ensures that local emergency information, weather, news, and public interest information reaches the entire community." *Id.*

Locast's actual operations are not faithful to its stated purposes. To start, Locast does not merely retransmit local programs to persons within local markets. Instead, it captures local broadcasts and retransmits them over the internet, which is an "inherently global communications network." Pls.' SUMF ¶ 19. Although Locast employs "geo-fencing" technology in an effort to limit its transmissions to specific markets, that technology produces errors and is subject to circumvention, meaning users can watch broadcasts from other markets. Pls.' SUMF ¶¶ 21-24.

Moreover, despite representing that its purpose is to serve rural households unable to receive over-the-air signals, Locast principally operates in many of the country's largest media markets. Pls.' SUMF ¶¶ 10-12. In 2018, it began capturing signals in New York City. Pls.' SUMF ¶ 10. And since that time, it has expanded to capturing signals in more than 30 markets. Pls.' SUMF ¶¶ 11-12. When selecting markets, Locast does not even analyze the number of people who have trouble receiving over-the-air signals. Pls.' SUMF ¶ 13. Instead, it chooses markets based on other factors, such as population size, relevance to sports audiences, political importance, or payments from local cable interests. Pls.' SUMF ¶¶ 13, 50-51. Also, Locast captures signals in many markets where broadcasters already authorize translators and boosters. Pls.' Ex. 61 (Corn-Revere Decl., Ex. B, ¶ 12). And Locast retransmits those signals to registered users, regardless of whether they are able to receive over-the-air signals. Pls.' SUMF ¶ 15.

Also, despite representing that it serves "cost-sensitive consumers unable to pay a monthly pay-tv fee," Locast charges its users monthly fees for uninterrupted service (as discussed below).

Locast also partners with pay-television providers to make its application available on their paid platforms.  Pls.' SUMF ¶¶ 36, 42.  Although subscribers to many of those platforms already can access broadcast programming through their subscriptions, pay-television providers welcome the additional leverage that Locast provides in retransmission-consent negotiations.  Pls.' SUMF ¶ 46 (AT&T executive admitting that it paid Locast a "donation" to get "leverage" in negotiations).

Additionally, while Locast claims it ensures the availability of local news and other public-interest programming, local broadcasters routinely provide that programming to the public for free on their own websites or mobile applications.  Pls.' SUMF ¶ 16.  Also, as discussed below, Locast frequently interrupts users' streams with its own advertisements seeking "donations"—causing users to miss news and other important programming.  For example, one user complained to Locast that she "can't enjoy interviews, or news reports, or just basic shows with the constant interruptions of the Locast donation/membership ads!"  Pls.' Ex. 16 (Falkowski Ex. 36, at EC00022161).  Another wrote: "You had to interrupt the *state of the union* presentation with your ads and wanting money.  Couldn't you have put this on hold for this event???"  *Id.* (emphasis added).  The interruptions even caused one perceptive user to write: "You seem like a for-profit company trying to disguise itself as a non-profit."  *Id.* (Falkowski Ex. 36, at EC00022160)

### 2.  Locast Collects Revenue From Users And Pay-Television Providers.

Locast initially was funded by a $2 million line of credit provided to SFCNY by former DISH executive, Michael Kelly.  Pls.' SUMF ¶ 7.  Two other former DISH employees, Scott Landers and Scott Larson, also work for Locast.  Pls.' SUMF ¶¶ 8-9.

In the fall of 2018, Locast was not generating enough revenue to cover its expenses or to pay down the loan to Kelly.  Pls.' Ex. 64 (Landers Ex. 16, at SFCNY-000012639).  At that point, Landers wrote that Locast's "top priority" needed to be a "plan to raise significant capital contributions from corporate donors who have a *vested interest* in seeing a platform like LOCAST

exist and thrive." *Id.* (emphasis added).  Landers also circulated a business plan that included raising revenue through "*[u]ser subscriptions*," that "*[w]e call ... a donation* like the PBS guys do."  Pls.' SUMF ¶ 73 (emphasis added).  And he wrote that Locast should move to a "'MEMBERSHIP' MODEL" and "be more aggressive about asking for contribution[s]."  Pls.' Ex. 65 (Landers Ex. 26, at JYBRD00027557).

Thereafter, Kelly and Goodfriend outlined ways to gather revenues from users and pay-television companies, both of whom Goodfriend said were "freeload[ing]" off Locast.  Pls.' SUMF ¶ 32.  As to users, Locast would begin providing a "dual feed" consisting of (1) a service interrupted by frequent "promos" for "non-contributors" and (2) an "uninterrupted service for members" who pay a "membership fee" of $5 per month.  SUMF ¶ 64.  As to pay-television companies, Locast would "charge all of them [a licensing] fee" for its application "[a]nd/[o]r they can make a charitable contribution, if they prefer."  SUMF ¶ 32.

Shortly thereafter, Goodfriend informed SFCNY's board that the organization faced a "material risk" of "exhausting its ability to draw down funds" and having to "wind down."  Pls.' SUMF ¶ 33.  The board then approved various "fundraising activities," including "[m]embership assessments" on users and "[c]ash contributions" or "licensing fees" from pay-television providers.  Pls.' SUMF ¶ 33.  These activities are further discussed below.

### a. Locast Charges Users For Uninterrupted Service.

To raise funds, Locast implemented what is known as a "freemium" business model:  it attracts users with a "free" streaming service interrupted by frequent advertisements and then charges users monthly subscription fees for access to uninterrupted service.  *See* Pls.' SUMF ¶ 65 (Locast expert discussing this business model).  In Locast's case, it interrupts a user's stream with *its own* advertisements, offering uninterrupted service for $5 per month.  While Locast publicly

describes these payments as "donations," it internally refers to them as "fees" or "subscriptions." Pls.' SUMF ¶¶ 64, 73.

Locast's subscriptions work as follows:  After registering, a new user can watch broadcast television over the service without interruption for a brief "free trial period."  Pls.' SUMF ¶ 66. Thereafter, Locast interrupts the user's stream every 15 minutes on a given channel with a Locast advertisement asking the user to pay $5 per month for uninterrupted service.  Pls.' SUMF ¶ 67. During these interruptions, Locast completely cuts off the stream, causing the user to miss television programing.  Pls.' SUMF ¶ 66.  If the user does not pay, he or she is sent to Locast's program guide and must navigate back to the channel he or she was watching before the interruption—missing even more programming in the interim.  Pls.' SUMF ¶ 69.  However, if the user pays, he or she receives uninterrupted service for a length of time correlating to the amount of the payment.  Pls.' SUMF ¶ 69.  As Landers acknowledged, "[t]he more money you pay, the longer [the interruption screen] [i]s suppressed."  Pls.' SUMF ¶ 71.

Notably, Locast does not time its interruptions to coincide with commercial breaks.  Thus, as various users have reported to Locast, their streams may be interrupted during key television moments, such as punchline of a comedy, a pivotal play of a sporting event, or an acceptance speech at an award show.  Pls.' SUMF ¶ 72.  As a PowerPoint circulated within Locast put it, Locast's strategy is to "create viewer frustration by frequently interrupting their local programming" and then to ask for $5 to make the interruptions "STOP."  Pls.' Ex. 57 (SFCNY-0000088829, at 8831).  Otherwise, users may miss the "The Big Play," "The Final Verdict," the "Long awaited kiss," or "The Punchline."  Pls.' Ex. 57 (SFCNY-0000088829, at 8833).

Indeed, Locast is aware that many users have complained that its interrupted service is essentially unwatchable and that they effectively have to pay for uninterrupted service.  Pls.'

SUMF ¶ 75.  Locast also is aware that users have complained that the so-called "donations" are actually "subscriptions" or "fees" for uninterrupted service.  Pls.' Ex. 47 (Falkowski Ex. 35, at EC0063367-63368).  To take a few examples, users have told Locast that:

- "Your service is not free if you shut down my stream with a nag for 'donations' every 15 minutes.  That makes the service unwatchable, and your 'donation' is actually a subscription, which is illegal." Pls.' Ex. 47 (Falkowski Ex. 35, at EC0063367).

- "Your app says it is free, but after using it for a couple of weeks you have made watching anything through Locast impossible.  From the constant interruptions mid-program to ask for a $5 donation, to now slowing the feed down to make viewing impossible unless I give in to your request for a donation.  V[i]ewing is now impossible. Free app my *#*%." Pls.' Ex. 16 (Falkowski Ex. 36, at EC00022160).

- "Are you free or not?  Your streams are unwatchable now with the timed ads, and I assume donating won't stop them so what's the point?  I'd be more than happy to donate if you didn't hold us hostage to the ads."  Pls.' Ex. 47 (Falkowski Ex. 35, at EC0063367).

- "Well, you[r] website does not appear to work if I do not donate… a donation is voluntary, this appears to be a fee."  Pls.' Ex. 47 (Falkowski Ex. 35, at EC0063368).

According to Locast's own communications, its interruptions have had a significant impact on deterring users from watching its free service and inducing them to pay the monthly fee for uninterrupted service.  For example, after "the launch of the pre/post-roll interrupt," Landers wrote that it "transformed our [b]usiness" by "driving donations and decreasing viewership."  Pls.' Ex. 58 (Landers Ex. 22, at SFCNY-000064686).  He later described the "interrupt[ions]" as "essential" to limiting Locast's "free usage exposure."  Pls.' SUMF ¶ 74.  In other words, Locast's claimed purpose of providing free television to those who cannot receive it or afford pay services is, in fact, an "exposure" that must be limited, in favor of generating revenue to support its business.

In March 2020, after this litigation was filed, Locast announced a "special offer" for users who "need the uninterrupted service" but "cannot afford to contribute $5 per month."  Pls.' Ex. 66 (SFCNY-000082815, at 82816).  Specifically, it said that such users could request "interruption-free service for 30-days."  *Id.*  In response, it received a number of requests from users stating they

"can't afford" to pay $5 per month, but nonetheless want uninterrupted service, showing that they understand the *quid pro quo* nature of the exchange.  Dfs.' Ex. 32.  Also, Locast recently capped the number of waivers at 25,000, confirming that the fee remains mandatory for the vast bulk of users who want uninterrupted service.  Pls.' Ex. 67 (Locast Announcement).

### b. Locast Raises Revenue From Pay-Television Providers.

As noted, Goodfriend expected that pay-television providers would "flock" to Locast "if a blackout threatens."  Pls.' SUMF ¶ 31.  Having spent the better part of his professional life as a soldier in the pay-television industry's assault on Congress's retransmission-consent regime, Goodfriend knew that pay-television providers would invest to integrate Locast into their platforms and employ Locast during negotiations, as the record confirms they did.  Pls.' SUMF ¶¶ 35-48.

For example, DISH invested to integrate Locast's application into its platform.  Pls.' SUMF ¶ 36.  It then deployed Locast:  in anticipation of a blackout involving Tegna, DISH accelerated the launch of a preliminary version of Locast's application on its set-top boxes.  Pls.' SUMF ¶ 38.  And when negotiations with Nexstar failed, DISH referred subscribers to Locast to watch Nexstar stations through DISH's set-top boxes.  Pls.' SUMF ¶ 39.  ███████████████████████

████████████████████████████████████████  Pls.' SUMF ¶ 37.

Similarly, AT&T (which owns DirectTV) ████████████████████████████████

████████████████████████.  SUMF ¶¶ 40-41.  ████████████████████████

████████████████████  SUMF ¶ 45.  An AT&T executive admitted the "donation" was "meant to give [it] some leverage during [its] [r]etrans negotiations" with CBS.  SUMF ¶ 46.  And during a dispute with Tegna, AT&T sent a letter to television stations specifically stating that DirectTV subscribers could watch broadcasts during a blackout simply by "choosing the Locast app."  SUMF

18

¶ 47. ███████████████████████████████████████████████████████

███████████████████████████████████████████. SUMF ¶ 48.

The record also shows Locast has had a real impact on retransmission-consent negotiations.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███. Pls.' Ex. 68 (Orlando Dep. 195:12-198:1, 217:9-219:22). ██████████████████

█████████████████████████████████████████████████ Pls.'

Ex. 69 (Orlando Ex. 23); *see also* Pls' Exs. 70-72 (Orlando Ex. 18, 21, 22).

Recognizing that pay-television had a "vested interest" in its operations, Locast cashed in.

Pls.' Ex. 64 (Landers Ex. 16, at SFCNY-000012639). As noted above, SFCNY's board approved

various "fundraising activities," including soliciting "[c]ash contributions" and charging

"licensing fees" for "permission to deploy the Locast app." Pls.' SUMF ¶ 33. Locast also began

charging "launch fees" of $50,000 per market. Pls.' SUMF ¶ 49. Locast successfully executed on

this plan, collecting hundreds of thousands of dollars, as well as other benefits:

- As noted, AT&T paid Locast a $500,000 "donation" in connection with integrating Locast's application into its platforms. Pls.' SUMF ¶¶ 40-46.

- Liberty Cablevision of Puerto Rico, a cable company, paid Locast a $50,000 "donation," after which Locast launched in Puerto Rico. Pls.' SUMF ¶ 50.

- A South Dakota entity, associated with local cable companies, paid Locast a $100,000 "donation," after which Locast launched in two South Dakota markets. Pls.' SUMF ¶ 51.

- Although DISH has not paid a "donation," DISH integrated Locast's application into its platform—giving Locast access to DISH subscribers from whom it can solicit "donations." Pls.' SUMF ¶¶ 36, 74.

### 3. Locast's Revenues Greatly Exceed Its Costs.

Importantly, Locast's revenues are not tethered to the costs of maintaining and operating

its service. For example, Locast's subscription fees are not based on the marginal costs of adding

users.  Pls.' SUMF ¶ 76.  Instead, Goodfriend set the monthly fee at $5 because it was a "small round number[]."  Pls.' SUMF ¶ 77.

Locast's revenues also greatly exceed its costs.  For example, in 2020, Locast collected total revenue of $4.519 million, including $4.372 million from users.  Pls.' SUMF ¶ 79.  However, its total costs (including depreciation) were only $2.436 million.  Pls.' SUMF ¶ 78.  In other words, Locast's user revenue alone (setting aside other sources) exceeded its costs by $1.936 million.

Locast forecasts that its profit margin will only grow.  For example, for 2021, it forecasts total revenue of $15.622 million, including about $15.572 million from users.  Pls.' SUMF ¶ 80.  However, it predicts total costs of only $3.074 million.  Pls.' SUMF ¶ 80.  In other words, Locast expects that user revenue alone will exceed its total costs by over $12 million.

Locast also forecasts that it will accumulate millions in cash over the coming years.  By 2024, Locast predicts that, depending on the number of new markets from which it captures broadcast signals, it will accumulate between $236 million and $357 million, net of any costs including expansion expenses.  Pls.' SUMF ¶ 80.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Where the movant bears the burden of proof on a claim or defense at trial, the movant bears a heavy burden when seeking summary judgment:  it "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Such a movant cannot simply point to the non-movant's purported lack of evidence; instead, "its own submissions in support of the motion must entitle it to judgment as a matter of law."  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).

## ARGUMENT

Locast moves for summary judgment on the grounds that it is exempt from copyright liability under 17 U.S.C. § 111(a)(5).  Limitations on exclusive rights, like that found in Section 111(a)(5), are affirmative defenses.  *See, e.g., Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994) (fair use under Section 107 is an affirmative defense); *Fourth Floor Music v. Highfill*, 1986 WL 10883, at *3 (W.D. Mo. June 3, 1986), *aff'd*, 831 F.2d 300 (8th Cir. 1987) (not-for-profit exemption under Section 110(4) is an affirmative defense).  Thus, to succeed on its motion, Locast must adduce evidence as to each element of its defense showing that it is entitled to judgment as a matter of law.  *See Albee Tomato*, 155 F.3d at 618.

Locast cannot come close to meeting that burden.  To prevail on its affirmative defense, Locast cannot simply say that it registered as a nonprofit and labels all of its revenues "donations." Instead, Locast must satisfy a series of independent but mutually reinforcing elements, each of which reflects the nature of the local translators and boosters that Congress designed Section 111(a)(5) to cover.  *First*, Locast must prove that it makes secondary transmissions that fall within the scope of Section 111(a)(5).  *Second,* it must prove that those otherwise qualifying secondary transmissions are made without "*any* purpose of direct or indirect commercial advantage."  17 U.S.C. § 111(a)(5) (emphasis added).  *Third*, it must prove that it operates "without charge" to recipients, "other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service."  *Id.  Fourth*, it must prove that it actually operates as a "nonprofit organization."  *Id*.[3]

---

[3] As a fifth element, Locast also must prove that it is not a "cable system."  17 U.S.C. § 111(a)(5). Here, Plaintiffs do not contend that Locast is a cable system.  However, as discussed herein, Locast's motion fails with respect to each of the other elements.

As explained in Plaintiffs' summary-judgment motion, there is no genuine dispute that Locast fails the first three elements, the failure of any one of which dooms its affirmative defense. Pls.' Mem. 18-45.  The Court should therefore grant Plaintiffs' motion.  Certainly, however, Locast has not proven those elements as a matter of law so as to warrant summary judgment in its favor. Nor has Locast proven the fourth element as a matter of law, as the facts show that Locast does not actually operate for its stated purposes.  The Court should deny Locast's motion.

## I.   SECTION 111(A)(5) DOES NOT APPLY TO LOCAST'S INTERNET RETRANMSISSION SERVICE.

To start, Locast cannot satisfy the first element of its defense.  As explained in Plaintiffs' summary-judgment memorandum, Section 111(a)(5)'s exemption is limited to *local* transmission services.  Pls.' Mem. 18-26.  It therefore does not extend to internet services, like Locast, which are inherently *global* in reach.  This conclusion flows from Section 111(a)(5)'s text, history, purpose, and regulatory background, all of which show that Congress designed the exemption for local services.  *Id.* at 18-25.  Extending this exemption to internet services also would risk violating international agreements, contravening a basic canon of construction.  *Id.* at 25-26.  For this threshold reason, the Court should deny Locast's motion and grant Plaintiffs' motion.

Locast offers a cursory argument that Section 111(a)(5) extends to internet services.  It contends that the general definitions of "transmit" in Section 101 and "secondary transmission" in Section 111(f) are "technology agnostic" and thus cover internet services.  Dfs.' Mem. 20-21.

Locast's argument is misplaced.  The fact that internet transmissions are not excluded by those general definitions does not mean they fit within Section 111(a), let alone within the narrow bounds of Section 111(a)(5).  By its terms, Section 111(a) does not create a categorical exemption for all types of secondary transmissions.  Instead, it exempts only "[c]ertain" ones.  17 U.S.C. § 111(a).  And, as Plaintiffs have explained, multiple tools of statutory construction show that the

exemption in Section 111(a)(5) is limited to *local* transmissions.   Pls.' Mem. 18-24.   The exemption does not encompass inherently global internet services like Locast.

In this regard, *FilmOn X, LLC v. Window to the World Commc'ns, Inc.*, 2016 WL 1161276 (N.D. Ill. Mar. 23, 2016), is instructive.   There, the court reasoned that "although § 101's broad definition of 'transmit' plainly applies to the activities of internet-based retransmission services," such services do not fall within Section 111's "narrower definition of a 'cable system,'" even though that definition uses variants of the word "transmit."   *Id.* at *10.   Similarly here, although Locast's internet transmissions fall within Section 101's broad definition of "transmit," they do not fit within Section 111(a)(5)'s narrower exemption, which is limited to *local* transmissions.

Locast also argues that because Section 111(a)(5) excludes secondary transmissions "made by a cable system," it places "no further limitation on the types of service or technology" that fall within the exemption.   Dfs.' Br. 21.   But that turns logic on its head.   To begin with, the fact that Section 111(a)(5) excludes transmissions by cable systems confirms that the exemption was *not* intended for all technologies.   That contradicts Locast's principal theory that Section 111(a)(5) is "technology agnostic."   Dfs.' Br. 20.   Further, the fact that Congress excluded transmissions by cable systems sheds light on the type of technologies that fall within the exemption.   As courts have recognized, cable systems are inherently *localized* systems of limited reach.   *See, e.g., Fox TV Stations v. Aereokiller, LLC*, 851 F.3d 1002, 1013-15 (9th Cir. 2017); *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 281-84 (2d Cir. 2012).   Congress thus limited the type of transmissions that fall within Section 111(a)(5) by carving out a type of local media—indicating that it crafted the entire exemption with local services in mind.

Indeed, the legislative history confirms this understanding.   As Plaintiffs have explained (Pls.' Mem. 20), Congress added the clause "not made by a cable system" at the suggestion of the

Motion Picture Association of America, which explained the clause was meant "to *limit* the exemption to nonprofit translators and boosters and similar secondary transmitters"—*i.e.* to other local services.  *See* Copyright Law Rev. Hearings before Sen. Subcomm. on Patents, Trademarks, and Copyrights on S.1361, 93rd Cong., 1st Sess., at 303 (Aug. 1, 1973) (emphasis added).  Thus, contrary to Locast's theory, the cable-system clause does not imply Congress intended to expand the exemption to cover inherently global services.  Instead, it shows that Congress meant to limit the exemption to other forms of *local* media.

Finally, Locast's argument distorts the purpose of the "transmit" clause in Section 101. That clause was meant to broadly protect *copyright holders' rights*, not to expand the scope of exemptions from copyright liability.  Specifically, Congress added the clause to make clear that copyright holders' public-performance rights included "transmit[ing] … a performance … to the public."  17 U.S.C. § 101.  It then defined "transmit" as communicating a performance "by any device or process whereby images or sounds are received beyond the place from which they are sent."  *Id.*  Congress adopted that "broad" definition, so that "if the transmission reaches the public in [an]y form, the case comes within the scope of clauses (4) or (5) of the section 106"—*i.e.,* within the scope of copyright holders' rights.  H.R. Rep. No. 94-1476, at 64 (1976).

It thus would contravene Congress' intent to employ the transmit clause to broadly construe an *exemption* from copyright liability.  Indeed, such a reading would be particularly suspect given the principle that copyright exceptions generally should be "narrowly" construed to preserve the primary operation of a provision.  *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 168 (2d Cir. 2000) (quoting *Commissioner v. Clark,* 489 U.S. 726, 739 (1989)); *see Capitol Recs., LLC v. Vimeo, LLC,* 826 F.3d 78, 90-91 (2d Cir. 2016).  In light of these considerations, it is "perfectly coherent" to pair a broad reading of the transmit clause with a narrow reading of Section 111(a)(5)'s

exemption, as both "work in tandem to bolster the property interests of copyright holders." *Aereokiller*, 851 F.3d at 1009 (construing Section 111's cable-system provisions).

For all these reasons, and those in Plaintiffs' summary-judgment memorandum, Section 111(a)(5) is limited to local transmission services.  Locast, however, does not make local transmissions.  Instead, it retransmits broadcasts over the internet, which is an "inherently global communications network."  Pls.' SUMF ¶ 19.  Its service therefore falls outside the exemption.

## II.   LOCAST CANNOT PROVE AS A MATTER OF LAW THAT IT MAKES SECONDARY TRANSMISSIONS WITHOUT ANY PURPOSE OF COMMERCIAL ADVANTAGE.

Even if internet services fell within the scope of Section 111(a)(5) (they do not), Locast's motion still would fail for an independent reason.  It falls far short of proving *as a matter of law* that it makes secondary transmissions "without any purpose of direct or indirect commercial advantage."  17 U.S.C. § 111(a)(5).  Locast argues that the commercial-advantage clause merely "[i]ncorporates" nonprofit tax and corporate law, such that a nongovernmental organization can satisfy the clause simply by operating as a nonprofit.  Dfs.' Mem. 23-27.  But that contention makes no sense, as it would mean the commercial-advantage clause serves no purpose in the statute.  As discussed below, the clause instead imposes an *independent* requirement, above and beyond the separate requirement that a nongovernmental organization operate as nonprofit.  And that independent requirement is strict:  it requires a nonprofit to prove that it makes secondary transmissions *without any* purpose of commercial advantage, whether direct or indirect.

Moreover, there is no merit to Locast's claim that this plain reading of the commercial-advantage clause would "deny [Section] 111(a)(5) protection to *any* nonprofit that effectively expands the reach of the over-the-air broadcast signals."  Dfs.' Mem. 23.  To the contrary, it would cover—as it has for the decades since its enactment—the many translators and boosters that "do nothing more than amplify broadcast signals and retransmit them to everyone in an area for free

reception" and act for no purpose of commercial advantage.  H.R. Rep. No. 94-1476, at 92 (1976). In other words, a plain reading ensures that the exemption applies to the type of local operators that Congress wanted to protect.  In contrast, Locast's reading would distort Section 111(a)(5) to allow Locast to exploit copyrighted works for a host of commercial purposes—including fueling its nationwide expansion, benefiting its pay-television patrons, unfairly competing with licensed services, collecting valuable data, and enhancing its name recognition and that of its founder.

As discussed in Plaintiffs' summary-judgment memorandum, there is no genuine dispute that Locast makes secondary transmissions for these commercial purposes, any one of which disqualifies it from the exemption. Pls.' Mem. 27-36.  The Court should therefore grant Plaintiffs' motion.  Certainly, however, Locast has not proven as a matter of law that it acts *without any* purpose of commercial advantage—which, at a minimum, mandates denying its motion.

### A. The Commercial Advantage Clause Imposes An Additional Requirement, Above And Beyond Operating As A Nonprofit.

Locast posits that the commercial-advantage clause—like the term "nonprofit organization"—"[i]ncorporates" nonprofit tax and corporate law. Dfs.' Mem. 23, 27.  Under those bodies of law, Locast contends, a nonprofit may engage in "commercial activities without losing [tax] exempt status so long as the commercial activity serves its nonprofit mission." *Id.* at 25. Thus, in Locast's view, if an organization merely operates as a nonprofit under tax and corporate law, then it necessarily lacks any purpose of commercial advantage under Section 111(a)(5).

The Court should reject that argument, which would effectively read the commercial-advantage clause out of the exemption.  To start, the clause "without any purpose of direct or indirect commercial advantage" nowhere mentions, much less "incorporates," nonprofit tax or corporate law.  Indeed, while Locast asserts that the "commercial advantage" clause "mirrors the tax code," it does not cite a single tax provision that even uses that phrase.  *See* Dfs.' Mem. 27.

Moreover, Locast's argument contravenes the fundamental canon that a statute "'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, *Statutes and Stat. Constr.* § 46.06 (rev. 6th ed. 2000)).  Here, Section 111(a)(5) requires not only that a nongovernmental organization operate as a "nonprofit," but *also* that a nonprofit make secondary transmissions "without any purpose of direct or indirect commercial advantage." Locast, however, interprets those two clauses to do the same thing: namely, to incorporate nonprofit tax and corporate law.  Dfs.' Mem. 23, 27.  Indeed, Locast goes so far as to treat the clauses interchangeably, devoting much of its discussion of the commercial-advantage clause to the term "nonprofit organization." Dfs.' Mem. 23-27.  Because Locast's reading would render the commercial-advantage clause superfluous, it should be rejected.  The clause instead imposes an *independent* requirement, above and beyond operating as nonprofit organization.

Locast also ignores that the commercial-advantage clause refers to any purpose of making *the secondary transmission itself*—not to the nonprofit's ultimate purpose as an organization.  *See* 17 U.S.C. § 111(a)(5) (referring to a "secondary transmission . . . made by a governmental body, or other nonprofit organization, without any purpose of direct or indirect commercial advantage."). In this regard, the 1976 House Report's discussion of 17 U.S.C. § 108 is instructive.  In language tracking that of Section 111(a)(5), Section 108 addresses a library's reproduction or distribution of copies "made without any purpose of direct or indirect commercial advantage."  The report explains that "the 'advantage' referred to in this clause must attach to the immediate commercial motivation behind the reproduction or distribution itself, rather than to the ultimate profit-making motivation behind the enterprise in which the library is located."  H.R. Rep. No. 97-1476, at 75 (1976).  Similarly here, the "advantage" in Section 111(a)(5) refers to any purpose of making the

secondary transmission itself, not to the ultimate "mission" of the nonprofit organization. Further, by using the term "*any* purpose," Congress recognized that a nonprofit may make secondary transmissions for purposes beyond its charitable "mission," which might not be problematic under tax law, but would disqualify the nonprofit from Section 111(a)(5).

In addition to being at war with the text and principles of statutory construction, Locast's argument is contradicted by the legislative history. That history shows that, when crafting nonprofit exemptions in the 1976 Copyright Act, Congress did not reflexively incorporate nonprofit tax or corporate law. To the contrary, it recognized that "[t]he line between commercial and 'nonprofit' organizations is increasingly difficult to draw"; "[m]any 'non-profit' organizations are highly subsidized and capable of paying royalties"; and a "broad 'not-for-profit' exemption" would not only "hurt" copyright holders, but "dry up" incentives to create copyrighted content. H.R. Rep. No. 94-1476, at 62-63 (1976). Congress thus eschewed any "outright exemption" for nonprofits in favor of "specific exemptions" for certain "nonprofit uses." *Id.* at 62.

The legislative history also shows that Congress employed the phrase "direct or indirect commercial advantage" *not* to incorporate nonprofit tax or corporate law, but to codify judicial decisions that broadly construed the "for profit" language of 1909 Copyright Act. *See* H.R. Rep. No. 94-1476, at 85 (discussing phrase in context of Section 110(4)). Those decisions recognized that "[t]he term 'non-profit' as used in the law of corporations has a meaning which is *substantially different* from the phrase 'not for profit' as used in the law of copyrights." *Mills Music, Inc. v. Arizona*, 1975 WL 21095, at *21 (D. Ariz. July 23, 1975), *aff'd*, 591 F.2d 1278 (9th Cir. 1979) (emphasis added). Performances by nonprofit corporations could "nonetheless be regarded as performances 'for profit'" under the 1909 Act. *Id.* This history contradicts Locast's argument that the commercial-advantage clause merely incorporates nonprofit tax and corporate law.

Indeed, the flaw in Locast's theory is best illustrated by its reliance on the inapposite *tax* decision in *Debs Mem'l Radio Fund v. Commissioner*, 148 F.2d 948 (2d Cir. 1945).  Locast cites that case for the proposition that a nonprofit radio station could earn income from commercial advertising "without losing its tax-exempt status" because its "ultimate purpose" was charitable. Dfs.' Mem. 24.  But Locast ignores that the Second Circuit issued a separate *copyright* decision involving the same nonprofit radio station.  *Associated Music Publishers v. Debs Mem'l Radio Fund*, 141 F.2d 852 (2d Cir. 1944); *see* Pls.' Mem. 29-30 (discussing *Debs*).

In that copyright case, the Second Circuit specifically applied the "for profit" language of 1909 Copyright Act, which is the foundation for the commercial-advantage clause in Section 111(a)(5).  *Debs*, 141 F.2d at 854.  Applying that language, the Second Circuit found that the nonprofit radio station was broadcasting copyrighted songs during certain ad-free programs "in order to maintain and further build up the listening audience and thus furnish the field from which the paying advertisers may reap a profit."  *Id.* at 855.  The station was "engaged in an enterprise which resulted in profit to the advertisers," as well as "an increment to its own treasury."  *Id.*  For purposes of *copyright* law, the Second Circuit held it made "no difference that the ultimate purposes of the corporate defendant were charitable or educational."  *Id.*  What mattered was that the nonprofit station sought "immediate profit" to itself and its third-party advertisers by broadcasting copyrighted works.  *Id.*

By including the commercial-advantage clause in Section 111(a)(5), Congress incorporated cases like the *copyright* decision in *Debs*—not the *tax* decision on which Locast relies.  Thus, it makes no difference under the commercial-advantage clause that a nonprofit organization claims its ultimate purposes are charitable.  Instead, what matters is whether the nonprofit *makes secondary transmissions* without any purpose of commercial advantage.

**B.      To Qualify For The Exemption, A Nonprofit Must Prove It Makes Secondary Transmissions With No Purpose of Commercial Advantage Whatsoever.**

In addition to being an independent requirement, the commercial-advantage clause is strict. It requires a nonprofit to prove it makes secondary transmissions without "*any* purpose of direct or indirect commercial advantage." 17 U.S.C. § 111(a)(5) (emphasis added).  Read naturally, the word "any" has "expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5 (1997).  It means "one or some indiscriminately of whatever kind." *Id.* (quoting *Webster's Third New Int'l Dict.* (1976)).  Thus, to qualify for the exemption, it does not suffice for a nonprofit to prove that it acts for a mix of non-commercial and commercial purposes or for some purported public purpose. Instead, it must prove that it makes secondary transmissions for no purpose of commercial advantage whatsoever, no matter how tangential.  In other words, the exemption applies only to "[w]holly noncommercial secondary transmissions." H.R. Rep. No. 90-83, at 6 (1967).

Locast contends that the term "purpose" corresponds to "specific intent."  Dfs.' Mem. 27. But that hardly alleviates Locast's burden.  As Locast's own authority explains, a person acts purposefully whenever he "consciously desires [a] result, whatever the likelihood of that result happening from his conduct." *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 104 (2d Cir. 2019) (citation omitted).  Further, purpose "can be established in all the ways intent can be found in our law, including explicit attestation, concrete evidence, or in some circumstances, inference from the foreseeable and logical consequences of a course of conduct." *Id.*  Thus, to be entitled to summary judgment, Locast must show that no reasonable jury could conclude in *any* of these ways that Locast acted for *any* commercial purpose.

Further, Locast is wrong that the concept of "direct or indirect commercial advantage" is limited to "monetary gain."  Dfs.' Mem. 28.  That reading is belied by the fact that, elsewhere in the 1976 Copyright Act, Congress referred to "purposes of commercial advantage or private

financial gain." *See* 17 U.S.C. § 506(a) (criminal liability provision).  If, as Locast contends, "commercial advantage" were limited to financial gain, then the term would be superfluous in that provision.  This indicates that Congress intended "commercial advantage" to be broader than financial gain.  And that conclusion applies with even greater force under Section 111(a)(5), which refers to "*direct* or *indirect* commercial advantage." (emphasis added).[4]

Locast's reading also is at odds with cases construing the fair-use defense, which asks, *inter alia*, whether a use was of "a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  In that context, courts recognize that "[m]onetary gain is not the sole criterion," particularly in settings where "profit is ill-measured in dollars."  *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989).  For example, a nonprofit (or an individual associated with one) acts commercially if it exploits copyrighted works to increase its name "recognition."  *Id.* at 1324; *accord Soc'y of Holy Transfiguration Monastery. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012).  A nonprofit also acts commercially if it exploits copyrighted works to attract "new members" and enable the organization's "growth."  *Worldwide Church of God v. Phila. Church of God*, 227 F.3d 1110, 1118 (9th Cir. 2000).  These cases underscore that commercial advantages are not, as Locast contends, limited to direct monetary gains.

### C.   Locast Cannot Prove As A Matter Of Law That It Makes Secondary Transmissions Without Any Purpose of Commercial Advantage.

Here, Locast falls far short of proving as a matter of law that it makes secondary transmissions without *any* purpose of commercial advantage.  In fact, the record compels the

---

[4] Locast's reliance on *United States v. Rothberg*, 222 F. Supp. 2d 1009 (N.D. Ill. 2002), is misplaced.  There, the court merely reasoned that a barter-type arrangement was not among the "heartland of cases" contemplated by the former sentencing guideline for Section 506(a), thus permitting a sentencing departure.  *Id.* at 1017-18.  The court nowhere purported to construe the full scope of the term "commercial advantage" in Section 506(a), much less interpret the broader phrase "direct or indirect commercial advantage" in Section 111(a)(5).

opposite conclusion.  By Locast's own account, it retransmits broadcasts to attract users from whom it collects money to fund its "expansion" into new markets.  *See, e.g.,* Dfs.' Mem. 22, 23, 36.  Under copyright law, that is a quintessential purpose of commercial advantage.  In the words of the *Debs* copyright decision, Locast exploits copyrighted works to "build up" a user base and "furnish the field" from which it may solicit money for "its own treasury."  141 F.2d at 855.  And it does so not simply to defray its costs, but to enable its "growth."  *Worldwide Church*, 227 F.3d at 1118.  Indeed, as an expert report that Locast attaches to its motion shows, Locast's value already has grown to over *$34.5 million*, underscoring that it exploits copyrighted works for commercial advantage.  Dfs.' Ex. 11, at 33.

It is no defense for Locast to say that, under tax law, nonprofits are not forbidden from expanding or accumulating value, and that Plaintiffs' position supposedly would strip thousands of nonprofits of tax-exempt status.  *See, e.g.,* Dfs.' Mem. 22, 27, 31-32.  Again, Locast improperly conflates *tax* and *copyright* law.  Regardless of what nonprofit tax law permits, that Locast exploits copyrighted works to fuel its "growth" betrays a purpose of commercial advantage under copyright law.  *See Worldwide Church*, 227 F.3d at 1118.  For purposes of copyright law, it makes "no difference" that Locast claims its "ultimate purposes" are "charitable."  *Debs*, 141 F.2d at 855.

The record also demonstrates that Locast acts for a host of other commercial purposes, any one of which not only dooms its motion, but is fatal to its defense.

<u>Commercial Benefits to, and Reciprocal Benefits from, Pay-Television Providers</u>:  As Plaintiffs have explained, Locast exploits copyrighted works to benefit pay-television providers in retransmission-consent negotiations, and certain of those providers, in turn, support Locast.  *See* Pls.' Mem. 32-34.  Based on this evidence, the Court should grant Plaintiffs' motion.  At a minimum, however, such evidence clearly precludes summary judgment in Locast's favor.

To start, Locast does not seriously dispute that Section 111(a)(5) forbids making secondary transmissions for the purpose of commercially benefiting third parties.  Nor could it.  In the *Debs* copyright decision, the Second Circuit held that the 1909 Copyright Act broadly protected against performances "for profit," and that it was "unimportant" whether a profit went to the nonprofit itself, its employees, or third-party advertisers.  141 F.2d at 855.  Similarly, here, Section 111(a)(5) broadly forbids any purpose of direct or indirect commercial advantage, and it is unimportant whether the advantage flows to Locast, its employees, or certain pay-television providers.

Locast instead advances the narrower argument that a commercial purpose cannot be inferred from "collateral" or "incidental" benefits to third parties.  Dfs.' Mem. 28-29.  But the benefits that Locast provides pay-television providers hardly fit that description.  To the contrary, they have been central to Locast's plan from the beginning.  Before launching Locast, Goodfriend predicted to the board of his advocacy group that he could "raise funds" for Locast because "so many entities [*i.e.* pay-television providers] are frustrated with the restrictions of the current video market."  Pls.' Ex. 62 (Goodfriend Ex. 20, SFCNY-000044164, at 44167).  Similarly, around launch, Goodfriend predicted that pay-television providers would "flock" to Locast "if a blackout threatens."  Pls.' SUMF ¶ 31.  And when pay-television providers initially took advantage of Locast without paying it, Goodfriend denounced them as "freeloaders."  Pls.' SUMF ¶ 32.  This evidence unambiguously shows that Goodfriend viewed pay-television providers as far more than "incidental" beneficiaries.

It is no defense for Locast to assert that Goodfriend did "not coordinate" or "even speak" to pay-television companies before launching Locast.  Dfs.' Mem. 30.  To begin with, Goodfriend's principal contact at DISH testified that Goodfriend asked DISH for financial support *before* Locast launched.  Pls.' Ex. _63(Blum Dep. 26:4-11).  In any event, Locast's argument is a

red herring.  Regardless of whether he "coordinated" with pay-television providers before launch, Goodfriend planned all along to seek funding from these companies, and even Locast concedes that he sought funding from them after launch.  *See* Dfs.' Mem. 30.

It also is no defense for Locast to say that no pay-television company "provided support to [Locast] in its first eighteen months."  Dfs.' Mem. 29.  To begin with, that statement ignores that DISH integrated Locast into its set-top boxes within that period—giving Locast access to a nationwide network of subscribers from whom to solicit so-called "donations."  *See* Pls.' Ex. 19 (SFCNY-000048578, at 48578) (Goodfriend stating in January 2019 that "Locast already is deployed on [DISH's] Hopper").  Further, the fact that pay-television providers initially did not pay Locast cash is precisely what led Goodfriend to declare that they could no longer "freeload[]." Pls.' SUMF ¶ 32.  Instead, they would have to pay a licensing fee for access to its application or "make a charitable contribution, if they prefer."  Pls.' SUMF ¶ 32.  And Locast proceeded to collect substantial sums from those companies, including $500,000 from AT&T and $150,000 from cable companies and their supporters.  Pls.' SUMF ¶¶ 43, 50-51.  Thus, far from being "collateral" or "incidental," the benefits that Locast provides these companies were a significant part of its fundraising plan.

Locast nonetheless contends it has "no purpose" of benefiting pay-television providers because its service helps their subscribers "cut the cord" (*i.e.* cancel their subscriptions) and it has "publicized" its service to "cord-cutters."  Dfs.' Mem. 29.  But the fact that Locast publicly markets itself to "cord cutters" does not mean it has "no purpose" of helping pay-television providers. Indeed, any such contention is contradicted by Goodfriend's internal statement that such providers would "flock" to Locast.  Pls.' SUMF ¶ 31.  It also is contradicted by the fact that Locast directly benefits pay-television providers by facilitating access to its application so that they can integrate

it into their platforms.  Pls.' SUMF ¶¶ 31, 36, 42, 53; Pls'. Ex. 73 (SFCNY-000003751, at 3751) (invoice showing that Locast incurred $100,000 to adopt its application to AT&T platforms).

Locast's contention is further belied by the unambiguous evidence that pay-television providers themselves view Locast as providing leverage in retransmission-consent negotiations. ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.  Pls.'  SUMF ¶ 37. Similarly, AT&T admitted it paid Locast $500,000 to gain "some leverage during [its] [r]etrans negotiations" with CBS.  Pls.' SUMF ¶ 46.  ████████████████████████████ ████████████████████████████████  Pls.' SUMF ¶ 48.  This evidence shows that, whatever Locast now claims in Court, the pay-television providers with the greatest interest in Locast's impact recognize that it gives them significant advantages in retransmission-negotiations.  As AT&T put it, Locast is a "net positive" for pay-television providers.  Pls.' Ex. 74 (Tyrer Dep. 69:12-18).[5]  And, this is exactly why Goodfriend anticipated that pay-television providers would "flock" to Locast and why Landers recognized that such providers had a "vested interest" in seeing Locast "survive and thrive."  Pls.' SUMF ¶ 31; Pls.' Ex. 64 (SFCNY-00012639, at 12639).

It is no answer for Locast to complain that Plaintiffs have not "quantfi[ed]" Locast's monetary impact on retransmission-consent negotiations.  Dfs.' Mem. 30.  To begin with, Plaintiffs are pursuing statutory damages, not actual ones, so there is no need for them to "quantify" the harm.  *See* 17 U.S.C. § 504(c).  More to the point, Section 111(a)(5)'s applicability does not turn

---

[5] Locast cites the deposition of Plaintiffs' expert, Dr. Jeffrey Eisenach, to argue that Plaintiffs have "conceded" that cord-cutting is harmful to pay-television providers.  Dfs.' SOMF ¶ 116.  But Locast ignores that Dr. Eisenach explained that Locast has only a "de minimis impact" on cord-cutting, but a "very significant impact" on retransmission-consent negotiations.  Pls.' Ex.78 (Eisenach Dep. 297:21-298:3).

on whether Locast has "actually benefited" pay-television companies, much less on whether those benefits have been quantified.  Dfs.' Mem. 30.  Instead, the mere fact that Locast acts for any "purpose" of commercially advantaging those companies suffices to disqualify it from the exemption.  *See Herbert v. Shanley Co.*, 242 U.S. 591, 595 (1917) (holding that a "purpose" of using a copyrighted work for profit was "enough" under 1909 Copyright Act).  In any event, the record shows that Locast has had a significant impact on negotiations. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████ Pls.' Ex. 68 (Orlando Dep. 195:12-198:1, 217:9-219:22); Pls.' Ex. 69 (Orlando Ex. 23); *see also* Pls.' Exs. 70-72 (Orlando Ex. 18, 21, 22).

It also is no answer for Locast to assert that pay-television providers have raised Locast "only three times" in retransmission-consent negotiations since Locast launched in 2018.  Dfs.' Mem. 30.  The fact that deponents in this case have testified about certain instances in which pay-television providers expressly raised Locast in negotiations hardly implies those were the "only" instances that ever occurred.  Indeed, if Locast provided negotiating leverage to pay-television providers like AT&T, DISH, and Charter, there is no reason why it would not have provided leverage to other providers as well.  Moreover, that the record contains actual examples of pay-television providers invoking Locast in negotiations only confirms that those providers believe Locast increases their leverage.  And that conclusion is further confirmed by the internal documents, quoted above, ████████████████████████████████████████████ a source of "leverage," ██████████████████████████.  Pls.' SUMF ¶¶ 37, 46, 48.

All of this evidence illustrates why Goodfriend predicted that he could "raise funds" from pay-television providers and that those companies would "flock" to his service.  Pls.' SUMF ¶ 31;

Pls.' Ex. 62__ (Goodfriend Ex. 20, SFCNY-000044164, at 44167).  In light of this evidence, Locast cannot come close to proving as a matter of law that it acts without *any* purpose of benefiting its pay-television patrons.

 <u>Competition with Other Internet Streaming Companies</u>:  As Plaintiffs have explained, Locast also acts for a purpose of commercial advantage by unfairly competing with internet streaming services, like Hulu + Live TV and YouTube TV, that pay licensing fees to retransmit copyrighted programing.  Pls.' Mem. 35.  Locast responds that merely "avoiding licensing fees" is not a commercial advantage.  Dfs.' Mem. 33.  But Locast does more than just avoid such fees: it capitalizes on the fact that it does not pay fees to unfairly compete for paying subscribers.  For example, when Hulu raised its prices, Locast launched ad "campaigns" to "target" Hulu subscribers with an "anti-Hulu rate increase message."  Pls.' SUMF ¶ 55.  Such blatantly competitive conduct disqualifies Locast from the exemption.

 In an attempt to avoid this conclusion, Locast posits that, by allowing nonprofits to retransmit broadcasts without paying licensing fees, Section 111(a)(5) itself confers a "competitive advantage" on nonprofits.  Dfs.' Mem. 33.  But that reading flips Section 111(a)(5) on its head.  Section 111(a)(5) does not broadly permit nonprofits to retransmit broadcasts without paying licensing fees.  Instead, it exempts nonprofits from liability only under certain conditions, including that they make retransmissions "*without* any purpose of direct or indirect commercial advantage" and "*without* charge to the recipients … other than assessments necessary to defray the actual and reasonable costs of maintaining and operating" the service.  17 U.S.C. § 111(a)(5) (emphasis added).  Thus, the fact that Locast attempts to exploit the statute to compete for paying subscribers is not a point in its favor; instead, it confirms Locast is ineligible for the exemption.

Yet again, this point illustrates that Locast has nothing in common with translators and boosters. Those entities do nothing more than retransmit signals "to everyone in an area for free reception" and charge community assessments only to defray their actual costs. H.R. Rep. No. 94-1476, at 92 (1976). They do not compete with other companies for paying subscribers, much less "target" other companies' subscribers with ad campaigns. For this additional reason, Locast cannot come close to showing it is entitled to summary judgment.

Data Collection: As Plaintiffs have explained, Locast also acts for a commercial purpose by making secondary transmissions to collect valuable information, including email addresses and viewership data. Pls.' Mem. 35-36. Contrary to Locast's suggestion, its information collection is not merely a "collateral" or "incidental" consequence of its actions. Dfs.' Mem. 28. Instead, it is a deliberate exercise. For example, Locast tracks "how many people are watching a … broadcast station in a particular market at any given moment." Pls.' SUMF ¶ 58. And Locast has sought to capitalize on this data—for example, pitching to a potential investor the opportunity to use Locast to "monetize" the online audience through "dynamic ad insertion" and "analytics." Pls.' SUMF ¶ 59. Whether Locast actually has succeeded in monetizing this data makes no difference. Under Section 111(a)(5), the mere fact that Locast makes secondary transmissions with any "purpose" of collecting commercially valuable data suffices to disqualify it from the exemption.

Recognition: Finally, as discussed in Plaintiffs' summary-judgment memorandum, Locast acts for a commercial purpose by exploiting copyrighted works to increase its name recognition and that of its founder. Pls.' Mem. 36. In its motion, Locast does not dispute it acts for this purpose. Dfs.' Mem. 33-34. Instead, it contends that, as a matter of law, increasing one's notoriety cannot constitute a purpose of commercial advantage. Id. at 34.

That argument, however, cannot be squared with the Second Circuit's decision in *Weissmann*, 868 F.2d at 1324.  Applying the fair-use factor in Section 107(1), the Second Circuit held that an employee of a nonprofit organization acted commercially by exploiting copyrighted works to increase his professional "recognition."  *Id.*  If using copyrighted works to gain recognition counts as a commercial use under Section 107(1), then *a fortiori* such a use is disqualifying under Section 111(a)(5), which more broadly forbids "any purpose of direct or indirect commercial advantage."

It is no defense for Locast to say that a nonprofit must "make its existence known among the population it seeks to serve."  Dfs.' Mem. 33.  Here, Locast does not simply make its service known to the public; rather, it seeks notoriety for other ends.  For example, Goodfriend touted Locast's "notoriety" when pitching business opportunities to a private equity investor, Pls.' SUMF ¶ 62, including the opportunity to create a "for-profit entity working with Locast," Pls.' Ex. 43 (AMG000000015, at 15).  Also, Goodfriend himself stated that if Locast were held liable, he would probably gain personal "notoriety as a fearless badass" and that Locast "put [him] in a position to go a number of different directions."  Pls.' SUMF ¶ 62.  Goodfriend also wrote that a dispute involving Locast would "enhance [the] reputation and mission" of his advocacy group.  Pls.' Ex. 62 (Goodfriend Ex. 20, SFCNY-000044164, at 44167).

Again, these facts show that Locast has nothing in common with the translator and booster stations to which it compares itself.  *See* Dfs.' Mem. 34.  Those entities "do nothing more than that amplify broadcast signals and retransmit them to everyone in an area for free reception."  H.R. Rep. No. 94-1476, at 92 (1976).  They do not pursue notoriety to create investment opportunities with private equity or to spin off for-profit subsidiaries.  Nor do they encourage litigation to

enhance the reputations and opportunities of their founders or related advocacy groups. That Locast pursues notoriety for these ends underscores that is ineligible for the exemption.

## III.   LOCAST CANNOT PROVE AS A MATTER OF LAW THAT IT IMPOSES NO CHARGES OTHER THAN ASSESSEEMENTS NECESSARY TO DEFRAY ITS ACTUAL AND REASONABLE OPERATING COSTS.

Locast also cannot come close to proving as a matter of law the third element of its defense—namely, that it makes secondary transmissions "without charge to the recipients of the secondary transmission other than assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service." 17 U.S.C. § 111(a)(5). By its terms, that clause generally forbids a nonprofit from imposing any "charge" on recipients. The only exception is for "assessments" that are "necessary" to defray the actual and reasonable costs of "maintaining and operating" the service.

As explained in Plaintiffs' memorandum, there is no genuine dispute that Locast fails these requirements. Pls.' Mem. 36-45. The Court should therefore grant Plaintiffs' motion. Certainly, however, Locast has not proven as a matter of law that it complies with these requirements, which requires denying its motion. *First*, although Locast offers a "free" streaming service frequently interrupted by its own advertisements, it charges users subscription fees for access to uninterrupted (and far superior) services. While Locast calls these fees "donations," the Court must look beyond that label to the substance of the transaction. *Second*, Locast's charges do not qualify as "assessments," which are community-based charges. *Third*, even if Locast's charges were assessments, Locast cannot show they are "necessary" to defray its operating costs.

### A.   Locast Charges Users For Uninterrupted Service.

To start, Locast has not proven as a matter of law that it merely solicits "donations" and does not "charge" users for its uninterrupted service. To the contrary, Section 111(a)(5)'s text, basic principles of copyright law, and the facts all refute Locast's argument.

Starting with the text, it is a "fundamental canon of statutory construction" that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).  Here, Congress did not define the word "charge," so the Court should look to its ordinary meaning in 1976.  Then, as now, dictionaries defined "charge" in an economic context as the price for good or services.[6]  In this regard, a charge differs from a donation; while a charge is a payment in exchange for goods or services, a donation is merely a gift.[7]

When distinguishing between charges and donations in copyright cases, courts do not take labels at face value.  Instead, as a case cited by Locast explains, courts "look beyond mere formal labels and consider the substance of the transaction." *Fourth Floor Music v. Highfill*, 1986 WL 10883, at *4 (W.D. Mo. June 3, 1986), *aff'd,* 831 F.2d 300 (8th Cir. 1987).  This is because "donations" are "often merely euphemisms" for the purchase prices of goods or services. *Hinton v. Mainlands of Tamarac*, 611 F. Supp. 494, 496 (S.D. Fla. 1985).  In *Hinton*, for example, the Court held on summary judgment that a "suggested and voluntary donation" for attending a musical performance was "purely and simply the price of admission." *Id.*

Similarly here, Locast's so-called "donations" are the price of its uninterrupted service.  Like many internet companies, Locast employs a "freemium" business model:  it attracts users

---

[6] *See, e.g., Webster's New World Dict. of the Am. Lang.*, Charge (2d ed. 1976) ("The cost or price of an article, service, etc."); *Concise Oxford Dict. of Current Eng.*, Charge (1976) ("Expense (*at his own charge*); price demanded for service or goods (*are his charges reasonable?*); obligation to pay."); 1 *Funk & Wagnalls Standard Desk Dict.*, Charge (1976) ("The expense or cost of something; price.").

[7] *See, e.g., Webster's New World Dict. of the Am. Lang.*, Donation (2d ed. 1976) ("The act of donating," defined as "to give, esp. to some philanthropic or religious cause; contribute); *Concise Oxford Dict. of Current Eng.*, Donation (1976) ("Bestowal, presenting; thing presented, gift (esp. of money given to institution"); 1 *Funk & Wagnalls Standard Desk Dict.*, Donation (1976) ("The act of giving" or "a gift").

with a "free" streaming service interrupted by frequent advertisements and then charges users monthly subscription fees for access to uninterrupted service. *See* Pls.' SUMF ¶ 65 (Locast expert discussing this business model). Indeed, in Locast's case, it interrupts the user's stream with *its own* advertisements, offering uninterrupted service for $5 per month. As Kelly put it, Locast offers a "dual feed" consisting of (1) service interrupted by "promos" for "non-contributors" and (2) "uninterrupted service for members" who pay a "$5/mo membership fee." Pls.' SUMF ¶ 64.

Specifically, after a brief "free trial" period, Locast interrupts a user's stream every 15 minutes on a given channel with its own advertisements asking the user to pay $5 per month. Pls.' SUMF ¶¶ 66-67. During those advertisements (which are not timed to coincide with commercial breaks), the user misses underlying television programming. Pls.' SUMF ¶ 72. If a user does not pay, the user is returned to Locast's programming guide and must navigate back to the channel he or she was watching before the interruption—missing even more programming in the interim. Pls.' SUMF ¶ 69. If, however, the user pays, he or she receives uninterrupted service for a length of time correlating to the size of the payment. Pls.' SUMF ¶ 70.

The record also shows that Locast's uninterrupted service is far superior to its interrupted service. As Locast is aware, users have complained that the interruptions cause them to miss key moments of television, including the punchline of a comedy, the pivotal play of a sporting event, an acceptance speech at an awards show, or even passages of the State of the Union Address. Pls.' SUMF ¶ 72; Pls.' Ex. 16 (Falkowski Ex. 36, at EC00022161). Many users also have complained that Locast's interruptions render its free service essentially unwatchable and that they effectively must pay for uninterrupted service. Pls.' SUMF ¶ 75. Similarly, Locast's business partner, DISH, asked it to remove the interruptions to "improve the experience for DISH users," but Locast refused

absent payment, stating the interruptions were "essential" to "how we limit our free usage exposure." Pls.' SUMF ¶ 74.

In these circumstances, not only is Locast not entitled to summary judgment, but there is no genuine dispute that Locast *does* impose charges for its uninterrupted service. While Locast labels these payments "donations," the substance of the transactions is clear. Locast requires users to pay a monthly fee in exchange for access to uninterrupted streaming of copyrighted programs. It therefore imposes "charges" under Section 111(a)(5).

Indeed, Locast's internal communications confirm as much. When summarizing a discussion with Goodfriend, Kelly wrote that Locast would "begin assessing a $5/mo membership *fee*." Pls.' Ex. 19 (SFCNY-000048576, at 48580) (emphasis added). Goodfriend responded that this was an "accurate summary of our discussion." Pls.' Ex. 19 (*Id.* at 48570). Similarly, when describing Locast's business plan, Landers wrote that Locast would earn revenue from "[*u*]ser *subscriptions*" that "*we call… a donation*." Pls.' Ex. 49 (SFCNY000012162, at 12162) (emphasis added). As these admissions make clear, the term "donation" is merely a euphemism for the subscription fee that Locast charges for uninterrupted service.

Although Locast attempts to evade this conclusion, its arguments are meritless. *First*, Locast invokes an IRS regulation permitting a taxpayer who claims a charitable deduction to disregard membership benefits, such as "preferred access to goods or services," offered by a nonprofit in exchange for a payment of $75 or less per year. 26 C.F.R. § 1.170A-13.

Again, Locast improperly conflates *tax* and *copyright* law. Unlike the foregoing IRS regulation, Section 111(a)(5) nowhere carves out an exception for charges of $75 or less per year. Instead, it provides that, to qualify for the exemption, a nonprofit may not impose *any* "charge" other than certain "assessments" (discussed below). Locast's reliance on IRS regulations is

therefore misplaced.[8]  Moreover, Locast's statement that the "requested $5 per monthly payments are for 'preferred' uninterrupted access to the Locast service" (Dfs.' Mem. 35) only confirms Plaintiffs' point:  Locast charges a monthly fee in exchange for access to superior service.

*Second*, Locast claims that many users employ its service "without donating."  Dfs.' Mem. 35.  But that argument fails for several reasons.  To start, Locast's assertion that "[a]pproximately 90% of all Locast users watch TV through Locast without donating" is highly misleading.  Dfs.' Mem. 18.  As Locast's expert admits, that statistic is based on the total number of individuals who register for Locast, regardless of whether they ever use it.  Pls.' Ex. 75 (Schwartzman Dep. 109:9-110:18.).  Indeed, the figure includes users who do not even list market areas.  Dfs.' Exs. 74-75.  As Goodfriend admits, these users may be in markets where Locast has not even launched and to which it claims not to transmit signals.  Pls.' Ex. 76 (Goodfriend Dep. 260:21-262:17).  Similarly, Locast's assertion that the "majority" (i.e. 54%) of "regular" users never "donate" also is misleading, as that figure includes users who use the service as few as *two* times per month.  Dfs.' Mem. 35; Goodfriend Decl. ¶ 44.

Regardless, the fact that some portion of users employ Locast's free, interrupted service does not alter the fact that Locast charges a large number of *other* users for uninterrupted services.  In this regard, Locast is readily distinguishable from the "PBS radio and television stations" that it invokes.  Dfs.' Mem. 35.  Those stations broadcast the same programs to everyone and then ask for donations during "pledge breaks" (during which viewers or listeners do *not* miss programing).  Locast, in contrast, offers two levels of service: a free, interrupted service for non-paying users

---

[8] For the same reasons, Locast's analogy to "a nonprofit museum or concert hall" that provides "special benefits" to "recurring donors" is misplaced.  Dfs.' Mem. 36.  Whether taxpayers may disregard those benefits for purposes of *tax law* has no bearing on whether a nonprofit may charge for benefits and still claim a *copyright* exemption under Section 111(a)(5).

and an uninterrupted service for users who pay monthly subscription fees.  Locast thus is far more akin to for-profit streaming services like Spotify or YouTube.  Most of those services' users employ their free, ad-supported services.[9]  Yet, no reasonable person would dispute that those entities charge other users for access to ad-free services.  The same is true of Locast.[10]

*Third*, Locast contends that "the difference between a suggested donation and an admission charge is that the latter is understood by the public to be mandatory."  Dfs.' Mem. 35.  That proposition, however, only undercuts Locast's position.  While Locast may offer uninterrupted services for free, it requires users to pay for access to uninterrupted services.  Thus, any reasonable member of the public would understand that Locast imposes a *mandatory* fee for the latter.

Locast gains nothing by arguing that it "suspends" the so-called "donation" requirement when a user claims hardship.  Dfs.' Mem. 36.  That Locast must affirmatively "suspend" the payment requirement is the exception that proves the rule:  it shows that, absent a special dispensation, Locast imposes a mandatory fee for uninterrupted service.  Indeed, if the payment requirement were truly a "voluntary donation," there would be no need for Locast to "suspend" it at all.  Charities do not "suspend" donations when times are tight; they simply receive fewer voluntary donations.  Further, the user requests that Locast touts only confirm this point:  they are replete with examples of users stating they "cannot afford" to pay $5 per month but nonetheless want uninterrupted service—showing that users understand the *quid pro quo* nature of the

---

[9] For example, Spotify has 345 million users, only 155 of which pay for premium, ad-free services. *See* https://www.businessofapps.com/data/spotify-statistics/.

[10] It is no defense for Locast to say that users can avoid interruptions "by simply changing the channel, which restarts the 15-minute timer."  Dfs.' Mem. 36.  Of course, Locast has never suggested this to its users, as the interruptions are, in Locast's words, "essential" to limiting its "free-usage exposure."  Pls.' SUMF ¶ 74.  In any event, that nonpaying users must remember to change the channel every 15 minutes, lest they experience an interruption, only underscores that Locast's free, interrupted service is far inferior to its paid, uninterrupted service.

payment.  Dfs.' Ex. 32.  Also, Locast recently capped the number of suspensions at 25,000, which confirms that monthly fees remain mandatory for the vast bulk of users who want uninterrupted service, regardless of ability to pay.  Pls.' Ex. 67 (Locast announcement).

Finally, Locast's citation to *Fourth Floor Music*, 1986 WL 10883, only underscores that it imposes charges.  There, a music venue charged $3 for concert tickets, but it posted a sign stating tickets "were strictly a donation" and it allowed persons who could not pay to "see the show for free."  *Id.* at *3.  The district court nonetheless held on summary judgment that the ticket price was an admission charge because "the average customer … would feel compelled to pay."  *Id.* at *4.

Here, it is even more obvious that Locast imposes charges.  Unlike the venue in *Fourth Floor Music* which offered one type of service, Locast offers both interrupted and uninterrupted services and requires users who chose the latter to pay monthly fees.  In other words, Locast is analogous to a music venue that offers both obstructed and unobstructed viewing and charges for the latter.  Had the venue in *Fourth Floor Music* done that, it would have been an even easier case. Here, the "average" user of Locast's uninterrupted services not only would "feel compelled" to pay; he or she would understand that, absent a special dispensation, the monthly fee is *mandatory*. Thus, far from supporting Locast, *Fourth Floor Music* undercuts its case.

### B.  Locast's Charges Are Not "Assessments."

Locast next contends that its charges qualify as "assessments necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service."  17 U.S.C. § 111(a)(5).  That argument fails for a threshold reason that Locast ignores: its charges are not assessments at all.  As discussed in Plaintiffs' memorandum, an "assessment" is a community-wide charge for a community-wide benefit.  Pls.' Mem. 40-41.

By its own admission, Locast does not impose assessments.  Indeed, Mr. Goodfriend so testified.  Pls.' SUMF ¶ 76.  ("Q:  Has Locast ever made such assessments? [A]:  No.) (objection

omitted).  Instead, as discussed above, it charges subscription fees to specific persons for use of its uninterrupted service.  Locast's charges therefore disqualify it from the exemption.

### C.  Locast's Charges Are Not Necessary to Defray Its Operating Costs.

Even if Locast could show its charges qualify as "assessments," it still would need to prove that they are "necessary to defray the actual and reasonable costs of maintaining and operating the secondary transmission service." 17 U.S.C. § 111(a)(5).  Locast cannot come close to showing it is entitled to summary judgment on this question.  As discussed in Plaintiffs' memorandum, the foregoing clause permits a nonprofit to charge assessments only if they are essential to paying the costs of maintaining and operating the secondary transmission itself; it does not allow a nonprofit to charge assessments *exceeding* those costs. Pls.' Mem. 41-45.  This limitation again reflects the nature of translators and boosters, which charge assessments only to sustain their local operations.

Here, however, there is no genuine dispute that Locast imposes charges far exceeding its maintenance-and-operation costs.  In this regard, Locast quotes its expert's statement that the record shows no "break even" point at which Locast would move into "profitability." Dfs.' Mem. 36.  But its expert admitted that that was true only through "June 2020." Pls.' Ex. 77 (Raffa Dep. 250:14-21).  Since that time, Locast has moved far beyond any "break even" point.  Specifically, by the end of 2020, it collected total revenue of $4.159 million, including $4.372 million from users.  Pls.' SUMF ¶ 79.  In comparison, its total costs (including depreciation) were only $2.436 million.  Pls.' SUMF ¶ 78.  In other words, for 2020, Locast's user revenue alone (setting aside other revenue) exceeded its total costs by *$1.936 million*.

Moreover, Locast forecasts that its profit margins will only grow.  For example, for 2021, Locast forecasts total revenue of $15.622 million, including $15.572 from users. Pls.' SUMF ¶ 80.  In comparison, it predicts total costs of only $3.074 million.  *Id.*  In other words, Locast expects that user revenues alone (again setting aside other revenue) will exceed its total costs in 2021 by

over *$12 million*.  Thus, by any conceivable standard, Locast's user charges far exceed what is "necessary" to defray its maintenance-and-operation costs.

It is no defense for Locast to argue that it uses this excess revenue to "expand" its service to capture signals in new markets.  Dfs.' Mem. 36.  Section 111(a)(5) permits use of assessments only to defray the costs of "*maintaining* and *operating* the secondary transmission service" itself. 17 U.S.C. § 111(a)(5) (emphasis added).  It nowhere permits a nonprofit to collect revenues to "expand" its mission into new markets.  But even if the statute did that, Locast still would be ineligible for the exemption because it imposes charges wildly exceeding even the costs of its "expansion."  Specifically, Locast forecasts that, depending on the number of new markets it enters, it will accumulate cash net of any costs (including expansion costs) of *$236 million and $357 million* by 2024.  Pls.' SUMF ¶ 80.  Such massive cash accumulation takes Locast far outside the narrow bounds of Section 111(a)(5).

Finally, Locast's argument once again underscores it has nothing in common with translators and boosters.  Those local operators impose "general community assessments" to defray the costs of extending broadcast signals to "everyone in an area."  H.R. Rep. No. 90-83, at 53-54 (1967).  Congress nowhere contemplated that such operators would garner enormous revenues to "expand" nationwide, let alone accumulate hundreds of millions in cash.  For all these reasons, the Court should grant Plaintiffs' motion and deny Locast's motion.

## IV.  LOCAST CANNOT PROVE AS A MATTER OF LAW THAT IT OPERATES AS A NONPROFIT ORGANIZATION.

Finally, Locast's motion fails for a fourth, independent reason.  It has not proven as a matter of law that it operates as a "nonprofit organization" under Section 111(a)(5).  To the contrary, the facts show that Locast does not operate for its stated purposes, which requires denying its motion.

As to this element, Locast touts that it is incorporated as a nonprofit in New York and has been granted tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. Dfs.' Mem. 21. But the mere fact that an organization registers as a nonprofit with state or federal authorities does not end the inquiry. Section 111(a)(5) nowhere suggests that registration alone is sufficient to satisfy the nonprofit element, nor does it somehow preclude courts looking past a nonprofit label to the actual facts. Moreover, the legislative history confirms that Congress designed the exemption for entities that "*operate* on a *completely* nonprofit basis." H.R. Rep. No. 94-1476, at 92 (1976) (emphasis added). The Court thus should look beyond Locast's nonprofit registration to examine whether it, in fact, operates as a nonprofit organization.[11]

Locast invokes tax law, but cases from that context only support the conclusion that this Court should examine how Locast actually operates. In tax cases, courts revoke Section 501(c)(3) status when an entity organized as a nonprofit fails to *operate* exclusively for one or more exempt purposes. *See, e.g., Orange Cnty. Agr. Soc'y v. Commissioner*, 893 F.2d 529, 531-32 (2d Cir. 1990); *Freedom Church of Revelation v. United States*, 588 F. Supp. 693, 697 (D.D.C. 1984). "The presence of a single non-exempt purpose, if substantial in nature, will destroy the exemption." *Orange Cnty. Agr. Soc'y*, 893 F.2d at 532 (citing *Better Bus. Bureau v. United States*, 326 U.S. 279, 283 (1945)). When examining how an entity operates, courts "look beyond the four corners of the organization's charter to discover 'the actual objects motivating the organization and the subsequent conduct of the organization.'" *Am. Campaign Acad. v. Commissioner*, 92 T.C. 1053, 1064 (1989) (quoting *Tax. with Rep. v. United States*, 585 F.2d 1219, 1222 (4th Cir. 1978)). Indeed, Locast's own authority recognizes that even when an organization claims an exempt

---

[11] Locast asserts that Plaintiffs "admit that SCFNY is a nonprofit organization." Dfs.' Mem. 22. But Plaintiffs admit only that SCFNY is "incorporated" as a nonprofit in New York, not that it actually *operates* as such an entity. *See* Am. Compl. ¶ 28.

purpose, courts focus on "the manner in which activities themselves are carried on." *Presbyterian & Reformed Pub. Co. v. Commissioner*, 743 F.2d 148, 155 (3d Cir. 1984) (quoting tax court).

In this case, Locast represented to the IRS that it provides a "public service" by "offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market (designated market area), in particular consumers who do not receive local broadcast station programming through a pay-tv service, such as cost-sensitive consumers unable to pay a monthly pay-tv fee or rural households unable to receive an over-the-air signal." Dfs.' Ex. 39. Locast further represented that it "ensures that local emergency information, weather, news, and public interest information reaches the entire community." *Id.* The facts, however, show that Locast does *not* operate in a manner consistent with these stated purposes.

*First*, despite representing that it provides programing to "rural households unable to receive an over-the-air signal," Locast operates principally in the country's largest media markets. Pls.' SUMF ¶¶ 10-12. It first launched in New York City and now has expanded to more than thirty of the largest designated market areas. Pls.' SUMF ¶¶ 10-12. Although Locast now contends that viewers in these urban areas may have trouble receiving signals, Dfs.' Mem. 25, it makes no effort to aim its service at that subset of viewers. Instead, it simply retransmits broadcasts to all registered users, regardless of whether they are able to receive over-the-air signals. Pls.' SUMF ¶ 15. Thus, far from limiting its service to rural areas, Locast acts as a substitute for over-the-air signals in urban areas where such signals already are available.

Furthermore, in selecting markets, Locast does not even analyze the number of people who have trouble receiving over-the-air signals. Pls.' SUMF ¶ 13. Instead, it selects markets based on other factors, such as population size, relevance to sports audiences, and political importance. Pls.' SUMF ¶ 13. These facts belie any notion that Locast actually operates to benefit rural households.

*Second*, despite representing it provides programming to "cost-sensitive consumers unable to pay a monthly pay-tv fee," Locast charges its users monthly subscription fees for uninterrupted service.  *See supra* Section III.A.  While it waives those fees for certain users claiming hardship, it capped the number of waivers at 25,000.  Pls.' Ex. 67 (Locast announcement).  Thus, for the vast bulk of users, Locast requires monthly fees for uninterrupted service, regardless of ability to pay.

Furthermore, Locast partners with pay-television companies to integrate its application into their platforms.  As noted, Goodfriend recognized that pay-television providers would "flock" to Locast "if a blackout threatens."  Pls.' SUMF ¶ 31.  And Locast sought to capitalize on the benefits it gives these providers.   In January 2019, Goodfriend declared that pay-television companies could no longer "freeload[]" off Locast and would have to pay a licensing fee for its application or "make a charitable contribution, if they prefer."  Pls.' SUMF ¶ 32.  And his plan worked: ██

██████████████████████████████████████████████████████  Pls.' SUMF ¶¶ 45-46.  Locast also has gained access to DISH's platforms, allowing it to solicit DISH's subscribers for so-called "donations."  Pls.' SUMF ¶¶ 36, 53.  Locast's tight relationships with these pay-television companies contradict any notion that Locast's true mission is to provide programming to consumers "unable to pay a monthly pay-tv fee."

*Third*, although Locast claims its goal is to "ensure[] that local emergency information, weather, news, and public interest information reaches the entire community," broadcasters already make that programming available on their own websites or mobile applications.  Pls.' SUMF ¶ 16.  What is more, Locast regularly interrupts public-interest programming to solicit so-called "donations."  Although Locast selectively highlights "feedback" it purportedly received from some users about such programming, Dfs.' Mem. 25, it neglects to mention that users

routinely complain about its interruptions.  For example, one user wrote: "You had to interrupt the *state of the union* presentation with your ads and wanting money.  Couldn't you have put this on hold for this event???"  Pls.' Ex. 16 (Falkowski Ex. 36, at EC00022161).  Thus, far from ensuring the availability of important programming, Locast intrudes on such programming to generate revenue.

For all these reasons, Locast falls far short of proving as a matter of law that it actually operates as a nonprofit.  To the contrary, the facts show that Locate operates not for its stated purposes, but for the commercial purposes discussed in Section II above.  Of course, Locast has not reported any of this information to the IRS or state authorities.  *See, e.g.,* Dfs.' Ex. 36-40 (Locast's state and federal filings).  Thus, the mere fact that Locast is registered as a nonprofit for tax or corporate purposes does not entitle it to summary judgment.  Its motion should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Locast's motion for summary judgment and grant Plaintiffs' motion.

Dated: June 4, 2021

/s/ Gerson A. Zweifach
Gerson A. Zweifach
Thomas G. Hentoff (*pro hac vice*)
Joseph M. Terry (*pro hac vice*)
Tian Huang (*pro hac vice*)
Jean Ralph Fleurmont (*pro hac vice*)
Angelica H. Nguyen

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

650 Fifth Avenue
Suite 1500
New York, NY 10019

Tel: (202) 434-5000
Fax: (202) 434-5029
gzweifach@wc.com
thentoff@wc.com
jterry@wc.com
thuang@wc.com
jfleurmont@wc.com
anguyen@wc.com

*Attorneys for All Plaintiffs*

Paul D. Clement (*pro hac vice*)
Erin E. Murphy (*pro hac vice*)

KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue,
N.W. Washington, DC 20004

Tel: (202) 389-5000
Fax: (202) 389-5200
paul.clement@kirkland.com
erin.murphy@kirkland.com

*Attorneys for Plaintiffs Fox Television
Stations, LLC and Fox Broadcasting
Company, LLC*

53