**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., TWENTIETH CENTURY FOX FILM CORPORATION, CBS BROADCASTING INC., CBS STUDIOS INC., FOX TELEVISION STATIONS, LLC, FOX BROADCASTING COMPANY, LLC, NBCUNIVERSAL MEDIA, LLC, UNIVERSAL TELEVISION LLC, and OPEN 4 BUSINESS PRODUCTIONS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID R. GOODFRIEND and SPORTS FANS COALITION NY, INC.,<br><br>Defendants. | No. 19-cv-7136 |

**PLAINTIFFS' RESPONSE TO DEFENDANT DAVID R. GOODFRIEND'S**
**STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Plaintiffs submit this response to Defendant David Goodfriend's Statement of Material Facts in support of his motion for summary judgment ("Mr. Goodfriend's Rule 56.1 Statement").

If Plaintiffs indicate that a statement of fact asserted by Mr. Goodfriend is undisputed, it is undisputed solely for the purpose of Plaintiffs' Opposition to Mr. Goodfriend's Motion for Summary Judgment, and Plaintiffs reserve the right to dispute any statement for all other purposes and for any reason. To the extent that any of the statements in Mr. Goodfriend's Rule 56.1 Statement are immaterial, not properly supported by the record, argumentative, or conclusory, such statements should be rejected under Local Rule 56.1. *See Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 260 (S.D.N.Y. 2014) (assertions in 56.1 statement should be stricken where they are "unsupported by citation to evidence"); *Bank of Am., N.A. v. Fischer*, 927 F. Supp. 2d 15, 19-20 (E.D.N.Y. 2013) (assertions in 56.1 statement must be "adequately supported with record evidence" to be valid).

Plaintiffs reserve the right to make any and all evidentiary objections to the purported evidence cited in the Mr. Goodfriend's Rule 56.1 Statement, including objections as to admissibility at trial, regardless of whether an objection is asserted below. To the extent Mr. Goodfriend states as a "fact" in his memorandum of law any proposition not reflected in its Rule 56.1 Statement, and the Court finds such "fact" to be material to the resolution of Mr. Goodfriend's motion, the Court should conclude that Mr. Goodfriend has not met his burden of showing that the "fact" is undisputed. *See Glidepath Holding B.V. v. Spherion Corp.*, 2010 WL 1372553, at *5 (S.D.N.Y. Mar. 26, 2010), *aff'd*, 425 F. App'x 76 (2d Cir. 2011) ("Nor have Plaintiffs used their Local Rule 56.1 statements to identify other misrepresentations or omissions that have properly been placed in the record. . . . To the extent that Plaintiffs have tried to use briefing and oral argument to raise misrepresentations or omissions that were not identified in . . . or referenced in

Plaintiffs' 56.1 statements, the Court rejects these misrepresentations and omissions as improperly raised."); *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, 511 F. Supp. 2d 324, 332 (E.D.N.Y. 2007). In addition, or in the alternative, Plaintiffs dispute each and every such fact unsupported by the Rule 56.1 Statement.

Plaintiffs reprint below, but do not respond to, the headings and footnotes contained in Mr. Goodfriend's Rule 56.1 Statement, and object to such headings and footnotes to the extent that they purport to state or characterize facts as such facts or characterizations are not properly supported with citations to the record. To the extent a response is required, Plaintiffs dispute any facts or characterizations contained in these headings or footnotes.

For the purposes of Plaintiffs' Response to Mr. Goodfriend's Statement of Material Facts and Plaintiffs' Opposition to Mr. Goodfriend's Motion for Summary Judgment, any Exhibit attached to the Declaration of Joseph M. Terry in support of Plaintiffs' Opposition to Mr. Goodfriend's Motion for Summary Judgment, dated June 4, 2021, filed herewith is identified as Terry Decl., Ex. Thus, by way of illustration, "Terry Decl., Ex. 3" would refer to Exhibit 3 to the Terry Declaration.

Any Exhibit attached to the Declaration of Laura B. Najemy in support of Mr. Goodfriend's Motion for Summary Judgment ("Najemy Declaration") is identified as Goodfriend Ex. Thus, by way of illustration, "Goodfriend Ex. 7" would refer to Exhibit 7 to the Najemy Declaration.

**PLAINTIFFS' SPECIFIC RESPONSES TO MR. GOODFRIEND'S STATEMENT OF
MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

## I.    David R. Goodfriend, Founder of Sports Fans Coalition NY, Inc.

1.          Sports Fans Coalition NY, Inc. ("SFCNY") was founded in 2017 by David R.
Goodfriend ("Mr. Goodfriend"). *See* Declaration of David R. Goodfriend ("Goodfriend Decl."),
May 6, 2021, filed herewith, at ¶ 9.

**RESPONSE TO PARAGRAPH 1:**  The statement in the preceding Paragraph is undisputed for

the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

2.          Mr. Goodfriend founded SFCNY and created Locast to deliver to all Americans
free, local broadcast TV service, after he identified and observed that many Americans lack access
to local television transmitted for free over the public airwaves, for numerous different reasons,
during his years working in communications policy.  Goodfriend Decl. ¶ 8.

**RESPONSE TO PARAGRAPH 2:**  The statement in the preceding Paragraph is disputed for

many reasons, including the following, and is immaterial to Mr. Goodfriend's motion.  Mr.

Goodfriend purports that he founded SFCNY for the stated reasons, but the evidence shows that

he did not found SFCNY and create Locast to deliver free, local broadcast TV service to Americans

who lack access to over-the-air broadcast signals.  Among other things, Mr. Goodfriend founded

SFCNY and created Locast in part to benefit Sports Fans Coalition ("SFC"), an advocacy

organization he founded, and to benefit himself.  Per his April 11, 2017 memorandum to SFC's

board of directors, Mr. Goodfriend explained that he "would like to launch a new initiative that

would expand the reach and scale of SFC but which would be controversial and involve

litigation"—SFCNY/Locast. Terry Decl., Ex. 20 at SFCNY-000044166.   In attempting to

convince SFC's board of directors to take on this project, Mr. Goodfriend stated that he "believe[d]

that this would be a good fight for us to mount, particularly as it would expand our relationships

with donors and new fans." *Id.*  Mr. Goodfriend noted that SFC "could be accused (again) of being

a front for industries adverse to broadcasters and sports leagues" (e.g., pay-television providers), but ultimately, he concluded that "a dispute like this would enhance our reputation and mission." *Id.* On November 22, 2017, Brian Hess, an employee at Emmer Consulting (the lobbying firm Mr. Goodfriend co-owns with his wife) and the executive director of Sports Fans Coalition, wrote that Locast was a "vanity thing for David [Goodfriend]. He's trying to create something he can attach his legacy to regardless of Sports Fans Coalition. I think there are real benefits that SFC can reap from this but that's not the real motivation behind David's push on this project." Terry Decl., Ex. 22. A few days after Locast's launch, on January 18, 2018, Mr. Goodfriend exchanged emails with his mother about Locast. Terry Decl., Ex. 23. Mr. Goodfriend wrote:

> [I]f we lose in court, I haven't lost much and probably gain reputation as a fearless badass. Major, major figures have reached out to me with a quiet 'attaboy.' As always, I don't make a move without calculating who my allies might be and I think my assumptions are proving to be true. One example: today I got an email from my client, PayPal, including their global head of public policy saying, 'this is why we love you.' It's my brand, man! If I actually win, now I'm fcking [sic] kryptonite!!! Even if all my clients went away, projects like this put me in a position to go a number of different directions. I could go around the country and raise money for a new venture. I could merge my practice with a digital grassroots advocacy firm. Lots of options.

*Id.* On January 31, 2019, the New York Times published an article entitled, "Locast, a Free App Streaming Network TV, Would Love to Get Sued." Terry Decl., Ex. 65. The article noted that Mr. Goodfriend "said he would welcome a legal challenge from the networks" and made "a dare to the networks to take legal action against him." *Id.* After the article was published, Mr. Goodfriend sent it to Mr. Kelly, who was then funding Locast. Terry Decl., Ex. 21. Mr. Goodfriend wrote that "[m]y only cringe moment was the headline, but even that serves a purpose for us. The article overall hits it just right. And the publicity! Priceless." *Id.* Mr. Kelly responded that he "hate[d] the headline," to which Mr. Goodfriend replied, "[j]ust got high praise from my top fundraising target. That's all I care about—it's a win." *Id.* Mr. Kelly, however, disagreed,

and wrote, "No that is not what you care about.  Let's be honest.  You care about getting sued and the publicity that comes along with it."  *Id*.

Furthermore, Mr. Goodfriend founded SFCNY/Locast to help undermine the retransmission consent regime, which is consistent with his ongoing work for DISH Network Corp ("DISH").  Mr. Goodfriend has spent the bulk of his professional life in service to DISH, a pay-television provider that has spent decades attacking the retransmission regime established by Congress in 1992.  Terry Decl., Ex. 10 (Goodfriend Dep. 37:20-38:16); Terry Decl., Ex. 39 (Blum Dep. 27:2-5; 36:4-11).  Mr. Goodfriend spent years overseeing DISH's lobbying efforts, and ██

████████████████████████████████████████████████████████████████████

███████████████ .  Terry Decl., Ex. 10 (Goodfriend Dep. 54:10-55:2; 61:13-16); Terry Decl., Ex. 40; Terry Decl., Ex. 39 (Blum Dep. 19:14-18; 35:20-22).  Mr. Goodfriend remains on the DISH payroll today.  *Id.*; Terry Decl., Ex. 27 at ¶ 12.  As Mr. Goodfriend noted in his April 17, 2017 memorandum, SFCNY/Locast's activities would, in his words, "test the boundaries of the Aereo decision" via 17 U.S.C. § 111(a)(5) and "magnif[y] . . . the law in this area."  Terry Decl., Ex. 20 at SFCNY-000044166-67.

In fact, Locast has conferred benefits to pay-television providers, particularly for their retransmission consent negotiations, and in turn, Locast has received benefits from pay-television providers who have provided monetary support as well as integrated Locast into their systems. Mr. Goodfriend identified early on that pay-television providers would "flock" to SFCNY if a blackout threatens, since, in the event of a blackout, pay-television providers can direct their subscribers to Locast to watch broadcast stations that are otherwise unavailable on their platforms—allowing the providers to hold out longer in retransmission consent negotiations. Terry Decl., Ex. 15; Terry Decl., Ex. 18 (Ross Dep. 48:12-50:3).  Locast is a "tool" that pay-television providers find "helpful for content negotiations."  Terry Decl., Ex. 18 (Ross Dep.

48:12-19, 101:21-102:5); Terry Decl., Ex. 41 (Eisenach Dep. 158:9-161:14).  For pay-television

providers, Locast "prevent[s] customers from churning."  Terry Decl., Ex. 18 (Ross Dep. 48:19).

The availability of Locast also "help[ed] AT&T's bargaining position in [retransmission consent]

negotiations."  Terry Decl., Ex. 18 (Ross Dep. 49:5-50:2).  In terms of DISH, it paid an outside

vendor to integrate Locast's application into its Hopper platform. Terry Decl., Ex. 42 (Sadler

Dep. 39:1-9; 41:17-42:5). ████████████████████████████████████████████

████████████████████████████████  Terry Decl., Ex. 39 (Blum Dep. 112:10-112:13);

Terry Decl., Ex. 43 at DISH002190. ██████████████████████████████████████

███████████████████████████  Terry Decl., Ex. 43  at DISH002193, DISH002199.  In

anticipation of a blackout involving broadcaster Tegna, DISH "accelerate[d] [its] testing of the

Locast app because [DISH] would have had an additional core of customers that were interested

in the . . . Locast app, more so than they normally would have been." Terry Decl., Ex. 42 (Sadler

Dep. 85:1-7); Terry Decl., Exs. 44- 46.  When its retransmission consent negotiations with

Nexstar failed in 2020 and DISH dropped Nexstar-owned television stations from its satellite

system, DISH referred its subscribers to Locast to obtain access to those stations.  Terry Decl.,

Ex. 39 (Blum Dep. 186:5-187:11).  On May 30, 2019, AT&T "added the Locast interactive app

to its DIRECTV and U-verse receivers."  Terry Decl., Ex. 47. ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████  Terry Decl., Ex. 16.  And in internal

communications, an AT&T executive wrote the donation was "meant to give [AT&T] some

leverage during [its] [r]etrans negotiations" with CBS.  Terry Decl., Ex. 17; Terry Decl., Ex. 18

(Ross Dep. 98:18-102:5); *see also* Terry Decl., Ex. 18 (Ross Dep. 48:19) (Locast "prevent[s]

customers from churning.").

Mr. Goodfriend also has pursued other versions of Locast, or for-profit affiliates designed to skim the profit off Locast's operations. *See, e.g.*, Terry Decl., Ex. 3 (Mr. Goodfriend writing DISH's chairman on April 19, 2019, that he is "exploring with outside counsel how to structure a relationship with a for-profit entity that could provide add-on services"); Terry Decl., Ex. 4 (Mr. Goodfriend writing executives at Apollo Global Management, LLC on April 5, 2019, about a "Locast collaboration," including "better monetizing the online audience through dynamic ad-insertion," "better monetizing the existing and online audiences through superior online/digital back-end analytics of your Locast-enabled viewers," and "exploring how a for-profit entity working with Locast could play a role in facilitating success"); Terry Decl., Ex. 5 (Charles Theiss "[f]ollow[ing] up" with Mr. Goodfriend and Brian Hess, Mr. Goodfriend's employee, on June 6, 2019, on "Locast Plus," the "development of a for profit entity utilizing the Locast non-profit tech platform for distribution").

In addition, the record shows that Mr. Goodfriend has not been providing "free, local broadcast TV" nor has he been launching Locast in markets to benefit the "Americans [who] lack access to local television transmitted for free over the public airwaves." Rather than attempting to enter markets based on need, Locast, like any commercial media entity, enters markets based on the size of the potential subscriber base, Terry Decl., Ex. 12, and made no effort to analyze to determine the number of people unable to receive free over-the-air broadcast television in any market. Terry Decl., Ex. 10 (Goodfriend Dep. 135:18-136:1); Terry Decl., Ex. 11 (Landers Dep. 270:1-7). And it makes no effort to target its product to those who cannot access over-the-air television, but instead seeks to take subscribers from other pay streaming services such as Hulu. Terry Decl., Ex. 48 at JYBRD0050290 (November 15, 2019 email from Kelly to Landers, writing "Hulu is rain [sic] their prices by 20% ($10). How do you suggest we target HUKU [sic] users?" and Landers responding that, "[w]e can target keywords in ad sense, Bryce may be able to Target

Hulu followers in Facebook and we can run Roku ads with an anti-Hulu rate increase message").
It has selected new markets in which to launch in based on population size, relevance to sports
audiences, and cash payments from cable operators—*not* rural geography or lack of access to over-
the-air signals.  Terry Decl., Ex. 12 ("map[ing] out the next few markets that we could light up
[based on] . . . factors in market size, NFL teams, and Political salience (how many members does
a market have on either judiciary or commerce committees)" and "treat[ing] market size as by far
the most important variable, then added political points and NFL teams").  SFCNY only launched
Locast in Puerto Rico after Liberty Cablevision of Puerto Rico, a cable company, paid SFCNY
$50,000.  Terry Decl., Ex. 13 at SFCNY-000070818; Terry Decl., Ex. 10 (Goodfriend Dep.
176:16-19).  And similarly, SFCNY began operations in Sioux Falls, and Rapid City, South
Dakota, after Promotion and Advancement of Local Opportunities ("PALO"), a South Dakota
organization funded by cable operators, paid SFCNY $100,000.  Terry Decl., Ex. 14 at SFCNY-
000046688; Terry Decl., Ex. 10 (Goodfriend Dep. 152:4-153:2, 159:9-15, 163:10-13).

      Also, Locast is not "free," nor is it intended to be free, as confirmed by Mr. Goodfriend
and others.  After registering, a new user has a short "free trial period" that lasts one hour (or,
during some periods, 24 hours).  Terry Decl., Ex. 10 (Goodfriend Dep. 141:12-142:2); Terry Decl.,
Ex. 11 (Landers Dep. 220:6-12).  Otherwise, Locast charges users a $5 a month (or $60 a year)
membership fee for uninterrupted service.  Terry Decl., Ex. 49 at SFCNY-000048580; Terry Decl.,
Ex. 50 (Foster Decl. ¶ 14) (describing how Locast directs users to a payment webpage that
describes the "donations" as "subscriptions.").  If a user does not pay, they suffer interruptions,
during which Locast completely cuts off the stream such that the user misses television
programming and is taken back to the program guide.  Terry Decl., Ex. 51 (Falkowski Dep. 111:6-
17); Terry Decl., Ex. 10 (Goodfriend Dep. 141:12-142:2); Terry Decl., Ex. 11 (Landers Dep.
214:13-20) .  Locast's goal is to maximize subscriptions from users and minimize "free usage

exposure." Terry Decl., Ex. 19.

3.          Mr. Goodfriend has had a long-time interest in public service and spent much of his early career working in government. Goodfriend Decl. at ¶ 3.

**RESPONSE TO PARAGRAPH 3:**  The statement in the preceding Paragraph is disputed as to

the characterizations of "long-time" and "much."  Mr. Goodfriend has spent the bulk of his

professional life in service to DISH Network Corp. ("DISH"), a pay-television provider that has

spent decades attacking the retransmission regime established by Congress in 1992.  Terry Decl.,

Ex. 10 (Goodfriend Dep. 37:20-38:16); Terry Decl., Ex. 39 (Blum Dep. 27:2-5; 36:4-11).  Mr.

Goodfriend spent years overseeing DISH's lobbying efforts, and ███████████████████

██████████████████████████████████████████████████████.  Terry

Decl., Ex. 10 (Goodfriend Dep. 54:10-55:2; 61:13-16); Terry Decl., Ex. 40; Terry Decl., Ex. 39

(Blum Dep. 19:14-18; 35:20-22).  Mr. Goodfriend remains on the DISH payroll today as a paid

consultant and registered lobbyist.  *Id.*; Terry Decl., Ex. 27 at ¶ 12.

4.          Mr. Goodfriend worked as a professional staff member to Congressional committees chaired by Senator Herb Kohl (D-WI) and Charles B. Rangel (D-NY) in 1990-1993. Goodfriend Decl. at ¶ 3.

**RESPONSE TO PARAGRAPH 4:**  The statement in the preceding Paragraph is undisputed for

the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

5.          Mr. Goodfriend also worked as Deputy Staff Secretary for President Bill Clinton in 1998 and 1999. Goodfriend Decl. at ¶ 3.

**RESPONSE TO PARAGRAPH 5:**  The statement in the preceding Paragraph is undisputed for

the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

6.        From around 1999 to 2001, Mr. Goodfriend worked in various roles at the Federal Communications Commission ("FCC"), including as Media Legal Advisor to Commissioner Susan Ness. Goodfriend Decl. at ¶ 3.

**RESPONSE TO PARAGRAPH 6:**  The statement in the preceding Paragraph is disputed as to whether Mr. Goodfriend was "directly involved"—neither the statement nor Mr. Goodfriend's statement defines what "directly involved" means.   Furthermore, the statement in the preceding Paragraph is immaterial to Mr. Goodfriend's motion.

7.        After leaving government service, Mr. Goodfriend spent a total of seven years at DISH Network ("DISH") where he continued to work on television and MVPD regulation. Goodfriend Decl. at ¶ 4.

**RESPONSE TO PARAGRAPH 7:**  The statement in the preceding Paragraph is immaterial and omits that ███████████████████████████████████████████████

██████████████████████████████████████████████████████████.

Terry Decl., Ex. 10 (Goodfriend Dep. 54:10-55:2, 61:13-16); Terry Decl., Ex. 40.  Mr. Goodfriend continues to serve as a paid consultant and lobbyist to DISH to this day.  Terry Decl., Ex. 27 at ¶ 12; Terry Decl., Ex. 10 (Goodfriend Dep. 63:3-7, 84:13-101:21); Terry Decl., Ex. 39 (Blum Dep. 19:14-18, 35:20-22).

8.        First, Mr. Goodfriend spent six years, from 2001 to 2006, as Director of Regulatory Affairs at DISH.  Goodfriend Decl. at ¶ 4.

**RESPONSE TO PARAGRAPH 8:**  The statement in the preceding Paragraph omits that Mr. Goodfriend spent years overseeing DISH's lobbying efforts directed at attacking the retransmission regime established by Congress in 1992, and █████████████████████

████████████████████████████████████████████████████.  Terry Decl.,

Ex. 10 (Goodfriend Dep. 54:10-55:2; 61:13-16); Terry Decl., Ex. 40; Terry Decl., Ex. 39 (Blum

Dep. 19:14-18; 35:20-22).  Mr. Goodfriend remains on the DISH payroll today as a paid consultant

and registered lobbyist.  *Id.*; Terry Decl., Ex. 27 at ¶12.

9.              Mr. Goodfriend left DISH for one year in 2003 to co-found Air America Radio,
the progressive-talk radio network. Goodfriend Decl. at ¶ 4.

**RESPONSE TO PARAGRAPH 9:**  The statement in the preceding Paragraph is undisputed for

the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

10.             Mr. Goodfriend was then promoted to Vice President of Law and Public Policy
at DISH in 2006, a position he held until 2009. Goodfriend Decl. at ¶ 4.

**RESPONSE TO PARAGRAPH 10:**  The statement in the preceding Paragraph is undisputed

for the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

11.             In 2009, following his work at DISH, Mr. Goodfriend joined his wife's
consulting business, Emmer Consulting, through which he represents various companies, labor
unions, nonprofits and other organizations involved in telecommunications. Goodfriend Decl. at ¶
5.

**RESPONSE TO PARAGRAPH 11:**  The statement in the preceding Paragraph is disputed for

many reasons, including the following.  Per Mr. Goodfriend's deposition testimony, he is a co-

owner of Emmer Consulting, which he characterized as a "family owned" lobbying firm that was

established before Mr. Goodfriend left DISH.  Terry Decl., Ex. 10 (Goodfriend Dep. 48:18-49:8;

64:11-13).  The statement in the preceding Paragraph also omits that ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████.  Terry

Decl., Ex. 10 (Goodfriend Dep. 54:10-55:2, 61:13-16); Terry Decl., Ex. 40.  Mr. Goodfriend

continues to serve as a paid consultant and lobbyist to DISH to this day.  Terry Decl., Ex. 27 at ¶

12; Terry Decl., Ex. 10 (Goodfriend Dep. 63:3-7, 84:13-101:21); Terry Decl., Ex. 39 (Blum Dep.

19:14-18, 35:20-22).   The statement in the preceding Paragraph also is immaterial to Mr.

Goodfriend's motion.

12.            In 2009, Mr. Goodfriend founded "Sports Fans Coalition," a non-profit
organization that protects the rights of sports fans.  Sports Fans Coalition's policy platforms
include promoting equality and inclusion in sports, adopting a Sports Bettors' Bill of Rights to
protect consumers against fraud, and fighting the wage gap between men and women in U.S.
soccer. Goodfriend Decl. at ¶ 6.

**RESPONSE TO PARAGRAPH 12:**  The statement in the preceding Paragraph is disputed for

many reasons, including the following.  Per Mr. Goodfriend's April 17, 2017 memorandum to

Sports Fans Coalition's board of directors, Sports Fans Coalition has "be[en] accused . . . of being

a front for industries adverse to broadcasters and sports leagues."  Terry Decl., Ex. 20 at SFCNY-

000044167.  The cited evidence also does not support the proposed fact.  Mr. Goodfriend's

declaration merely repeats the proposition in Paragraph 12 without citation to any admissible

evidence.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil

Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence

which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  The statement in the

preceding Paragraph also is immaterial to Mr. Goodfriend's motion.

13.            Sports Fans Coalition also petitioned the FCC to end the "Sports Blackout Rule,"
a rule that prevented local sports fans from watching home games if tickets didn't sell out. It
opposed the NFL, MLB, NHL, and NBA and, in September 2014, the FCC finally eliminated the
Sports Blackout Rule. Goodfriend Decl. at ¶ 7.

**RESPONSE TO PARAGRAPH 13:**  The statement in the preceding Paragraph is undisputed for

the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

14.          Based on his years of experience in public advocacy, particularly in the communications industry, and his awareness that many American consumers lack quality access to over-the-air broadcast signals, Mr. Goodfriend launch SFCNY in 2017, a 501(c)(3) nonprofit, which provides access to local television broadcast signals over the internet in 32 markets. Goodfriend Decl. at ¶¶ 8-9.

**RESPONSE TO PARAGRAPH 14:**  The statement in the preceding Paragraph is disputed for

many reasons, including the following, and immaterial to Mr. Goodfriend's motion.  The statement

in the preceding Paragraph is disputed as to the characterization of Mr. Goodfriend as a "public

advoca[te]."  Mr. Goodfriend has spent the bulk of his professional life in service to DISH Network

Corp. ("DISH"), a pay-television provider that has spent decades attacking the retransmission

regime established by Congress in 1992.  Terry Decl., Ex. 10 (Goodfriend Dep. 37:20-38:16);

Terry Decl., Ex. 39 (Blum Dep. 27:2-5; 36:4-11).  Mr. Goodfriend spent years overseeing DISH's

lobbying efforts, and ████████████████████████████████████████

████████████████████████.  Terry Decl., Ex. 10 (Goodfriend Dep. 54:10-55:2;

61:13-16); Terry Decl., Ex. 40; Terry Decl., Ex. 39 (Blum Dep. 19:14-18; 35:20-22).  Mr.

Goodfriend remains on the DISH payroll today as a paid consultant and registered lobbyist.  *Id.*;

Terry Decl., Ex. 27 at ¶ 12.

Mr. Goodfriend purports that he launched SFCNY for the stated reasons, but as Plaintiffs'

Response to Paragraph 2 (incorporated in this Response) shows, Locast does not provide local

television broadcast signals to "American consumers [who] lack quality access to over-the-air

broadcast signals," and SFCNY was launched in part to benefit Sports Fans Coalition and Mr.

Goodfriend.  The cited evidence also does not support the proposed fact.  Mr. Goodfriend's

declaration merely repeats the majority of the proposition in Paragraph 14 without citation to any

admissible evidence.  Mr. Goodfriend thus fails to comply with Southern District of New York

Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

Plaintiffs also dispute that "many American consumers lack quality access to over-the-air broadcast signals." Mr. Goodfriend cites no admissible evidence for this proposition. He points to no evidence that quantifies the number of people, if any, who are unable to obtain quality access to over-the-air broadcast signals. Neither Mr. Goodfriend nor SFCNY have done studies regarding what number of people "lack . . . access to over-the-air signals," Terry Decl., Ex. 10 (Goodfriend Dep. 135:18-136:1); Terry Decl., Ex. 11 (Landers Dep. 270:1-7), and they have no other basis for knowing what number of people have such problems. And Andrew Jay Schwartzman, Defendants' expert, admitted in his deposition that he "can't give . . . an estimate" as to how many Americans cannot access over-the-air signal and that he's "not sure anybody has an especially good estimate." Terry Decl., Ex. 52 (Schwartzman Dep. 69:10-12).

Mr. Goodfriend's declaration also does not claim that SFCNY is a "501(c)(3) nonprofit," as characterized in Paragraph 14. Regardless, though SFCNY has secured 501(c)(3) filing status, Mr. Goodfriend has not operated SFCNY in a manner consistent with the public purpose claimed in its tax filings. SFCNY's stated purpose is that, *inter alia*, it:

> provides a public service by offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market (designated market area), in particular, consumers who do not receive local broadcast station programming through a pay-TV service, such as cost-sensitive consumers unable to pay a monthly pay-TV fee or rural households unable to receive an over-the-air signal.

Terry Decl., Ex. 8; *see also* Terry Decl., Ex. 9. But in fact, SFCNY has been launching Locast in major media markets since its conception, without regard to whether individuals in those markets could not receive local broadcast television signals, and has not undertaken any analysis to determine the number of people who are not able to receive free over-the-air broadcast signals.

Terry Decl., Ex. 10 (Goodfriend Dep. 135:18-136:1); Terry Decl., Ex. 11 (Landers Dep. 270:1-7).

Rather than attempting to enter markets based on need, Locast, like any commercial media entity, enters markets based on the size of the potential subscriber base, Terry Decl., Ex. 12,  and made no effort analyze to determine the number of people unable to receive free over-the-air broadcast television in any market.  Terry Decl., Ex. 10 (Goodfriend Dep. 135:18-136:1); Terry Decl., Ex. 11 (Landers Dep. 270:1-7).    And it makes no effort to target its product to those who cannot access over-the-air television, but instead seeks to take subscribers from other pay streaming services such as Hulu.  Terry Decl., Ex. 48 at JYBRD0050290 (November 15, 2019 email from Kelly to Landers, writing "Hulu is rain [sic] their prices by 20% ($10). How do you suggest we target HUKU [sic] users?" and Landers responding that, "w]e can target keywords in ad sense, Bryce may be able to Target Hulu followers in Facebook and we can run Roku ads with an anti-Hulu rate increase message.").  It has selected new markets in which to launch in based on population size, relevance to sports audiences, and cash payments from cable operators—*not* rural geography or lack of access to over-the-air signals.  Terry Decl., Ex. 12 ("map[ing] out the next few markets that we could light up [based on] . . . factors in market size, NFL teams, and Political salience (how many members does a market have on either judiciary or commerce committees)" and "treat[ing] market size as by far the most important variable, then added political points and NFL teams").  SFCNY only launched Locast in Puerto Rico after Liberty Cablevision of Puerto Rico, a cable company, paid SFCNY a $50,000 "donation."  Terry Decl., Ex. 13 at SFCNY-000070818; Terry Decl., Ex. 10 (Goodfriend Dep. 176:16-19).  And similarly, SFCNY began operations in Sioux Falls, and Rapid City, South Dakota, after Promotion and Advancement of Local Opportunities ("PALO"), a South Dakota organization funded by cable operators, paid SFCNY a $100,000 "donation."  Terry Decl., Ex. 14 at SFCNY-000046688; Terry Decl., Ex. 10 (Goodfriend Dep. 152:4-153:2, 159:9-15, 163:10-13).

In addition, Locast is not "free," nor is it intended to be free, as confirmed by Mr. Goodfriend and others.  After registering, a new user has a short "free trial period" that lasts one hour (or, during some periods, 24 hours).  Terry Decl., Ex. 10 (Goodfriend Dep. 141:12-142:2); Ex. 11 (Landers Dep. 220:6-12).  Otherwise, Locast charges users a $5 a month (or $60 a year) membership fee for uninterrupted service.  Terry Decl., Ex. 49 at SFCNY-000048580; Terry Decl., Ex. 50 (Foster Decl. ¶ 14) (describing how Locast directs users to a payment webpage that describes the "donations" as "subscriptions.").  If a user does not pay, they suffer interruptions, during which Locast completely cuts off the stream such that the user misses television programming and is taken back to the program guide.  Terry Decl., Ex. 51 (Falkowski Dep. 111:6-17); Terry Decl., Ex. 10 (Goodfriend Dep. 141:12-142:2); Terry Decl., Ex. 11 (Landers Dep. 214:13-20) .  Locast's goal is to maximize subscriptions from users and minimize "free usage exposure."  Terry Decl., Ex. 19.

SFCNY has also received significant cash and other benefits from pay-television providers in exchange for making the Locast application available on their pay-television platforms.  Mr. Goodfriend identified early on that pay-television providers would "flock" to SFCNY if a blackout threatens, since, in the event of a blackout, pay-television providers can direct their subscribers to Locast to watch broadcast stations that are otherwise unavailable on their platforms—allowing the providers to hold out longer in retransmission consent negotiations. Terry Decl., Ex. 15; Terry Decl., Ex. 18 (Ross Dep. 48:12-50:3).  ████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████  Terry Decl., Ex. 16.  And in internal communications, an AT&T executive wrote the donation was "meant to give [AT&T] some leverage during [its] [r]etrans negotiations" with CBS.  Terry Decl., Ex. 17; Terry Decl., Ex. 18

(Ross Dep. 98:18-102:5); *see also* Terry Decl., Ex. 18 (Ross Dep. 48:19) (Locast "prevent[s] customers from churning."). In other words, SFCNY is not *bringing* free television to those who cannot receive it over the air; SFCNY is instead collecting revenue from pay-television platforms and users by *limiting* and then selling access to its pirated programming. Thus, Mr. Goodfriend is not operating SFCNY in a manner consistent with SFCNY's public filings and the claimed public purpose that underlies its status as a not-for-profit organization; it is not prioritizing those who cannot receive a free-to-air signal; and it is doing business with pay-television providers. SFCNY thus cannot be characterized as a "501(c)(3) nonprofit."

Finally, as to the statement in Paragraph 14 characterizing Locast as operating in "32 markets," that portion of the statement is undisputed for the purposes of this motion to the extent that it pertains to the time period in or before May 2021 and "markets" refers to "designated market areas" ("DMAs") in the United States.

## II.    Sports Fans Coalition NY, Inc. is a 501(c)(3) Nonprofit Organization

15.        SFCNY was incorporated in the State of New York on September 8, 2017 as a charitable organization under Section 201 of the Not-For-Profit Corporation law. Ex. 1 (Form CHAR410); Ex. 9 (Expert Report of Gregory J. Nachtwey ("Nachtwey Report")) at 4; *see also* Goodfriend Decl. at ¶ 11.

**RESPONSE TO PARAGRAPH 15:**  Plaintiffs do not dispute that SFCNY is registered as a nonprofit with state or federal authorities. However, the statement in the preceding Paragraph is disputed for many reasons, including the following, and immaterial to Mr. Goodfriend's motion. Plaintiffs dispute whether Mr. Goodfriend has operated SFCNY in a manner consistent with the public purpose claimed in its tax filings. For instance, Locast represented to the IRS that it provides a "public service" by "offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market (designated market area), in particular

consumers who do not receive local broadcast station programming through a pay-tv service, such as cost-sensitive consumers unable to pay a monthly pay-tv fee or rural households unable to receive an over-the-air signal."  Terry Decl., Ex. 8 (2018 Form 990-EZ).  Locast further represented that it "ensures that local emergency information, weather, news, and public interest information reaches the entire community."  *Id.*

Yet, SFCNY has been launching Locast in major media markets since its conception, and has not undertaken any analysis to determine the number of people who are not able to receive free over-the-air broadcast signals.  Terry Decl., Ex. 10 (Goodfriend Dep. 135:18-136:1); Terry Decl., Ex. 11 (Landers Dep. 270:1-7).  It has selected new markets in which to launch in based on population size, relevance to sports audiences, and cash payments from cable operators—*not* rural geography or lack of access to over-the-air signals.  Terry Decl., Ex. 12 ("map[ing] out the next few markets that we could light up [based on] . . . factors in market size, NFL teams, and Political salience (how many members does a market have on either judiciary or commerce committees)" and "treat[ing] market size as by far the most important variable, then added political points and NFL teams").  SFCNY only launched Locast in Puerto Rico after Liberty Cablevision of Puerto Rico, a cable company, paid SFCNY a $50,000 "donation."  Terry Decl., Ex. 13 at SFCNY-000070818; Terry Decl., Ex. 10 (Goodfriend Dep. 176:16-19). And similarly, SFCNY began operations in Sioux Falls, and Rapid City, South Dakota, after Promotion and Advancement of Local Opportunities ("PALO"), a South Dakota organization funded by cable operators, paid SFCNY a $100,000 "donation."  Terry Decl., Ex. 14 at SFCNY-000046688; Terry Decl., Ex. 10 (Goodfriend Dep. 152:4-153:2, 159:9-15, 163:10-13).

In addition, Locast is not intended as a service for "cost-sensitive consumers unable to pay a monthly pay-tv fee," because Locast charges its own subscription fees, as confirmed by Mr. Goodfriend and others.  After registering, a new user has a short "free trial period" that lasts one

hour (or, during some periods, 24 hours).  Terry Decl., Ex. 10 (Goodfriend Dep. 141:12-142:2);

Terry Decl., Ex. 11 (Landers Dep. 220:6-12).  Otherwise, Locast charges users a $5 a month (or

$60 a year) membership fee for uninterrupted service.  Terry Decl., Ex. 49 at SFCNY-000048580;

Terry Decl., Ex. 50 (Foster Decl. ¶ 14) (describing how Locast directs users to a payment webpage

that describes the "donations" as "subscriptions.").  If a user does not pay, they suffer interruptions,

during which Locast completely cuts off the stream such that the user misses television

programming and is taken back to the program guide.  Terry Decl., Ex. 51 (Falkowski Dep. 111:6-

17); Terry Decl., Ex. 10 (Goodfriend Dep. 141:12-142:2); Terry Decl.,  Ex. 11 (Landers Dep.

214:13-20) .  Locast's goal is to maximize subscriptions from users and minimize "free usage

exposure."  Terry Decl., Ex. 19.  SFCNY has not reported any of this to the IRS or state authorities.

Instead, SFCNY has simply reported that all of its revenue are donations.  *See, e.g.*, Terry Decl.,

Ex. 9 (2019 Form 990); Terry Decl., Ex. 8 (2018 Form 990-EZ); Goodfriend Ex. 1 (Form

CHAR410).

Moreover, the cited evidence does not support the proposed fact. The statements within

Goodfriend Exhibit 1 are hearsay within hearsay, and thus inadmissible.  Unsworn expert reports,

such as Goodfriend Exhibit 9, also are inadmissible to support a fact on summary judgment.  Fed.

R. Evid. 56(c)(4) (requiring factual evidence be presented by way of a sworn declaration); *Berk v.

St. Vincent's Hosp. & Medical Ctr.*, 380 F. Supp. 2d 334, 352-53 (S.D.N.Y 2005) ("Courts in this

Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility

requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion

without additional affidavit support." (internal citations and quotations omitted)).  Finally, the

support for Mr. Goodfriend's statement in his declaration (also Goodfriend Ex. 1) is hearsay within

hearsay, and thus also inadmissible.  Mr. Goodfriend thus fails to comply with Southern District

of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by

a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

16.         On April 5, 2018, SFCNY filed Federal form 1023, applying for recognition of exemption under § 501(c)(3) of the Internal Revenue Code. Ex. 2 (Application for Recognition of Exemption Under 501(c)(3) of the Internal Revenue Code and Attachments ("Form 1023"); *see also* Goodfriend Decl. at ¶ 12.

**RESPONSE TO PARAGRAPH 16:**  The statement in the preceding Paragraph is undisputed for the purposes of this motion, and immaterial to Mr. Goodfriend's motion.

17.         On December 3, 2018, the Internal Revenue Service ("IRS") issued a tax determination confirming SFCNY's status as a tax-exempt public charity under § 501(c)(3) of the Internal Revenue Code. Ex. 3 (IRS 501(c)(3) Determination Letter); *see also* Goodfriend Decl. at ¶ 13.

**RESPONSE TO PARAGRAPH 17:**  The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion.  Plaintiffs do not dispute that SFCNY is registered as a nonprofit with state or federal authorities.  However, Plaintiffs dispute whether Mr. Goodfriend has operated SFCNY in a manner consistent with the public purpose claimed in its tax filings.  For instance, Locast represented to the IRS that it provides a "public service" by "offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market (designated market area), in particular consumers who do not receive . . . local broadcast station programming through a pay-tv service, such as cost-sensitive consumers unable to pay a monthly pay-tv fee or rural households unable to receive an over-the-air signal."  Terry Decl., Ex. 9 (2019 Form 990).  Locast further represented that it "ensures that local emergency information, weather, news, and public interest information reaches the entire community."  *Id.*

Yet, SFCNY has been launching Locast in major media markets since its conception, and has not undertaken any analysis to determine the number of people who are not able to receive free over-the-air broadcast signals.  Terry Decl., Ex. 10 (Goodfriend Dep. 135:18-136:1); Terry Decl.,

20

Ex. 11 (Landers Dep. 270:1-7). It has selected new markets in which to launch in based on population size, relevance to sports audiences, and cash payments from cable operators—*not* rural geography or lack of access to over-the-air signals. Terry Decl., Ex. 12 ("map[ing] out the next few markets that we could light up [based on] . . . factors in market size, NFL teams, and Political salience (how many members does a market have on either judiciary or commerce committees)" and "treat[ing] market size as by far the most important variable, then added political points and NFL teams"). SFCNY only launched Locast in Puerto Rico after Liberty Cablevision of Puerto Rico, a cable company, paid SFCNY a $50,000 "donation." Terry Decl., Ex. 13 at SFCNY-000070818; Terry Decl., Ex. 10 (Goodfriend Dep. 176:16-19). And similarly, SFCNY began operations in Sioux Falls, and Rapid City, South Dakota, after Promotion and Advancement of Local Opportunities ("PALO"), a South Dakota organization funded by cable operators, paid SFCNY a $100,000 "donation." Terry Decl., Ex. 14 at SFCNY-000046688; Terry Decl., Ex. 10 (Goodfriend Dep. 152:4-153:2, 159:9-15, 163:10-13).

In addition, Locast is not intended as a service for "cost-sensitive consumers unable to pay a monthly pay-tv fee," because Locast charges its own subscription fees, as confirmed by Mr. Goodfriend and others. After registering, a new user has a short "free trial period" that lasts one hour (or, during some periods, 24 hours). Terry Decl., Ex. 10 (Goodfriend Dep. 141:12-142:2); Terry Decl., Ex. 11 (Landers Dep. 220:6-12). Otherwise, Locast charges users a $5 a month (or $60 a year) membership fee for uninterrupted service. Terry Decl., Ex. 49 at SFCNY-000048580; Terry Decl., Ex. 50 (Foster Decl. ¶ 14) (describing how Locast directs users to a payment webpage that describes the "donations" as "subscriptions."). If a user does not pay, they suffer interruptions, during which Locast completely cuts off the stream such that the user misses television programming and is taken back to the program guide. Terry Decl., Ex. 51 (Falkowski Dep. 111:6-17); Terry Decl., Ex. 10 (Goodfriend Dep. 141:12-142:2); Terry Decl., Ex. 11 (Landers Dep.

214:13-20) .  Locast's goal is to maximize subscriptions from users and minimize "free usage exposure."  Terry Decl., Ex. 19.  SFCNY has not reported any of this to the IRS or state authorities. Instead, SFCNY has simply reported that all of its revenue are donations.  *See, e.g.*, Terry Decl., Ex. 9 (2019 Form 990); Terry Decl., Ex. 8 (2018 Form 990-EZ); Goodfriend Ex. 1 (Form CHAR410).

Moreover, the cited evidence does not support the proposed fact.  The statements within Goodfriend Exhibit 3 are hearsay within hearsay, and thus inadmissible.  The support for Mr. Goodfriend's statement in his declaration (also Goodfriend Exhibit 3) is hearsay within hearsay, and thus also inadmissible.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

18.            The IRS tax determination letter applied this determination retroactively, establishing September 8, 2017 as the effective date of exemption. Ex. 3; *see also* Goodfriend Decl. at ¶ 14.

**<u>RESPONSE TO PARAGRAPH 18:</u>**  The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion.  The cited evidence does not support the proposed fact. The statements within Goodfriend Exhibit 3 are hearsay within hearsay, and thus inadmissible. Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  The statement is also disputed for the same reasons outlined in Plaintiffs' Response to Paragraph 17 (incorporated in this Response).

19.          SFCNY's mission, as identified in its 2019 federal Form 990 ("Return of Organization Exempt from Income Tax") is to "provide[] a public service by offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market (designed market area.)." Ex. 4 (2019 Form 990); *see also* Ex. 2 (Form 1023) ("SFCNY aims to provide television consumers within the New York City Designated Market Area ('DMA'), as defined by Nielsen Media Research, with access to local broadcasting including local news, weather and sports—through an online 'digital translator' service. SFCNY's translator service will amplify local, over-the-air broadcast signals to the New York City DMA via an Internet streaming utility. This streaming service will be available to any consumer within the New York City DMA with a broadband Internet connection capable of providing at least 10mbps (megabits per second) of data service.").

**RESPONSE TO PARAGRAPH 19:**  The statement in the preceding Paragraph is disputed for many reasons, including the following.  The statement in the preceding Paragraph is disputed as the characterization that SFCNY's "mission" is the one identified in its 2019 federal Form 990. As Plaintiffs' Response to Paragraph 2 (incorporated in this Response) shows, Locast's purpose is not to provide "a public service by offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market" or not provide access to local broadcasting.  Rather, SFCNY was launched in part to benefit Sports Fans Coalition and Mr. Goodfriend, as well as to undermine the retransmission consent regime.  The statement also fails to include the entirety of SFCNY's "mission" as stated in its 2019 federal Form 990, which states:

> Sports Fans Coalition NY, Inc. provides a public service by offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market (designated market area), in particular consumers who do not receive . . . local broadcast station programming through a pay-TV service, such as cost-sensitive consumers unable to pay a monthly pay-TV fee or rural households unable to receive an over-the-air signal[.]  In this way, Sports Fans Coalition NY, Inc. ensures that local emergency information, weather, news, and public interest information reaches the entire community that the federal communications commission issued a given local broadcast TV license to serve[.]  It also expands the reach of public broadcasting stations, including through the carriage of such stations' multiple programming streams.

Terry Decl., Ex. 9.  Furthermore, SFCNY/Locast is not a "translator service" as it is characterized in the statement in the preceding Paragraph.  Unlike translators or boosters, Locast does not obtain

consent from broadcast stations to retransmit their signals. Terry Decl., Ex. 27 at ¶ 3. And while translators and boosters merely amplify and extend broadcast signals to everyone in an area for free reception, Locast limits its service to registered users and interrupts its service depending on whether a user pays what Locast calls a "donation." Terry Decl., Ex. 27 at ¶ 12; *see also* Plaintiffs' Response to Paragraph 2 (incorporated in this Response). While translators and boosters merely retransmit broadcast signals to the local vicinity, Locast retransmits broadcasts over the internet. Terry Decl., Ex. 27 at ¶ 12. The internet is an "inherently global communications network that allows for data transmission from any Internet-connected computer to any other Internet-connected computer, regardless of those computers' locations." Terry Decl., Ex. 50 (Foster Decl. ¶ 8). Recognizing this, Locast employs "geofencing" technology in an effort to limit its transmissions to particular markets. Terry Decl., Ex. 11 (Landers Dep. 129:10-130:20). But even Locast's technology chief admits that its geofencing is "an imprecise tool." Terry Decl., Ex. 11 (Landers Dep. 134:1-4). In fact, users can circumvent Locast's geofencing, allowing them to watch broadcast stations from other markets. Terry Decl., Ex. 11 (Landers Dep. 138:3-11); Terry Decl., Ex. 50 (Foster Decl. ¶ 12). And Locast's geofencing often produces errors, leading users to complain they are receiving broadcasts from markets in which they are not located. Terry Decl., Ex. 51 (Falkowski Dep. 105:2-107:12); Terry Decl., Ex. 54; Terry Decl., Ex. 55; Terry Decl., Ex. 50 (Foster Decl. ¶¶ 11-12). Further distinguishing it from translators and boosters, Locast actively competes with licensed streaming services, such as Hulu + Live TV or YouTube TV, that retransmit broadcast stations. Terry Decl., Ex. 56 (Kelly Dep. 271:22-272:2); Terry Decl., Ex. 41 (Eisenach Dep. 296:19-297:3). For example, when Hulu raised its prices, Locast launched advertising "campaigns" to "target" Hulu users. Terry Decl., Ex. 48. Unlike those services, however, Locast does not pay fees for the right to retransmit copyrighted programming. Terry Decl., Ex. 27 at ¶ 3; Terry Decl., Ex. 41 (Eisenach Dep. 83:2-7, 308:1-10).

In addition, the cited evidence does not support the proposed fact. The statements within Goodfriend Exhibits 2 and 4 are hearsay within hearsay, and thus inadmissible. Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

20.        SFCNY has no employees. Ex. 12 (Transcript of Deposition of David R. Goodfriend on December 18, 2020 ("Goodfriend Depo Tr.")) at 75:22-76:1; Ex. 9 (Nachtwey Report) at 4.

**RESPONSE TO PARAGRAPH 20:** The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion. Unsworn expert reports, such as Goodfriend Exhibit 9, are inadmissible to support a fact on summary judgment. Fed. R. Evid. 56(c)(4) (requiring factual evidence be presented by way of a sworn declaration); *Berk*, 380 F. Supp. at 352-53 ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." (internal citations and quotations omitted)).

21.        The SFCNY Board has three members: Mr. Goodfriend, Gigi Sohn, and Habiba Alcindor. Goodfriend Decl. at ¶ 15.

**RESPONSE TO PARAGRAPH 21:** The statement in the preceding Paragraph is undisputed for the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

22.        Gigi Sohn has dedicated her career to the public interest in media and technology policy. Goodfriend Decl. at ¶ 16.

**RESPONSE TO PARAGRAPH 22:** The statement in the preceding Paragraph is disputed for many reasons, including the following, and immaterial to Mr. Goodfriend's motion. The cited

evidence does not support the proposed fact. Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 22 without citation to any admissible evidence. Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Moreover, Plaintiffs dispute that Gigi Sohn "has dedicated her career to the public interest in media and technology policy" because Plaintiffs dispute Mr. Goodfriend's definition of what is or is not in the public interest—specifically, Plaintiffs dispute that any activities undermining the constitutional and federal protections for copyrights is in the public interest. *See* Plaintiffs' Response to Paragraph 69 of Defendants' Statement of Material Facts (incorporated in this Response). The admission of such evidence is also unduly prejudicial.

23.        She founded and led the nonprofit advocacy organization Public Knowledge. Goodfriend Decl. at ¶ 16.

**RESPONSE TO PARAGRAPH 23:** The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion. The cited evidence does not support the proposed fact. Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 23 without citation to any admissible evidence. Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." The admission of such evidence is also unduly prejudicial.

24.        Ms. Sohn has also served as the Executive Director of the nonprofit law firm Media Access Project, which represented the public interest in media and telecommunications regulation. Goodfriend Decl. at ¶ 16.

**RESPONSE TO PARAGRAPH 24:**  The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion.  The cited evidence does not support the proposed fact. Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 24 without citation to any admissible evidence.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Moreover, Plaintiffs dispute that Media Access Project "represent[s] the public interest in media and telecommunications regulation" because Plaintiffs dispute Mr. Goodfriend's definition of what is or is not in the public interest.  *See* Plaintiffs' Response to Paragraph 22 (incorporated in this Response), *supra*.   The admission of such evidence is also unduly prejudicial.

25.        Ms. Sohn has also been a Project Specialist at the Ford Foundation and served as Special Counsel for FCC Chairman Tom Wheeler. Goodfriend Decl. at ¶ 16.

**RESPONSE TO PARAGRAPH 25:**  The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion.  The cited evidence does not support the proposed fact. Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 25 without citation to any admissible evidence.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." The admission of such evidence is also unduly prejudicial.

26.          Habiba Alcindor is a writer, producer, dramatist, director, and social justice activist who has written on topics such as equality, education, sports, and the media, and has advocated for expanding access to media, particularly with respect to sports. Goodfriend Decl. at ¶ 17.

**RESPONSE TO PARAGRAPH 26:**  The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion.  The cited evidence does not support the proposed fact. Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 26 without citation to any admissible evidence.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Moreover, Plaintiffs also dispute that all of Ms. Alcindor's activities are in furtherance of "social justice" because Plaintiffs dispute Mr. Goodfriend's definition of what is or is not in the public interest. *See* Plaintiffs' Response to Paragraph 22 (incorporated in this Response).  The admission of such evidence is also unduly prejudicial.

### III.    Mr. Goodfriend's Role at SFCNY

27.          Mr. Goodfriend founded SFCNY in 2017. Goodfriend Decl. at ¶ 9.

**RESPONSE TO PARAGRAPH 27:**  The statement in the preceding Paragraph is undisputed for the purposes of this motion, but immaterial to the motion.

28.          Mr. Goodfriend has served as the Chairman, President, and Treasurer of SFCNY and currently serves as SFCNY's Chairman. Goodfriend Decl. at ¶ 18.

**RESPONSE TO PARAGRAPH 28:**  The statement in the preceding Paragraph is undisputed for the purposes of this motion.

29.          Mr. Goodfriend is a member of the SFCNY Board of Directors and has been a member of the SFCNY Board since 2017. Goodfriend Decl. at ¶ 18.

**RESPONSE TO PARAGRAPH 29:**  The statement in the preceding paragraph is undisputed

for the purposes of this motion.


30.          Mr. Goodfriend's duties include supervising and managing SFCNY's affairs. Ex. 2 (Form 1023); Goodfriend Decl. at ¶ 18.

**RESPONSE TO PARAGRAPH 30:**  The statement in the preceding Paragraph is disputed.  The

statements within Goodfriend Exhibit 2 are hearsay within hearsay, and thus inadmissible.


31.          All of Mr. Goodfriend's conduct with respect to SFCNY and the Locast service have been within the scope of his duties as President, Treasurer, Chairman and/or as a member of the Board of SFCNY.  Goodfriend Decl. at ¶ 23.

**RESPONSE TO PARAGRAPH 31:** The statement in the preceding Paragraph is undisputed

for the purposes of this motion.


32.          Mr. Goodfriend has never received any monetary compensation for any services performed on behalf of SFCNY. Goodfriend Decl. at ¶¶ 19-20; Ex. 4 (2019 Form 990); Ex. 6 (2018 Form 990-EZ); Ex. 2 (Form 1023); Ex. 8 (Rebuttal Expert Report of Thomas J. Raffa) at ¶¶ 10, 28; Ex. 9 (Nachtwey Report) at 43, n.198; Ex. 13 (Transcript of Deposition of Gregory J. Nachtwey on April 12, 2021 ("Nachtwey Depo. Tr.")) at 99:21-100:3.

**RESPONSE TO PARAGRAPH 32:**  The statement in the preceding Paragraph is disputed for

many reasons, including the following.  The statements within Goodfriend Exhibits 2, 4, and 6 are

hearsay within hearsay.  Unsworn expert reports, such as Goodfriend Exhibits 8 and 9, are

inadmissible to support a fact on summary judgment.  Fed. R. Evid. 56(c)(4) (requiring factual

evidence be presented by way of a sworn declaration); *Berk*, 380 F. Supp. at 352-53 ("Courts in

this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility

requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion

without additional affidavit support." (internal citations and quotations omitted)).

Mr. Nachtwey's cited testimony also does not state that Mr. Goodfriend "has never received any monetary compensation for any services performed on behalf of SFCNY." Rather, Mr. Nachtwey testified that he had "seen that [Mr. Goodfriend] has not yet received any payments from Locast." Goodfriend Ex. 13 (Nachtwey Dep. 100:2-3).

The evidence also shows that Mr. Goodfriend has received monetary compensation for services performed on behalf of SFCNY, as Mr. Goodfriend received monetary compensation from Sports Fans Coalition ("SFC"), a SFCNY related organization that approved of the launch of Locast by SFCNY and funded SFCNY's initial expenses. Those expenses included the payment of $15,000 to Nicholas & Lence Communications ("NLC"), which, in December 2017, was contracted by Mr. Goodfriend to serve as "public relations counsel" to SFCNY. Terry Decl., Ex. 30; Terry Decl., Ex. 64. SFC also paid for $9,531.46 of legal fees to Harmon & Curran and $6,500 of "digital marketing expenses." Terry Decl., Ex. 31. Nor did Mr. Goodfriend believe that SFCNY was obliged to reimburse SFC for these funds. Mr. Goodfriend directed Mindi Ringdahl to pay only $23,827.46 of the SFC invoice, which he acknowledged was "about $9k short of the SFC invoice" because he was not certain if he could "generate additional invoices for those expenses." Terry Decl., Ex. 32. Mr. Goodfriend added that, "[i]f SFC has to eat those costs, so be it." *Id.*

Mr. Goodfriend reported compensation of $104,000 in 2018 and $182,000 in 2019 at SFC. Terry Decl., Ex. 37 at 7; Terry Decl., Ex. 38 at 7. SFCNY, which operates Locast, was created by SFC; is controlled by the same people; and its finances have in fact been intermingled. On April 11, 2017, Mr. Goodfriend proposed to SFC's board members "a new expansion opportunity through the launch of a free-to-the-user online video service," and outlined plans to form and operate Locast. Terry Decl., Ex. 20 at SFCNY-000044164, SFCNY-000044166-67. In attempting to convince SFC's board of directors to take on this project, Mr. Goodfriend stated that he

"believe[d] that this would be a good fight for us to mount, particularly as it would expand our relationships with donors and new fans," and that "a dispute like this would enhance our reputation and mission." Terry Decl., Ex. 20 at SFCNY-000044167. SFC's board then approved of the launch of Locast by SFCNY. Terry Decl., Ex. 28 at SFCNY-000029222. Upon launch in 2018, Mr. Goodfriend informed the SFC board members of Locast's launch by SFCNY, SFC's "sister organization," which had overlapping board members (Habiba Alcindor, Phillip Berenbroick, and David Goodfriend were board members of SFCNY and SFC), that "much of" the press coverage regarding the launch "discusse[d] the history of Sports Fans Coalition." Terry Decl., Ex. 29 (also listing articles in Forbes, Crain's, The Observer, and others as examples of press coverage).

Mr. Goodfriend noted that from his work for SFCNY/Locast, he received "[p]riceless" publicity, as well as opportunities for other employment. Terry Decl., Ex. 21. For example, as Plaintiffs' opening motion for partial summary judgment outlined, Mr. Goodfriend has developed commercial relationships with the companies he solicits for Locast funding and has used those relationships to make pitches for his other companies, including making a proposal for his family-owned consulting business to a potential Locast investor. Terry Decl., Ex. 4 (Mr. Goodfriend writing to Apollo executives in an email that he and his consulting team were "putting together a presentation for you" regarding expanding opposition to a corporate merger.).

In addition, the Form 990 instructions specify that a "Related organization" includes "Brother/Sister" organizations, which are "organization[s] controlled by the same person or persons that control the filing organization." Terry Decl., Ex. 33 at 71. Mr. Goodfriend himself has described SFCNY as a "sister organization" of SFC with three SFC board members serving as the SFCNY board members, Terry Decl., Ex. 29, and both SFCNY and SFC have publicly and internally acknowledged that SFCNY is a "New York chapter" and "local chapter" of SFC, *see, e.g.*, Terry Decl., Ex. 34 at SFCNY-000050081 ("New York chapter"); Terry Decl., Ex. 35 at 1

("local chapter").

33.          Mr. Goodfriend has never received any in-kind payments for any services performed on behalf of SFCNY. Goodfriend Decl. at ¶ 19; Ex. 8 (Rebuttal Expert Report of Thomas J. Raffa) at ¶¶ 10, 28.

**RESPONSE TO PARAGRAPH 33:**  The statement in the preceding Paragraph is disputed for many reasons, including the following.  Unsworn expert reports, such as Goodfriend Exhibit 8, are inadmissible to support a fact on summary judgment.  Fed. R. Evid. 56(c)(4) (requiring factual evidence be presented by way of a sworn declaration); *Berk*, 380 F. Supp. at 352-53 ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." (internal citations and quotations omitted)).

Aside from the monetary compensation that Mr. Goodfriend has received from SFCNY through SFC, its sister organization (*see* Plaintiffs' Response to Paragraph 32, *supra*), Mr. Goodfriend also has received things of value.  In December 2017, prior to the launch of Locast, Mr. Goodfriend signed an agreement with Nicholas & Lence Communications ("NLC"), which was charged with, among other things, securing him "speaking and networking opportunities . . . at business events in the NYC Metro areas" as well as "interviews with business media." Terry Decl., Ex. 57 at SFCNY-000060274.  In other words, NLC was charged with not just promoting Locast but also promoting Mr. Goodfriend, which it did.  *See* Terry Decl., Ex. 58 at SFCNY-000051623; Terry Decl., Ex. 59 at SFCNY-000047887.  For fulfilling this work, NLC was paid an initial project fee of $15,000, and then monthly fees of $10,000.  Terry Decl., Ex. 57 at SFCNY-000060274.  SFC and later SFCNY paid these expenses, and thus, in part, paid for Mr. Goodfriend to receive greater media exposure.  Terry Decl., Ex. 31; *see also* Terry Decl., Ex. 32.  As Plaintiffs' opening motion for partial summary judgment outlined, Mr. Goodfriend also

has developed commercial relationships with the companies he solicits for Locast funding and has used those relationships to make pitches for his other companies, including making a proposal for his family-owned consulting business to a potential Locast investor.  Terry Decl., Ex. 4. (Mr. Goodfriend writing to Apollo executives in an email that he and his consulting team were "putting together a presentation for you regarding" expanding opposition to a corporate merger.).

34.         Mr. Goodfriend has never accepted any form of compensation for any activities related to SFCNY or Locast. Goodfriend Decl. at ¶ 20.

**RESPONSE TO PARAGRAPH 34:** The statement in the preceding Paragraph is disputed for many reasons, including the following.   First, the statement in the preceding Paragraph is disputed for the reasons stated in Plaintiffs' Responses to Paragraphs 32 and 33 (incorporated in this Response).  Furthermore, Mr. Goodfriend has received other forms of benefits for his activities related to SFCNY or Locast.  Mr. Goodfriend founded SFCNY and created Locast in part to benefit Sports Fans Coalition ("SFC"), an advocacy organization he founded, and to benefit himself.  Per his April 11, 2017 memorandum to SFC's board of directors, Mr. Goodfriend explained that he "would like to launch a new initiative that would expand the reach and scale of SFC but which would be controversial and involve litigation"—SFCNY/Locast.  Terry Decl., Ex. 20 at SFCNY-000044166.   In attempting to convince SFC's board of directors to take on this project, Mr. Goodfriend stated that he "believe[d] that this would be a good fight for us to mount, particularly as it would expand our relationships with donors and new fans." *Id.*  Mr. Goodfriend noted that SFC "could be accused (again) of being a front for industries adverse to broadcasters and sports leagues" (e.g., pay-television providers), but ultimately, he concluded that "a dispute like this would enhance our reputation and mission." *Id.*  On November 22, 2017, Brian Hess, an employee at Emmer Consulting (Mr. Goodfriend's lobbying firm) and the executive director of Sports Fans

Coalition, wrote that Locast was a "vanity thing for David [Goodfriend]. He's trying to create something he can attach his legacy to regardless of Sports Fans Coalition. I think there are real benefits that SFC can reap from this but that's not the real motivation behind David's push on this project." Terry Decl., Ex. 22. A few days after Locast's launch, on January 18, 2018, Mr. Goodfriend exchanged emails with his mother about Locast. Terry Decl., Ex. 23. Mr. Goodfriend wrote:

> [I]f we lose in court, I haven't lost much and probably gain reputation as a fearless badass. Major, major figures have reached out to me with a quiet "attaboy." As always, I don't make a move without calculating who my allies might be and I think my assumptions are proving to be true. One example: today I got an email from my client, PayPal, including their global head of public policy saying, "this is why we love you." It's my brand, man! If I actually win, now I'm fcking [sic] kryptonite!!! Even if all my clients went away, projects like this put me in a position to go a number of different directions. I could go around the country and raise money for a new venture. I could merge my practice with a digital grassroots advocacy firm. Lots of options.

*Id.* On January 31, 2019, the New York Times published an article entitled, "Locast, a Free App Streaming Network TV, Would Love to Get Sued." Terry Decl., Ex. 65. The article noted that Mr. Goodfriend "said he would welcome a legal challenge from the networks" and made "a dare to the networks to take legal action against him." *Id.* After the article was published, Mr. Goodfriend sent it to Mr. Kelly, who was then funding Locast. Terry Decl., Ex. 21. Mr. Goodfriend wrote that "[m]y only cringe moment was the headline, but even that serves a purpose for us. The article overall hits it just right. And the publicity! Priceless." *Id.* Mr. Kelly responded that he "hate[d] the headline," to which Mr. Goodfriend replied, "[j]ust got high praise from my top fundraising target. That's all I care about—it's a win." *Id.* Mr. Kelly, however, disagreed, and wrote, "No that is not what you care about. Let's be honest. You care about getting sued and the publicity that comes along with it." *Id.* Furthermore, as Plaintiffs' opening motion for partial summary judgment outlined, Mr. Goodfriend has developed commercial relationships with the

companies he solicits for Locast funding and has used those relationships to make pitches for his other companies, including making a proposal for his family-owned consulting business to a potential Locast investor.  Terry Decl., Ex. 4 (Mr. Goodfriend writing to Apollo executives in an email that he and his consulting team were "putting together a presentation for you regarding" expanding opposition to a corporate merger).

## IV.    No Other Officer, Director, or Related Party Has Received Money or Other Compensation from SFCNY

35.          No officer or director of SFCNY has ever received a salary or other compensation from SFCNY or any related organization. Ex. 6 (2018 Form 990-EZ); Ex. 4 (2019 Form 990).

**RESPONSE TO PARAGRAPH 35:**  The statement in the preceding Paragraph is disputed.  The cited evidence also does not support the proposed fact.  The statements within Goodfriend Exhibits 4 and 6 are hearsay within hearsay, and thus inadmissible.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Finally, Plaintiffs' Responses to Paragraphs 32, 33, and 34 (incorporated in this Response) provide additional evidence showing that Mr. Goodfriend, an officer and director of SFCNY, received a salary or other compensation from SFCNY and/or its related organization, Sports Fans Coalition.

36.          In 2019, GRF CPAs & Advisors ("GRF CPAs") performed an audit of SFCNY's financial statements for the 2019 financial year using generally accepted accounting principles. Ex. 10 (2019 Auditor's Report).

**RESPONSE TO PARAGRAPH 36:**  The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion.  The statements within Goodfriend Exhibit 10 are hearsay within hearsay, and thus inadmissible.  Mr. Goodfriend thus fails to comply with Southern District

of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

37.        In the 2019 audit, the auditors did not disclose any parties related to SFCNY.  Ex. 10   (2019 Auditor's Report); *see also* Ex. 7 (Expert Report of Thomas J. Raffa ("Raffa Report")) at ¶ 29 (noting that if related parties had received a benefit, such benefit would have been noted in the audit report).

**RESPONSE TO PARAGRAPH 37:**  The statement in the preceding Paragraph is disputed for many reasons, including the following, and immaterial to Mr. Goodfriend's motion.   The statements within Goodfriend Exhibit 10 are hearsay within hearsay, and thus inadmissible.  Unsworn expert reports, such as Goodfriend Exhibit 7, are inadmissible to support a fact on summary judgment.  Fed. R. Evid. 56(c)(4) (requiring factual evidence be presented by way of a sworn declaration); *Berk*, 380 F. Supp. at 352-53 ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." (internal citations and quotations omitted)).  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Walter Derengowski, one of the auditors, also testified that the audit report was based on "management representations and information provided to [him] by management" and "corroborating documentation to support their representation," and that the auditors did not conduct a "forensic" audit.   Terry Decl., Ex. 60 (Derengowski Dep. 10:8-10; 23:7-12).  Furthermore, the record shows that Sports Fans Coalition is a related organization to SFCNY, as outlined in Plaintiffs' Response to Paragraph 32, which is incorporated in this Response.

38.         In 2020, GRF CPAs performed another audit of SFCNY's financial statements for the 2020 financial year using generally accepted accounting principles. Ex. 11 (2020 Auditor's Report).

**RESPONSE TO PARAGRAPH 38:**  The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion.  The statements within Goodfriend Exhibit 10 are hearsay within hearsay, and thus inadmissible.   Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

39.         In the 2020 audit, the auditors did not disclose any parties related to SFCNY.  Ex. 11.  (2020 Auditor's Report).

**RESPONSE TO PARAGRAPH 39:**  The statement in the preceding Paragraph is disputed for many reasons, including the following, and immaterial to Mr. Goodfriend's motion.   The statements within Goodfriend Exhibit 11 are hearsay within hearsay, and thus inadmissible.   Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."   Walter Derengowski, one of the auditors, also testified that the audit report was based on "management representations and information provided to [him] by management" and "corroborating documentation to support their representation," and that the auditors did not conduct a "forensic" audit.  Terry Decl., Ex. 60 (Derengowski Dep. 10:8-10; 23:7-12).  Furthermore, as noted in Plaintiffs' Response to Paragraph 32 (incorporated in this Response), the record shows that Sports Fans Coalition is a related organization to SFCNY.

40.        SFCNY's 2019 federal Form 990 also did not disclose any parties related to SFCNY. Ex. 4 (2019 Form 990); *see also* Ex. 7 (Raffa Report) at ¶ 29.

**RESPONSE TO PARAGRAPH 40:** The statement in the preceding Paragraph is disputed for many reasons, including the following, and immaterial to Mr. Goodfriend's motion.  The statements within Goodfriend Exhibit 4 are hearsay within hearsay, and thus inadmissible. Unsworn expert reports, such as Goodfriend Exhibit 7, are inadmissible to support a fact on summary judgment.  Fed. R. Evid. 56(c)(4) (requiring factual evidence be presented by way of a sworn declaration); *Berk*, 380 F. Supp. at 352-53 ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." (internal citations and quotations omitted)).

Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Furthermore, as noted in Plaintiffs' Response to Paragraph 32 (incorporated in this Response), the record shows that Sports Fans Coalition is a related organization to SFCNY.

41.        The 2020 Form 990 is in the process of being prepared, but there have been no material changes from 2019 with respect to SFCNY's officers or directors receiving income or other compensation from SFCNY or the existence of any parties related to SFCNY. Goodfriend Decl. at ¶ 21.

**RESPONSE TO PARAGRAPH 41:** The statement in the preceding Paragraph is disputed as Plaintiffs have no way to know whether there have or have not been material changes from 2019 with respect to SFCNY's officers or directors receiving income or other compensation or the existence of any parties related to SFCNY, and Mr. Goodfriend's declaration merely repeats the

proposition in Paragraph 41 without citation to any documentary evidence.  The statement also is immaterial to Mr. Goodfriend's motion.  Furthermore, as Plaintiffs' Responses to Paragraphs 32-35, 37, 39-40 (incorporated in this Response) show, SFCNY's officers (namely, Mr. Goodfriend) have received income or other compensation from SFCNY, and Sports Fans Coalition is a related party to SFCNY.

42.       SFCNY would be required to report any benefits to related parties in its federal Form 990. Ex. 8 (Rebuttal Expert Report of Thomas J. Raffa) at ¶ 10; Ex. 5 (Form 990 Instructions).

**RESPONSE TO PARAGRAPH 42:** The statement in the preceding Paragraph is disputed, and immaterial to Mr. Goodfriend's motion.  The cited evidence does not support the proposed fact. Unsworn expert reports, such as Goodfriend Exhibit 8, are inadmissible to support a fact on summary judgment.  Fed. R. Evid. 56(c)(4) (requiring factual evidence be presented by way of a sworn declaration); *Berk*, 380 F. Supp. at 352-53 ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." (internal citations and quotations omitted)).

43.       Mr. Goodfriend signed SFCNY's 2019 federal Form 990 and 2018 federal Form 990-EZ under penalties of perjury. Ex. 4 (2019 Form 990) at SFCNY-000061210; Ex. 6 (2018 Form 990-EZ) at SFCNY-000058578.

**RESPONSE TO PARAGRAPH 43:** The statement in the preceding Paragraph is undisputed for the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

44.         Sports Fans Coalition and SFCNY are completely separate incorporated nonprofit organizations and there is no intermingling of their finances. Goodfriend Decl. at ¶ 10.

**RESPONSE TO PARAGRAPH 44:**  The statement in the preceding Paragraph is disputed, for many reasons, including the following.  The cited evidence does not support the proposed fact. Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 44 without citation to any admissible evidence.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Furthermore, as Plaintiffs' Response to Paragraphs 32, 37, 39-40 (incorporated in this Response) show, Sports Fans Coalition is a related organization to SFCNY, and there is intermingling of their finances.

## V.    Mr. Goodfriend Has a Good Faith Belief That Locast Falls Under 17 U.S.C. § 111(a)(5)

45.         Since SFCNY first launched Locast and at all times since, Mr. Goodfriend has believed that Locast's activities were exempted under 17 U.S.C. § 111(a)(5). Goodfriend Decl. at ¶ 26; Ex. 2 (Form 1023); Ex. 14 (Open Society Foundation Grant Application) at SFCNY-000007909; Ex. 15 (https://www.nexttv.com/news/the-five-spot-david-goodfriend); Ex. 16 (https://www.globenewswire.com/en/news-release/2021/01/19/2160732/0/en/Locast-surpasses-2-3-million-users-seeking-to-stream-their-local-TV-channels-for-free.html);         Ex.     17 (https://www.wsj.com/articles/streaming-service-challenges-broadcasters-with-free-tv-feeds-11561986187);         Ex.     18     (https://www.locast.org/news/about/);         Ex.     19 (https://www.locast.org/news/press-releases/locast-white-paper/).

**RESPONSE TO PARAGRAPH 45:**  The statement in the preceding Paragraph is disputed for many reasons, including the following, and immaterial to Mr. Goodfriend's motion.  The cited evidence also does not support the proposed fact.  The statements within Goodfriend Exhibits 2, 14, 15, 16, 17, 18, and 19 are hearsay within hearsay, and thus inadmissible.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth

as required by Fed. R. Civ. P. 56(c)."  Furthermore, the record shows that, at a minimum, Mr.

Goodfriend, from the inception of Locast, was aware that (1) a lawsuit from Plaintiffs was a

certainty because Locast would be intentionally exploiting Plaintiffs' copyrights without

authorization, and (2) the outcome of the lawsuit was uncertain and unsupported by current law,

but would require a "magnification of the law" to succeed, and (3) affirmatively courted and

desired this lawsuit.  Terry Decl., Ex. 20.  Mr. Goodfriend noted in his April 17, 2017

memorandum to SFC's board that Locast would be a "controversial" initiative that would "involve

litigation" regarding Section 111(a)(5), which "ha[d] never been tested in court, and we do not

know how a court would rule on whether online retransmission of the broadcast signal falls within

the scope of the provision."  *Id.* at SFCNY-000044166-67 (adding that "[l]itigation would be a

given.  Broadcast networks and other copyright holders would sue, just as they sued Aereo.").

Regardless of these legal risks, Mr. Goodfriend suggested to SFC's board that the impending legal

dispute would benefit SFC because Mr. Goodfriend was "confident that [he] could raise funds for

the cost of operations and to mount a vigorous litigation defense because so many entities are

frustrated with the restrictions of the current video market and would welcome some magnification

of the law in this area."  *Id.* at SFCNY-000044167 (also arguing that he "believe[d] that this would

be a good fight for us to mount, particularly as it would expand our relationships with donors and

new fans" and that "a dispute like this would enhance [SFC's] reputation and mission").  In other

words, Mr. Goodfriend, prior to even launching Locast, was aware that litigation was inevitable,

and even considered it desirable as a way to "magnif[y]" an otherwise narrow area of law as "so

many entities [were] frustrated with the restrictions of the current video market," and boost SFC's

reputation and relationships.  *Id.*  He was aware that it was by no means certain that the Court

would conclude that Locast's operations were in compliance with Section 111(a)(5).

Moreover, Mr. Goodfriend recognized that aside from SFC, he also stood to gain from such

a legal dispute, even though he knew that a court could conclude that Locast's activities were not permitted by Section 111(a)(5).  Shortly after Locast's streaming service began in January 2018, Mr. Goodfriend, in writing to his mother, noted that "if we lose in court, I haven't lost much and probably gain reputation as a fearless badass" and that Locast's controversial launch was garnering him attention from "major figures."  Terry Decl., Ex. 23.  In public, Mr. Goodfriend openly acknowledged the legal risks in operating Locast, whether in discussions with potential funders/investors, Terry Decl., Ex. 61 (outlining legal costs); Terry Decl. Ex. 26 (Sobel Dep. 123:15-124:16), or with the press.  For example, the New York Times article, entitled "Locast, a Free App Streaming Network TV, Would Love to Get Sued," noted that Mr. Goodfriend "said he would welcome a legal challenge from the networks" and made "a dare to the networks to take legal action against him."  Terry Decl., Ex. 65.  In fact, people working on Locast acknowledged that Mr. Goodfriend only "care[d] about getting sued and the publicity that comes along with it" and that his "strategy" was "one market, shit product and technology and you litigating."  Terry Decl., Ex. 21; *see also* Terry Decl., Ex. 22 (Hess writing that Locast was a "vanity thing for David [Goodfriend]"); Terry Decl., Ex. 24 (Hankerson concluding that "Locast is kind of more about the legal fight than making an appealing product"); Terry Decl., Ex. 25 (Kelly writing to Goodfriend that he "hate[d] this notion that Locust [sic] is looking for a fight for a law suit.").  In fact, in discussions with a potential investor, Mr. Goodfriend stated that he thought getting sued "would be a good thing for Locast" because "it would bring notoriety and publicity to his platform."  Terry Decl., Ex. 26 (Sobel Dep. 124:5-16).

46.          Mr. Goodfriend knew that, even though he believed Locast's services were lawful, broadcasting companies might sue SFCNY in an attempt to shut down Locast. Goodfriend Decl. at ¶ 26.

**RESPONSE TO PARAGRAPH 46:** The statement in the preceding Paragraph is disputed, and

immaterial to Mr. Goodfriend's motion. As Plaintiffs' Response to Paragraph 45 (incorporated in

this Response) show, Mr. Goodfriend, from the inception of Locast, was aware that (1) a lawsuit

from Plaintiffs was a certainty because Locast would be intentionally exploiting Plaintiffs'

copyrights without authorization, and (2) the outcome of the lawsuit was uncertain (that is,

Locast's services were not lawful).

47.          Mr. Goodfriend's belief that SFCNY's activities were lawful led him to believe that SFCNY would succeed in any potential litigation and gave him confidence to continue working on behalf of SFCNY. Goodfriend Decl. at ¶ 27.

**RESPONSE TO PARAGRAPH 47:** The statement in the preceding Paragraph is disputed, and

immaterial to Mr. Goodfriend's motion. As Plaintiffs' Response to Paragraph 45 (incorporated in

this Response) show, Mr. Goodfriend, from the inception of Locast, was aware that (1) a lawsuit

from Plaintiffs was a certainty because Locast would be intentionally exploiting Plaintiffs'

copyrights without authorization, and (2) the outcome of the lawsuit was uncertain (that is,

SFCNY's activities were not lawful).

48.          For eighteen months after Mr. Goodfriend launched Locast, he did not receive a cease-and-desist letter from any of the Plaintiffs or any other broadcaster. Goodfriend Decl. at ¶ 28.

**RESPONSE TO PARAGRAPH 48:** The statement in the preceding Paragraph is undisputed

for the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

49.          During this period of time, Mr. Goodfriend also did not receive any phone calls, e- mails, or other communications from Plaintiffs or any other broadcaster claiming that SFCNY's

actions were unlawful. Goodfriend Decl. at ¶ 28.

**RESPONSE TO PARAGRAPH 49:** The statement in the preceding Paragraph is undisputed

for the purposes of this motion, but immaterial to Mr. Goodfriend's motion.

50.         Mr. Goodfriend believed that the Plaintiffs' lack of legal action confirmed his
belief that SFCNY's activities were lawful. Goodfriend Decl. at ¶ 29; *see also* Ex. 20
(https://www.spglobal.com/marketintelligence/en/news-
insights/trending/82_enplx5zqr7glmm90hmg2); Ex. 21
(https://www.mercurynews.com/2019/06/24/cord-cutters-get-another-choice-with-tv-streamer-
locast/); Ex. 22 (SFCNY-000042549).

**RESPONSE TO PARAGRAPH 50:**  The statement in the preceding Paragraph is disputed for

many reasons, including the following, and immaterial to Mr. Goodfriend's motion.   The

statements within Goodfriend Exhibits 20, 21, and 22 are hearsay within hearsay, and thus

inadmissible.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil

Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence

which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Furthermore, as

Plaintiffs' Response to Paragraph 45 (incorporated in this Response) show, Mr. Goodfriend, from

the inception of Locast, was aware that (1) a lawsuit from Plaintiffs was a certainty because Locast

would be intentionally exploiting Plaintiffs' copyrights without authorization, and (2) the outcome

of the lawsuit was uncertain (that is, SFCNY's activities were not lawful).

51.         Mr. Goodfriend's goal in forming SFCNY and launching Locast was to benefit
the American public by providing greater access to the programing carried on the free-to-air local
broadcasts. Goodfriend Decl. at ¶ 25.

**RESPONSE TO PARAGRAPH 51**:  The statement in the preceding Paragraph is disputed.  As

Plaintiffs' Response to Paragraph 2 (incorporated in this Response) shows, Mr. Goodfriend's

"goal" in forming SFCNY and launching Locast was not "to benefit the American public by

providing greater access to the programming carried on the free-to-air local broadcasts."

52.        Mr. Goodfriend did not intend to cause any harm to broadcasters and does not believe that he does cause harm to broadcasters. Goodfriend Decl. at ¶ 25.

**RESPONSE TO PARAGRAPH 52:**  The statement in the preceding Paragraph is disputed.  As the record shows, the very purpose of establishing Locast was to harm broadcasters.  Essentially, Mr. Goodfriend, who has spent the bulk of his professional life in service to DISH, a pay-television provider that has spent decades attacking the retransmission regime established by Congress in 1992, set out to pursue through Locast what he had been unsuccessful in pursuing through lobbying of undermining the retransmission consent regime and the value of the broadcasters' copyrighted programming.  Terry Decl., Ex. 10 (Goodfriend Dep. 37:20-38:16); Terry Decl., Ex. 39 (Blum Dep. 27:2-5; 36:4-11).  Mr. Goodfriend spent years overseeing DISH's lobbying efforts, and ███

███████████████████████████████████████████████████████

█████████████.  Terry Decl., Ex. 10 (Goodfriend Dep. 54:10-55:2; 61:13-16); Terry Decl., Ex. 40; Terry Decl., Ex. 39 (Blum Dep. 19:14-18; 35:20-22).  Mr. Goodfriend remains on the DISH payroll today.  *Id.*; Terry Decl., Ex. 27 at ¶ 12.  Furthermore, Mr. Goodfriend identified early on that pay-television providers would "flock" to SFCNY if a blackout threatens, since, in the event of a blackout, pay-television providers can direct their subscribers to Locast to watch broadcast stations that are otherwise unavailable on their platforms—allowing the providers to hold out longer in retransmission-consent negotiations.  Terry Decl., Ex. 15; Terry Decl., Ex. 18 (Ross Dep. 48:12-50:3).  He was "confident that [he] could raise funds for the cost of operations and to mount a vigorous litigation defense because so many entities are frustrated with the restrictions of the current video market and would welcome some magnification of the law in this area."  Terry Decl., Ex. 20 at SFCNY-0000044167.  Mr. Goodfriend also has admitted "that Locast is a service which completely undermines the rationale of retransmission consent."  Terry Decl., Ex. 62; *see also* Terry Decl., Ex. 63 at SFCNY-000056397 (September 26, 2018 Landers email to

Kelly and Goodfriend, stating, "I think our top priority for the 4th quarter needs to be a plan to raise significant capital contributions from corporate donors who have a vested interest in seeing a platform like LOCAST exist and thrive.")

53.                Some broadcasters have worked with SFCNY and donated to the organization. Goodfriend Decl. at ¶ 25; *see also* Ex. 27 (Pledge Acknowledgment Letter to PCMTV).

**RESPONSE TO PARAGRAPH 53:**  The statement in the preceding Paragraph is disputed, and immaterial to the motion.  The statements within Goodfriend Exhibit 27 are hearsay within hearsay, and thus inadmissible.  Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 53 without citation to any admissible evidence.  Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Furthermore, the statement in the preceding Paragraph misleadingly asserts that "**[s]ome** broadcasters have worked with SFCNY and donated to the organization."  Mr. Goodfriend only includes one inadmissible document (Goodfriend Exhibit 27) regarding one broadcaster to support this statement, and one broadcaster does not equate to "some broadcasters."


54.                Plaintiffs' expert, Jack N. Goodman, testified that if consumers stop receiving their local broadcast television content from cable and Pay-TV platforms that have hundreds of additional channels of competing content (i.e., they cut the cord), then the broadcasters may benefit by facing fewer competitors for consumers' eyeballs. Ex. 23 (Transcript of Deposition of Jack N. Goodman on April 13, 2021 ("Goodman Depo. Tr.")) at 92:3-94:9; Goodfriend Decl. at ¶ 25.

**RESPONSE TO PARAGRAPH 54:**  The statement in the preceding Paragraph is disputed for many reasons, including the following, and immaterial to the motion.  It also misstates the record and the purported supporting evidence.  Mr. Goodman's cited testimony does not support the proposed fact in the preceding Paragraph, as nowhere in that cited testimony does Mr. Goodman testify that "broadcasters **may benefit** by facing fewer competitors for consumers' eyeballs."  Mr. Goodman testified that if a consumer cuts the cord, "the broadcaster may lose out on revenue that

comes in through retransmission consent fees" and "**may make up for it** because that consumer is self-limiting their options because they no longer have all of the cable stations." Goodfriend Ex. 23 at 93:5-14 (emphasis added). Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 54 and cites to Goodfriend Exhibit 23, the excerpt of Mr. Goodman's testimony, which does not support the proposed fact in the preceding Paragraph. Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

55.        Locast enables consumers to cut the cord. Goodfriend Decl. at ¶ 25; Ex. 24 (https://www.nbcrightnow.com/lifestyles/entertainment/thecord-cutter-s-guide-to-watching-broadcast-tv-for-free/article_def30577-8bae-59bc-a319-cf93e4266c7d.html); Ex. 25 (https://www.wsj.com/articles/streaming-vs-cable-how-to-save-money-watching-live-tv-11612101600); Ex. 26 (https://www.cordcuttersnews.com/how-to-watch-local-channels/).

**RESPONSE TO PARAGRAPH 55:** The statement in the preceding Paragraph is disputed for many reasons, including the following, and immaterial to the motion. The statements within Goodfriend Exhibits 24, 25, and 26 are hearsay within hearsay, and thus inadmissible. Mr. Goodfriend's declaration merely repeats the proposition in Paragraph 55 without citation to any admissible evidence. Mr. Goodfriend thus fails to comply with Southern District of New York Local Civil Rule 56.1(d), which requires that every statement must be supported by a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

Furthermore, the proposition that Locast enables consumers to cut the cord is rebutted by the record, which shows that Mr. Goodfriend understood that Locast would be beneficial to pay-television providers, who would in turn provide monetary support as well as integrate Locast into their systems. Mr. Goodfriend identified early on that pay-television providers would "flock" to SFCNY if a blackout threatens, since, in the event of a blackout, pay-television providers can direct

their subscribers to Locast to watch broadcast stations that are otherwise unavailable on their platforms—allowing the providers to hold out longer in retransmission-consent negotiations. Terry Decl, Ex. 15; Terry Decl., Ex. 18 (Ross Dep. 48:12-50:3). Locast is a "tool" that pay-television providers find "helpful for content negotiations." Terry Decl., Ex. 18 (Ross Dep. 48:12-19, 101:21-102:5); Terry Decl., Ex. 41 (Eisenach Dep. 158:9-161:14). Locast "prevent[s] customers from churning." Terry Decl., Ex. 18 (Ross Dep. 48:19). The availability of Locast also "help[ed] AT&T's bargaining position in [retransmission consent] negotiations." Terry Decl., Ex. 18 (Ross Dep. 49:5-50:2). In terms of DISH, it paid an outside vendor to integrate Locast's application into its Hopper platform. Terry Decl., Ex. 42 (Sadler Dep. 39:1-9; 41:17-42:5). █

████████████████████████████████████████████████████

████████████ Terry Decl., Ex. 39 (Blum Dep. 112:10-112:13); Terry Decl., Ex. 43 at DISH002190. ████████████████████████████████████████

████████ Terry Decl., Ex. 43 at DISH002193, DISH002199. In anticipation of a blackout involving broadcaster Tegna, DISH "accelerate[d] [its] testing of the Locast app because [DISH] would have had an additional core of customers that were interested in the . . . Locast app, more so than they normally would have been." Terry Decl., Ex. 42 (Sadler Dep. 85:1-7); Terry Decl., Exs. 44-46. When its retransmission consent negotiations with Nexstar failed in 2020 and DISH dropped Nexstar-owned television stations from its satellite system, DISH referred its subscribers to Locast to obtain access to those stations. Terry Decl., Ex. 39 (Blum Dep. 186:5-187:11). On May 30, 2019, AT&T "added the Locast interactive app to its DIRECTV and U-verse receivers." Terry Decl., Ex. 47. ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Terry Decl., Ex. 16. And in internal communications, an AT&T executive wrote the donation was

"meant to give [AT&T] some leverage during [its] [r]etrans negotiations" with CBS.  Terry Decl.,

Ex. 17; Terry Decl., Ex. 18 (Ross Dep. 98:18-102:5); *see also* Terry Decl., Ex. 18 (Ross Dep.

48:19) (Locast "prevent[s] customers from churning.").


      Dated: June 4, 2021

                /s/ Gerson A. Zweifach
                Gerson A. Zweifach
                Thomas G. Hentoff (*pro hac vice*)
                Joseph M. Terry (*pro hac vice*)
                Tian Huang (*pro hac vice*)
                Jean Ralph Fleurmont (*pro hac vice*)
                Angelica H. Nguyen

                WILLIAMS & CONNOLLY LLP
                725 Twelfth Street, N.W.
                Washington, DC 20005

                650 Fifth Avenue
                Suite 1500
                New York, NY 10019

                Tel: (202) 434-5000
                Fax: (202) 434-5029
                gzweifach@wc.com
                thentoff@wc.com
                jterry@wc.com
                thuang@wc.com
                jfleurmont@wc.com
                anguyen@wc.com

                *Attorneys for All Plaintiffs*

                Paul D. Clement (*pro hac vice*)
                Erin E. Murphy (*pro hac vice*)

                KIRKLAND & ELLIS LLP
                1301 Pennsylvania Avenue,
                N.W. Washington, DC 20004

                Tel: (202) 389-5000
                Fax: (202) 389-5200
                paul.clement@kirkland.com

erin.murphy@kirkland.com

*Attorneys for Plaintiffs Fox Television Stations, LLC and Fox Broadcasting Company, LLC*