# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., TWENTIETH CENTURY FOX FILM CORPORATION, CBS BROADCASTING INC., CBS STUDIOS INC., FOX TELEVISION STATIONS, LLC, FOX BROADCASTING COMPANY, LLC, NBCUNIVERSAL MEDIA, LLC, UNIVERSAL TELEVISION LLC, and OPEN 4 BUSINESS PRODUCTIONS, LLC, | Case No. 19-cv-7136-LLS |
| Plaintiffs and Counterclaim-Defendants, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| DAVID R. GOODFRIEND and SPORTS FANS COALITION NY, INC., | |
| Defendants and Counterclaim-Plaintiffs. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESS JEFFREY A. EISENACH, PH.D.

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ........................................................................ 1

II.  LEGAL STANDARD ................................................................................. 3

    A. The Court As Gatekeeper Under Daubert ......................................................... 3

    B. Courts Exclude Irrelevant Expert Testimony Under Federal Rules Of Evidence 702
       And 401 .......................................................................................... 4

    C. Courts May Exclude Expert Testimony If It Applies An Incorrect Standard .................... 5

    D. Even Relevant Testimony May Be Excluded under Rule 403 ................................... 6

III.  ARGUMENT ....................................................................................... 6

    A. Dr. Eisenach Applies The Wrong Legal Standard ............................................... 7

    B. Dr. Eisenach Applies An Improper Methodology In Discerning SFCNY's "Purpose" ...... 9

    C. Dr. Eisenach's Opinions Regarding The Legislative History And Purpose Of The
       Cable Act Are Not Helpful To The Trier Of Fact And Should Be Excluded ................... 12

    D. Any Arguably Probative Value Of Dr. Eisenach's Opinions Is Outweighed By The
       Dangers Of Confusion Of The Issues, Misleading The Jury, And Unfair Prejudice ........ 14

    E. Dr. Eisenach's Opinion That The Locast Service Is Not Free Is A Personal Opinion
       That Should Be Excluded ...................................................................... 15

IV.  CONCLUSION .................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiro LLC v. House of Cheatham, Inc.*,
    946 F. Supp. 2d 324 (S.D.N.Y. 2013)...........................................................................11, 16

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)................................................................................................4

*Associated Music Publishers v. Debs Mem'l Radio Fund, Inc.*,
    141 F.2d 852 (2d Cir. 1944)...............................................................................................8

*Bacchi v. Massachusetts Mutual Life Ins. Co.*,
    2016 WL 1170958 (D. Mass. Mar. 23, 2016)............................................................12, 14

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)..................................................................................................10

*In re Cellco P'ship*,
    663 F. Supp. 2d. 363 (S.D.N.Y. 2009).................................................................................8

*Daubert v. Merrell Dow Pharm. Inc.*,
    509 U.S. 579 (1993)...........................................................................................3, 4, 5, 6, 9

*Davis v. Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013)................................................................................4

*Debs Mem'l Radio Fund, Inc. v. Commissioner*,
    148 F.2d 948 (2d Cir. 1945)...........................................................................................8, 9

*DeRienzo v. Metro. Transp. Auth.*,
    694 F. Supp. 2d 229 (S.D.N.Y. 2010).................................................................................3

*DiBella v. Hopkins*,
    403 F.3d 102 (2d Cir. 2005)...............................................................................................4

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...........................................................................................................9

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)........................................................................................................4, 9

*Linde v. Arab Bank, PLC*,
    920 F. Supp. 2d 282 ........................................................................................................14

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005)...................................................................................4, 6, 9

*Noskowiak v. Bobst SA*,
  No. 04-C-0642, 2005 WL 2146073 ............................................................... 5-6

*In re Novatel Wireless Sec. Litig.*,
  846 F. Supp. 2d 1104 (S.D. Cal. 2012).........................................................5

*R.F.M.A.S., Inc. v. So*,
  748 F. Supp. 2d 244 (S.D.N.Y. 2010)..........................................................10

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004)...........................................................5

*Salas v. Carpenter*,
  980 F.2d 299 (5th Cir. 1992) ...............................................................11, 16

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2015) ...................................................................12

*Thomsen v. Kefalas*,
  15-CV-2668 (BCM), 2018 WL 1508735 (S.D.N.Y. Mar. 26, 2018) ....................14

*U.S. Gypsum Co. v. Lafarge N. Am. Inc.*,
  670 F. Supp. 2d 737 (N.D. Ill. 2009) ..........................................................5

*United States v. Aegis Therapies, Inc.*,
  No. CV 210-072, 2015 WL 1541491 (S.D. Ga. Mar. 31, 2015) ........................6

*Vanderbilt Mortg. & Fin., Inc. v. Flores*,
  No. CIV.A. C-09-312, 2010 WL 4595592 (S.D. Tex. Nov. 1, 2010) ...................5

*Zaccaro v. Shah*,
  746 F. Supp. 2d 508 (S.D.N.Y. 2010)...........................................................15

**Statutes**

17 U.S.C. § 110(4) .............................................................................................8

1976 Copyright Act...........................................................................................13

Communications Act Section 325 .....................................................................13

Copyright Act Section 111(a)(5) .....................................................................1, 15

**Other Authorities**

1992 Cable Act .................................................................................................2, 7

Federal Rule of Evidence 401 ................................................................................................4, 5

Federal Rule of Evidence 403 ................................................................................................6, 14

Federal Rule of Evidence 702 ................................................................................................3, 4, 5, 9

Defendants David R. Goodfriend and Sports Fans Coalition NY, Inc. ("Defendants") respectfully submit this Memorandum of Law in Support of their Motion to Exclude Plaintiffs' Expert Witness Jeffrey A. Eisenach, Ph.D.

## I.   PRELIMINARY STATEMENT

Dr. Eisenach's testimony should be excluded because it is not relevant to the issues to be decided in this trial.  The parties have agreed that this portion of the trial shall be limited solely to a determination of whether Sports Fans Coalition NY, Inc.'s ("SFCNY") secondary transmissions fall within the ambit of Section 111(a)(5) of the Copyright Act.  *See generally* Ex. 16[1] (Case-Limiting Agreement).  That section provides that retransmissions do not infringe copyright if they are:

(1)   "secondary transmission[s];"
(2)   "not made by a cable system;"
(3)   "made by a . . . nonprofit organization;"
(4)   "without any purpose of direct or indirect commercial advantage;" and
(5)   "without charge to the recipients other than assessments necessary to defray the actual and reasonable costs of operating the service."

17 U.S.C. § 111(a)(5).  Only issues relevant to a determination of whether SFCNY's secondary transmissions fall under Section 111(a)(5) are relevant to issues to be decided in this trial.

Dr. Eisenach does not purport to offer any testimony related to whether the Locast service makes "secondary transmissions" as that term is used in Section 111(a)(5).  Ex. 8 (Eisenach Dep. Tr.) at 50:2-12; 54:16-55:3; *see generally* Ex. 6 (Eisenach Report).  Nor does he offer any testimony related to whether SFCNY operates a cable system. Ex. 8 (Eisenach Dep. Tr.) at 55:19-56:1.  Further, Dr. Eisenach has admitted that he offers no testimony regarding the question of whether SFCNY is a legitimate nonprofit organization under federal or state law. *Id.* 59:21-60:15;

---

[1] All Exhibits ("Ex.") are attached to the Declaration of Laura B. Najemy filed herewith.

*see generally* Ex. 6 (Eisenach Report).  Dr. Eisenach only purports to offer testimony related to the fourth and fifth elements under 111(a)(5).  *See generally*, Ex. 6 (Eisenach Report).

Even to the extent that Dr. Eisenach claims to offer testimony related to the fourth and fifth elements, his testimony should be excluded because it is neither relevant to those issues nor helpful to the trier of fact, and instead is likely to confuse the jury.  Dr. Eisenach's expert report is more than 100 pages long, and can be roughly divided into four categories of anticipated testimony:  (1) more than twenty-five pages of proffered background testimony covering academic discussions of economies of scale and scope, multi-sided markets, bargaining theory, the history of 1992 Cable Act, general historical trends in video distribution, and the importance of retransmission consent revenue for broadcasters; (2) more than twenty pages of proffered testimony regarding the sources of funding that SFCNY has relied upon to fulfill its mission; (3) more than thirty-five pages of proffered testimony regarding the impact that SFCNY's Locast service **might possibly** have on retransmission consent negotiations and both MVPD and vMVPD entities; and (4) seven pages of testimony explaining why Dr. Eisenach does not personally view SFCNY to be offering the Locast service for "free" and why he does not think the Locast service is helpful to the public.  None of this testimony would be helpful to the jury in determining whether SFCNY has a commercial purpose or whether it "charges" users.

For example, the testimony that Dr. Eisenach offers that is purportedly related to the question of whether SFCNY has a purpose of direct or indirect commercial advantage actually has nothing to do with that issue.  Instead, the testimony relates solely to the manner in which the Plaintiff broadcasters make money from retransmission consent negotiations and the history of the FCC regulations that led to the retransmission consent regime.  It also contains impermissible legal testimony about issues of congressional intent behind certain aspects of the regulations.  None of

this is relevant to the question of whether SFCNY has a commercial purpose and will merely confuse the jury as to the issues that are actually relevant to their inquiry.

Similarly, Dr. Eisenach's testimony regarding whether SFCNY "charges" users for the Locast service would not be helpful to the jury.  The parties do not dispute the manner in which the Locast service operates, nor do they dispute the nature of the donation requests that are made. Dr. Eisenach has no particular "expertise" relevant to the jury's view of the Locast service's operation.  He claims to be an expert in "the economic analysis of competition, intellectual property, regulatory and consumer protection issues."  Ex. 6 (Eisenach Report) at ¶ 5.  His claimed expertise is thus completely unrelated to the issues the jury will consider, and his opinion on this issue is a personal opinion, not within the proper ambit of expert testimony.[2]

## II.   LEGAL STANDARD

### A.  The Court As Gatekeeper Under Daubert

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge ***will help the trier of fact to understand the evidence or to determine a fact in issue***; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702[3]; *see also Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 591 (1993).

The party seeking to admit the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592, n.10; *DeRienzo v.*

---

[2] To the extent Dr. Eisenach purports to offer the same or similar opinions in his rebuttal report, any such opinions should also be excluded for the reasons stated herein.

[3] Unless otherwise indicated, all internal citations and quotations have been omitted and all emphasis has been added.

*Metro. Transp. Auth.*, 694 F. Supp. 2d 229, 235 (S.D.N.Y. 2010).  In their "gatekeeping" function, courts scrutinize expert testimony and ensure that it is relevant, reliable, admissible, and helpful to the trier of fact.  *Daubert*, 509 U.S. at 590-91.  These requirements guard against admission of an expert's "subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, and ensure that expert testimony is "helpful to the jury in comprehending and deciding issues beyond the understanding of a layperson."  *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005).  Courts play a gatekeeping role regardless of whether the expert testimony is scientific, technical, or more general "experience-based" testimony.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999); *see also Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).  This role requires more than "taking the expert's word for it," and courts have latitude to decide "*how* to test an expert's reliability."  Fed. R. Evid. 702, Advisory Committee's Note (2000 amendments); *Kumho Tire*, 526 U.S. at 152 (emphasis in original).

**B. Courts Exclude Irrelevant Expert Testimony Under Federal Rules Of Evidence 702 And 401**

Expert testimony is only admissible if it will assist the trier of fact in understanding the evidence or determining a fact in question.  Fed. R. Evid. 702.  This inquiry "goes primarily to relevance," as "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591.  "It is black letter law that [u]nder *Daubert*, trial judges are charged with ensuring that expert testimony . . .  is relevant to the task at hand."  *Davis v. Carroll*, 937 F. Supp. 2d 390, 420 (S.D.N.Y. 2013).

When determining the relevance of expert testimony, "the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *Amorgianos*

4

*v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002); *see also* Fed. R. Evid. 401. However, Rule 702's "helpfulness requirement . . . goes beyond mere relevance . . . because it also requires expert testimony to have a valid connection to the pertinent inquiry." *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004). In *Daubert*, the Court referred to this connection as "fit" between the offered expert opinion and fact in issue. *Daubert*, 509 U.S. at 591; *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 544 (excluding expert testimony that was neither reliable nor helpful "in determining any factual dispute in this case").

### C. Courts May Exclude Expert Testimony If It Applies An Incorrect Standard

Courts routinely exclude expert testimony when an expert has applied an incorrect or inappropriate legal standard in their opinion. *See In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1107-08 (S.D. Cal. 2012) (expert's testimony regarding loss causation for investors' securities fraud claim was not admissible since expert employed incorrect legal standard in undertaking his loss causation analysis on behalf of corporation and corporate officers); *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 745 (N.D. Ill. 2009) ("Having applied the incorrect legal standard in formulating damages under the CFAA, Davis will not be permitted to testify on that topic."). This makes sense because expert testimony relying on the wrong legal standard may confuse the trier of fact, which is the exact opposite of what expert witnesses are meant to do. *See Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. CIV.A. C-09-312, 2010 WL 4595592, at *6 (S.D. Tex. Nov. 1, 2010) (excluding portions of expert's testimony for applying an incorrect legal standard where such opinions were likely to confuse the jury and result in the application of an incorrect standard). If an expert does apply an incorrect standard or framework in their testimony, it may be grounds for exclusion as "[p]art of the Court's gatekeeping function." *Noskowiak v. Bobst SA*, No. 04-C-0642, 2005 WL 2146073, at *5 (holding that expert testimony

applying an incorrect legal standard may be excluded because "[an expert's] testimony should not be a source of confusion by invoking a legal standard, which entails a different set of issues than those operative in the present controversy."); *see also United States v. Aegis Therapies, Inc.*, No. CV 210-072, 2015 WL 1541491, *9 (S.D. Ga. Mar. 31, 2015) (excluding expert testimony where the expert's opinions relied on "an incorrect and misleading standard").

### D.  Even Relevant Testimony May Be Excluded under Rule 403

Expert testimony is also "subject to Rule 403, and" even relevant testimony "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely*, 414 F.3d at 397; Fed. R. Evid. 403. Indeed, courts have explained that the Rule 403 analysis is "particularly important in the context of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397; *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.").

## III.   ARGUMENT

Dr. Eisenach's core opinion is that SFCNY has a purpose of direct or indirect commercial advantage because it may benefit MVPDs vis-à-vis network broadcasters when there is an impasse in retransmission consent negotiations.  Ex. 6 (Eisenach Report) at ¶ 16.  This core opinion (as well as the underlying subsidiary opinions he claims support this conclusion) should be excluded for multiple reasons.  *First*, the opinion is irrelevant and based on the wrong legal standard because whether SFCNY's Locast service might benefit MVPDs in certain limited circumstances is irrelevant to the question of whether SFCNY itself has a purpose of direct or indirect commercial

benefit.  *Second*, the opinion applies an inappropriate methodology in that it is based on Dr. Eisenach's *ipse dixit* view that if MVPDs **might** potentially benefit from the existence of the Locast service, then that **must be** SFCNY's purpose in providing the Locast service.  Dr. Eisenach employs no methodology based on any expertise to draw such conclusions.  *Third*, the opinion purports to be based, at least in part, on Dr. Eisenach's analysis of congressional intent behind the 1992 Cable Act.  Setting aside that fact that the Cable Act is not a piece of legislation that is at issue in this case, testimony interpreting statutes or purporting to divine congressional intent is not appropriate for an expert as it invades the purview of the Court in instructing the jury regarding the law.  *Finally*, to the extent that there were any relevance to Dr. Eisenach's core opinion that the existence of the Locast service might be a benefit to certain MVPDs in some limited circumstances (there is not), nothing about that opinion would justify more than one hundred pages of anticipated expert testimony exploring the complex academic basis for bargaining theory and a historical review of the retransmission consent regime for cable and satellite companies.  Such voluminous and tangential testimony would merely serve to waste time and divert the jury's attention from the issues that are actually relevant to this case.

## A.  Dr. Eisenach Applies The Wrong Legal Standard

Dr. Eisenach's fundamental opinion is that SFCNY must have a purpose of direct or indirect commercial advantage because, in his view, the existence of the Locast service may benefit certain MVPDs in limited circumstances involving retransmission consent negotiations with the broadcasters.  Based on his view that SFCNY's Locast service provides some commercial benefit to third parties in this way, Dr. Eisenach opines, it must be viewed as having a commercial purpose.

But this opinion muddles the distinction between "commercial purpose" and "commercial activity," and thus applies the wrong legal standard in opining on whether SFCNY has a purpose

of direct or indirect commercial advantage.  Indeed, this court has already held, in construing that exact phrase, that the potential commercial benefit of an unrelated third party based on the performance of a work does not suggest that the party making the performance has "any purpose of direct or indirect commercial advantage."  In *In re Cellco P'ship,* 663 F. Supp. 2d. 363, 374-75 (S.D.N.Y. 2009), this court was urged that the playing of ringtones on cellular phones by Verizon customers who had downloaded those ringtones from Verizon could not qualify for an exemption under 17 U.S.C. § 110(4) because the playing of the ringtones provided a commercial benefit to Verizon, and therefore did not meet the requirement of having been made "without any purpose of direct or indirect commercial advantage."   This court disagreed, finding that even if some benefit was provided to Verizon (an unrelated third party), that did not qualify as a "purpose of direct or indirect commercial advantage" to the consumer making the performance.  *Id.* at 375.  ("The only commercial advantage that ASCAP identifies as being associated with the playing of a ringtone is a commercial benefit to Verizon, specifically, the possibility that others may be encouraged to purchase ringtones when they hear ringtones. A potential commercial advantage to Verizon, however, does not suggest that its customers may not qualify for the § 110(4) exemption.").

The same conclusion can be drawn from the Second Circuit's decision in *Debs Memorial Radio Fund, Inc. v. Commissioner,* 148 F.2d 948 (2d Cir. 1945) ("*Debs II*").  In that case, the court was called on to determine whether the nonprofit petitioner was being operated with any purpose other than a charitable purpose, such that it could be denied tax exempt status.  *Id.* at 949.  The petitioner was a nonprofit radio station that sold some commercial airtime to support its activities. *Id.* at 949-50.  In a prior decision, only a year before, the Second Circuit had noted that the sale of that commercial airtime provided third party advertisers with a commercial benefit by allowing them to reach consumers through their advertising.  *Associated Music Publishers v. Debs Mem'l*

*Radio Fund, Inc.*, 141 F.2d 852 (2d Cir. 1944) ("*Debs I*").  Notwithstanding this prior finding, the court in *Debs II* held that the nonprofit could not be deemed to have any purpose beyond a charitable purpose, and upheld its tax exempt status.  *Debs II* at 952.

Because Dr. Eisenach's core opinion bases his conclusion that SFCNY has a purpose of direct or indirect commercial benefit solely on claimed benefits provided to third-party MVPDs, his opinions are irrelevant to the key issues in dispute in this case and thus not helpful to the finder of fact.  *Daubert*, 509 U.S. at 590-91; *Kumho Tire*, 526 U.S. at 152-153; *Nimely*, 414 F.3d at 397. They should be excluded as a result.

**B.  Dr. Eisenach Applies An Improper Methodology In Discerning SFCNY's "Purpose"**

Even if purported commercial benefits to MVPDs were relevant to the question of whether SFCNY has any purpose of direct or indirect commercial advantage, Dr. Eisenach's testimony that this is, in fact, SFCNY's purpose is without any basis in any methodology related to his expertise. As a result, this testimony should be excluded.

Expert testimony is admissible only if the methodology employed by the expert is reliable. *Kumho Tire*, 526 U.S. at 152-153.  This tenet applies regardless of whether the expert is presenting scientific or experience-based testimony.  *Id.*  Expert testimony must be "the product of reliable principles and methods."  Fed. R. Evid. 702(c).  Without a reliable foundation for the expert's methodology, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Kumho Tire*, 526 U.S. at 157 ("Of course, Carlson himself claimed that his method was accurate, but, as we pointed out in *Joiner*, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  When assessing

whether an expert's methodology is reliable, courts must determine "not only whether an expert's methodology is reliable for some purposes, but whether it is a reliable way to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 248 (S.D.N.Y. 2010). Expert testimony "should be excluded" if it is "merely subjective belief or unsupported speculation." *Id.*; *see also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is speculative or conjectural").

Dr. Eisenach improperly testifies not only as to the impact that SFCNY's Locast service might have on retransmission consent negotiations, he goes further and testifies without any basis in his expertise that this impact is the very ***purpose*** of SFCNY. *See* Ex. 6 (Eisenach Report) at ¶ 16 ("The evidence demonstrates that ***one of the main purposes of Locast is to generate commercial benefits for MVPDs***, mainly by reducing losses during bargaining impasses, thus enhancing their bargaining leverage in the market for retransmission consent compensation and thereby generating reciprocal commercial benefits to Locast."). As noted above, the question of whether third-party MVPDs benefit from the existence of the Locast service is irrelevant to the question of SFCNY's purpose. Even if it were relevant, however, Dr. Eisenach has no relevant expertise to draw the conclusion that such an impact evinces SFCNY's ***purpose*** in operating the Locast service, rather than merely the effects of the service.

Dr. Eisenach has admitted that he is not a psychologist. Ex. 8 (Eisenach Dep. Tr.) at 50:14-17. He has never discussed SFCNY or the Locast service with Mr. Goodfriend or any of the board members of SFCNY, and he does not claim any expertise that would allow him to testify about the purpose behind the launch and operation of Locast. *Id.* at 50:18-51:18. The undisputed evidence shows that all revenue that has been collected by SFCNY has been used exclusively for the

operation of the service and has gone to no private individuals or parties related to SFCNY.  Ex. 11 (Nachtwey Dep. Tr.) at 99:14-100:3, 106:18-107:17, 123:19-124:7.  The undisputed evidence further shows that no MVPD was involved in or consulted regarding the launch and creation of SFCNY or the Locast service.  Ex. 8 (Eisenach Dep. Tr.) at 114:16-115:17; 119:4-15; 126:11-18; 131:9-133:13.  No MVPD provided funding to SFCNY for the first eighteen months of its operation, and DISH Network ("DISH") (which Dr. Eisenach claims to be a primary beneficiary of the Locast service) has never given any funding to SFCNY.  *Id.* at 115:13-17, 149:2-8; Ex. 6 (Eisenach Report) at ¶¶ 81, 86, 92; Declaration of David R. Goodfriend in Support of Defendants' Motion for Summary Judgment, ¶ 46, ECF No. 192; Ex. 18 (Blum Dep. Tr.) at 69:11-70:5.  Indeed, while Mr. Goodfriend has been a lobbyist for DISH for the past decade, the undisputed evidence shows that DISH has paid him less for his lobbying services since SFCNY launched the Locast service, and that DISH's Chairman, Charlie Ergen, has expressed his belief that the Locast service is harmful to DISH's interests in that it will likely encourage cord-cutting, thereby harming DISH's subscriptions.  Ex. 17 (Lobbying Reports for DISH Network); Declaration of David R. Goodfriend in Support of Defendants' Motion for Summary Judgment, ¶ 47, ECF No. 192.

In short, Dr. Eisenach's testimony that the claimed impact of the Locast service on retransmission consent negotiations illuminates SFCNY's purpose in starting the service is nothing more than improper attorney argument cloaked as expert testimony and should be excluded.  *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 332 (S.D.N.Y. 2013) (considering expert testimony only as "attorney argument, and not as evidence" where it "simply dress[ed] up [the party's] view of the underlying factual evidence in expert garb"); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.").

**C. Dr. Eisenach's Opinions Regarding The Legislative History And Purpose Of The Cable Act Are Not Helpful To The Trier Of Fact And Should Be Excluded**

It is the Court's role to instruct the jury on legal principles and the jury's role to apply those principles and reach an ultimate conclusion. An expert impermissibly usurps those roles when he testifies to the meaning of the law, legislative history, or Congressional intent. *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2015); *Bacchi v. Massachusetts Mutual Life Ins. Co.*, 2016 WL 1170958, at *3-4 (D. Mass. Mar. 23, 2016). That is exactly what Dr. Eisenach does in sections of his report. For example, Dr. Eisenach provides opinions stating that:

- "***Congress foresaw*** that cable television would grow into a significant competitor to the broadcast networks, competing for audiences, advertising and programming and that it would do so using the broadcasters' programming. ***Congress recognized*** that allowing cable companies to use broadcast content without compensation would place broadcasters at a competitive disadvantage and distort the marketplace. The retransmission consent regime it put in place in 1992 was ***specifically intended*** to give broadcasters the right to be compensated for their investments in programming content and to create a level, market based competitive playing field.";

- "***The changes Congress anticipated have indeed come to pass.*** Competition from cable operators and, more recently, over the top ("OTT") providers like Amazon and Netflix have raised the costs of acquiring and producing broadcast programming, reduced the ability of broadcasters to raise revenues through advertising, and increased the value of broadcast programming to MVPDs and vMVPDs.";

- "Section III describes the statutory basis for retransmission consent as set forth in the 1992 Cable Act, ***focusing on the economic and market developments that led Congress to establish the current retransmission consent regime***; and I show that the video marketplace has evolved ***in much the way Congress anticipated***.";

- "Evidence demonstrates that ***what Congress anticipated 30 years ago with 1992 Cable Act*** is even truer today: broadcasters face increasing costs to obtain the rights to popular programming (including sports programming, such as the NFL, NBA and the Olympics), and increasing costs associated with producing original.";

- "I discuss the facts ***that led Congress to conclude*** that broadcasters' inability to seek compensation constituted a "distortion in the video marketplace," and how it sought to address that distortion by passing the 1992 Cable Act which created retransmission consent.";

- "As cable continued to grow rapidly in the late 1980s and early 1990s, *Congress became concerned* that allowing cable operators to use broadcasters' content without paying was tilting the competitive playing field in favor of cable and against broadcasters. In deliberations leading up to passage of the 1992 Cable Act, *[Congress] concluded* that the absence of a retransmission consent requirement had created a "distortion in the video marketplace that threaten[ed] the future of over-the-air broadcasting [by supporting] a system under which broadcasters in effect subsidize the establishment of their chief competitors."  Moreover, *[Congress] found* that the end of the must-carry requirement in 1985 had led to the "demise of local television.";

- "In passing the Cable Act, *Congress specifically recognized* that the market for broadcast programming had changed dramatically.  The Senate report accompanying the bill noted, for example, that when the FCC originally interpreted Section 325 of the Communications Act to allow free retransmission by cable (in 1959), "cable systems had few channels and were limited to an antenna function of improving reception of nearby broadcast signals," so that the FCC's "interpretation had little practical consequences [sic] and did not unreasonably disrupt the rights that broadcasters possess in their signals.";

- "In passing the Cable Act, *Congress recognized* that satellite operators were treated differently from cable operators in the 1976 Copyright Act, and thus did not impose retransmission consent on DBS.";

- "The effect of retransmission consent, the report concluded, would be to "establish a marketplace for the disposition of the rights to retransmit broadcast signals" without "dictat[ing] the outcome of the ensuing marketplace negotiations" – negotiations which, *Congress recognized*, might result in monetary compensation, in-kind compensation, or no compensation at all.36 *Congress also believed* restoration of the must-carry obligation was essential to ensure a level playing field going forward.";

- "In other words, *Congress believed* it was likely that cable would continue to grow and to pose a competitive threat to local broadcasters, and saw retransmission consent as essential to restoring a level competitive playing field.";

- "As I explain immediately below, *Congress' predictions* about the growing intensity of competition between broadcasters and MVPDs for programming, audiences and advertising have been borne out by the facts.";

- "The economic trends *anticipated by Congress* when it passed the 1992 Cable Act have continued and accelerated in recent years.";

- "First, *as predicted by Congress*, MVPDs continued to expand their share of the viewing audience.";

- ***"This is precisely what Congress envisioned*** when it passed retransmission consent

in 1992."

Ex. 6 (Eisenach Report) at ¶¶ 16, 18, 28, 33, 34 n.33, 35-40, 61 (bolded emphasis added).

These opinions all invade the Court's province by opining on Congressional intent, the meaning of legislative history, and statutory purpose. *See, e.g.*, *Thomsen v. Kefalas*, 15-CV-2668 (BCM), 2018 WL 1508735, at *18 (S.D.N.Y. Mar. 26, 2018) (excluding expert declaration that primarily "consists of a series of assertions as to how the Act should be interpreted and how it should be applied in this case," explaining that "[t]he operative provisions of the [declaration] consist entirely of prohibited legal opinion and legal conclusions, and for that reason will be disregarded"); *see also Bacchi*, 2016 WL 1170958, at *3-4 (concluding that an expert opinion on legislative history that was offered to "explain the proper interpretation" of a statute was improper and striking the expert's report).   Mr. Eisenach's opinions regarding legislative history and Congressional intent usurp the Court's role and should therefore be excluded.

### D.  Any Arguably Probative Value Of Dr. Eisenach's Opinions Is Outweighed By The Dangers Of Confusion Of The Issues, Misleading The Jury, And Unfair Prejudice

Courts should independently scrutinize expert testimony under Federal Rule of Evidence 403.  And if the testimony's probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, courts should exclude it.  *See, e.g.*, *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 286-87 ("even if it could be said that some statements in some of the reports reference matters of marginal relevance to the discrete issues for trial in this case, the reports are so far afield from the specific allegations and statutory elements at issue that there is an appreciable risk of prejudice, jury confusion, and misleading the jury. The trial, anticipated to be lengthy, cannot be burdened with extraneous issues").

The significant risk of confusing and misleading the jury and prejudicing Defendants substantially outweighs any arguable probative value of Dr. Eisenach's report and testimony.  As

discussed, as offered purportedly in relation to the question of SFCNY's purpose, Dr. Eisenach's core opinion is that MVPDs benefit from the existence of the Locast service. His supporting opinions regard the history of cable television, the retransmission consent regime, and impermissible opinions regarding legislative history and Congressional purpose. None of these opinions relate to the application of Section 111(a)(5) of the Copyright Act. If these opinions have any probative value, it is highly attenuated from the key issues of fact in this case.

On the other hand, the more than 100 pages of planned testimony regarding the retransmission consent regime runs a high risk of confusing and misleading the jury. Dr. Eisenach's testimony would require the jury to sift through the jargon of a highly specialized industry and consider a witness's interpretation of complex communications law and regulations that are not even relevant to the key issues of fact and law to extract any probative value—assuming there is any to be found. This testimony would do nothing but confuse and distract the jury from the key factual issues in this case whether Defendants' conduct falls within the parameters of 17 U.S.C. § 111(a)(5). Even relevant evidence should be excluded under these circumstances. *See, e.g.*, *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 518 (S.D.N.Y. 2010) (determining that expert testimony's minimal probative value "would be substantially outweighed by the potential to confuse the jury and for unfair prejudice and is excluded").

### E. Dr. Eisenach's Opinion That The Locast Service Is Not Free Is A Personal Opinion That Should Be Excluded

Finally, Dr. Eisenach's opinion that the Locast service is not "free" should be excluded because it is not based on any expertise that Dr. Eisenach claims, and is merely personal opinion that is unhelpful to the jury.

The parties do not dispute the manner in which the Locast service operates, nor do they dispute the nature of the donation requests that are made. Dr. Eisenach has no particular

"expertise" relevant to the jury's view of the Locast service's operation.  He claims to be an expert in "the economic analysis of competition, intellectual property, regulatory and consumer protection issues."  Ex. 6 (Eisenach Report) at ¶ 5.  His claimed expertise is thus completely unrelated to the issues the jury will consider, and his opinion on this issue is a personal opinion, not within the proper ambit of expert testimony.  Indeed, to the extent that Plaintiffs will look to the jury to draw this conclusion, it should be presented in closing arguments, not masked as expert testimony.  *Akiro*, 946 F. Supp. 2d at 332 (considering expert testimony only as "attorney argument, and not as evidence" where it "simply dress[ed] up [the party's] view of the underlying factual evidence in expert garb"); *Salas*, 980 F.2d at 305 ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.").

## IV.    CONCLUSION

Because the opinions described above in Dr. Eisenach's reports are irrelevant and not helpful to the trier of fact, are based on the wrong legal standard, apply an inappropriate methodology, and any arguably probative value is outweighed by the risk of prejudice, confusing the issues, and misleading the jury, the Court should grant in its entirety Defendants' motion to exclude Dr. Eisenach's opinions and testimony.

Dated: July 1, 2021                                    Respectfully submitted,


                                                       */s/ R. David Hosp*
                                                       R. David Hosp
                                                       Mark S. Puzella (admitted pro hac vice)
                                                       Sheryl Koval Garko (admitted pro hac vice)
                                                       Caroline K. Simons
                                                       Laura B. Najemy (admitted pro hac vice)
                                                       ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                       222 Berkeley Street, Suite 2000
                                                       Boston, MA 02116

Tel: (617) 880-1800
dhosp@orrick.com
mpuzella@orrick.com
sgarko@orrick.com
csimons@orrick.com
lnajemy@orrick.com

Elizabeth E. Brenckman
Lindsay Rindskopf
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: (212) 506-5000
ebrenckman@orrick.com
lrindskopf@orrick.com

Shane D. Anderson (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
sanderson@orrick.com

Erin M.B. Leach (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main St. Suite 1100
Irvine, CA 92614
Tel: (949) 567-6700
eleach@orrick.com

Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Tel: (415) 436-9333
mitch@eff.org

*Counsel for Defendants and Counterclaim-Plaintiffs David R. Goodfriend and Sports Fans Coalition NY, Inc.*