## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AMERICAN BROADCASTING
COMPANIES, INC., DISNEY
ENTERPRISES, INC., TWENTIETH
CENTURY FOX FILM CORPORATION,
CBS BROADCASTING INC., CBS
STUDIOS INC., FOX TELEVISION
STATIONS, LLC, FOX BROADCASTING
COMPANY, LLC, NBCUNIVERSAL
MEDIA, LLC, UNIVERSAL TELEVISION
LLC, and OPEN 4 BUSINESS
PRODUCTIONS, LLC,

        Plaintiffs and
        Counterclaim-Defendants,

    v.

DAVID R. GOODFRIEND and SPORTS
FANS COALITION NY, INC.,

        Defendants and
        Counterclaim-Plaintiffs.

Case No. 19-cv-7136-LLS

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DEFENDANTS' EXPERT ROLAND S. MARTIN

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 1

II.     ARGUMENT ....................................................................................................... 4

    A.   Plaintiffs' Irrelevant Ad Hominem Attacks on Mr. Martin Are Inappropriate................... 4

    B.   Plaintiffs Misrepresent Mr. Martin's Opinions and Incorrectly Assert That Mr. Martin Offers Opinions About the Signal Strength of Broadcast Transmissions........................... 6

    C.   Mr. Martin's Opinions and Testimony Are Relevant to Key Issues of Fact. .................... 10

    D.   Plaintiffs' Disagreements with Mr. Martin's Conclusions Go to The Weight of His Testimony, Not Its Admissibility..................................................................... 12

    E.   The Probative Value of Mr. Martin's Opinions Outweighs Any Alleged Danger of Unfair Prejudice. .................................................................................... 13

III.    CONCLUSION ................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Daubert v. Merrell Dow Pharms., Inc,*
  509 U.S. 579 (1993)............................................................................................11, 12

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
  97 F. Supp. 3d 485 (S.D.N.Y. 2015)...............................................................8

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995)............................................................................8

*Pearlman v. Cablevisions Sys. Corp.*,
  No. 10-CV-4992(JS)(GRB), 2015 WL 8481879 (E.D.N.Y. Dec. 8, 2015).........................8, 11

*United States v. Doe*,
  903 F.2d 16 (D.C. Cir. 1990)...........................................................................15

*United States v. Jones*,
  No. 16-cr-0553 (AJN), 2018 WL 1115778 (S.D.N.Y. Feb. 27, 2018)...................................11

**Statutes**

17 U.S.C. § 111(a)(5)...........................................................................................10

26 U.S.C. § 501(c)(3)...........................................................................................10

**Other Authorities**

26 C.F.R. § 1.501(c)(3)........................................................................................10

Fed. R. Evid. 401 ...............................................................................................2

Fed. R. Evid. 702 .............................................................................................7, 8

132 Cong. Rec. 2300-03 .......................................................................................2

138 Cong. Rec. 639-01 ........................................................................................2

## I.     INTRODUCTION

Defendants David R. Goodfriend ("Mr. Goodfriend") and Sports Fans Coalition NY, Inc. ("SFCNY") (together "Defendants") oppose Plaintiffs' Motion to Exclude the Opinions and Testimony of Defendants' Expert Roland S. Martin ("Pls.' Mot.").

To the extent that this case is not decided on summary judgment, one of the central questions that the jury will have to determine at trial is the nature of SFCNY's Locast service's purpose.   Plaintiffs have argued that the Locast service's primary purpose is to generate commercial advantages for Mr. Goodfriend and for multichannel video programming distributor ("MVPD") interests.   *See, e.g.*, Mem. in Support of Pls.' Mot. to Dismiss Defs.' Counterclaims, ECF No. 38, 24 (". . . Locast is operating for the commercial benefit of itself (securing distribution and data), its founder (through his lobbying fees because Locast is serving the strategic interests of his clients), and its financial patrons.").[1]   Indeed, Plaintiffs have gone further and argued that SFCNY has ***no legitimate public interest purpose*** at all.   *See* Pls.' Opp'n to Def. David R. Goodfriend's Mot. for Summ. J., ECF No. 240, 10 (arguing that SFCNY is not "operat[ing] . . . in a manner consistent with the public purpose claimed in [sic] tax filings.   Indeed, the evidence entirely contradicts Mr. Goodfriend's claim that SFCNY is solving a 'public interest problem.'"); Pls.' Opp'n to Defs.' Mot. for Summ. J., ECF No. 237, 4; (". . . Locast is not faithful to its stated purposes of benefiting consumers unable to afford pay-television, helping rural households unable to receive over-the-air signals, and ensuring availability of public-interest information").   Notwithstanding Plaintiffs' arguments that SFCNY serves no public interest, Plaintiffs now seek to exclude competent expert testimony about the manner in which the Locast service advances the

---

[1] Unless otherwise indicated, all internal citations and quotations have been omitted and all emphasis added.

public interest because they contend that this testimony fails to have "any connection to the contested issues of this case." Pls.' Mot. 12. Plaintiffs' position is the height of gamesmanship.

To be clear, even if Plaintiffs had not gone so far as to argue expressly that SFCNY has ***no public purpose whatsoever***, testimony about SFCNY's strong charitable purposes is still clearly relevant. The presence of those charitable purposes makes it more likely that any economic impact Plaintiffs claim the Locast service has on Plaintiffs or third parties is not part of SFCNY's purpose in operating the Locast service—rather it would merely be the effect of serving the charitable purposes. Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Plaintiffs also argue that Mr. Martin's observation that over-the-air ("OTA") broadcast signals cannot be received by the entire population, and many areas where there are reception issues are areas with high concentrations of minorities both in inner cities and in rural communities, should be excluded because he does not have technical expertise related to OTA signal strength. Pls.' Mot. 5-10. As detailed below, however, Mr. Martin does not offer any expert opinion on signal strength. The observation that there are reception issues is a background fact that has been acknowledged by Plaintiffs, by Congress, and by the FCC, and is not genuinely or credibly disputed in this case. *See, e.g.*, 132 Cong. Rec. 2300-03 (Mr. Clinger) (1986) (statement of Mr. Clinger) ("Residents or [sic] rural areas, where reception of regular television broadcast signals is poor at best and impossible at worst, have turned to the backyard satellite dish as their only means of receiving television programming."); 138 Cong. Rec. 639-01 (Jan. 30, 1992) (statement of Sen. Seymour) ("Many consumers who live in rural, or mountainous areas with poor over-the-air reception do not have the ability to receive network programming beyond the cable wire.");

Rindskopf Ex. 8[2] (FCC, DTV Reception Maps) ("Actual signal strength may vary based on a variety of factors, including, but not limited to, building construction, neighboring buildings and trees, weather, and specific reception hardware. Your signal strength may be significantly lower in extremely hilly areas."); Rindskopf Ex. 4 (Leone Dep. Tr.) at 39:13-40:18, 81:22-82:8 (testifying that he personally has received a pixelated signal and agreeing that mountains, valleys, and physical impediments could impact customers' abilities to access the OTA signal); Rindskopf Ex. 5 (Morris Dep. Tr.) at 110:13-112:7 (agreeing that "geographic anomalies," solar flares, an antenna's location, and weather all impact reception); Rindskopf Ex. 6 (Corn-Revere Dep. Tr.) at 83:22-84:17 (agreeing that weather and "urban canyons" can affect broadcast signal reception). It informs Mr. Martin's opinion regarding the impact of SFCNY's Locast service on minority communities, but is not a matter upon which Mr. Martin intends to offer technical expert testimony.

Finally, Plaintiffs argue that Mr. Martin's description of the need for more access to programming tailored to underserved populations because the entertainment industry has traditionally failed to adequately provide for such communities should be excluded because *that fact* is too prejudicial. Pls.' Mot. 12-15. But Plaintiffs themselves acknowledge that this need exists and has been poorly served in the past. Indeed, they conduct media blitzes to tout their own efforts to address this problem. This is not a controversial or disputed point of fact; it is readily admitted by Plaintiffs and is part of the problem that the increased access to OTA programming provided by the Locast service helps to address.

Mr. Martin is a journalist and media entrepreneur with more than thirty years of experience

---

[2] All exhibits referenced herein as "Rindskopf Ex. __" are attached to the Declaration of Lindsay Rindskopf filed herewith.

in the media industry.  *See* Fleurmont Ex. 1[3] (Expert Report of Roland Martin ("Martin Rep.")) ¶¶

3-11.  His extensive experience in this industry has particularly focused on expanding media

programming for and by underserved communities.  *Id.* at ¶ 5-10.   He describes his role as an

expert as follows:

> I have been asked to opine on whether the Locast service serves a legitimate public
> purpose related to efforts to make over-the-air ("OTA") broadcast television signals
> more available and accessible to low-income and underserved communities
> generally, and to provide greater opportunities for minority owned and operated
> media companies to reach underserved communities with content targeted
> specifically to them.

*Id.* at ¶ 2; *see also id.* at ¶ 14.  Plaintiffs do not assert any challenges to his expertise and ability to

opine on those issues, and to the extent that Plaintiffs disagree with Mr. Martin's conclusions on

those topics, they are, of course, free to cross-examine him on the basis for those conclusions.

Plaintiffs' Motion, however, offers no basis for his opinions to be excluded.

## II.    ARGUMENT

### A.    Plaintiffs' Irrelevant Ad Hominem Attacks on Mr. Martin Are Inappropriate.

Mr. Martin's qualifications to opine on the impact of the broadcast and media industry on

underserved population cannot be credibly challenged.  His experiences and accolades are too

extensive to list here and are contained in his expert report and the exhibits thereto, but it is not

disputed that he has been directly involved in this industry for more than thirty years.  *See*

Fleurmont Ex. 1 (Martin Rep.) ¶¶ 3-12.  During this time, he has been involved in numerous media

outlets that have focused specifically on the need to expand access to content targeted at

communities of color, including CNN, #RolandMartinUnfiltered, the Chicago Defender, and TV

One.  Fleurmont Ex. 1 (Martin Rep.) ¶¶ 5-6.

---

[3] Exhibits referenced herein as "Fleurmont Ex. __" are attached to the Declaration of Jean
Fleurmont in Support of Plaintiffs' Motion to Exclude the Opinions and Testimony of Defendants'
Expert Roland S. Martin, dated July 1, 2021 (ECF No. 235).

Mr. Martin is a serious and respected journalist who has spent decades studying and commenting on the interaction of the media and underserved communities, and as a result, he has received more than 30 awards for journalistic excellence.  Fleurmont Ex. 1 (Martin Rep.) ¶ 10. For example, the National Association of Black Journalists awarded Mr. Martin the 2008 President's Award for his work and named him Journalist of the Year in 2013 for his journalism focused on voter suppression and other issues of concern to African Americans during the 2012 election.  *Id.*  He is also a four-time NAACP Image Award winner.  *Id.*  And in 2008, he was inducted into the Texas A&M University Journalism Hall of Honor.  *Id.*

Notwithstanding the unchallengeable nature of Mr. Martin's experience with the issues on which he opines, Plaintiffs begin their attack on Mr. Martin by snidely quoting several headlines from articles and commentary written by Mr. Martin nearly a decade ago that have nothing to do with this case or the issues addressed herein.  See Pls' Mot. at 1 (quoting, without explanation, headlines of commentary written by Mr. Martin in 2012 and 2013).  Though Plaintiffs do not indicate why they highlight these nearly decade-old headlines, it appears to be an attempt to suggest that Mr. Martin somehow lacks seriousness, having nothing to do with the opinions or issues in this case.

Plaintiffs then continue by ridiculing the title of Mr. Martin's podcast,  accusing him of engaging in conspiracy theories, and suggesting in a condescending tone that he somehow should not be qualified as an expert based on commentary that has nothing to do with this case.  Pls.' Mot. 2 ("Of course, Mr. Martin's conspiracy theories voiced on his 'Unfiltered' streaming show are one thing, and testifying as an expert witness in federal court before a jury is another.")

Because the headlines and other matters detailed in Plaintiffs' opening paragraphs of their Motion are not relevant to any opinion offered in Mr. Martin's actual expert report or testimony,

they must be seen for what they are:  an ad hominem attack intended to call into question Mr. Martin's seriousness as a journalist, an entrepreneur, and an experienced player in the media ecosystem for more than three decades.  No misguided attempt to cast doubt on Mr. Martin's journalistic and industry experience through snide and inappropriate snark can truly challenge his credentials in giving testimony as to the manner in which underserved populations, and in particular the Black community, are impacted by and interact with the media industry.  Such irrelevant personal attacks should be stricken in their entirety.

### B.   Plaintiffs Misrepresent Mr. Martin's Opinions and Incorrectly Assert That Mr. Martin Offers Opinions About the Signal Strength of Broadcast Transmissions.

Having launched their attempt to have Mr. Martin's opinions excluded with an irrelevant personal attack, Plaintiffs next disingenuously argue that Mr. Martin's testimony should be excluded because he "has no training in measuring broadcast signals, topography, or any of the subjects in his expert report regarding signal strength issues."  Pls.' Mot. 5-7.  But this deliberately mischaracterizes the substance of Mr. Martin's opinions.  Pages 5 through 10 of Plaintiffs' Motion are devoted to arguing that Mr. Martin (1) "is not an expert *in broadcast signal coverage*" and (2) provides no "methodology" in support of his "opinions *on signal strength*."  Pls.' Mot. 5-10; *see also* Pls.' Mot. 3 ("Mr. Martin has no expertise, no empirical basis, and no scientific methodology to support any opinions about broadcast signal coverage").  None of these arguments are relevant, since the focus of Mr. Martin's report is not on broadcast signal coverage or signal strength.

Mr. Martin's report notes that digital over-the-air ("OTA") signals can be spotty because of tall buildings, construction materials, power lines, weather, distance, and topography. Fleurmont Ex. 1 (Martin Rep.) ¶¶ 38-40.  There cannot be a reasonable dispute about any of those facts; indeed, Plaintiffs' own witnesses have agreed that a variety of impediments may impact reception.  *See* Rindskopf Ex. 4 (Leone Dep. Tr.) at 39:13-40:18, 81:22-82:8 (testifying that he

personally has received a pixelated signal and agreeing that mountains, valleys, and physical impediments could impact customers' abilities to access the OTA signal); Rindskopf Ex. 5 (Morris Dep. Tr.) at 110:13-112:7 (agreeing that "geographic anomalies," solar flares, an antenna's location, and weather all impact reception); Rindskopf Ex. 6 (Corn-Revere Dep. Tr.) at 83:22-84:17. Mr. Martin's report notes these facts as background, but the technological aspects of signal strength is not the topic of his opinion.

Instead, as referenced above, his opinion focuses on the *impact* of reception issues on minority communities and how Locast provides a public service by increasing access to OTA programming to the public, including underserved communities. Fleurmont Ex. 1 (Martin Rep.) ¶¶ 38-46; Rindskopf Ex. 1 (Martin Dep. Tr.) at 34:8-17 ("what I am offering is testimony that is specific to what it means to have a distribution platform to serve an underserved community. That is what I am specifically speaking to. And the value of that, not only for the audience, but for the opportunity to create wealth for African Americans where historically we have been frozen out of this industry").

Contrary to Plaintiffs' claim that "a comparison of Mr. Martin's area of expertise with the subject matter of his proffered testimony requires exclusion," Pls.' Mot. at 5, Mr. Martin provides those opinions based on his over-thirty years of experience in the media industry, including direct experience attempting to convince cable distributors to carry television stations dedicated to serving minority populations. *See, e.g.,* Fleurmont Ex. 1 (Martin Rep.) ¶¶ 6, 34, 46; *see also* Rindskopf Ex. 1 (Martin Dep. Tr.) at 33:15-22 (describing his experience "travel[ing] around the country having to go to individual cities in order to get TV One on those cable systems"). And, despite Plaintiffs' derisive comments about the value of his experience, a witness may be qualified as an expert based on practical experience. *See* Fed. R. Evid. 702 ("A witness who is qualified as

an expert by knowledge, skill, experience, training, *or* education may testify in the form of an opinion"); Fed. R. Evid. 702, Advisory Committee's Note to 2000 Amendments ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."); *Pearlman v. Cablevisions Sys. Corp.*, No. 10-CV-4992(JS)(GRB), 2015 WL 8481879, at *6 (E.D.N.Y. Dec. 8, 2015) (explaining that "[e]xpert qualification is appropriate on the sole basis of practical experience and a formal degree is not required" and refusing to find expert unqualified "on the sole basis that she lacks expertise in the specialized areas that are not directly pertinent");[4] *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 506 (S.D.N.Y. 2015) (explaining that the "Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience").  Moreover, any "[d]isputes regarding the strength of an expert's credentials speak to the weight of the testimony, not its admissibility."  *Pearlman*, 2015 WL 8481879, at *6; *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("quibble with [the expert's] academic training . . . and his other alleged shortcomings . . . were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility").

---

[4] In *Pearlman*, the court similarly rejected Plaintiffs argument that the expert did not "provide sufficient methodology for her conclusions," emphasizing that the expert was "testifying based on her experience, not a scientific method" and determining that "Plaintiffs' reliability argument speaks more to the weight of the evidence than its admissibility."  *Id.* at *7.

8

Notably, in arguing that Mr. Martin's opinions should be excluded because he is not an expert in signal coverage, Plaintiffs' Motion primarily cites to Mr. Martin's *deposition testimony* in response to Plaintiffs' questions, *not* to his report.  *See* Pls.' Mot. at 6-7, 8-10.  The opinions Mr. Martin intends to offer in his direct testimony at trial are those included in his report; not the opinions elicited by Plaintiffs' counsel in his deposition, which go beyond the scope of that report. *See, e.g.,* Rindskopf Ex. 1 (Martin Dep. Tr.) at 81:14-82:13 (Q: "if we could look at your report . . . You write, 'It is no secret that systematic racism has long pervaded every aspect of the American media and entertainment industries' . . . Is it your opinion that any current limitations in the reach of free to air broadcast signals are the product of racism?").  Because signal strength was not the thrust of Mr. Martin's expert report and expert opinions, beyond the uncontroverted and uncontroversial background observation that issues with signal reception exist, he reasonably responded to Plaintiffs' counsel's questions based on his personal knowledge.  As noted above, Mr. Martin's *report* does not provide an opinion regarding the sources or technical aspects of broadcast signal strength.  It merely states the uncontroversial facts that: (1) reception "is often spotty"; and (2) geographic features, man-made impediments, and the weather can impact reception.  Fleurmont Ex. 1 (Martin Rep.) ¶¶ 38-40; *see* Rindskopf Ex. 8 (FCC, DTV Reception Maps) ("Actual signal strength may vary based on a variety of factors, including, but not limited to, building construction, neighboring buildings and trees, weather, and specific reception hardware. Your signal strength may be significantly lower in extremely hilly areas.").

Any claims relating to Mr. Martin's lack of technical expertise regarding signal strength or issues relating to any methodology (or lack thereof) in support of opinions regarding signal strength are therefore irrelevant.  Mr. Martin does not intend to offer direct testimony regarding the technical aspects of the signal strength of OTA broadcasts, nor does he claim expertise on that

specific topic.  He instead plans to testify to the opinions offered in his report: SFCNY provides a public benefit by increasing access to OTA signals, particularly for underserved populations, and increasing exposure for content producers and broadcasting networks run by and working for these underserved populations.  Fleurmont Ex. 1 (Martin Rep.) ¶¶ 17-24.

## C.     Mr. Martin's Opinions and Testimony Are Relevant to Key Issues of Fact.

The relevant determination at trial will be whether SFCNY's Locast service falls within the parameters of Section 111(a)(5) of the Copyright Act.   Plaintiffs argue that "Mr. Martin's opinions about Locast assisting minority producers or programmers" are irrelevant because a commercial purpose could still be present.  Pls.' Mot. 3, 14.  But the presence of legitimate charitable purposes makes it less likely that Locast was formed for any improper commercial purpose.  Put another way, to the extent that the Court prohibits SFCNY from explaining the public good it does, SFCNY will be severely prejudiced in combatting Plaintiffs' assertions that the real reason Mr. Goodfriend started SFCNY was to benefit himself and MVPDs commercially.

In addition, Section 111(a)(5) also requires that retransmissions be "made by a . . . nonprofit organization."  17 U.S.C. § 111(a)(5).  The federal tax code requires that nonprofit organizations organized under Internal Revenue Code Section 501(c)(3), such as SFCNY, operate for specified purposes, including "religious, charitable, scientific, testing for public safety, literary, or educational purposes."   Internal Revenue Code, 26 U.S.C. § 501(c)(3) (2019); 26 C.F.R. § 1.501(c)(3)-1(d)(1)(i)-(ii) (2001); 26 C.F.R. § 1.501(c)(3)-1(a)(1) ("In order to be exempt as an organization described in section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section.  If an organization fails to meet either the organizational test or the operational test, it is not exempt.").  SFCNY's stated purpose is to "provide[] a public service by offering local, over-the-air broadcast programming via the internet to anyone located within such local stations' market (designed market area), *in*

***particular consumers who do not receive local broadcast station programming through a Pay-TV service***, such as cost-sensitive consumers unable to pay a monthly Pay-TV fee or rural households unable to receive an Over-the-Air signal."  Rindskopf Ex. 7 (SFCNY's 2019 Form 990) at SFCNY-000061211, SFCNY-000061238.

In their Motion, Plaintiffs argue that the "question that Plaintiffs have raised about SFCNY is whether some of its activity . . . was inconsistent with its stated public purpose."  Pls.' Mot. 12. Plaintiffs' previous arguments have been significantly broader than this characterization suggests. Indeed, Plaintiffs have repeatedly argued that SFCNY is not a legitimate nonprofit organization and is not operating in accordance with its stated mission.  *See* Am. Compl., ECF No. 81, ¶ 8; Pls.' Opp'n to Defs.' Mot. for Summ. J., ECF No. 237, 4, 48; Pls.' Opp'n to Def. David R. Goodfriend's Mot. for Summ. J., ECF No. 240, 10.  It is therefore ***Plaintiffs*** who have repeatedly questioned SFCNY's nonprofit status.

Mr. Martin's opinions are relevant to determining whether SFCNY operates as a genuine nonprofit organization.  Whether an expert's opinion is relevant depends on the "fit" between the expert's opinion and the facts the trier of fact is asked to consider: testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).  Admissibility standards are "liberal" and "the rejection of expert testimony [under Rule 702] is the exception rather than the rule." *United States v. Jones*, No. 16-cr-0553 (AJN), 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018) (alteration in original) (finding that proposed expert testimony "satisfies the low bar of relevance"); *see also Pearlman*, 2015 WL 8481879 at *7 (explaining that "[t]he relevance standard is liberal" and "doubts regarding the usefulness of an expert's testimony should generally be resolved in favor of admissibility").  Mr. Martin's opinions respond to Plaintiffs' arguments that "SFCNY launched

and operates the Locast service as a sham, for the purpose of reaping a commercial benefit for its founder, as well as for certain MVPD interests, rather than for any legitimate public purpose." Fleurmont Ex. 1 (Martin Rep.) ¶ 17.  In response to these arguments, Mr. Martin offers the opinion that SFCNY's Locast service provides a public benefit by increasing access to programming targeting minority communities and expanding the availability of news and public service programming for populations who have been historically underserved.  Fleurmont Ex. 1 (Martin Rep.) ¶¶ 29-46.  Mr. Martin's opinions therefore directly "fit" the issue of whether SFCNY is a nonprofit organization operating with a charitable purpose.

### D.    Plaintiffs' Disagreements with Mr. Martin's Conclusions Go to The Weight of His Testimony, Not Its Admissibility.

Plaintiffs disagree with Mr. Martin's opinions, arguing that "Locast does not provide 'greater exposure' for this programming than the broadcasters; in fact, *Locast provides less*."  Pls.' Mot. 13 (emphasis in original).  First, Plaintiffs' argument in this regard is incorrect—SFCNY's Locast service provides numerous benefits to underserved communities, as Mr. Martin explains in his report.  Fleurmont Ex. 1 (Martin Rep.) ¶¶ 41-46.  That Plaintiffs believe there are additional ways in which SFCNY's Locast service could provide even more benefit to these communities in the future does not negate the benefits already provided by the Locast service.  More importantly, disagreement with an expert's opinion is not a proper basis for exclusion.  Plaintiffs can present contrary evidence and cross-examine Mr. Martin at trial.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [even] shaky but admissible evidence.").  Plaintiffs may not concur with Mr. Martin's conclusions, but this does not warrant excluding his opinions.

E.      **The Probative Value of Mr. Martin's Opinions Outweighs Any Alleged Danger of Unfair Prejudice.**

Plaintiffs also claim that "Mr. Martin's opinions are rooted in accusations of systemic racism that will inflame and prejudice the jury," and argue that Defendants offer his opinions "not because Locast is in fact a cure, but to associate Plaintiffs with the disease."  Pls.' Mot. 15.  Not so.  Mr. Martin's report discusses (1) the historical discrimination against minority-owned media companies, the underrepresentation of minority communities in media, and barriers to access; and (2) how the Locast service ameliorates these problems by increasing access to programming for underserved populations and expanding the reach of content produced by minority owned and operated media.  Fleurmont Ex. 1 (Martin Rep.) ¶¶ 25-45.  As outlined *supra* at Section II.C., these opinions contravene Plaintiffs' position that SFCNY is not a legitimate nonprofit and is not fulfilling a public purpose.

Mr. Martin's observation regarding underrepresentation of minority communities in the media is not controversial.  The Plaintiffs themselves have repeatedly and publicly acknowledged this historical discrimination and underrepresentation and have touted their efforts to address it.  For example, over two decades ago, NBC publicly recognized the importance of placing "a high priority on diversity" and that it "need[ed] to do better."  *See* MCCA, *NBC Television Agrees to Increase Opportunities for Attorneys of Color* (Mar. 2000), https://mcca.com/mcca-article/nbc-agrees-to-increase-opportunities-for-attorneys-of-color/.  In March of 2000, NBC announced an agreement with the NAACP which included a number of "initiatives, including several that would make a steady progression toward the full inclusion of people of color in employment, casting and image portrayal, content creation and development, program production, distribution, promotion, financing and professional services."  *Id.*  NBC's President Bob Wright further noted that in working with the NAACP, NBS had "come up with a series of aggressive initiatives to widen the

pipeline of diverse talent and raise awareness in our community on these issues." *Id.* Part of NBC's initiatives involved its agreement "to use its best efforts to increase deals with other minority-owned production companies." *Id.*

And just last year CBS reached an agreement on a multi-year partnership with the NAACP through which it will focus on "producing premium content that expands the number of diverse voices contributing to an ever-evolving society, and by telling inclusive stories that increase the visibility and impact of Black artists in a growing media landscape." *See* NAACP, *NAACP and CBS Strike Multi-Year Partnership Agreement To Create Content For Broadcast, Cable and Streaming* (Jul. 15, 2020), https://naacp.org/articles/naacp-and-cbs-strike-multi-year-partnership-agreement-create-content-broadcast-cable-and. CBS and the NAACP jointly announced this partnership on July 15, 2020.

Through their actions and statements over the years, other Plaintiffs have similarly acknowledged the existence of these pervasive issues:

- "'The kinds of stories we have told for decades have been mostly told through a white male lens,' [Brian Morewitz, Senior Vice President of Drama Development for Disney Network] said. 'I think we realized that different points of view and finding underrepresented voices is key to the change. It's certainly a work in progress and we are not there yet, but we done a lot of great work this past year to affect some change.'" Dino-Ray Ramos, *Disney TV Studios Execs Address Inclusion, How Difficult Conversations About Race Will Incite Change And Accountability Of White Decision Makers – TCA*, Deadline (Feb. 25, 2021), https://deadline.com/2021/02/disney-tv-studios-abc-tca-inclusion-diversity-representation-tim-mcneal-dma-donna-michelle-anderson-alexi-hawley-brian-morewitz-carol-turner-jonathan-groff-david-renaud-1234701114/.

- "'These new guidelines are intended to make our content and our sets as inclusive as possible, and will serve as a further catalyst for real and sustained change,' said [Simran Sethi, Executive Vice President of Development and Content Strategy at ABC] in the memo to staff. 'We want to take this moment to evaluate systems and habits in an effort to remove barriers to access and opportunity. It's important for us to look around the room, see who's not there, and then take the steps to not only bring them in, but also set them up for success.'" Lesley Goldberg, *ABC Unveils Ambitious Set of Inclusion Standards (Exclusive)*, Hollywood Reporter (Sept. 30,

14

2020), https://www.hollywoodreporter.com/tv/tv-news/abc-unveils-ambitious-set-of-inclusion-standards-exclusive-4069409/.

Mr. Martin's report is not making a new or controversial claim. Instead, it references a problem that has been broadly covered and admitted by Plaintiffs, and one that SFCNY's Locast service, by addressing its core mission of providing greater access to the broadcast programming for underserved communities—including minority communities, helps to solve.[5]

The case Plaintiffs cite for the propositions that "[a]ppeals to racial passion can distort the search for truth and drastically affect a jurors impartiality" and "[t]he impropriety of pleas capable of arousing racial biases is consistently recognized in federal courts" is inapposite. Pls.' Mot. 15; *United States v. Doe*, 903 F.2d 16 (D.C. Cir. 1990). In *United States v. Doe*, a criminal case, the prosecutor's summation included racially inflammatory statements such as "what is happening in Washington D.C. is that Jamaicans are coming in, they're taking over the retail sale of crack in Washington D.C. . . . They're coming into the apartments, they're taking them over, they're using them for drugs, they're using them to package the drugs, to cook them, to sell them on the street." 903 F.2d at 24. The court discussed federal courts' condemnation of "racially-biased prosecutorial arguments" in criminal cases. *Id.* at 26. This is a far cry from Mr. Martin's discussions of the

---

[5] One of the many ways Locast achieves this mission is by engaging in targeted outreach to underserved communities. *See, e.g.*, Locast, *Edenwald Community Outreach* (Mar. 30, 2018), https://www.locast.org/news/press-releases/edenwald-community-outreach/ ("We want to be sure that we thank all of the people who came out to hear more about the Locast mission and allowed us to hear from them about their issues accessing media content in today's cable dominated world. As a public-service oriented, mission-based non-profit, Locast.org is making sure that every residential community knows that there IS an alternative to overpaying for cable, and the alternative is Locast.org . . . . We asked residents if they thought that a service like Locast would be useful. What we heard in response was both interesting and distressing. Community members immediately recognized that Locast, with 14 channels, two in Spanish, gave them the opportunity to reduce their own media consumption costs.").

historical discrimination against and underrepresentation of minority populations in the media.[6]
The probative value of Mr. Martin's opinions therefore outweighs any unlikely prejudicial impact.

## III.     CONCLUSION

Because (1) Plaintiffs mischaracterize the thrust of Mr. Martin's opinions; (2) Mr. Martin's
opinions are relevant to the central issue of whether SFCNY is a nonprofit organization; (3) any
disagreements with Mr. Martin's conclusions should go to the weight accorded to his opinions,
not their admissibility; and (4) the probative value of Mr. Martin's opinions outweighs any danger
of unfair prejudice, the Court should deny Plaintiffs' motion to exclude Mr. Martin's opinions and
testimony.

Dated: July 22, 2021                                Respectfully submitted,

                                                    */s/ R. David Hosp*
                                                    R. David Hosp
                                                    Mark S. Puzella (admitted pro hac vice)
                                                    Sheryl Koval Garko (admitted pro hac vice)
                                                    Caroline K. Simons
                                                    Laura B. Najemy (admitted pro hac vice)
                                                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                    222 Berkeley Street, Suite 2000
                                                    Boston, MA 02116
                                                    Tel: (617) 880-1800
                                                    dhosp@orrick.com
                                                    mpuzella@orrick.com
                                                    sgarko@orrick.com
                                                    csimons@orrick.com

---

[6] Furthermore, contrary to Plaintiffs' characterization of Mr. Martin's opinions, Mr. Martin speaks
more broadly about discrimination in the media and television industry, *including among cable
companies*: "The phenomenon of ***cable companies discriminating against Black-owned media
companies*** and denying carriage to such interests targeting underserved communities drew a
significant amount of attention in recent years."  Fleurmont Ex. 1 (Martin Rep.) ¶ 35 (discussing
lawsuits against cable companies, including Charter).  These are the same companies that Plaintiffs
repeatedly attempt to tie to SFCNY.  *See, e.g.* Am. Compl., ECF No. 81 ¶ 8 ("[Locast] is operating
for its own commercial benefit and for the commercial benefit of companies that are among the
largest commercial pay-TV distributors in the country."); Pls.' Mem. of Law in Support of its Mot.
for Partial Summ. J., ECF No. 195, 12-14.

lnajemy@orrick.com

Elizabeth E. Brenckman
Lindsay Rindskopf
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: (212) 506-5000
ebrenckman@orrick.com
lrindskopf@orrick.com

Shane D. Anderson (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
sanderson@orrick.com

Erin M.B. Leach (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main St. Suite 1100
Irvine, CA 92614
Tel: (949) 567-6700
eleach@orrick.com

Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Tel: (415) 436-9333
mitch@eff.org

*Counsel for Defendants and Counterclaim-
Plaintiffs David R. Goodfriend and Sports
Fans Coalition NY, Inc.*