# EXHIBIT 5

## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x
AMERICAN BROADCASTING           :
COMPANIES, INC., et al.,        :
                                :
        Plaintiffs,             :
                                :   Case No.
    vs.                         :
                                :   19-cv-7136-LLS
DAVID R. GOODFRIEND and         :
SPORTS FANS COALITION NY,       :
INC.,                           :
                                :
        Defendants.             :
------------------------------x

VIRTUAL VIDEOTAPED DEPOSITION OF
LEW LEONE
Monday, November 16, 2020
10:01 a.m. Eastern Standard Time

REPORTER: Dawn A. Jaques, CSR, CLR

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

1  APPEARANCES:
2
3  On behalf of the Plaintiffs:
4      JOSEPH M. TERRY, ESQ.
5      JANE CHONG, ESQ.
6      Williams & Connolly LLP
7      725 Twelfth Street, N.W.
8      Washington, D.C.  20005
9      PHONE: (202) 434-5320   (Mr. Terry)
10             (202) 434-5295   (Ms. Chong)
11     EMAIL:  jterry@wc.com
12             jchong@wc.com
13
14 ALSO PRESENT:
15     Elizabeth Casey, In-House Counsel, Fox
16     Joe Di Scipio, In-House Counsel, Fox

## Page 3

1  APPEARANCES (Continued):
2
3  On behalf of Defendants David R. Goodfriend and
4  Sports Fans Coalition NY, Inc.:
5      R. DAVID HOSP, ESQ.
6      MARK PUZELLA, ESQ.
7      LAURA NAJEMY, ESQ.
8      LINDSAY RINDSKOPF, ESQ.
9      CAROLINE SIMONS, ESQ.
10     Orrick, Herrington & Sutcliffe LLP
11     51 West 52nd Street
12     New York, New York  10019
13     PHONE:  (212) 506-3535
14     EMAIL:  dhosp@orrick.com
15             mpuzella@orrick.com
16             lnajemy@orrick.com
17             lrindskopf@orrick.com
18             csimons@orrick.com
19
20 VIDEOGRAPHER AND EXHIBIT TECHNICIAN:
21     Henry Marte, Digital Evidence Group

## Page 4

1           I-N-D-E-X
2  WITNESS:                          PAGE:
3  LEW LEONE
4      Examination by Mr. Hosp  ........ 8, 93
5      Examination by Mr. Terry ....... 86, 100
6
7           E-X-H-I-B-I-T-S
8  LEONE DEPOSITION EXHIBIT:           PAGE:
9  Exhibit 1   December 17, 2019, Agreement
10     (No Bates number) ........... 55

Page 89

1  advantaged when the Towers came down, and NBC,
2  Fox, and the other stations were scrambling to get
3  back up to put temporaries up on Empire, but there
4  was a -- there was a scramble.
5      Q   And you talked about a number of
6  efforts that were made after that to try to find a
7  new location for an antenna that a number of
8  different broadcasters could use; is that right?
9      A   Yes, those efforts went on for years.
10     Q   And you talked about as part of that
11 effort, one thing that people looked at was
12 putting an antenna on Governors Island?
13     A   Yeah, a stand-alone antenna on
14 Governors Island, and it was countless hours of
15 discussion.  And again, that was sort of the
16 consensus that that would be the best place, and
17 there was a lot of lobbying done, and it was
18 basically shut down by, I believe it was
19 Governor Pataki at the time.
20     Q   Okay.  And there was also discussion
21 at the time of potentially using translators as
22 one alternative; is that right?

Page 90

1      A   That was one of -- yes, that was one
2  of the options that was talked about.
3      Q   Okay.  And ultimately, what did Fox
4  and other broadcasters land on as the best viable
5  solution for broadcasting to the largest number of
6  people with the strongest signal strength allowed?
7      A   Well, as it turned out, our best
8  option at that time was go back to Empire, which
9  we did, and wait until the World Trade Center was
10 complete.
11     Q   Okay.  And that is currently where
12 your signal is?
13     A   Yes.
14     Q   All right.  And as a result of the
15 location and the power there, are your stations
16 able to broadcast to the largest area and with the
17 strongest strength permitted by the FCC?
18     A   Yes, we're at -- we're at full power
19 as regulated by the FCC.
20     Q   Okay.  You had mentioned, and I asked
21 you a question about a couple of different
22 Fox entities, Fox Television Stations and

Page 91

1  Fox Broadcasting, and I think you had mentioned
2  something about their corporate relationship
3  earlier.
4      Do you know the precise corporate
5  relationship between those two entities?
6      A   No, I don't.  I'd have to be able to
7  read, you know, a prospectus to figure that out,
8  but no, I don't know.
9      We're part of the same company.  I
10 don't know, you know, if we're a subsidiary or
11 wholly owned or the terminology.
12     Q   Okay.  And you had mentioned how
13 audience size plays a role in advertising revenue.
14 Is that based on Nielsen ratings or something
15 else?
16     A   It's based solely on Nielsen ratings.
17     Q   Okay.
18     A   Now, we do -- anything that we put out
19 on our website, we know what the viewership levels
20 are.  And I don't know -- I honestly don't know
21 the relationship with the over-the-top.  I mean, I
22 know they would know what the viewership is.  I

Page 92

1  don't know to the extent that they share that with
2  Fox, but I typically don't see that data.
3      Q   Okay.  And to your knowledge, do
4  individuals who view your programming through
5  Locast count for Nielsen ratings?
6      A   They do not.  That's one of the
7  biggest issues with Locast in my mind.
8      Q   You had mentioned -- you had testified
9  a little bit about the relationship between
10 retransmission fees and advertising revenue and,
11 you know, what percentage of your overall revenue
12 came from which.
13     Can you give us a high-level
14 explanation of what has happened with advertising
15 fees during this period?  I think you said what
16 was happening with retransmission, but what was
17 happening with advertising over the last 10 years?
18     A   Well, because of my knowledge of the
19 market and having worked at multiple TV stations,
20 and also we do receive audited figures that were
21 from Ernst & Young, now they're from a different
22 company, the ad revenue in -- I can take you back

Page 93

1  even further -- in the New York market peaked in
2  2000, 2001, at roughly $1.6 billion amongst all
3  the over-the-air TV stations. We're now down
4  under a billion dollars in ad revenue, so it's
5  been death by a thousand cuts to the TV stations.
6       Some of that -- we've recouped some of
7  that, not even close to all of it, with
8  retransmission, but again, the number is under a
9  billion dollars. So it went from a billion six to
10 under a billion, and that's all in. That includes
11 ad revenues and retransmission fees.
12      So it's substantially -- it's a
13 substantially depressed environment in the
14 New York market, and it's worse in other markets.
15      MR. TERRY: I don't have any more
16 questions at this time.
17      MR. HOSP: Mr. Leone, I just have a
18 few follow-ups.
19   FURTHER EXAMINATION BY COUNSEL FOR DEFENDANTS
20      BY MR. HOSP:
21   Q  You mentioned that individuals at Fox,
22 the Fox network, communicated to you their mandate

Page 94

1  to have the best signal possible. I'm
2  paraphrasing, I'm not trying to put words in your
3  mouth, but do you recall that testimony?
4    A  Yes.
5    Q  Who communicated that to you?
6    A  It was both the CFO, the CEO, and the
7  EVP of Sales.
8    Q  Who were those?
9    A  My boss, Jack Abernethy, is the CEO.
10 The CFO is no longer here, that was Betsy Swanson;
11 and the EVP of Sales is Jim Burke. I'd also add
12 the COO, Dennis Swanson.
13   Q  And in the course of either those
14 conversations or any other conversations, did any
15 of those individuals discuss whether or not cable
16 subscriber viewers are more valuable to the
17 company than over-the-air viewers?
18   A  No, did not have that discussion.
19   Q  Have you ever had any sort of
20 discussion about that?
21   A  No, not with anyone at Fox.
22   Q  Have you had any conversation like

Page 95

1  that with anyone?
2    A  No.
3    Q  And so do you know whether or not the
4  network considers viewers of the cable stream as
5  more valuable to them than viewers who access by
6  over the air?
7       MR. TERRY: Objection to form, and
8  I'll caution the witness not to speculate about
9  what others may think.
10      BY MR. HOSP:
11   Q  Do you know?
12   A  Can you repeat the question?
13   Q  Sure. Do you know what type of viewer
14 the network considers more valuable, somebody who
15 accesses it through a cable subscription or
16 somebody who accesses it through over the air?
17   A  No, I don't know how they feel.
18   Q  You mentioned that Locast is not
19 measured in Nielsen. How do you know that?
20   A  I asked my head of research.
21   Q  And what did they find out?
22   A  And there's no over-the-top -- there's

Page 96

1  no measurement currently of the over-the-top
2  audience via Nielsen.
3    Q  Well, I think what you indicated was
4  you didn't know the degree to which Nielsen shared
5  those ratings of over-the-top with Fox.
6    A  I don't -- I don't agree with -- I
7  didn't say that.
8       The over-the-top -- over-the-top
9  operators, they know who's watching, and we
10 know -- just as we know who's watching our
11 website, but they don't share that information as
12 far as I know. They may share it with Fox, but
13 that doesn't get shared by me.
14      And honestly, what we care about here
15 is the overall audience, because the only thing
16 that we can control is our ad sales. We have no
17 control over our retransmission or anything like
18 that. So I'm agnostic. I don't care how the
19 person is watching, as long as they're counted,
20 then we can monetize that.
21      That's my -- that's job one for me is
22 to -- I control what I can control and get the

Page 97

1  greatest, you know, ad revenue that we possibly
2  can for the viewers that are measured. And again,
3  I don't care where they come from are.
4      Q   Okay. And Nielsen has the ability to
5  track over-the-top viewership, correct?
6      A   I don't know that. It's currently
7  not -- I know that it's currently not counted.
8      Q   When you say that you know that it's
9  currently not counted, how do you know that?
10     A   My head of research told me it's
11 currently not counted, and he's got more knowledge
12 than anyone I know.
13     Q   So that's all -- no over-the-top is
14 counted, is that what you're trying to say?
15     A   That's what I'm saying.
16     Q   Okay. And you know that just from
17 your head of research?
18     A   That and other factors, yes.
19     Q   What are the other factors?
20     A   Business practices.
21     Q   What do you mean by that?
22     A   We do not currently stream in pattern

Page 98

1  our ads that we run over the air on over-the-top.
2      Q   But how does that impact the question
3  of whether or not Nielsen tracks over-the-top
4  viewing?
5      A   Because Nielsen doesn't track them, so
6  they're not counted, so therefore we don't stream
7  the same ads to them.
8      Q   Okay. But do you know whether or not
9  Nielsen has the ability to track?
10     A   I don't know. They're currently not
11 tracking it for us.
12     Q   Okay. And other than business
13 practice and your research assistants, is there
14 any other basis that you believe you know that?
15     A   No, I know it. If they were counting
16 it, we would run the same ads and get credit for
17 them. We're currently not getting any credit for
18 any over-the-top viewing.
19     Q   Okay. But do you know whether or not
20 Nielsen tracks other over-the-top viewing?
21         MR. TERRY: Objection to form, asked
22 and answered. You can answer.

Page 99

1          THE WITNESS: I don't know. I know
2  that they're not tracking our viewing.
3          BY MR. HOSP:
4      Q   Okay. And other than the ways in
5  which you express that you know it, is there any
6  other basis that you claim that knowledge?
7      A   Yeah, I believe Nielsen has stated
8  that they're not tracking to my research -- head
9  of research.
10     Q   Okay. And you believe that?
11     A   I know that.
12     Q   Because?
13     A   It's not in our numbers.
14     Q   And you're basing -- I just want
15 to make -- other than -- I just want to make sure
16 that other than -- you know, other than the
17 conversations you've had with your research
18 assistant and your -- and your knowledge of the
19 business practices, of your own business
20 practices, there isn't any other basis.
21         MR. TERRY: Objection. I don't think
22 he said research assistant. It was head of

Page 100

1  Research.
2          THE WITNESS: It was President of
3  Research, and I'm pretty sure Nielsen would --
4  Nielsen is going to want to charge us when they
5  start measuring that.
6          BY MR. HOSP:
7      Q   Okay. So no other -- other than what
8  you've testified to so far, no other basis?
9      A   Correct.
10         MR. HOSP: Okay, I have nothing
11 further.
12 FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
13         BY MR. TERRY:
14     Q   Mr. Leone, with over-the-top carriers
15 such as YouTube, are there licensing agreements or
16 carriage agreements between Fox and those
17 entities?
18     A   Yes. I'm not -- same way I'm not
19 privy to the exact agreements as I am with cable,
20 yes, there's very similar agreements.
21     Q   Okay. And when cable operators carry
22 your programming, that is subject to agreements

Page 101

1  with those carriers as well, right?
2       A   Yes, also measured by Nielsen.
3       Q   Okay.  Now, when people view when
4  Locast transmits your programming, do you have any
5  agreements in place with them?
6       A   No agreements in place that I know of.
7       Q   And do you have any concerns about the
8  manner in which Locast presents your programming?
9       A   I have great concerns.  So when I
10 found out that I would be called upon for this
11 deposition, I downloaded the Locast app to
12 experience it for myself, and I was horrified,
13 one, that it's portrayed as a free service, and I
14 was inundated and barraged by ads asking for
15 money.
16           And those ads are indiscriminate in
17 their placement, whereby they're placed over the
18 top of my content -- our content, our news
19 content, our syndicated content, our network
20 content, our sports -- randomly.  So it's
21 disruptive.
22           It's also placed over advertisements,

Page 102

1  which I have a contract with my advertisers to
2  display their ads on our signal, and the ads get
3  covered up.  So it's disingenuous and immoral, I
4  think, to sell our advertisers a commercial, and
5  then have it get covered up by viewers that are
6  viewing it over Locast.
7           So it's, in my mind, a disruption of
8  our business arrangements with legitimate
9  over-the-top carriers and cable companies, and
10 it's immoral to the way we -- you know, the way I
11 want to carry out my business practices.
12          And it's also not measured, so it's
13 sort of a double whammy on us.  It's not measured,
14 and it takes away from subscribers, so we can't,
15 you know, benefit from any subscriber fees we get
16 from people that watch our signal, and we can't
17 benefit from any advertisers we might --
18 advertising fees we might get because it's not
19 counted.
20          So it's a -- to say it's a free
21 service is also disingenuous, because I assume
22 that if you pay the five bucks, you won't be

Page 103

1  tortured any further with those ads, but I'm not
2  going to pay the five bucks to something that is
3  just antithetical to my business.
4           MR. TERRY:  Okay, thank you.
5           No more questions at this time.
6           MR. HOSP:  We have nothing further.
7           THE VIDEOGRAPHER:  Okay.  The time is
8  12:43 p.m.  Off the record.
9           (Whereupon, at 12:43 p.m., the taking
10          of the deposition was concluded.
11          Reading and signature were reserved.)

Page 104

1       CERTIFICATE OF NOTARY PUBLIC
2       I, DAWN A. JAQUES, a Notary Public in and for
the District of Columbia, before whom the foregoing
3  deposition was taken, do hereby certify that witness
whose testimony appears in the foregoing pages was
4  duly sworn by me; that the testimony of said witness
was taken by me in shorthand at the time and place
5  mentioned in the caption hereof and thereafter
reduced to typewriting under my supervision; that
6  said deposition is a true record of the testimony
given by said witness; that I am neither counsel
7  for, related to, nor employed by any of the parties
to the action in which this deposition is taken;
8  and, further, that I am not a relative or employee
of any attorney or counsel employed by the parties
9  thereto, nor financially or otherwise interested in
the outcome of the actions.
10
11
12
13
14
15
16           _____
17           Dawn A. Jaques, CSR, CLR
18           Notary Public in and for
19           Commonwealth of Virginia
20 My commission expires:
21 August 31, 2023
22 Registration No. 132328

Page 105

1  Lew Leone, c/o
   Williams & Connolly LLP
2  725 Twelfth Street, N.W.
   Washington, D.C. 20005
3
4  Case: American Broadcasting Companies, Inc., et al. v. Goodfriend, et al.
   Date of deposition: November 16, 2020
5  Deponent: Lew Leone
6
7  Please be advised that the transcript in the above
8  referenced matter is now complete and ready for signature.
9  The deponent may come to this office to sign the transcript,
10 a copy may be purchased for the witness to review and sign,
11 or the deponent and/or counsel may waive the option of
12 signing. Please advise us of the option selected.
13 Please forward the errata sheet and the original signed
14 signature page to counsel noticing the deposition, noting the
15 applicable time period allowed for such by the governing
16 Rules of Procedure. If you have any questions, please do
17 not hesitate to call our office at (202)-232-0646.
18
19
20 Sincerely,
   Digital Evidence Group
21 Copyright 2020 Digital Evidence Group
   Copying is forbidden, including electronically, absent
22 express written consent.

Page 106

1  Digital Evidence Group, L.L.C.
   1730 M Street, NW, Suite 812
2  Washington, D.C. 20036
   (202) 232-0646
3
4  SIGNATURE PAGE
   Case: American Broadcasting Companies, Inc., et al. v. Goodfriend, et al.
5  Witness Name: Lew Leone
   Deposition Date: November 16, 2020
6
7  I do hereby acknowledge that I have read
   and examined the foregoing pages
8  of the transcript of my deposition and that:
9
10 (Check appropriate box):
   ( ) The same is a true, correct and
11 complete transcription of the answers given by
   me to the questions therein recorded.
12 ( ) Except for the changes noted in the
   attached Errata Sheet, the same is a true,
13 correct and complete transcription of the
   answers given by me to the questions therein
14 recorded.
15
16 _____   _____
17   DATE         WITNESS SIGNATURE
18
19
20
21 _____   _____
22   DATE         NOTARY

Page 107

1  Digital Evidence Group, LLC
2  1730 M Street, NW, Suite 812
3  Washington, D.C. 20036
4  (202)232-0646
5
6        ERRATA SHEET
7
8  Case: American Broadcasting Companies, Inc., et al. v. Goodfriend, et al.
9  Witness Name: Lew Leone
10 Deposition Date: November 16, 2020
11 Page No.   Line No.   Change
12
13
14
15
16
17
18
19
20
21 _____    _____
22   Signature              Date